12/14/23, 2:32 PM
This porn company profits by shaming porn consumers - Los Angeles Times
Case 2:23-cv-04901-WLH-AGR   Document 40-3   Filed 12/15/23   Page 1 of 14   Page ID #:1178

# Los Angeles Times

BUSINESS

# Column: This porn company makes millions by shaming porn consumers



Greg Lansky, supposedly the Steven Spielberg of porn and former co-owner of Strike 3 Holdings, is shown at his company booth during an Adult Entertainment Expo in Las Vegas. (Ethan Miller / Getty Images)

BY MICHAEL HILTZIK | BUSINESS COLUMNIST

DEC. 12, 2023 3 AM PT

Strike 3 Holdings is a Southern California maker of pornographic films that identifies its products as "high-end, artistic, and performer-inspiring motion pictures produced with a Hollywood style budget and quality." It has bragged that Greg Lansky, a former owner and the firm's leading *auteur*, has been called the porn industry's "answer to Steven Spielberg."

There's more to Strike 3, however. Here's how U.S. Judge Royce C. Lamberth of Washington, D.C., described the firm:

"Strike 3 is … a copyright troll," Lamberth wrote in 2018. "Armed with hundreds of cut-and-pasted complaints and boilerplate discovery motions, Strike 3 floods this courthouse (and others around the country) with lawsuits smacking of extortion. It treats this Court not as a citadel of justice, but as an ATM." He likened its litigation strategy to a "high-tech shakedown."

> *The Court will not idly watch what is essentially an extortion scheme, for a case that plaintiff has no intention of bringing to trial.*
>
> — U.S. Judge Otis Wright

Lamberth was not speaking off the cuff. Since September 2017, Strike 3 has filed more than 12,440 lawsuits in federal courts alleging that defendants infringed its copyrights by downloading its movies via BitTorrent, an online service on which unauthorized content can be accessed by almost anyone with a computer and internet connection.

That includes 3,311 cases the firm filed this year, more than 550 in federal courts in California. On some days, scores of filings reach federal courthouses — on Nov. 17, to select a date at random, the firm filed 60 lawsuits nationwide.

These cases have numerous features in common. They're almost identical, varying largely by the identity of the defendant and the number of movies downloaded in what the lawsuits allege, hyperbolically, to be theft "on a grand scale."

Also, they don't ever seem to reach trial. Typically, they are settled for what lawyers say are cash payments in the four or five figures or are dismissed outright.

ADVERTISEMENT

12/14/23, 2:32 PM
Case 2:23-cv-04901-WLH-AGR   Document 40-3   Filed 12/15/23   Page 4 of 14   Page ID #:1181
Alt+R: This porn company profits by shaming porn consumers - Los Angeles Times

That points to the question of whether Strike 3 is really serious about using the courts to fight online pirating of its product, or is merely exploiting a revenue stream.

It's impossible to pinpoint the profits that can be made from this courthouse strategy. J. Curtis Edmondson, a Portland, Ore., lawyer who is among the few who pushed back against a Strike 3 case and won, estimates that Strike 3 "pulls in about $15 million to $20 million a year from its lawsuits." That would make the cases "way more profitable than selling their product."

Strike 3's output comprises more than 1,700 copyrighted adult films distributed on video or via subscriptions to its online services, which include Vixen, Tushy, Blacked and Blacked Raw.

BUSINESS

# A federal judge takes on 'copyright trolls'

April 9, 2013

No one appears to have obtained financial information about Strike 3 that would validate Edmondson's estimate. Still, the scale of its effort is impressive: If only one-third of its more than 12,000 lawsuits produced settlements averaging as little as $5,000 each, the yield would come to $20 million. (Strike 3 didn't respond to my requests for comment relayed to its in-house and outside lawyers.)

Nor does anyone suggest that Strike 3 doesn't own the copyrights it ostensibly sues to protect, or that as a copyright holder it doesn't have the right to sue alleged infringers. But copyright law and the inattention and lack of technological knowledge on the federal bench have combined to create an unlevel playing field on which small-time infringers or innocent targets can get trampled.

That risk is magnified by the nature of the allegedly pirated content. Porn producers can "shame people because the mere fact that you were watching porn can be used against you," says Jef Pearlman, an expert on intellectual property law at USC's law school.

It should be obvious that this model harbors the real risk of extracting money from anyone caught downloading an adult film and

even from innocent people who, aware of the difficulty of cleansing one's reputation of an unwarranted smear, might be coerced into paying a "nuisance-value" settlement.

Some judges have acknowledged as much. "Given the nature of the films at issue," a federal judge in Connecticut observed last year, "defendants may feel coerced to settle these suits merely to prevent public disclosure of their identifying information, even if they believe they have been misidentified."

Similar cases have been clogging federal dockets for years; between 2014 and 2016, according to a 2018 survey by Matthew Sag of Emory University law school, more than half of all copyright infringement cases were filed by a small number of obscure plaintiffs against individual defendants accused of downloading from BitTorrent.



BUSINESS

**Column: These historic works are coming free from copyright. Why did it take so long?**

Dec. 30, 2022

The lawsuits follow a standard road map. Strike 3, like other similar plaintiffs, starts by identifying the defendant only by his or her IP address, a designation typically assigned to users' computers by their internet service provider, ostensibly used to download content from

12/14/23, 2:32 PM
Case 2:23-cv-04901-WLH-AGR    Document 40-3    Filed 12/15/23    Page 7 of 14    Page ID #:1184
Column: This porn company profits by shaming porn consumers - Los Angeles Times

BitTorrent. At that stage, the defendant is identified in court papers only as "John Doe."

The plaintiffs then ask a federal judge for permission to subpoena the internet service provider — which could be AT&T, Spectrum, Frontier, or another provider — for the name and address of the subscriber with that IP address. Judges have almost invariably granted these requests routinely.

Armed with the name, the plaintiffs proceed by sending a letter implicitly threatening the subscriber with public exposure as a pornography viewer and explicitly with the statutory penalties for infringement written into federal copyright law — up to $150,000 for each example of willful infringement and from $750 to $30,0000 otherwise.

As unlikely as it may be that a casual BitTorrent user would realistically face penalties of that magnitude, the threat itself may be enough to bring even an innocent defendant to the settlement table.

The principle of bringing lawsuits against possible copyright violators is not new, though it has a checkered history. The method was pioneered by the Recording Industry Assn. of America around the turn of this century, when the industry feared that unauthorized

12/14/23, 2:32 PM
Case 2:23-cv-04901-WLH-AGR   Document 40-3   Filed 12/15/23   Page 8 of 14   Page ID #:1185
Column: This porn company profits by shaming porn consumers - Los Angeles Times

downloading of music through programs such as Napster threatened its very existence.

From 2003 through 2008, the RIAA sued some 35,000 alleged song pirates. But it abandoned the strategy for several reasons. For one thing, it didn't work: Music piracy hadn't appreciably diminished.

Moreover, the lawsuits turned into a public relations disaster, with sympathetic litigation targets including single mothers and teenage girls and the practice of suing the industry's most devoted fans not really looking like a good idea.

The industry was eventually rescued by the emergence of legal, low-priced song downloads and music streaming via Apple's iTunes, Spotify and other such platforms.



BUSINESS

**Column: AI investors say they'll go broke if they have to pay for copyrighted works. Don't believe it**

Nov. 16, 2023

A few years later brought the appearance of outright trolls such as Prenda Law Group, which posted porn films online as bait to attract downloaders, whom it then sued in what judges ultimately found to be sham lawsuits.

The Prenda lawyers had the misfortune to bring one of their cases before U.S. Judge Otis Wright II of Los Angeles, who put them on the stand to explain their litigation strategy, at which point they pleaded the 5th.

Ominously, Wright informed an attorney for Prenda principal John L. Steele, "If you say answering these kinds of questions would incriminate him, I'm inclined to take you at your word."

He slapped them with stiff sanctions for contempt and pledged to warn other federal judges about their shenanigans. Steele bragged publicly that Prenda had made nearly $15 million with its lawsuits.

A few years later, Steele and his partner Paul R. Hansmeier were indicted for fraud by a federal grand jury in Minnesota and eventually sentenced to prison terms of four and 14 years, respectively.

Strike 3 doesn't appear to be engaged in Prenda-style fraud. But its litigation technique does come straight out of the Prenda playbook. It also relies on the willingness of federal judges to wave through requests for third-party subpoenas without notice to possible defendants.

The firm's targets don't know they're in Strike 3's gunsights until they receive a letter saying they've been outed as copyright pirates but can

12/14/23, 2:32 AM
Case 2:23-cv-04901-WLH-AGR   Document 40-3   Filed 12/15/23   Page 10 of 14   Page ID #:1187
This porn company profits by shaming porn consumers - Los Angeles Times

make the case go away for a few thousand bucks. For the average target, the cost of hiring a lawyer to fight the claim is prohibitive, and certainly more than the offered settlement fee.

That's why virtually none of the lawsuits makes it to trial. That in itself is a problem for the legal system.

Because the cases customarily settle out of court or are withdrawn, "there's no real vetting of these strategies for identifying infringers," Pearlman told me. "So the flaws in these identification systems are never exposed and this cycle continues indefinitely."



**BUSINESS**

**Column: The squabble over Anne Frank's diary shows the absurdity of copyright law**

Nov. 16, 2015

Nor has there been a development of case law balancing the right of copyright holders to combat infringement against the privacy rights of defendants. As a result, the plaintiffs almost always get their way without questioning by defense lawyers or judges.

As it happens, the software Strike 3 uses to identify infringers has come into question. That happened in a case brought in federal court in Washington state, which ended with a summary judgment in favor

of the defendant and a judge's declaration that he was innocent — along with an award of nearly $50,000 in attorney fees and court costs to be paid by Strike 3.

"There's been no testing of Strike 3's system to show that it can accurately identify an infringer," says Edmondson, who won his case in part by introducing expert testimony that Strike 3's software can not flawlessly tie an IP address to infringing downloads.

Edmondson further asserted that even if the connection could be established, it is difficult if not impossible to prove that the owner of the IP address is the pirate, since anyone in a household or an apartment house sharing an internet account, or even someone on the outside poaching on a neighbor's account, might be the guilty party.

As Lamberth, the D.C. federal judge, observed: Strike 3's IP-address method is "famously flawed." He turned down the porn company's request to subpoena its target's internet service provider.

But Lamberth is in the bare minority of federal judges who have challenged plaintiffs such as Strike 3. That points to the question of what, if anything, to do about the torrent of copyright infringement lawsuits?

It's true that copyright litigation has evolved, if modestly, in the wake of a few adverse legal rulings. In 2012, Judge Wright called a halt to pornography plaintiffs' practice of filing against mass defendants to save on filing fees.

"[The federal courts are not cogs](#) in a plaintiff's copyright-enforcement business model," Wright thundered in a lawsuit brought by Malibu Media, a copyright troll of that period. "The Court will not idly watch what is essentially an extortion scheme, for a case that plaintiff has no intention of bringing to trial."

Wright required Malibu Media to file separately against each defendant, running up its filing fees and "making this type of litigation less profitable." That's been the practice ever since.

Federal judges are also amenable to allowing defendants to respond to copyright cases anonymously, as "John Does," reducing the leverage porn plaintiffs gain from the threat of public exposure.

Yet that has not been enough to hold back the tide. The volume of Strike 3 cases has increased every year — from 1,932 in 2021 to 2,879 last year and 3,311 this year. What's really needed is a change in copyright law to bring the statutory damages down to a level that truly reflects the value of a film lost because of unauthorized

downloading — not $750 or $150,000 but perhaps a few hundred dollars.

That would require congressional action, however. Don't hold your breath for our dysfunctional Congress to act. In the meantime, the best option for those needing their pornography fix is the simplest: Don't use BitTorrent. Most porn is legal; pay producers like Strike 3 their legitimate fees, instead of becoming a target of their alternative revenue stream.

**LATEST FROM MICHAEL HILTZIK** ›

Column: How the retail lobby sold a $45-billion whopper about organized shoplifting

Column: A new initiative by Biden that might finally bring drug prices down

Column: The war on 'junk fees' is gaining ground, but the fight is not yet won

 Michael Hiltzik

Los Angeles Times columnist Michael Hiltzik writes a daily blog appearing on latimes.com. His seventh book, "Iron Empires: Robber Barons, Railroads, and the Making of Modern America," published in

2020. Follow him on Twitter at [twitter.com/hiltzikm](twitter.com/hiltzikm) and on Facebook at [facebook.com/hiltzik](facebook.com/hiltzik).

Copyright © 2023, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information