**BIBIYAN LAW GROUP, P.C.**
David D. Bibiyan (SBN 287811)
*david@tomorrowlaw.com*
Jeffrey D. Klein (SBN 297296)
*jeff@tomorrowlaw.com*
Sarah H. Cohen (SBN 330700)
*sarah@tomorrowlaw.com*
1460 Westwood Blvd.
Los Angeles, California 90024
Tel: (310) 438-5555; Fax: (310) 300-1705

Attorneys for Plaintiff MACKENZIE ANNE THOMA, an individual and on behalf of all others similarly situated,

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated,

Plaintiff,

v.

VXN GROUP LLC, a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 through 100, inclusive,

Defendants.

CASE NO.: 2:23-cv-04901-WLH (AGRx)

[*Assigned to the Hon. Alicia Rosenburg*]

**INFORMAL DISCOVERY CONFERENCE STATEMENT**

1

Pursuant to the Rules and Procedures of the Honorable Alicia Rosenburg, this Joint Statement is being submitted by counsel for Plaintiff Mackenzie Anne Thoma ("Plaintiff"), an individual and on behalf of all others similarly situated, and counsel for Defendants VXN GROUP, LLC and MIKE MILLER ("Defendants") (hereby referred to collectively as "the Parties").

**PLAINTIFF'S POSITION**

I.    **Artists Business Management Group Inc. Subpoena**

On August 20, 2024, Defendants served Plaintiff with a Notice of Intent to Serve Subpoena ("Subpoena Notice") attached hereto as **Exhibit "A"**. The Subpoena seeks the production of Plaintiff's financial records from Artists Business Management Group, Inc. ("Artists Business Management) who is Plaintiff's former accounting firm. The Subpoena set the date of compliance as September 2, 2024 at 5:00 pm. The Subpoena commands production of Plaintiff's private financial records generally related to Plaintiff's income generated Kenzieland and Lola March (hereinafter "Loan Out Companies") and business expenses claimed in tax returns of Plaintiff's Loan Out Companies.

On August 23, 2024, Plaintiff's counsel emailed Defendant's counsel requesting a meet and confer video conference. In this email, Plaintiff's counsel informed Defendant's counsel of intent to serve objections to the subpoena and file a Motion to Quash due to the subpoena's breach of Plaintiff's constitutional right to privacy.

On August 27, 2024, the parties engaged in a meet and confer via Zoom regarding this disagreement. During the meet and confer, the parties could not come to an agreement. In an email following the meet and confer, received on August 28, 2024, Defendant's counsel claimed the Subpoena was necessary to determine elements of California Code, Labor Code - LAB § 2776, commonly known as the business-to-business exception to California's ABC Test for determining whether a worker is an employee or an independent contractor.

1    The three elements identified by Defendant's counsel were (1) the level of

2    control Defendants exerted over Plaintiff, (2) whether and to what extent Plaintiff was

3    "customarily engaged" in work of the same nature of the services she provided to

4    Defendants, and (3) whether and to what extent Plaintiff, through her entities,

5    provided similar services to other studios during the contract period.

6    Plaintiff's counsel contends this subpoena is unduly burdensome and harassing

7    in nature given the available evidence on the record, namely the August 13, 2024

8    Deposition of Plaintiff. Examples of deposition testimony obtained by Defendant

9    from Plaintiff during her deposition are attached hereto as **Exhibit "B"** which

10   demonstrate that Defendant had the opportunity to obtain the information it seeks

11   through less intrusive means as detailed below.

12   As to (1), Plaintiff testified thoroughly to the level of control Defendants

13   exerted over her during the August 13, 2024 Deposition. Plaintiff identified how

14   Defendant enforced "who they did and didn't want" her "to be around or work for"

15   (***see Exhibit B,*** **p. 143**). Plaintiff detailed an "average day" on a set for Defendant -

16   how she was instructed before, during and after filming and photography and how

17   many hours she spent doing certain things at Defendant's direction (***see Exhibit B,*** **p.**

18   **145**). The testimony was exhaustive, even revealing the level of control Defendant

19   exercised over Plaintiff's personal grooming (***see Exhibit B,*** **p. 143**).

20   As to (2) and (3), Plaintiff testified both to her customary engagement of work

21   of the same nature and to her provision of services in the deposition. An excerpt of

22   that deposition demonstrates that Plaintiff testified as to the business activities and

23   income of her Loan Out Companies even before she was contracted to work for

24   Defendant. (***see Exhibit B, p. 26)***. The exact number shared is redacted in this

25   document for privacy purposes but demonstrates the available information already on

26   the record regarding income generated by Plaintiff's Loan Out Companies.

27   As can be seen from Exhibit B, Defendant obtained at least **20 pages of**

28   **testimony** relating to Kenzieland operations. Defendant obtained an additional 4

3

1  pages of testimony regarding Kenzieland operations later on in the deposition. There
2  is no compelling need for the production of financial records of Kenzieland. (*see*
3  *Exhibit B, pp. 61-80)*. Defendant also obtained 5 pages of testimony regarding the
4  purpose and operations of Lola March. (*see Exhibit B, pp. 126-130*)

5      Furthermore, Defendant obtained testimony from Plaintiff regarding the
6  payment arrangement of "booking fees" between Plaintiff and Motley Models. (*see*
7  *Exhibit B, pp. 105-110)*. There is no compelling need for the production of financial
8  records between Plaintiff and Motley Models.

9      Plaintiff can provide this Court with the full deposition transcript should the
10  Court so require.

11      Plaintiff's counsel contends that the documents Defendant seeks to subpoena
12  breach Plaintiff's right to financial privacy and are privileged. Additionally,
13  Plaintiff's counsel contends the Subpoena is harassing and unduly burdensome and
14  intrusive as Defendant served a subpoena on May 22, 2024 on Mainboard LLC. The
15  Mainboard LLC Subpoena sought a variety of documents and information, including
16  "TALENT ACCOUNTING DATA," which directly satisfy Defendant's purported
17  needs for the current Subpoena as that data will reflect other business that Plaintiff
18  was engaged in *and* includes financial information (e.g., rates) while contracted to
19  work for Defendant. In the August 27, 2024 meet and confer, Defendants admitted
20  they have received no documents from this subpoena, but there is no evidence that
21  Defendant has taken any action to enforce the Mainboard LLC subpoena. Instead,
22  Defendant now targets Plaintiff's former accountant for private financial records.

23      Defendant should not be permitted to continue with a harassment campaign
24  into Plaintiff's private financial dealings. Defendant has gathered evidence of
25  Plaintiff's other business dealings through other means, such as Plaintiff's deposition,
26  as to Plaintiff's separate business activities before, during and after she was contracted
27  to work for Defendant. Thus, there is no compelling need for the production of
28  sensitive private financial documents from Plaintiff's former accounting firm.

1

2      ## II.    Larry Lerner Deposition

3            On August 20, 2024, Defendants served Plaintiff with a Notice of Taking

4      Deposition ("Deposition Notice") attached hereto as Exhibit C. The Deposition

5      Notice was to be taken of Larry Lerner, c/o Artists Business Management Group, Inc.,

6      Plaintiff's former accountant. The Deposition Notice set the date of deposition as

7      September 10, 2024 at 11:00 am.

8            For all of the stated reasons above, Plaintiff's counsel objects to this deposition

9      and contends that the information from this deposition breach the Plaintiff's right to

10     privacy and is privileged. It is only reasonable to presume that Defendant will seek

11     testimony from Mr. Lerner as to Plaintiff's private financial information relating to

12     her Loan Out Companies. Additionally, Plaintiff's counsel contends based on all

13     foregoing reasons that the Deposition is unduly burdensome and intrusive in light of

14     the information available through the deposition of the Plaintiff on August 13, 2024.

15                        ## DEFENDANTS' POSITION

16     ## I.    Artists Business Management Group Inc. Subpoena

17            Defendants' Subpoena to Artists Business Management Group, Inc.

18     seeks documents relevant to one of Defendants' defenses of Plaintiff's claim of

19     misclassification, namely, that the relationship between Plaintiff and Defendants

20     meets the elements of the business-to-business ("B2B") exception of Cal. Lab. Code

21     § 2776. Plaintiff testified during her deposition that her contract with Defendants

22     materially impaired her income and her ability to work for herself or through others.

23     *See* ***Exhibit C***.    Defense counsel attempted to verify this testimony by asking

24     questions regarding the amount of income she received from various enterprises and

25     activities prior to her contract with Defendants, however, Plaintiff's counsel routinely

26     objected and instructed Plaintiff not to answer on account of financial privacy. *See*

27     ***Exhibit D***.  Defense counsel also asked Plaintiff questions regarding the income from

28     those same sources (e.g., other studios, OnlyFans, and Plaintiff's own website) during

the time period in which she was under contract with Defendants, however, Plaintiff's counsel likewise instructed Plaintiff not to answer such questions.

When Defense counsel asked Plaintiff how much revenue her website (Kenzieland.com) generated during 2021, a year in which Plaintiff was under contract with Defendants, Plaintiff testified that she did not know. Plaintiff then indicated that her former accountant may have such relevant information. Accordingly, because Plaintiff claims not to have knowledge regarding her finances during periods relevant to the Complaint, and because Plaintiff's counsel refuses to permit questioning regarding those finances, Defendants are left with the choice of either proceeding absent relevant dispositive evidence, or diligently pursuing the facts necessary to prove essential elements of their defense. The information sought by the subpoena is relevant to the B2B elements under § 2776, as well as the *Borello* test.

Regarding the Subpoena to Mainboard, LLC, despite Defendants' best efforts, Mainboard has failed to produce any responsive documents because Mainboard claims that Motley Models, Plaintiff's former talent agency, deleted all files from their account in February of 2024 (after the filing of this lawsuit), and that Mainboard's data retention policy required Mainboard to permanently erase Motely Models' data after 30 days. Because Defendant's subpoena to Mainboard was served beyond 30 days from Motley Models' account deletion, Mainboard is no longer in possession of responsive documents.

## II.    **Larry Lerner Deposition**

Larry Lerner is the former accountant identified by Plaintiff in her deposition testimony as someone who would have relevant information regarding the activities, revenue, and expenses of her Loan Out Companies during the time period in which she rendered services for Defendants. Accordingly, Defendants believe that Mr. Lerner will have information relevant to determine the veracity of Plaintiff's testimony that her contract with Defendants restricted her income and work activity.

Dated:  August 29, 2024                                     BIBIYAN LAW GROUP, P.C.


                                          By:    /s/  *Sarah H. Cohen*
                                                 DAVID D. BIBIYAN
                                                 JEFFREY D. KLEIN
                                                 SARAH H. COHEN
                                                 Attorneys for Plaintiff


Dated: August 29, 2024


                                          By:    /s/  *Trey Brown*
                                                 BRAD KANE
                                                 TREY BROWN
                                                 Attorneys for Defendant

INFORMAL DISCOVERY CONFERENCE STATEMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A



**KANE LAW FIRM**
Brad S. Kane (SBN 151547)
bkane@kanelaw.la
1154 S. Crescent Heights. Blvd.
Los Angeles, CA 90035
Tel:  (323) 697-9840
Fax: (323) 571-3579

Trey Brown (SBN 314469)
trey.brown@vixenmediagroup.com
11337 Ventura Blvd.
Studio City, CA 91604

*Attorneys for Defendants*
VXN Group, LLC and
Mike Miller

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>VXN GROUP LLC, a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 to 100, inclusive,<br><br>        Defendants. | Case No. **2:23–cv–04901 WLH (AGRx)**<br><br>**NOTICE OF INTENT TO SERVE SUBPOENA** |

*(sidebar, rotated)* **KANE LAW FIRM** 1154 S. Crescent Heights Blvd. Los Angeles, CA 90035

1    PLEASE TAKE NOTICE that on August 21, 2024, Defendant VXN

2   GROUP, LLC, by and through undersigned counsel, will cause the attached

3   subpoena to be served via process server on Artists Business Management Group,

4   Inc.

5                        Respectfully submitted,

6

7

8                   By:   /s/ Trey Brown

9                         Trey Brown

10                        Brad S. Kane

11                        Attorneys for Defendants
                          VXN Group LLC and Mike Miller

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

NOTICE OF INTENT TO SERVE SUBPOENA

1

2

### CERTIFICATE OF SERVICE

3

4
I hereby certify that on August 20, 2024, a true and correct copy of the foregoing document was served via email to the following recipients:

5

6
David D. Bibiyan
*david@tomorrowlaw.com*

7
Jeffrey D. Klein
*jeff@tomorrowlaw.com*

8
Sarah H. Cohen
*sarah@tomorrowlaw.com*

9
Rafael Yedoyan
*rafael@tomorrowlaw.com*

10

11

12

13    Dated: August 20, 2024          By:    */s/ Trey Brown*

14                                             Trey Brown

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

NOTICE OF INTENT TO SERVE SUBPOENA

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Central District of California

MACKENZIE ANNE THOMA, a.k.a KENZIE ANNE )
_____ )
*Plaintiff* )
v. ) Civil Action No. 2:23-cv-04901-WLH (AGRx)
 )
VXN GROUP LLC et al. )
_____ )
*Defendant* )

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS**
**OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: Artists Business Management Group Inc., Attn: Larry Lerner, 5950 Canoga Ave., Suite 417, Woodland Hills, CA 91367

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:    SEE ATTACHMENT 1

| Place: 11337 Ventura Blvd., Studio City, CA 91604; trey.brown@vixenmediagroup.com | Date and Time: 9/2/24 at 5 p.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 8/20/24

*CLERK OF COURT*

OR

_____     /s/ Trey Brown
*Signature of Clerk or Deputy Clerk*     *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendants VXN Group LLC et al. , who issues or requests this subpoena, are:

Trey Brown; 11337 Ventura Blvd., Studio City, CA 91604; trey.brown@vixenmediagroup.com; (323) 697-9840

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

<div align="center">

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

</div>

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ 0 _____ .

My fees are $ 0 _____ for travel and $ 0 _____ for services, for a total of $ 0 _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT 1

## DEFINITIONS

As used herein, the following terms shall have the following definitions:

1.      "You" refers to Artists Business Management Group, Inc. and all persons or entities acting on its behalf or in its interest.

2.      "Thoma" refers to Plaintiff Mackenzie Thoma and all persons or entities acting on her behalf or in her interest.

3.      "Kenzieland" refers to Kenzieland LLC and all persons or entities acting on its behalf or in its interest.

4.      "Lola March" refers to Lola March LLC and all persons or entities acting on its behalf or in its interest.

5.      "Motley Models" refers to Twice Baked Media, Inc. d/b/a Motley Models and all persons or entities acting on its behalf or in its interest.

## DOCUMENTS TO BE PRODUCED

1.      Documents sufficient to ascertain the date and amount of all payments from or on behalf of Thoma to Motley Models between November 11, 2020 and December 31, 2022.

2.      Documents sufficient to ascertain the date and amount of all payments from or on behalf of Kenzieland to Motley Models between November 11, 2020 and December 31, 2022.

3.      Documents sufficient to ascertain the date and amount of all payments from or on behalf of Lola March to Motley Models between November 11, 2020 and December 31, 2022.

4.      Documents sufficient to ascertain the amount and nature of all business expenses claimed by Thoma in any tax return filed between November 11, 2020 and the present.

5.      Documents sufficient to ascertain the amount and nature of all business expenses claimed by Kenzieland in any tax return filed between November 11, 2020 and the present.

6.      Documents sufficient to ascertain the amount and nature of all business expenses claimed by Lola March in any tax return filed between November 11, 2020 and the present.

7.      Documents sufficient to ascertain the studios for which Thoma rendered services, individually or through any business entities, each year from 2020 through 2022.

8.      Documents sufficient to ascertain the amount and date of all payments between Thoma, Kenzieland, and Lola March, or any of them, from November 11, 2020 through the present.

9.      All documents identifying or describing the business activities of Kenzieland from November 11, 2020 through the present.

10.     All documents identifying or describing the business activities of Lola March from November 11, 2020 through the present.

11.     Documents sufficient to ascertain the income generated by Kenzieland for the rendering of services in the field of acting for each year from 2020 through 2022.

12.     Documents sufficient to ascertain the income generated by Lola March for the rendering of services in the field of acting for each year from 2020 through 2022.

# EXHIBIT B

```
 1    that same capacity during the time that you worked with
 2    Vixen?
 3         A    Lauren was on my first set with Vixen.  I
 4    don't know what she was doing, honestly.  I've -- maybe
 5    Chris's assistant for the day, I'm not sure.
 6         Q    Did you communicate with Lauren Bonner in the
 7    runup to the first scene with Vixen?
 8         A    I don't think so.
 9         Q    Would you have had any reason to communicate
10    with Lauren Bonner prior to your first scene with Vixen?
11         A    We were friends for a little bit and like --
12    so in that capacity we were friends for -- I mean, hung
13    out maybe like five or six times outside of knowing her
14    as Chris's assistant.
15         Q    So your understanding is that Lauren Bonner is
16    Chris Applebaum's personal assistant?
17         A    Yes.
18         Q    But personal assistant in the context of like
19    getting groceries for him or personal assistant in the
20    context of film?
21         A    Both.
22         Q    Both.  Okay.  What's Kenzieland?
23         A    Kenzieland was my first LLC.
24         Q    And what was the purpose of Kenzieland, LLC?
25              MS. COHEN:  Objection.  Vague.
```

Page 61

```
 1        A    I initially just started Kenzieland without

 2    the knowledge of an LLC and just had a brand that I

 3    called my own.  I was trying to make content that was

 4    digestible for many of its OnlyFans, and I wanted to

 5    have a professional camera instead of an iPhone for that

 6    content, to take amateur to a professional view.

 7        Q    So Kenzieland was an idea or a thing before

 8    you actually incorporated Kenzieland, LLC?

 9        A    Yes.

10        Q    Who came up with the concept for Kenzieland?

11        A    I did.

12        Q    And the concept -- can you talk about that a

13    little bit more, like what the concept was for

14    Kenzieland?

15        A    I marketed it as glamorously dirty.  I wanted

16    a glam detail of sexual acts on camera.

17        Q    And so how did you get Kenzieland off the

18    ground?  In other words, it started as an idea in your

19    head to produce dirty glam.  And how did you put that

20    into motion?

21        A    I had hired Chris as my videographer to shoot

22    my concepts.

23        Q    And when you say you hired Chris as your

24    videographer, did you hire him as an employee, a partner

25    of yours?
```

Page 62

1          A     Again, at the time I didn't know much about

2     the legal parts of that, so I just hired him out of

3     pocket.

4          Q     Okay.  And when we say Chris, we mean Chris

5     Applebaum?

6          A     Yes, Chris Applebaum.

7          Q     And so to get Kenzieland -- to get this vision

8     off the ground, you hired Chris Applebaum as your

9     videographer?

10         A     Yes.

11         Q     And what was the first thing y'all did

12     together under this banner of Kenzieland?

13         A     I don't recall.

14         Q     Is Kenzieland an ongoing thing?

15         A     Kenzieland website works.  I had a guy create

16     a website where I sell the videos that I made.  So it

17     does produce a small amount of revenue.  I actually

18     can't remember if I renewed that LLC this year.

19         Q     Who created the website for you?

20         A     What was his name?  I can't think of his name

21     right now.

22         Q     If you happen to remember, let me know any

23     time.

24         A     Okay.

25         Q     So Kenzieland is an ongoing thing?

Page 63

```
 1        A    There's no more creation left.  It's only
 2   what's been filmed.
 3        Q    Okay.  So there is still content that is for
 4   sale under the Kenzieland brand?
 5        A    Yes.
 6        Q    Okay.  Are you the sole owner of Kenzieland
 7   LLC?
 8        A    Yes.
 9        Q    Does anyone else have an equity interest
10   that's not on paper for Kenzieland, LLC?
11        A    No.
12        Q    And what were your ultimate goals in creating
13   Kenzieland beyond the creation of a particular type of
14   content that you wanted to have made?  What were the
15   goals?
16        A    Again about goals, there's a lot.  I was new
17   to the industry, and I just wanted to bring something
18   new to the vision.
19        Q    Was Kenzieland -- would it be fair to say that
20   Kenzieland -- part of the purpose of Kenzieland was to
21   raise your profile in adult entertainment?
22        A    Yes.  Kenzieland was designed to showcase my
23   creativity to the industry.
24        Q    Would it be fair to say that you also wanted
25   to showcase your aesthetic?  In other words, the way
```

Page 64

1    that you look?

2         A    Being the star of every film I did, yes.

3         Q    And what was the first movie that you created

4    for Kenzieland?

5         A    I don't recall.

6         Q    Do you know when you might have made the first

7    film for Kenzieland?

8         A    I do not.

9         Q    What role would you play in a typical

10   Kenzieland film?

11        A    I did creative directing, which I also had

12   hired Chris for, Chris Applebaum.  I picked out what the

13   wardrobe was, hair and makeup, location, and being in

14   the film.

15        Q    So you were jack of all trades in this

16   Kenzieland business?

17        A    Yes.

18        Q    You were creative director, stylists for -- I

19   guess wardrobe, right?  I assume that you weren't the

20   actual stylist.  Did you have makeup artists and things

21   like that?

22        A    Yes.

23        Q    Would it be fair to say that you were the

24   executive producer of Kenzieland films?

25        A    Yes.

Litigation Services
A Veritext Company                    www.veritext.com

1      Q     Did you have a -- did you hire a video editor

2    for those films?

3      A     Because I hired Chris Applebaum, his job was

4    to include my video editing.  So --

5      Q     Okay.

6      A     -- he sent -- I don't know if he did it

7    himself or would send it off.  I think he does both.

8      Q     So Chris Applebaum was the cinematographer,

9    director, and video editor for Kenzieland videos?

10      A     I did not say that.  He was responsible for

11    editing.  I -- I'm not sure if he did the editing

12    himself.

13      Q     I see.  So Chris Applebaum was the

14    cinematographer and director, and he was also tasked

15    with getting the film edited, however that might happen?

16      A     Yes.

17      Q     Okay.  And you chose the locations that these

18    films would be shot in?

19      A     Yes.

20      Q     Were they shot in multiple locations?

21      A     Yes.

22      Q     Were they shot primarily in one location?

23      A     No.

24      Q     Were the locations in California?

25      A     Yes, I believe all of them.

Litigation Services
A Veritext Company                    www.veritext.com

1          Q      And how did you choose those locations?

2          A      Budget.

3          Q      Did you like go scout location, go into a

4     location agreement?

5          A      I had been modeling for a while, so I have a

6     good book of who I can contact for a location and then

7     work around it.

8          Q      So are we talking about like nice houses that

9     you would film in?

10         A      Yes, sometimes.

11         Q      What about like a sound stage?

12         A      I don't think I ever used a sound stage.

13         Q      Do you know about how many movies that you

14    created under the Kenzieland brand?

15         A      What's considered a movie?  Because some can

16    be broken up into many, that's from one.  So I'm not

17    sure because editing creates a lot more movies than --

18         Q      Okay.  Would you say it was more than five?

19         A      I'm going to say yes because I think I have

20    more than five for sale.

21         Q      And are those movies still for sale?

22         A      Yes.

23         Q      And where would I go if I wanted to buy one of

24    those movies?

25         A      You would go to kenzieland.com or

Litigation Services
A Veritext Company                          www.veritext.com

1    misskenzieanne.com.

2        Q    And how much do you sell the movies for?

3        A    I honestly don't know.

4        Q    And are the movies for sale outright?  In

5    other words, if I buy a movie on kenzieland.com, do I

6    own that movie forever, or do I need to go to Kenzieland

7    to watch it?

8        A    I believe I did it so that you have to go to

9    Kenzieland to watch it, but I -- I don't know that for

10   sure.

11       Q    Does Kenzieland obtain revenue via like a

12   subscription service or is it per movie?

13       A    It's per movie.

14       Q    Okay.  The money that you generated from

15   Kenzieland movies, what did you put that -- did that

16   money go back into Kenzieland, LLC?  How was that money

17   used?

18       A    Almost all of the money for Kenzieland was

19   either cut even based off of production costs or put

20   into the next film.

21       Q    Okay.  And when you say, "production costs,"

22   you mean paying the various people that were involved in

23   the production of the movie?

24       A    Yes.

25       Q    And payment for the props and the wardrobe?

```
 1         A    Yes.

 2         Q    And payment for the locations?

 3         A    Yes.

 4         Q    I'm going to show you a list of movies

 5    produced under Kenzieland that I pulled from the

 6    internet adult film database.  I'm going to introduce

 7    this as deposition Exhibit 1.

 8              Does this list look accurate to you in terms

 9    of the titles of the movies and the year of production?

10                   (Exhibit 1 was marked for

11                    identification.)

12         A    To my knowledge, yes.

13         Q    Okay.  So it looks like there are 23 movies on

14    here; is that correct?

15         A    That's what it says.

16         Q    But earlier you said that sometimes you break

17    up a movie into separate parts, and that's why we might

18    get something like we see on the exhibit, Maid 1, Maid

19    2, and Maid 3?

20         A    Yes.

21         Q    Okay.  Did you engage other performers to

22    perform on Kenzieland movies?

23         A    I did, yes, but they were not all sex.

24         Q    Okay.  So other performers beyond you

25    performed in many of these movies?
```

Page 69

```
 1        A    It would be -- I believe six, seven.

 2        Q    Seven of these movies?

 3        A    Yes.

 4        Q    Do you recall which ones?

 5        A    Kenzie and Jax, Maid 1, 2, and 3, The

 6   Sleepover, Vanna Bardot and Codey Steele.

 7        Q    Okay.  And the year of production is accurate?

 8        A    I -- I believe so.

 9        Q    Okay.  Did you enter into agreements with the

10   performers who worked on the Kenzieland movies?

11             MS. COHEN:  Objection.  Calls for expert

12   opinion, legal conclusion.  Vague as to "agreements."

13   BY MR. BROWN:

14        Q    Did you enter into any written contracts with

15   the performers who performed on the Kenzieland movies?

16             MS. COHEN:  Same objections.

17        A    No, I did not.

18        Q    So just to be clear, for the performers that

19   worked on these Kenzieland pictures with you, none of

20   them did so pursuant to a signed agreement?

21        A    We traded content.

22        Q    Traded content?

23        A    So when I filmed with them, they were also

24   allowed to use what I produced to sell.

25        Q    Did you pay any of the performers money --
```

Page 70

1       A    No.

2       Q    -- in exchange for appearing in the Kenzieland

3    movies?

4       A    No.

5       Q    And when you say you "traded content," can you

6    be a little bit more specific in terms of what that

7    exchange looked like?

8       A    The outcome of video content produced in

9    anything they were in, they get full legal rights too.

10      Q    So in other words, if, let's take for example,

11   Vanna Bardot and the Codey Steele Submit film, Vanna

12   Bardot and Codey Steele have a full license to use that

13   content any way they want?

14      A    I sent it to them, yes.

15      Q    And have they used that content?

16      A    I have no idea.

17      Q    And does the trade work both ways?  In other

18   words, did you perform in films for these performers and

19   also have the ability to use that content as you saw

20   fit?

21      A    No.

22      Q    So it's kind of a one-way trade in terms of

23   you say, "Hey Vanna, come work on this film with me and

24   in exchange you can just use this content for your own

25   purposes"?

Litigation Services
A Veritext Company                    www.veritext.com

```
 1        A    Yes.

 2        Q    Are they able to monetize the content that

 3   they use, or are they just using it -- are they able to

 4   package it and sell it on their own?

 5        A    They're able to package and sell the content

 6   I've provided them to get revenue.

 7        Q    And the content that you provide them, is that

 8   the finished movie?

 9        A    Yes, and some behind the scenes.  So iPhone

10   things we -- photos we took.

11        Q    And does this same thing -- does that same

12   arrangement apply for the male actors as well?

13        A    Yes.

14        Q    So Jax Slayer -- just to be clear, you had no

15   agreement with Jax Slayer to perform in the Kenzieland

16   movies -- in other words, you had no written contract

17   with Jax Slayer in connection with Kenzieland movies?

18        A    No, I did not.

19        Q    You had a written contract with Rob Piper

20   pursuant to acting in Kenzieland movies?

21        A    No, I did not.  Where was Rob Piper?

22        Q    Did Rob Piper perform in a Kenzieland movie?

23        A    No, I don't believe he did.

24        Q    No.  Did Codey Steele perform in a Kenzieland

25   movie?
```

Page 72

1          A    Yes, Codey Steele did.

2          Q    And Codey Steele did not perform under a

3    written agreement with you?

4          A    No, he did not.

5          Q    Okay.  And was Jax Slayer paid any money in

6    connection with his performance on the Kenzieland

7    Worship video?

8          A    No, he was not.

9          Q    Was Codey Steele paid any money in connection

10   with the Kenzieland video that he acted in?

11         A    No, he was not.

12         Q    Was Vanna Bardot paid any money in connection

13   with the Kenzieland movie?

14         A    No, she was not.

15         Q    Was Charly Summer?

16         A    No, she was not.

17         Q    How about Kendra Sunderland?

18         A    No, she was not.

19         Q    Did Scarlett Scandal act in a Kenzieland movie

20   with you?

21         A    Oh, yeah.  Scarlet was in a video.  I don't

22   think we ever released that video.  I think we just took

23   pictures.  I -- yeah, I don't think that video ever came

24   out.

25         Q    Would that have been the Afternoon Delight

                                              Page 73

```
 1    video or was that a solo video?

 2         A    I believe Afternoon Delight was solo.  I don't

 3    know.

 4         Q    Okay.

 5         A    I'm not sure.

 6         Q    I'll just say these last names.  But to your

 7    knowledge, did any of Kim Kerotika, Lily Andrews, or

 8    Ashley Lane act in Kenzieland videos?

 9         A    Ashley Lane.

10         Q    She did?

11         A    Yeah.

12         Q    Did Lily Andrews act in any Kenzieland videos?

13         A    Oh, yes.  Lily Andrews was Sleepover Eats.

14         Q    And did Kim Kerotika act with you in any

15    Kenzieland movies?

16         A    Oh, she did too.  Yes.  I don't remember which

17    one that is.

18         Q    And just to be clear, you didn't enter into a

19    signed -- Kenzieland, LLC or you didn't enter into a

20    signed agreement with Kim Kerotika or Lily Andrews or

21    Ashley Lane?

22         A    No, we did not.

23         Q    Okay.  So the products and service -- the

24    products offered by Kenzieland, were they just movies?

25         A    Okay.  So now I'm remembering.  I don't know
```

Page 74

1    his name, but it was a company called FanGear.  He made

2    websites for people -- he designed websites for

3    performers, and he also made merch, so T-shirts, coffee

4    cups, key chains.  So I had little trinkets.  Honestly,

5    I'm not sure what's on there.

6        Q    What would be on the trinkets?

7        A    Would be photos that I had taken to promote

8    Kenzieland.

9        Q    Were they photos -- what were they photos of?

10       A    Me.

11       Q    And was there -- when you say "trinkets," what

12   all do you mean?

13       A    Like I stated before, t-shirts, coffee mugs,

14   bottle openers.

15       Q    Okay.  So on Kenzieland you can buy t-shirts,

16   coffee mugs with your photo on them?

17       A    Yes.

18       Q    Anything else?

19       A    No.

20       Q    Like a calendar?

21       A    Oh, I did.  I -- I produced a calendar, yes.

22   I did it two years.  I'm not sure which years they were.

23       Q    Would you say that those were popular items?

24       A    They were pretty popular.

25       Q    About how much revenue was Kenzieland, LLC

Page 75

1    generating in 2021?

2        A    I don't remember.

3        Q    Can you estimate?

4        A    No.  I would have to talk to my accountant.

5        Q    Was it a substantial amount of revenue?

6        A    I -- I guess that's subjective.

7        Q    Was it more than $5,000 per month?

8        A    I don't know.

9        Q    Who is the accountant that you referenced?

10       A    I honestly don't know my accountant's name.  I

11   had to switch over recently to a new one.

12       Q    Does the new accountant also handle Kenzieland

13   accounts?

14       A    No, I -- I -- like I said, I don't know if I

15   renewed Kenzieland this year.

16       Q    Who was the old accountant?

17       A    Larry -- Larry Lerner, I believe was his name.

18       Q    Lerner.  Like L-E-R-N-E-R?

19       A    Yeah.

20       Q    I have a friend with that last name.  I always

21   want to put the A in there, but.

22            So Kenzieland has produced -- it has generated

23   revenue?

24       A    A little bit.

25       Q    And does it still produce revenue?

```
 1        A     Nothing that I'm paying attention to.
 2        Q     Did it ever produce an amount of revenue that
 3   warranted your attention?
 4        A     No.
 5        Q     And how was the revenue from Kenzieland -- the
 6   revenue from Kenzieland, you've already said when a
 7   movie was made, the revenue from that movie went into
 8   creating the next movie.
 9        A     Mm-hmm.
10        Q     What about the revenue from the various items
11   for sale on Kenzieland?
12        A     Why is it important what I spend my money on?
13        Q     I'm asking you the revenue that was generated
14   from the products that you sold on kenzieland.com --
15        A     Right.
16        Q     What did that go towards?
17        A     I do not know how to answer that question --
18              MS. COHEN:  I'm just going to object to
19   my client's privacy right.  And instruct my client not
20   to answer.
21              MR. KANE:  I think what you're trying to
22   ask is, did the money go into Kenzieland, not what she
23   spent it on.
24              MR. BROWN:  Right.
25   //
```

Litigation Services
A Veritext Company                    www.veritext.com

```
 1   BY MR. BROWN:
 2       Q    I'm asking you not what you did with the
 3   money, but did the revenue from those items go back into
 4   funding the business venture?
 5              MS. COHEN:  Same objection.  I'm going to
 6   instruct my client not to answer.
 7   BY MR. BROWN:
 8       Q    So the money that you made off the movies from
 9   Kenzieland went back into the production of Kenzieland
10   movies?
11              MS. COHEN:  Objection.  Same objection.
12   I'm going to instruct my client not to answer.
13              MR. BROWN:  I'm confused because I feel
14   like she already answered that question.
15              MS. COHEN:  Well, then asked and
16   answered.
17   BY MR. BROWN:
18       Q    Did the revenue that Kenzieland generated, was
19   it affected, or did it change after you started working
20   with Vixen?
21              MS. COHEN:  Objection.  I'm going to
22   instruct my client not to answer.  It's her private
23   financial information for own company.
24              MR. KANE:  I think it's directly related
25   to phase one discovery, whether or not she was providing
```

Page 78

1    services to multiple companies.

2             MS. COHEN:  I don't think that has

3    anything to do with phase one.

4    BY MR. BROWN:

5        Q    Are you going to abide by your Counsel's

6    advice not to answer the question?

7        A    I am.

8        Q    So in 2022, were you really active as far as

9    being an adult performer?

10            MS. COHEN:  Objection.  Vague.

11       A    I was working often, yes.  Yes, I was working

12   a good amount at that point.

13       Q    And what were you working on in 2022?

14       A    Scenes.

15       Q    And were these scenes for adult entertainment

16   companies, studios?

17       A    Yes, and myself.

18       Q    And when you say yourself, do you mean

19   Kenzieland movies, or do you mean content produced for

20   your OnlyFans?

21       A    I mean content produced for my OnlyFans.

22       Q    Okay.  And would it be fair to say that 2022

23   was your most active year in performing as an adult film

24   actress?

25       A    Yes.  I would say 2022 was my most active

Litigation Services
A Veritext Company                    www.veritext.com

1    year.

2         Q    Did you do over a hundred scenes that year?

3         A    I have no idea.

4         Q    Would it have been over a hundred scenes to

5    your knowledge?

6         A    I have no idea.

7         Q    Would it have been fewer than a hundred scenes

8    to your knowledge?

9         A    I have no idea.

10         Q    But you were -- would you agree that you were

11    pretty prolific during 2022?

12         A    Can you define that word?

13         Q    Prolific meaning very active, prolific

14    meaning --

15         A    So the same question again?

16         Q    Sure.  Would you say that you were prolific in

17    2022?

18         A    I -- I -- yes.  It was my most active year as

19    I stated earlier.

20         Q    And did you get nominated for a lot of awards

21    that year?

22         A    "A lot" is an ambiguous term.  I had some

23    nominations.

24         Q    What awards in general have you won for being

25    an adult performer?

Page 80

```
 1         Q    Would anybody know?

 2         A    I'm not sure.

 3         Q    Would your accountant know?

 4         A    Possibly.  Good luck getting ahold of him.

 5         Q    So you don't remember signing a tax return

 6    involving Kenzieland?

 7         A    I think I had done my taxes individually that

 8    year.  Possibly, I'm not sure.  I don't remember.

 9         Q    When they advised you to form the LLC to

10    receive payment from Vixen, did they explain to you why

11    that would be beneficial to you?

12         A    It was the difference between direct deposit

13    and a check.  I guess they just didn't want to write

14    checks anymore and they wanted to do direct deposit.  So

15    that I -- I believe my first two films were check and

16    then afterwards were -- what is it, ACH or direct

17    deposit -- yeah.

18         Q    Okay.  Are you familiar with an entity called

19    Lola March?

20         A    Yes.

21         Q    Do you have ownership in that entity?

22         A    Yes.

23         Q    Is that an ongoing entity?

24         A    Yes.

25         Q    When did you form Lola March?
```

Page 126

```
 1        A    Really closely after Kenzieland.  I had

 2   realized that there's a lot of personal information when

 3   you have an LLC and that it should not be related to

 4   your business.  So I had -- a lawyer at the time advised

 5   me to get a new LLC and sort of just stop using

 6   Kenzieland.

 7        Q    And so what was the purpose behind forming

 8   Lola March, LLC?

 9        A    The safety of where I lived and where I

10   regulated.

11        Q    I see.  So you wanted to use Lola March, LLC

12   as a buffer between your personal information and

13   business?

14        A    Yes.

15        Q    And what did Lola March, LLC do?

16        A    It served as a method for people to pay me so

17   I could do my taxes as an independent contractor.

18        Q    Are you familiar with the term "loan out

19   company"?

20        A    No.

21        Q    Okay.  Is Lola March still active?

22        A    Yes.

23        Q    Did Lola March to your knowledge file a

24   separate tax return?

25        A    Yes.
```

Page 127

```
 1        Q    Did you sign that tax return?

 2        A    If we're talking about 2021, I'm not sure.

 3        Q    Any tax year?

 4        A    Yes.

 5        Q    Okay.  Did Lola March take business deductions

 6    to your knowledge?

 7        A    No.  Business deductions like write-offs?

 8        Q    Yeah.

 9        A    Yes.

10        Q    What kind of write-offs?

11        A    Things such as --

12             MS. COHEN:  Actually, hold on a second.

13    That's -- I'm going to instruct my client not to answer,

14    financial privacy.

15    BY MR. BROWN:

16        Q    So Lola March did take business deductions?

17        A    Yes.

18        Q    Did you take business deductions in connection

19    with Lola March, LLC related to the work that you

20    performed for Vixen?

21        A    I do not know.

22        Q    Okay.  What jurisdiction was Lola March formed

23    in?

24        A    Does that mean what -- what state?

25        Q    Yes.
```

Page 128

1          A     California.

2          Q     And Kenzieland, do you know what state

3    Kenzieland was formed in?

4          A     For some reason someone advised me to do

5    Wyoming, and that's where it was initially for

6    absolutely no reason other than taking someone's poor

7    advice.

8          Q     Do you have any idea why they would advise you

9    to form it in Wyoming?

10         A     No, I don't.

11         Q     Okay.  So you mentioned earlier that you were

12   advised to form Lola March, LLC to receive payment for

13   the work that you did, and furthermore, to protect your

14   personal information.  Have you -- as an adult

15   performer, do you have a heightened need for privacy

16   based on the work that you do?

17         A     Absolutely.

18         Q     Have you suffered any negative consequences

19   from your personal information being obtained by

20   somebody else?

21         A     Yes, I have.

22         Q     What kind of negative consequences?

23         A     People posting my address publicly, my phone

24   number.

25         Q     And how does that make you feel?

Litigation Services
A Veritext Company                    www.veritext.com

1        A     Obviously terrified.

2        Q     Is that on the low end of consequences that

3    you've suffered because of your personal information

4    getting out there, or is that on the high end of

5    consequences?

6        A     So initially Kenzieland, when that had all

7    happened, I had moved out of my apartment complex

8    because people had found out where my window was in

9    relation to my apartment building.

10       Q     Because of the Kenzieland, LLC?

11       A     Yes.

12       Q     Because your name was on the organizing

13   documents?

14       A     Yes.

15       Q     Okay.  So it's fair to say that you value your

16   privacy greatly, primarily because -- you know, all of

17   us value our privacy, but you value your privacy

18   greatly, primarily because you're an adult performer and

19   that puts you at higher risk; is that true?

20       A     I think in general as any form of a public

21   figure, adult performer, whatever category you want to

22   throw at -- an influencer, I don't know who else you

23   want to bring in -- I would say anybody in the public

24   eye has heightened security, you know, measures that I

25   take, or we take.

Litigation Services
A Veritext Company                    www.veritext.com

1   and Penthouse generated more than ▨▨▨▨▨ per month for

2   you?

3        A    At the time things were not always consistent.

4        Q    And were they inconsistent on the camming

5   side, or were they inconsistent on the modeling side?

6        A    The reason I'm having a hard time answering

7   that is because the modeling part of it was -- I guess

8   can you rephrase the question?

9             THE WITNESS:  What is happening on here

10   now?

11             MR. BROWN:  Are we good?

12   BY MR. BROWN:

13        Q    Just to clarify.  Prior you stated that you

14   were making around -- prior to working with Vixen you

15   were making around $▨▨▨▨▨ a month via camming.  And I

16   asked you if that was your main source of income prior

17   to working for Vixen.

18        A    I would say that both were equally sources of

19   income.

20        Q    So you made roughly $▨▨▨▨▨ per month modeling

21   just as you made roughly ▨▨▨▨▨ a month in camming?

22        A    The answer would be sometimes for both.

23        Q    Sometimes in modeling you would pull down

24   $▨▨▨▨▨ a month, sometimes in camming you would pull

25   down $▨▨▨▨▨ a month?

Page 26

1   the director's names.  Like Kayden Kross, we had to do

2   red nails for Deeper every time.

3        Q    Okay.  So is it a fair assessment when we say

4   that all personal grooming requirements, those were

5   controlled by Vixen?

6        A    100 percent they were.

7        Q    So there wasn't any flexibility in your

8   contract for you to make these decisions for yourself?

9             MR. KANE:  Calls for legal conclusion.

10       A    No.  There was no flexibility for me to make

11  appearance changes.

12       Q    Okay.  Do you have any knowledge as the

13  difference between Vixen's exclusive versus

14  non-exclusive contracts?

15       A    I was supposedly on two different contracts.

16  And the non-exclusive, I was allowed to work or film

17  with other companies filming porn.  Whereas my

18  exclusive, I could only perform with them.  However,

19  when I was on my non-exclusive, they did get upset when

20  I was crowned Pet of the Year and had of the months,

21  which was already established with them.  But that would

22  be happening moving forward.  But they were upset with

23  the timing of announcements for when I was Treat of the

24  Month, Bombshell of the Month, Pet of the Year.  So they

25  did enforce who they did and didn't want me to be around

Page 143

```
 1                    You can answer.

 2                    THE WITNESS:  I did answer.  You were

 3     talking over me.

 4                    I said, yes.  That is how I was directed

 5     by multiple people on set.

 6     BY MS. COHEN:

 7          Q    Okay.  So when you first arrived on set, what

 8     was -- can you just in general, or on an average day

 9     that you would arrive on scene, what was one of the

10     first things that Vixen or a director or Mike Miller

11     instructed you to do?

12                    MR. KANE:  I'm going -- objection.  Vague

13     and ambiguous and compound.

14          A    When I got to set, I was requested to get into

15     hair and makeup and was typically given my script or the

16     contract, W-9 for the day.

17          Q    Okay.  And once your hair and makeup were done

18     and you reviewed your script, would you go immediately

19     to start performing the scene, or was there something

20     that was required of you first before the filming began?

21          A    There was never -- I never went straight into

22     a scene.  I always had like six hours of photo shoots,

23     which didn't typically involve the scene.  Sometimes it

24     was split, but I'd be put in Vixen merchandise and shot

25     for their graphic tee brand, like panties, bra, whatever
```

Page 145

```
 1    believe it was around -- right before my 25th birthday.
 2    So I'm thirty-one, six years.
 3         Q    Which platform did you start camming on first?
 4         A    My first -- my first stream site was called
 5    Streamates.
 6         Q    Do you currently still use Streamates?
 7         A    No, sir.  I do not.
 8         Q    What sites do you currently cam on?
 9         A    I use OnlyFans -- and I'm trying to remember.
10    I believe the last one outside of OnlyFans is
11    Chatterbate.
12         Q    Okay.  So to clarify, you currently cam on
13    OnlyFans and Chatterbate?
14         A    Yes, sir.
15         Q    Are there any other platforms that you cammed
16    on in the course of your time in adult entertainment
17    beyond Chatterbate and OnlyFans and -- what was the
18    other one you named, Stream?
19         A    Streamates.
20         Q    Streamates.  Are there any other platforms
21    that you used?
22         A    Yes, but I don't -- there's been a lot that I
23    was on and off of.  I've made accounts for one or two
24    streams on, just tried out, so I couldn't recall all the
25    names.
```

Page 18

1    was saying I was Bombshell of the Month and essentially,

2    they wanted me to get -- to fall into the category for

3    the appropriate porn companies to become their of the

4    month.

5         Q    Okay.  Did you have a written representation

6    agreement with Motley?

7         A    Yes, I did.

8         Q    Did you pay commissions to Motley pursuant to

9    that agreement?

10        A    Yes, I did.

11        Q    Do you recall the rate of the commission?

12        A    It was 10 percent.

13        Q    And is that 10 percent of every dollar that

14   you made in your entire career, or is it 10 percent of

15   every dollar you made for like a particular shoot?

16        A    It would be 10 percent for a particular shoot

17   if they had booked me the job.

18        Q    Okay.  And so how would they get that 10

19   percent?

20        A    I paid them.

21        Q    So the studio pays you and then you pay them?

22        A    Yes.

23        Q    After the fact?

24        A    Yes.

25        Q    And how would you give that money to them?

Litigation Services
A Veritext Company                    www.veritext.com

```
 1        A    It was usually wire transfer.  Yeah, it was
 2   always wire transfer.
 3        Q    And would you personally initiate the wire
 4   transfer?
 5        A    Yes.
 6        Q    Did you always pay the commissions from the
 7   same account?
 8        A    No.
 9        Q    What accounts would you have paid the
10   commissions through?
11        A    Depending on what bank had more of my money at
12   the time.
13        Q    So you had accounts at a few different banks?
14        A    Just accounts with -- with a bank.
15        Q    Did you ever pay the commissions from a
16   business account?
17        A    Yes.
18        Q    Which business account?
19        A    Actually, kind of a weird question because my
20   initial business account was just with Wells Fargo, and
21   it initially started out as my hairdressing account.  So
22   my hairdressing account.
23        Q    Do you recall, was there a business associated
24   with that hairdressing?
25        A    It was just Mackenzie Anne Thoma.
```

Page 106

```
 1          Q     Okay.  Were there any other business accounts
 2     that you used to pay commissions to Motley?
 3          A     No.
 4          Q     Did you deduct the commissions that you paid
 5     to Motley off any of your taxes?
 6                     MS. COHEN:  Hold on.
 7                     Objection.  I'm going to instruct my
 8     client not to answer based on her financial privacy.
 9     BY MR. BROWN:
10          Q     Are you familiar with the term "booking fees"?
11                     MR. KANE:  -- she's going to follow that
12     instruction.
13     BY MR. BROWN:
14          Q     Are you going to follow your attorney's
15     instruction not to answer the question?
16          A     Yes, I am.
17          Q     Are you familiar with the term "booking fees"?
18          A     No, I'm not.
19          Q     Are you aware if when a studio booked, that
20     they paid money to Motley Models beyond the commission,
21     that you would pay Motley models for that shoot?
22          A     I'm not aware of that.
23          Q     Do you need me to inform you what booking fees
24     means?
25          A     Yes, I do.
```

Page 107

1      Q     Booking fee is a fee that a studio pays to a

2    talent agency flat off the top for a scene in which it

3    books a model.  So for example, Vixen and booked Kenzie

4    Anne for a scene.  We pay you the scene rate.  We pay

5    Motley Models a hundred dollars, but you also pay Motley

6    Models 10 percent of what you made.  That $100 is a

7    booking fee.

8           Were you aware that Motley Models was charging

9    booking fees on top of what you paid them as a

10   commission?

11     A     I'm not an agent or a -- a production company,

12   so I would not know what that is at all.  That does not

13   involve me.

14     Q     Did Motley ever pay you any portion of a

15   booking fee that they obtained on your behalf?

16     A     No, they did not.

17     Q     Okay.  Who represented you at Motley Models?

18     A     Dave Rock.  Ryan Kona was my booking agent.

19     Q     And what did Ryan Kona do as your booking

20   agent?

21     A     He put my schedule together and would relay my

22   availability.

23     Q     Did he communicate with you your bookings via

24   text message?

25     A     It was either text, phone call, or email.

Litigation Services
A Veritext Company                    www.veritext.com

1      Q    Did you use any platform to coordinate

2   bookings with Ryan Kona?

3      A    They eventually got something called -- it was

4   like Portfolio something.

5      Q    Was it Portfoliopad?

6      A    Yes, it was Portfoliopad.  I didn't -- I mean

7   I -- I had access to it, but it always glitched.  So

8   typically, I just looked for my call sheet that would be

9   sent to Ryan and then sent to me.

10     Q    And how did Motley communicate to you what the

11  amount of their commission should be?

12     A    That was in the initial contract agreement.

13     Q    So for example, if you got paid $3,000 for a

14  scene and Motley's owed 10 percent, does Motley send you

15  an invoice?

16     A    Yes.  I got either monthly or bimonthly

17  invoices.

18     Q    And they would aggregate the commissions that

19  were due to them on the invoices?

20     A    Correct.

21     Q    And how are the invoices given to you?

22     A    Via PDF.

23     Q    Was it via email?

24     A    I feel like Dave texted them more than

25  emailed.

Page 109

```
 1        Q    So Dave would text you the invoices?

 2        A    Yes.

 3        Q    Did they submit invoices on Portfoliopad?

 4        A    I don't think so.  Again, I hate -- I hated

 5   the app.  I always fought them on it.  I was so pissed

 6   when they started it.

 7        Q    So your preference was that Dave just text you

 8   the invoices?

 9        A    Yeah.  Yeah.

10        Q    And he continued to do that?

11        A    Yes.

12        Q    When was the last time that you talked to Ryan

13   Kona?

14        A    I don't know when it was, but I texted him

15   letting him know he might be a part of this case.  So

16   that may have been -- what, like before summer started,

17   I want to say.

18        Q    And so you texted him saying he might be part

19   of this case?

20        A    Yes and to not delete anything.

21        Q    And so in advising him that he might be part

22   of this case, why did you do that?

23        A    Because I hadn't talked to him in a long time,

24   and I just wanted to know where he was.

25        Q    Was there anything that happened that led you
```

                                           Page 110

# EXHIBIT C

**KANE LAW FIRM**
Brad S. Kane (SBN 151547)
bkane@kanelaw.la
1154 S. Crescent Heights. Blvd.
Los Angeles, CA 90035
Tel:  (323) 697-9840
Fax: (323) 571-3579

Trey Brown (SBN 314469)
trey.brown@vixenmediagroup.com
11337 Ventura Blvd.
Studio City, CA 91604

*Attorneys for Defendants*
VXN Group, LLC and Mike Miller

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>VXN GROUP LLC, a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 to 100, inclusive,<br><br>        Defendants. | Case No. **2:23–cv–04901 WLH (AGRx)**<br><br>**NOTICE OF TAKING DEPOSITION** |

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

**PLEASE TAKE NOTICE** that the undersigned attorneys will take the deposition of:

| | |
|---|---|
| Name: | LARRY LERNER |
| Date: | SEPTEMBER 10, 2024 |
| Time: | 11:00 A.M. |
| Place: | Ross LLP, 1900 Avenue of the Stars, Suite 1225, Los Angeles, CA 90067 |

**YOU ARE FURTHER NOTIFIED THAT**:

[**X**] Non-party deponent: The deponent is not a party to this action. So far as known to the deposing party, the deponent's address and telephone number are as follows: 5950 Canoga Ave., Suite 417, Woodland Hills, CA 91367; (818) 719-6541. Said deponent has been served with a Deposition Subpoena. A COPY OF THE DEPOSITION SUBPOENA IS ATTACHED HERETO AND SERVED HEREWITH.

Respectfully submitted,

By:  */s/ Trey Brown*
Trey Brown
Brad Kane
Attorneys for Defendants
VXN Group, LLC and Mike
Miller

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

NOTICE OF TAKING DEPOSITION

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2024, a true and correct copy of the foregoing document was served via email to the following recipients:

David D. Bibiyan
*david@tomorrowlaw.com*
Jeffrey D. Klein
*jeff@tomorrowlaw.com*
Sarah H. Cohen
*sarah@tomorrowlaw.com*
Rafael Yedoyan
*rafael@tomorrowlaw.com*
Wesley Gonzales
*wesley@tomorrowlaw.com*

Dated: August 20, 2024          By:   */s/ Trey Brown*
                                      Trey Brown

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | )  |
|---|---|
| _____  *Plaintiff* | ) |
| v. | ) |
| | ) |
| _____  *Defendant* | ) |

Civil Action No. _____

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❐  Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: | Date and Time: |
|---|---|
| | |

The deposition will be recorded by this method: _____

❐  *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| CLERK OF COURT | |
|---|---|
| | OR |
| _____  *Signature of Clerk or Deputy Clerk* | _____  *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

_____, who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A) Appearance Not Required.** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B) Objections.** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

  **(A) When Required.** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B) When Permitted.** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C) Specifying Conditions as an Alternative.** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A) Documents.** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B) Form for Producing Electronically Stored Information Not Specified.** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C) Electronically Stored Information Produced in Only One Form.** The person responding need not produce the same electronically stored information in more than one form.
  **(D) Inaccessible Electronically Stored Information.** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A) Information Withheld.** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B) Information Produced.** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# DEFENDANTS' EXHIBITS

# EXHIBIT C

```
 1        Q     And what would be the reason that you no
 2   longer use those platforms?
 3        A     The reason to leave a platform is lack of
 4   traffic.
 5        Q     And when you say "lack of traffic," is it fair
 6   to say that you also mean lack of revenue?
 7        A     Yes, traffic equates to revenue.
 8        Q     Okay.  Which of those platforms generates the
 9   most traffic for you?
10        A     Over time it would be OnlyFans.
11        Q     And prior to your work with Vixen how much
12   revenue would you estimate that you made camming in a
13   monthly period?
14        A     Roughly █████ a month.
15        Q     And this is prior to your starting to work
16   with Vixen?
17        A     Yes, sir.
18        Q     Okay.  And were you also camming during the
19   time in which you were working with Vixen?
20        A     No, sir because I was asked not to.
21        Q     Who asked you not to?
22        A     That would've been Mike Miller or whoever
23   drafted up my contract with Vixen.
24        Q     Whoever drafted the contract?
25        A     Mh-hmm.
```

Page 19

Q Did Mike Miller ever specifically instruct you not to cam?
A It was written in my contract.
Q So during the time that you were performing for Vixen you did not cam at all?
A To my best memory, no, I did not.
Q And just so we're clear with the timeframe that we're talking about, your contract with Vixen started in November of 2020; is that correct?
A I believe so.
Q So you're saying that from November 2020 and through the entire time that you worked for Vixen, you did not cam?
A Yes.
Q Okay. How much -- do you currently cam now?
A Yes, I do.
Q And about how much money do you make on a monthly basis from camming?
THE WITNESS: These are relevant questions?
MS. COHEN: One second.
I'm going to object on my client's privacy. I'm going to instruct my client not to answer.
MR. BROWN: Can we have a stipulation that if you instruct your client not to answer, that

```
 1          Q     And to your awareness, to your knowledge, that
 2     was a restriction in your contract that you could not
 3     cam on your own behalf?
 4          A     It absolutely was.
 5          Q     And do you recall there being any negotiations
 6     on that point?
 7          A     No, sir.  I do not.
 8          Q     So I just want to clarify.  Did Mike Miller
 9     specifically instruct you that you could not cam while
10     you were under contract with Vixen?
11          A     I am not sure who at Vixen had instructed me
12     not to, but I was not allowed to cam -- make content
13     longer than five minutes solo or with another
14     individual.  So I was restricted in my personal income
15     to be contracted with Vixen.
16          Q     And so because you had that belief, you did
17     not cam the entire time that you were under contract
18     with Vixen; is that correct?
19          A     Yes.
20          Q     Okay.  So before when I asked you about your
21     reasons for entering into the adult entertainment space,
22     you declined to answer that question.  Is there a reason
23     in comparison to the mainstream modeling industry that
24     you were in, is there a reason that you -- let me
25     rephrase this question.
```

Page 22

EXHIBIT D

1    time is 11:29 a.m., and we are off the record.

2              (Off the record.)

3              THE VIDEOGRAPHER:  This marks the

4    beginning of media number three.  The time is 12:03 p.m.

5    and we're on the record.

6              THE OFFICER:  To reiterate, the time is

7    12:03 p.m.  We are back on the record.

8              Counsel, before we went off record, your

9    prior question was "It did restrict you?"

10             MR. BROWN:  Okay.

11   BY MR. BROWN:

12        Q    You mentioned that prior to working with

13   Vixen, you were camming on several different platforms.

14   And you mainly cammed on OnlyFans; is that correct?

15        A    No, prior to my meeting Vixen, it had been

16   Streamates and OnlyFans.  So initially it was

17   Streamates, moved over to OnlyFans pretty close, like

18   maybe a year before I met Vixen.

19        Q    You switched from Streamates to OnlyFans?

20        A    There was no switch.

21        Q    Okay.  So just prior to meeting Vixen you were

22   more active on OnlyFans than you were Streamates at that

23   time?

24        A    No, sir.

25        Q    Were you equally active on both platforms

                                        Page 30

1    prior to working with Vixen?

2         A    I would say roughly equal on both platforms.

3         Q    And did those platforms combined give you the

4    $█████ per month?

5              MS. COHEN:  Hold on.  I'm going to

6    object.  Trying to avoid speaking objections, Counsel,

7    and we can meet and confer but I think it's just -- it's

8    an invasion into my client's financial privacy to ask

9    about her income.

10             So I'm going to object on the basis of

11   privacy and instruct my client not to answer as it

12   pertains to her specific income.

13   BY MR. BROWN:

14        Q    Are you going to abide by your Counsel's

15   objection that you don't answer the question how much

16   money you were making on cam platforms?

17        A    Yes, sir.

18        Q    During the time that you worked for Vixen, how

19   much money were you making on camming platforms per

20   month?

21             MS. COHEN:  Objection.  Based on my

22   client's private -- right to privacy, I'm going to

23   instruct my client not to answer.

24   BY MR. BROWN:

25        Q    Are you going to abide by your attorney's

```
 1        Q     And the other sources of your income were
 2   modeling for clothing companies?
 3        A     I did a lot of different jobs, modeling.  I
 4   was a hairdresser as well.
 5        Q     Did your contract with Vixen prohibit you from
 6   modeling or cosmetology?
 7        A     My contract had nothing to do with
 8   cosmetology.  They were not against me modeling for a
 9   few companies.  For instance, I had a shoot with Playboy
10   Plus, that when the photos were released were critiqued
11   in front of me by Miller because they felt that it had
12   imitated my first shoot with them.  But Playboy Plus was
13   shot before 'cause they were both photo shoots.
14        Q     Apart from modeling and cosmetology, how much
15   revenue did you make prior to your performing with
16   Vixen?
17                    MS. COHEN:  Objection.  I'm going to
18   instruct my client not to answer on the basis of her
19   privacy.
20   BY MR. BROWN:
21        Q     During the time that you were performing with
22   Vixen, how much revenue did you generate from camming?
23                    MS. COHEN:  Objection.  Privacy.  I'm
24   going to instruct my client not to answer.
25   //
```

                                                    Page 34