**KANE LAW FIRM**
Brad S. Kane (SBN 151547)
bkane@kanelaw.la
1154 S. Crescent Heights. Blvd.
Los Angeles, CA 90035
Tel:  (323) 697-9840
Fax: (323) 571-3579

Trey Brown (SBN 314469)
trey.brown@vixenmediagroup.com
11271 Ventura Blvd. #717
Studio City, CA 91604

Attorneys for Defendants
VXN GROUP LLC and MIKE MILLER

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> VXN GROUP LLC, a Delaware limited liability company; MIKE MILLER, an individual, <br><br> Defendants. | Case No. **2:23–cv–04901 WLH (AGRx)** <br><br> **APPLICATION FOR LEAVE TO FILE UNDER SEAL JOINT APPENDIX OF EVIDENCE (VOL. II) IN CONNECTION WITH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

1

2    **APPLICATION FOR LEAVE TO FILE UNDER SEAL JOINT APPENDIX**

3    **OF EVIDENCE (VOL. II) IN CONNECTION WITH DEFENDANTS'**

4    **MOTION FOR SUMMARY JUDGMENT**

5    Pursuant to the parties' Stipulated Protective Order [**Dkt. 92**, at §12.3] and

6    Civil Local Rule 79-5, Defendants VXN Group LLC and Mike Miller

7    ("Defendants") hereby respectfully apply for leave of Court for an order sealing the

8    Joint Appendix of Evidence (Vol. II) in connection with Defendants' Motion for

9    Summary Judgment, which contains information designated as "confidential" by

10    Plaintiff's counsel, and states as follows:

11    On July 9, 2024, after briefing Plaintiff's privacy concerns, the Court ordered

12    the parties to "file a stipulation and proposed protective order[.]" [**Dkt. 89**, at 4].

13    The parties submitted, [**Dkt. 91**], and the Court entered, a Stipulated Protective

14    Order on July 17. [**Dkt. 92**]. It covers "personal identifying information, financial,

15    and/or proprietary information." *Id.* at § B. On August 29, 2024 this Court entered

16    an order, which, in relevant part, granted "Plaintiff's request to designate

17    documents produced in response to the subpoena to Artists Business Management

18    Group[] as confidential pursuant to the protective order[.]" [**Dkt. 104**, at 3].

19    Larry Lerner, the principal owner of Artists Business Management Group

20    ("ABMG"), and Plaintiff's former accountant, sat for a deposition on September

21    10, 2024. Declaration of Trey Brown in Support of Defendants' Application for

22    Leave to File Under Seal ("**Brown Decl.**"), at ¶ 5. During that deposition, Lerner

23    produced Plaintiff's federal tax returns for the years 2020, 2021, and 2022. *Id.* As

24    noted above, this Court has ordered all documents produced in response to the

25    subpoena served on ABMG as confidential. Defendants, however, intend to attach

26    excerpts from Plaintiff's tax returns, in addition to Form W-9s signed by Plaintiff

27    and produced by Defendants, as exhibits in support of Defendants' Motion for

28    Summary Judgment. *See Adeyemi v. Garland*, No. 21-2107, 2024 WL 3087940, at

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

1

*1 (C.D. Cal. Mar. 26, 2024) (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)) ("There is a strong presumption against filing documents under seal.").

Defendants "may disclose any information or item designated 'CONFIDENTIAL'" to, *inter alia*, "the court and its personnel[.]" [**Dkt. 92** at § 7.2(d)]. "A party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue." *Id.* at § 12.3. When "someone else has designated these documents as confidential pursuant to a protective order," L.R. 79-5.2.2, a specific procedure applies. *See also id.* 79-5.2.2(a)(1) ("That the information may have been designated confidential pursuant to a protective order is not sufficient justification for filing under seal[.]").

> At least 3 days before seeking to file under seal a document containing information previously designated as confidential by another pursuant to a protective order, the Filing Party must confer with the person that designated the material confidential (the "Designating Party") in an attempt to eliminate or minimize the need for filing under seal by means of redaction. If the document cannot be suitably redacted by agreement, the Filing Party may file an Application pursuant to subsection (a), but the supporting declaration must identify the material previously designated as confidential, as well as the Designating Party, and must describe in detail the efforts made to resolve the issue.

L.R. 79-5.2.2(b).

Thus, on October 31, 2024, counsel for the parties conferred on what portions of Plaintiff's tax returns could be redacted. Brown Decl., at ¶ 8. Ultimately, the parties recognized that no agreement would be reached regarding the scope of appropriate redactions, as Plaintiff's counsel insisted that anything related to Plaintiff's personal financial information must be filed under seal. Brown Decl., at ¶ 8, Ex. A. However, Plaintiff's and Defense counsel verbally agreed to stipulate to the filing of documents produced by ABMG under seal. *Id.*

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

As no "suitabl[e]" agreement was reached, Defendants thus proceed under subsection (a) of the Civil Local Rules. That procedure requires that Defendants file an application that "describe the nature of the information that the Filing Party asserts should be closed to public inspection," L.R. 79-5.2.2(a), which must also include a declaration detailing the parties' efforts to resolve the issue, *see id.* 79-5.2.2(a)(i); *id.* 79-5.2.2(b), a proposed order, and both redacted and unredacted copies of the materials. *Id.* 79-5.2.2(a)(ii)–(iv).

Defendants have complied with these formalities, conferred with Plaintiff's counsel, and recommended redactions to the tax records which Plaintiff has rejected. *See id*. As such, Defendants now file this application recounting those steps, along with a proposed order adopting the Defendants' proposed redactions to specific financial and personally identifying information. Brown Decl., at ¶ 9. Both the redacted and unredacted copies of the Joint Appendix of Evidence (Vol. II) in connection with Defendants' Motion for Summary Judgment (*see* Exhibits 44, and 46–48 thereto) have been filed. Brown Decl., ¶ 11, Ex. A. Thus, Defendants seek leave to file the following materials under seal in support of their Motion for Summary Judgment:

| Description | Produced By | Status | Exhibit |
|---|---|---|---|
| Joint Appendix of Evidence (Vol. II) (*see* Exs. 44, 46–48) | Defendants | Confidential | A |

Accordingly, Defendants respectfully request that the Court grant it leave to file the above-listed documents under seal.

Dated: January 10, 2025          Respectfully submitted,

By:  */s/ Trey Brown*
_____
Trey Brown
Brad Kane
Attorneys for Defendants
VXN Group LLC and Mike Miller

# CERTIFICATE OF CONFERRAL

This motion is made following the conference of counsel pursuant to L.R. 79-5 which took place on October 31, 2024.

By:  */s/ Trey Brown*
_____
Trey Brown

# EXHIBIT A

**KANE LAW FIRM**
Brad S. Kane (SBN 151547)
*bkane@kanelaw.la*
1154 S. Crescent Heights. Blvd.
Los Angeles, CA 90035
Tel:  (323) 697-9840; Fax: (323) 571-3579

Trey Brown (SBN 314469)
*trey.brown@vixenmediagroup.com*
11271 Ventura Blvd. #717
Studio City, CA 91604

*Attorneys for Defendants*
VXN GROUP LLC and MIKE MILLER

**BIBIYAN LAW GROUP, P.C.**
David D. Bibiyan (SBN 287811)
*david@tomorrowlaw.com*
Sarah H. Cohen (SBN 330700)
*sarah@tomorrowlaw.com*
1460 Westwood Blvd.
Los Angeles, CA 90024
Tel: (310) 438-5555; Fax: (310) 300-1705

Attorneys for MACKENZIE ANNE THOMA, on behalf of herself
and all others similarly situated

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

| | |
|---|---|
| MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>VXN GROUP, LLC, a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 to 100, inclusive,<br><br>        Defendants. | Case No. **2:23–cv–04901 WLH (AGRx)**<br><br>**JOINT APPENDIX OF EVIDENCE REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**VOLUME II of IV**<br>**Exhibits 18 – 48**<br>**Page 318 – 588**<br><br>**[PUBLIC VERSION of Exhibits 46 - 48]**<br><br>[Filed concurrently with: (1) Notice of Motion and Motion for Summary Judgment; (2) Joint Brief; (3) Joint Appendix of Facts; (4) Joint Appendix of Objections; and (5) Proposed Order]<br><br>Date:        February 28, 2025<br>Time:        11:00 a.m.<br>Courtroom: 9B |

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

# TABLE OF CONTENTS

| Exhibit | VOLUME I of IV (Exhibits 1 – 17) | Page |
|---------|----------------------------------|------|
| 1 | Declaration of Emilie Kennedy | 7 |
| 2 | United States Copyright Registration Certificates | 15 |
| 3 | Scripts from films in which Plaintiff performed | 37 |
| 4 | Screenshots from films in which Plaintiff performed | 117 |
| 5 | July 15, 2022 Production Report | 172 |
| 6 | Statements of Information for VXN Group, LLC | 175 |
| 7 | September 8, 2021 Text Message from Plaintiff re: Vixen Angel Shoot | 179 |
| 8 | Deposition Transcript Excerpts: Basia Lew | 181 |
| 9 | Legislative Intent Service, Inc.: History of The Professional Actor Exemption | 198 |
| 10 | Declaration of Basia Lew | 224 |
| 11 | Project Brief re: Plaintiff's First VXN Scene | 229 |
| 12 | Slack Messages re: Plaintiff's First VXN Scene | 232 |
| 13 | Shooting Schedule for VXN film "Kenzieland" | 281 |
| 14 | DVD Covers Featuring Stills of Plaintiff | 285 |
| 15 | Website Thumbnails Featuring Stills of Plaintiff | 290 |
| 16 | Advertising Uses of Stills Featuring Plaintiff | 307 |
| 17 | Shooting Schedule for April 22, 2022 VXN "Deeper" Film Featuring Plaintiff | 312 |
| Exhibit | VOLUME II of IV (Exhibits 18 – 48) | Page |
| 18 | Declaration of Belen Burditte | 318 |
| 19 | Workers Compensation Insurance Audit Records | 323 |
| 20 | Form 1099-NECs Issued by VXN to Plaintiff | 340 |
| 21 | Record of Payments from VXN to Plaintiff | 344 |

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

| 22 | Declaration of Trey Brown | 346 |
|----|---------------------------|-----|
| 23 | Performance Agreement dated November 11, 2020 | 352 |
| 24 | Addendum to Performance Agreement dated April 15, 2021 | 362 |
| 25 | April 15, 2021 Emails re: Addendum to Performance Agreement | 365 |
| 26 | Performance Agreement dated July 13, 2021 | 370 |
| 27 | Notice of Termination dated September 28, 2022 | 380 |
| 28 | Deposition Transcript Excerpts: Plaintiff | 383 |
| 29 | Deposition Transcript Excerpts: Ryan Murphy | 425 |
| 30 | Screenshot from Kenzieland.com | 455 |
| 31 | "Kenzielandbykenzie" Instagram Profile | 457 |
| 32 | Kenzieland.com Promotion Post by "Kenzielandbykenzie" | 465 |
| 33 | Kenzieland LLC Application to Register a Foreign LLC | 473 |
| 34 | Kenzieland LLC Statements of Information | 476 |
| 35 | Lola March LLC Statements of Information | 480 |
| 36 | Deposition Transcript Excerpts: Larry Lerner | 484 |
| 37 | Text Messages between Plaintiff and Michael Mosney | 489 |
| 38 | Text Messages between Mosney and Ryan Murphy re: Scheduling Plaintiff's Work Dates | 493 |
| 39 | Text Messages between Mosney and Ryan Murphy re: Seeking Approval for Co-Stars | 506 |
| 40 | December 2020 Emails from Chris Applebaum | 517 |
| 41 | Kenzieland.com Film Titles | 526 |
| 42 | List of Plaintiff's Adult Film Credits | 528 |
| 43 | Deposition Transcript Excerpts: Michael Mosney | 536 |
| 44 | Form W-9s Submitted by Plaintiff to VXN (Redacted) | 547 |
| 45 | Declaration of Larry Lerner | 551 |

2

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

| 46 | Redacted Excerpts: Plaintiff's 2020 Federal Tax Return **FILED UNDER SEAL** | 558 |
|----|------------------------------------------------------------------------------|-----|
| 47 | Redacted Excerpts: Plaintiff's 2021 Federal Tax Return **FILED UNDER SEAL** | 568 |
| 48 | Redacted Excerpts: Plaintiff's 2022 Federal Tax Return **FILED UNDER SEAL** | 578 |
| **Exhibit** | **VOLUME III of IV (Exhibits 49 – 63)** <br> **Plaintiff's Exhibits** | **Page** |
| 49 | Deposition Transcript Excerpts: Basia Lew | 589 |
| 50 | SAG-AFTRA Coverage Information | 617 |
| 51 | Declaration of Rafael Yedoyan | 620 |
| 52 | Deposition Transcript Excerpts: Mackenzie Thoma | 624 |
| 53 | Reimbursement Invoices | 643 |
| 54 | Vixen Angel Description | 644 |
| 55 | Vixen Instagram Profile | 646 |
| 56 | Vixen Threads Profile | 648 |
| 57 | Screenshots from Vixen's Website: Description | 650 |
| 58 | Screenshots from Vixen's Website: Angels | 653 |
| 59 | Screenshots from Vixen's Website: Clothing on Sale | 658 |
| 60 | Vixen Threads Profile: Shopping Screenshots | 662 |
| 61 | Emails Between VMG Regarding Travel and Coordination | 664 |
| 62 | Creative & Modeling Photographs Featuring Plaintiff | 671 |
| 63 | Invoice & Planning Documents for Vixen Angel Shoot Featuring Plaintiff | 687 |
| **Exhibit** | **VOLUME IV of IV (Exhibits 64 – 76)** <br> **Plaintiff's Exhibits** | **Page** |
| 64 | Performance Agreement Between Plaintiff & Defendant | 702 |
| 65 | Addendum to Performance Agreement Between Plaintiff & Defendant | 712 |
| 66 | Performance Agreement Between Plaintiff & Defendant (2) | 715 |

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

3

| 67 | Addendum to Performance Agreement Between Plaintiff & Defendant (2) | 725 |
|----|----|----|
| 68 | IWC Order Classifications | 729 |
| 69 | Prop and Set Planning by Defendant | 775 |
| 70 | Defendant's Slack Screenshot Regarding Plaintiff's Social Media | 783 |
| 71 | Email Regarding Plaintiff's Performance Agreement | 786 |
| 72 | Model Record Keeping Form | 788 |
| 73 | Model Release and Grant of Rights | 804 |
| 74 | Declaration of Mackenzie Anne Thoma | 845 |
| 75 | Documents Showing Collaberation Between Eats and Vixen | 848 |
| 76 | Excerpts from the Deposition of Michael Mosny | 853 |

Dated: January 10, 2025    KANE LAW FIRM

By: */s/ Brad Kane*
   Brad S. Kane
   Attorney for Defendants

Dated: January 10, 2025    BIBIYAN LAW GROUP, P.C.

By: */s/ Rafael Yedoyan*
   Rafael Yedoyan
   Attorney for Plaintiff

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

# **EXHIBIT 18**

**KANE LAW FIRM**
Brad S. Kane (SBN 151547)
bkane@kanelaw.la
1154 S. Crescent Heights. Blvd.
Los Angeles, CA 90035
Tel:  (323) 697-9840
Fax: (323) 571-3579

Trey Brown (SBN 314469)
trey.brown@vixenmediagroup.com
11337 Ventura Blvd.
Studio City, CA 91604

*Attorneys for Defendants*
VXN GROUP LLC and MIKE MILLER

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated,<br><br>    Plaintiff,<br>v.<br><br>VXN GROUP LLC, a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 to 100, inclusive,<br><br>    Defendants. | Case No. **2:23–cv–04901 WLH (AGRx)**<br><br>**DECLARATION OF BELEN BURDITTE CERTIFYING DOMESTIC BUSINESS RECORDS**<br><br>Complaint Filed:   April 20, 2023<br>Removed:             June 21, 2023 |

*Left margin:* **KANE LAW FIRM** 1154 S. Crescent Heights Blvd. Los Angeles, CA 90035

DECLARATION OF BELEN BURDITTE CERTIFYING DOMESTIC
BUSINESS RECORDS

I, Belen Burditte, hereby declare as follows:

1.    I am competent to make this declaration. The facts stated within this declaration are within my personal knowledge.

2.    I am Production Accountant for VXN Group, LLC ("VXN"). I am responsible for ensuring that VXN maintains accurate and complete financial records of its regularly conducted film production activities.

3.    I am also VXN's liaison between VXN and our workers compensation insurance provider State Compensation Insurance Fund ("State Fund")[1].

4.    I am responsible for reporting to State Fund all of the income payments that are made to our actors, film production crew, office and remote employees.

5.    Approximately once a year, State Fund conducts audits of the reports we provide them.  They do this to ensure that the information we provide them is accurate.

6.    Even though it is very expensive for VXN, we are classified with State Fund as a Motion Picture Production Company because that is what VXN does as a company.  We create motion pictures.

7.    Our insurance coverage with State Fund has been since the beginning of 2020 to present.

8.    At all times, including when Plaintiff was casted in our motion pictures, we have been classified by State Fund as a Motion Picture Production Company.

9.    At all times that Plaintiff was contracted with VXN, Mackenzie Thoma was classified with State Fund as an actor.

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

---

[1] https://www.statefundca.com/about/fact-sheet/

1

DECLARATION OF BELEN BURDITTE CERTIFYING DOMESTIC BUSINESS RECORDS

10.    The information we submit has been audited twice in that time by State Fund.

11.    The audits have been both in person and at our office and remotely.

12.    The purpose of the audits was to review all job duties of our workers and their on set exposure.  I participated in each of these audits.

13.    The State Fund audit reported that Mackenzie Thoma, among others, was properly classified as an actor. The State Fund audit also acknowledged that VXN's actors were paid on a 1099 basis.

14.    We have also been audited as to whether we are in the correct class with State Fund as a Motion Picture Production Company.

15.    That audit took place on April 9, 2022 when an individual from the Workers' Compensation Insurance Rating Bureau of California (WCIRB) inspected our California operations.  They found the Motion Picture Production Company classification to be accurate.

16.    Attached to this declaration are true and correct records from VXN's Online Account with State Fund.

17.    Also attached to this declaration are true and correct records from VXN's audits with State Fund and WCIRB.  These records have been produced as excerpts and redacted to protect the privacy of the people and entities who work for VXN.

18.    I was also responsible for making payments to Mackenzie Thoma for each of the motion pictures that she was cast in for VXN.

19.    I paid Mackenzie Thoma her rate as set forth in her contract with VXN for each of the motion pictures she acted in for VXN.

20.    Pursuant to Federal Rules of Evidence 803(6) (Records of regularly conducted activity) and 902(11) (Certified domestic records or regularly conducted activity), I hereby certify that the records attached to this declaration were made

2

DECLARATION OF BELEN BURDITTE CERTIFYING DOMESTIC BUSINESS RECORDS

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

1    contemporaneously with the transactions and events stated therein by, or from

2    information transmitted by, someone with knowledge of the facts; were kept by

3    VXN in the course of regularly conducted activity; and were made as part of the

4    regular practice of that activity. The attached records are exact duplicates of the

5    original records.

6

7        I declare under penalty of perjury that the foregoing is true and

8    correct. Executed on September 13, 2024 at Los Angeles, California.

9

10

11                                              Belen Burditte

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

DECLARATION OF BELEN BURDITTE CERTIFYING DOMESTIC
BUSINESS RECORDS

KANE LAW FIRM
11154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

# **EXHIBIT 19**

Policy Information >> Classifications

## Classifications
VXN GROUP LLC

| | |
|---|---|
| Inception Date | 02-07-2020 |
| Expiration Date | 02-07-2021 |
| Anniversary Rating Date | --- |

| | |
|---|---|
| Regional Office | Los Angeles |
| Field Services Office | SC - LOS ANGELES |
| Quote ID | 801615961 |

**Policy Number** ████-2020

**Coverage Period** 02-07-2020 to 02-07-2021 ▾

### Industry Code

Industry Code 78 - MOTION PICTURES

### Classifications

Help

**Endorsed Classifications**

| | Code | Description | Effective |
|---|---|---|---|
| | 8810 (1) | CLERICAL OFFICE EMPLOYEES--N.O.C. | 02-07-2020 |
| Governing | 9610 (1) | MOTION PICTURES--PRODUCTION--IN STUDIOS AND OUTSIDE--ALL EMPLOYEES THE ENTIRE REMUNERATION OF ACTORS, MUSICIANS, PRODUCERS AND THE MOTION PICTURE DIRECTOR SHALL BE INCLUDED SUBJECT TO A MAXIMUM OF $139,100 PER YEAR PER PERSON. WHEN SUCH EMPLOYEES DO NOT WORK THE ENTIRE YEAR, THE PAYROLL LIMITATION SHALL BE PRORATED BASED UPON THE NUMBER OF WEEKS IN WHICH SUCH EMPLOYEES WORKED DURING THE POLICY PERIOD. | 02-07-2020 |

Copyright © 2000-2024 State Compensation Insurance Fund.
Legal Notice & California Privacy Policy

016772



**☎ (888) 782-8338**

**BELEN ▾**

Policy Information >> Classifications

## Classifications
**VXN GROUP LLC**

| | |
|---|---|
| Inception Date 02-07-2021 | Regional Office Los Angeles |
| Expiration Date 02-07-2022 | Field Services Office SC - LOS ANGELES |
| Anniversary Rating Date --- | Quote ID 801867152 |

**Policy Number** 9‌‌‌‌‌2021

**Coverage Period** 02-07-2021 to 02-07-2022    ▼

### Industry Code

Industry Code 78 - MOTION PICTURES

### Classifications                                                                          Help

#### Endorsed Classifications

| | Code | Description | Effective |
|---|---|---|---|
| | 8810 (1) | CLERICAL OFFICE EMPLOYEES--N.O.C. | 02-07-2020 |
| | 8871 (1) | CLERICAL TELECOMMUTER EMPLOYEES--N.O.C. | 02-07-2021 |
| Governing | 9610 (1) | MOTION PICTURES--PRODUCTION--IN STUDIOS AND OUTSIDE--ALL EMPLOYEES THE ENTIRE REMUNERATION OF ACTORS, MUSICIANS, PRODUCERS AND THE MOTION PICTURE DIRECTOR SHALL BE INCLUDED SUBJECT TO A MAXIMUM OF $139,100 PER YEAR PER PERSON. WHEN SUCH EMPLOYEES DO NOT WORK THE ENTIRE YEAR, THE PAYROLL LIMITATION SHALL BE PRORATED BASED UPON THE NUMBER OF WEEKS IN WHICH SUCH EMPLOYEES WORKED DURING THE POLICY PERIOD. | 02-07-2020 |

Copyright © 2000-2024 State Compensation Insurance Fund.
Legal Notice & California Privacy Policy

016773



📞 (888) 782-8338

QUOTE    POLICY ▼    CLAIMS ▼    SAFETY SERVICES ▼    MORE ▼

🔔    BELEN ▼

Policy Information >> Classifications

## Classifications
**VXN GROUP LLC**

| | |
|---|---|
| Inception Date 02-07-2022 | Regional Office Los Angeles |
| Expiration Date 02-07-2023 | Field Services Office SC - LOS ANGELES |
| Anniversary Rating Date --- | Quote ID 700070169 |

**Policy Number** 926▮▮-2022

**Coverage Period** 02-07-2022 to 02-07-2023 ▼

### Industry Code

Industry Code 78 - MOTION PICTURES

### Classifications                                                                                    Help

### Endorsed Classifications

| | Code | Description | Effective |
|---|---|---|---|
| | 8810 (1) | CLERICAL OFFICE EMPLOYEES--N.O.C. | 02-07-2022 |
| | 8871 (1) | CLERICAL TELECOMMUTER EMPLOYEES--N.O.C. | 02-07-2022 |
| Governing | 9610 (1) | MOTION PICTURES--PRODUCTION--IN STUDIOS AND OUTSIDE--ALL EMPLOYEES THE ENTIRE REMUNERATION OF ACTORS, MUSICIANS, PRODUCERS AND THE MOTION PICTURE DIRECTOR SHALL BE INCLUDED SUBJECT TO A MAXIMUM OF $144,300 PER YEAR PER PERSON. WHEN SUCH EMPLOYEES DO NOT WORK THE ENTIRE YEAR, THE PAYROLL LIMITATION SHALL BE PRORATED BASED UPON THE NUMBER OF WEEKS IN WHICH SUCH EMPLOYEES WORKED DURING THE POLICY PERIOD. | 02-07-2022 |

Copyright © 2000-2024 State Compensation Insurance Fund.
Legal Notice & California Privacy Policy

016774



ORIGINAL



**STATE COMPENSATION INSURANCE FUND**

QUOTE    POLICY ▾    CLAIMS ▾    SAFETY SERVICES ▾    MORE ▾

📞 (888) 782-8338

🔔    BELEN ▾

Policy Information >> Classifications

## Classifications
**VXN GROUP LLC**

|  |  |
|---|---|
| Inception Date 02-07-2023 | Regional Office Los Angeles |
| Expiration Date 02-07-2024 | Field Services Office SC - LOS ANGELES |
| Anniversary Rating Date --- | Quote ID 802286272 |

**Policy Number** 92    2023

**Coverage Period** 02-07-2023 to 02-07-2024  ▼

### Industry Code

Industry Code 78 - MOTION PICTURES

### Classifications                                                Help

#### Endorsed Classifications

|  | Code | Description | Effective |
|---|---|---|---|
|  | 8810 (1) | CLERICAL OFFICE EMPLOYEES--N.O.C. | 02-07-2023 |
|  | 8871 (1) | CLERICAL TELECOMMUTER EMPLOYEES--N.O.C. | 02-07-2023 |
| Governing | 9610 (1) | MOTION PICTURES--PRODUCTION--IN STUDIOS AND OUTSIDE--ALL EMPLOYEES THE ENTIRE REMUNERATION OF ACTORS, MUSICIANS, PRODUCERS AND THE MOTION PICTURE DIRECTOR SHALL BE INCLUDED SUBJECT TO A MAXIMUM OF $149,500 PER YEAR PER PERSON. WHEN SUCH EMPLOYEES DO NOT WORK THE ENTIRE YEAR, THE PAYROLL LIMITATION SHALL BE PRORATED BASED UPON THE NUMBER OF WEEKS IN WHICH SUCH EMPLOYEES WORKED DURING THE POLICY PERIOD. | 02-07-2023 |

Copyright © 2000-2024 State Compensation Insurance Fund.
Legal Notice & California Privacy Policy

016775



**(888) 782-8338**

QUOTE    POLICY ▾    CLAIMS ▾    SAFETY SERVICES ▾    MORE ▾

BELEN ▾

Policy Information >> Classifications

## Classifications
**VXN GROUP LLC**

| | |
|---|---|
| Inception Date | 02-07-2024 |
| Expiration Date | 02-07-2025 |
| Anniversary Rating Date | --- |

| | |
|---|---|
| Regional Office | Los Angeles |
| Field Services Office | SC - LOS ANGELES |
| Quote ID | 802568091 |

**Policy Number** ████74-2024

**Coverage Period** 02-07-2024 to 02-07-2025  ▼

### Industry Code

Industry Code 78 - MOTION PICTURES

### Classifications

Help

### Endorsed Classifications

| | Code | Description | Effective |
|---|---|---|---|
| | 8810 (1) | CLERICAL OFFICE EMPLOYEES--N.O.C. | 02-07-2024 |
| | 8871 (1) | CLERICAL TELECOMMUTER EMPLOYEES--N.O.C. | 02-07-2024 |
| Governing | 9610 (1) | MOTION PICTURES--PRODUCTION--IN STUDIOS AND OUTSIDE--ALL EMPLOYEES THE ENTIRE REMUNERATION OF ACTORS, MUSICIANS, PRODUCERS AND THE MOTION PICTURE DIRECTOR SHALL BE INCLUDED SUBJECT TO A MAXIMUM OF $154,700 PER YEAR PER PERSON. WHEN SUCH EMPLOYEES DO NOT WORK THE ENTIRE YEAR, THE PAYROLL LIMITATION SHALL BE PRORATED BASED UPON THE NUMBER OF WEEKS IN WHICH SUCH EMPLOYEES WORKED DURING THE POLICY PERIOD. | 02-07-2024 |

Copyright © 2000-2024 State Compensation Insurance Fund.
Legal Notice & California Privacy Policy

016776

| Name: | VXN GROUP LLC | | Carrier: | STATE COMPENSATION INSURANCE FUND | | Policy dt: | 2/7/2021 - 2/7/2022 |
|---|---|---|---|---|---|---|---|
| Pol/Acc WC-9269974-2021- --22 \| 9269974 | | Audit ID: 12683903 | Auditor: | 2245 - Christine ███████ | | Audit dt: | 2/7/2021 - 2/7/2022 |

| ID | Name | Class Combo | Exposure | 2/7-3/31/21 | 4/1-6/30/21 | 7/1-9/30/21 | 10/1-12/31/21 | 1/1-2/6/22 | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████owel | WC-9269974-2021- --2 | Other Remuneratio | | | | | 300 | | | | | | | | 300 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Campbell | WC-9269974-2021- --2 | Other Remuneratio | | | | | 1,600 | | | | | | | | 1,600 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Bell | WC-9269974-2021- --2 | Other Remuneratio | | | | | 850 | | | | | | | | 850 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Evans | WC-9269974-2021- --2 | Other Remuneratio | | | | | 400 | | | | | | | | 400 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Swanson dba ██████ouses | WC-9269974-2021- --2 | Other Remuneratio | | | | | 2,900 | | | | | | | | 2,900 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Banuelos ██████ dba 2██████ | WC-9269974-2021- --2 | Other Remuneratio | | | | | 23,500 | | | | | | | | 23,500 |
| actor; 10 weeks worked- under threshold | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | LLC ████Doudna | WC-9269974-2021- --2 | Other Remuneratio | | | | | 1,000 | | | | | | | | 1,000 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Turcios | WC-9269974-2021- --2 | Other Remuneratio | | | | | 300 | | | | | | | | 300 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Maetnyi dba ██████ | WC-9269974-2021- --2 | Other Remuneratio | | | | | 2,300 | | | | | | | | 2,300 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Pollock dba ██████ | WC-9269974-2021- --2 | Other Remuneratio | | | | | 1,500 | | | | | | | | 1,500 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | Mackenzie Anne Thoma | WC-9269974-2021- --2 | Other Remuneratio | | | | | 39,500 | | | | | | | | 39,500 |
| actor; 9 weeks | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | Mackenzie Anne Thoma | WC-9269974-2021- --2 | Other Remuneratio | | | | | -15,425 | | | | | | | | -15,425 |
| 9 weeks worked- adjusted based on proration | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Zoeller | WC-9269974-2021- --2 | Other Remuneratio | | | | | 1,400 | | | | | | | | 1,400 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Sokolowski | WC-9269974-2021- --2 | Other Remuneratio | | | | | 1,500 | | | | | | | | 1,500 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████ Johanon | WC-9269974-2021- --2 | Other Remuneratio | | | | | 5,400 | | | | | | | | 5,400 |
| actor; 3 weeks worked- under threshold | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Prive - ███ Holdings | WC-9269974-2021- --2 | Other Remuneratio | | | | | 1,200 | | | | | | | | 1,200 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |
| | ███████Mattioli | WC-9269974-2021- --2 | Other Remuneratio | | | | | 1,500 | | | | | | | | 1,500 |
| actor | | 9610(1) 0-CA-0  MOTION PICTURES-PRODUCTION | | | | | | | | | | | | | | |

Audited by: STATE COMPENSATION INSURANCE FUND on 09/21/2022

016777

4770302-WcAT

| Name | Amount |
|---|---|
| ████ Deere ████ 21 | 1200 |
| ████ Jones /IN: ████ | 1000 |
| ████ Fong /IN: 03█ | 1500 |
| ██ Johnson /IN: 07█ | 2000 |
| ████ Martinez /IN: 051█ | 5100 |
| ████ Elmore /IN: 041█ | 1400 |
| ██ Cowel /IN: 051█ | 300 |
| ████ Campbell /IN: 110 | 1600 |
| ██ Bell /IN: 071█ | 350 |
| ██ Bell /IN: 101█ | 500 |
| ██ Evans /IN: 020█ | 100 |
| ██ Evans /IN: 020█ | 400 |
| ██ Evans /IN: 020█ | 200 |
| ██ Evans /IN: 031█ | 1300 |
| ██ Evans /IN: 042█ | 1000 |
| ██ Evans /IN: 121█ | 1000 |
| ████ Swanson dba ████ | 1200 |
| ██ Banuelos ████ | 1500 |
| ████ Banuelos ████ | 3800 |
| ██ Banuelos ████ | 1500 |
| ██ Banuelos ████ | 13600 |
| LLC - ██ Doudna /IN: 2021- | 1000 |
| ██ Turcios /IN: 051█ | 300 |
| ████ Maetnyi dba ████ Corp / | 2300 |
| Mackenzie Anne Thoma | 1000 |
| Mackenzie Anne Thoma /IN: | 13000 |
| Mackenzie Anne Thoma /IN: 022721 | 15000 |
| Mackenzie Anne Thoma /IN: 040121 | 3000 |
| Mackenzie Anne Thoma /IN: 062921 | 1500 |
| Mackenzie Anne Thoma /IN: 072821 | 1500 |
| Mackenzie Anne Thoma /IN: 072921 | 3100 |
| ████ Zoeller /IN: | 1400 |
| ██ Sokolowski /IN: 090█ | 1500 |
| ████ Johanson /IN: 062 | 1800 |
| ████ Johanson /IN: 062█ | 1900 |
| ████ Johanson /IN: 0701 | 1700 |
| ████ Prive - ██ Holdings /IN: 031 | 1200 |
| ██ Mattioli /IN: 081█ | 1500 |
| ████ Pabon /IN: 030█ | 1300 |
| ████ Pabon /IN: 031█ | 1000 |
| ████ Pabon /IN: 090█ | 1300 |
| ██ Hase /IN: 042█ | 1500 |
| ████ /IN: 042█ | 250 |
| ████ /IN: 0515 | 300 |



Audited  by:  STATE  COMPENSATION  INSURANCE  FUND  on  09/21/2022    016778    4770302-WcAT / Content Talent 2021 Pivot Table-VXN / Sheet1 / Page (16 of 36)

Page 330 of 857 _ Joint MSJ Appendix

Name: VXN GROUP LLC    Case 2:23-cv-04901-WLH-AGR    Document 184   Carrier: STATE COMPENSATION   Filed 01/10/25   Page 26 of 252   Page

Policy: WC-9269974-2021- ---22    Audit ID: 12683903   Auditor: 2245 - Christine ████    Pol dt: 2/7/2021 - 2/7/2022

CONFIDENTIAL

| | | |
|---|---|---|
| 41 | ████ Productions LLC | 1,600.00 |
| 42 | ████ Productions LLC | 1,600.00 |
| 43 | ████es Inc | 2,000.00 |
| 44 | ████es Inc | 2,000.00 |
| 45 | ████es Inc | 2,000.00 |
| 46 | ████ Inc. - ████ Priebe | 1,000.00 |
| 47 | ████ Slayher ████ LLC | 1,200.00 |
| 48 | ████ Garrett | 1,600.00 |
| 49 | Mackenzie Anne Thoma | 15,000.00 |
| 50 | ████ Bobyn | 2,000.00 |
| 51 | ████ Bowser | 1,600.00 |
| 52 | ████ Jones | 1,000.00 |
| 53 | ████ Media LL REF: 0000████ - BATC | 9,230.00 |
| 54 | ████ Flynn | 1,600.00 |
| 55 | ████ Hodge | 1,100.00 |
| 56 | ████ Burnett | 2,500.00 |
| 57 | ████ Schneid | 1,500.00 |
| 58 | ████ Meilleur | 1,000.00 |
| 59 | ████ Solutions (Euro) | 29,554.04 |
| 60 | ████ James - ████ Legacy | 1,200.00 |
| 61 | ████ Skeirik | 1,100.00 |
| 62 | ████ LLC | 1,000.00 |
| 63 | ████ James - ████ Legacy C | 1,200.00 |
| 64 | ████ Yniguez | 1,200.00 |
| 65 | ████ Bobyn | 2,050.00 |
| 66 | ████ Cumming | 1,200.00 |
| 67 | ████ Pabon | 1,300.00 |
| 68 | ████ Productions LLC | 1,600.00 |
| 69 | ████ Productions LLC | 1,600.00 |
| 70 | ████ Productions LLC | 1,600.00 |
| 71 | ████es Inc | 6,000.00 |
| 72 | ████ LLC - ████ Doudna | 1,000.00 |
| 73 | ████ Douglas | 1,000.00 |
| 74 | ████ Douglas | 1,000.00 |
| 75 | ████ Couture | 1,200.00 |
| 76 | ████ Banuelos ████ B M | 2,800.00 |
| 77 | ████ Dobrochinkski | 350 |
| 78 | ████ Creech ████ | 1,500.00 |
| 79 | ████ Worley | 1,600.00 |
| 80 | ████ Rodriquez ████ | 1,300.00 |
| 81 | ████ Delong | 1,600.00 |
| 82 | ████ Fosmire (████ | 1,000.00 |
| 83 | ████ Perlutter dba ████ | 1,000.00 |
| 84 | ████ Cianci dba ████ LLC | 1,000.00 |

Audited by: STATE COMPENSATION INSURANCE FUND on 09/21/2022    016779    4770302-WcAT / Content Talent 2021 Pivot Table-VXN / Sheet2 / Page (20 of 36)

Page 331 of 857 _ Joint MSJ Appendix

CONFIDENTIAL
CNF#03728

| # | Name | Amount | |
|---|---|---|---|
| 173 | Waters | 1,200.00 | |
| 174 | Productions LLC | 1,600.00 | |
| 175 | Productions LLC | 1,600.00 | |
| 176 | Productions LLC | 1,600.00 | |
| 177 | Productions LLC | 1,600.00 | |
| 178 | Johnson | 800 | |
| 179 | Flores | 250 | |
| 180 | Jordan | 250 | |
| 181 | Brower | 250 | |
| 182 | Phan | 250 | |
| 183 | es Inc | 2,000.00 | |
| 184 | es Inc | 2,000.00 | |
| 185 | es Inc | 2,000.00 | |
| 186 | LLC - Doudna | 1,000.00 | |
| 187 | Productions ( | 1,200.00 | |
| 188 | McKenzie. | 1,500.00 | |
| 189 | Media LL REF: 00000 | | 9300 |
| 190 | Castro | 250 | |
| 191 | Lane dba Media | 1,200.00 | |
| 192 | Hernandez | 1,200.00 | |
| 193 | Solutions (Euro) | 84.14 | |
| 194 | Mackenzie Anne Thoma | 500 | |
| 195 | Mackenzie Anne Thoma | 3,500.00 | |
| 196 | Conrad ( | 2,500.00 | |
| 197 | McKenzie. | 4,000.00 | |
| 198 | Howell | 4,000.00 | |
| 199 | Williams | 1,000.00 | |
| 200 | Rosario dba | 300 | |
| 201 | Martin | 300 | |
| 202 | Niemi | 300 | |
| 203 | Cowel | 300 | |
| 204 | Dukeman | 300 | |
| 205 | Aguilar | 300 | |
| 206 | Productions LLC | 4,800.00 | |
| 207 | es Inc | 2,000.00 | |
| 208 | es Inc | 2,000.00 | |
| 209 | es Inc | 2,000.00 | |
| 210 | King | 300 | |
| 211 | Puignau dba | 1,600.00 | |
| 212 | Herschfelt | 1,200.00 | |
| 213 | Slayher LLC | 1,500.00 | |
| 214 | Martinez | 5,100.00 | |
| 215 | Vega | 1,000.00 | |
| 216 | McKenzie. | 4,000.00 | |

Audited by: STATE COMPENSATION INSURANCE FUND on 09/21/2022    016780    4770302-WcAT / Content Talent 2021 Pivot Table-VXN / Sheet2 / Page (23 of 36)

Page 332 of 857 _ Joint MSJ Appendix

Name: VXN GROUP LLC · Case 2:23-cv-04901-WLH-AGR Carrier: STATE COMPENSATION INSURANCE FUND
Document 131 Filed 01/10/25 Page 28 of 252 Page

Policy: WC-9269974-2021- ---22 · Audit ID: 12693109 · 2245 - Christine · Pol dt: 2/7/2021 - 2/7/2022

CONFIDENTIAL

| 261 | Leitner dba LLC | 1,500.00 | |
| 262 | Oxley | 2,200.00 | |
| 263 | King dba | 250 | |
| 264 | Williams | 1,000.00 | |
| 265 | Douglas | 3,500.00 | |
| 266 | Slayher LLC | 1,200.00 | |
| 267 | Rother | 1,300.00 | |
| 268 | Brooker dba LLC | 1,800.00 | |
| 269 | Britos | 1,300.00 | |
| 270 | Solutions (Euro) | 25,701.41 | |
| 271 | Slayher LLC | 1,200.00 | |
| 272 | Johanson | 1,800.00 | |
| 273 | Puignau dba | 1,100.00 | |
| 274 | Antle | 2,500.00 | |
| 275 | Bosher | 1,000.00 | |
| 276 | Douglas | 1,400.00 | |
| 277 | Douglas | 1,400.00 | |
| 278 | Douglas | 700 | |
| 279 | Johanson | 1,900.00 | |
| 280 | Mackenzie Anne Thoma | 1,500.00 | |
| 281 | Treglio | 1,000.00 | |
| 282 | es Inc | 2,000.00 | |
| 283 | es Inc | 2,000.00 | |
| 284 | es Inc | 2,000.00 | |
| 285 | Williams | 1,000.00 | |
| 286 | Productions LLC | 4,800.00 | |
| 287 | Media LL REF: 00000 | | 3050 |
| 288 | Johanson | 1,700.00 | |
| 289 | Johnson | 1,100.00 | |
| 290 | Janetsian | 1,400.00 | |
| 291 | Star Solutions (Euro) | 57,493.75 | |
| 292 | Brooker (Haley Reed) | 1,500.00 | |
| 293 | Barker | 1,700.00 | |
| 294 | Janetsian | 300 | |
| 295 | Modeling | 200 | |
| 296 | Modeling | 200 | |
| 297 | Williams | 1,000.00 | |
| 298 | Williams | 1,000.00 | |
| 299 | LLC - Doudna | 1,000.00 | |
| 300 | Douglas | 1,400.00 | |
| 301 | Douglas | 1,400.00 | |
| 302 | Douglas | 700 | |
| 303 | Inc | 6,000.00 | |
| 304 | Sherwood | 750 | |

Audited by: STATE COMPENSATION INSURANCE FUND on 09/21/2022 · 016781 · 4770302-WcAT / Content Talent 2021 Pivot Table-VXN / Sheet2 / Page (25 of 36)

Page 333 of 857 _ Joint MSJ Appendix

STATE COMPENSATION INSURANCE FUND
CONFIDENTIAL

| | | | |
|---|---|---|---|
| 305 | ███ Sherwood | 4,000.00 | |
| 306 | ███ Sherwood | 750 | |
| 307 | ███ Sherwood | 750 | |
| 308 | ███ Sherwood | 750 | |
| 309 | Banuelos ( | 500 | |
| 310 | ███ Vitale dba ███ | 950 | |
| 311 | ███ Bell | 350 | |
| 312 | ███ Trouselle | 500 | |
| 313 | ███ Entertainment | 500 | |
| 314 | ███ Vitale dba ███ | | 950 |
| 315 | ███ Vitale dba ███ In | 950 | |
| 316 | ███ Johnson | 2,000.00 | |
| 317 | ███ Maetnyi dba ███ / | 2,300.00 | |
| 318 | ███ LLC - ███ Marion | 1,500.00 | |
| 319 | ███ Banuelos ( ███ 3 M | 1,500.00 | |
| 320 | ███ Tena | 2,000.00 | |
| 321 | ███ LLC - ███ Hancock | 1,500.00 | |
| 322 | ███ Enterprise Inc - ███ | 1,200.00 | |
| 323 | Mackenzie Anne Thoma | 1,500.00 | |
| 324 | ███ Coryell | 400 | |
| 325 | ███ James - ███ Legacy | 1,500.00 | |
| 326 | Mackenzie Anne Thoma | 3,100.00 | |
| 327 | ███ ces Inc | 2,000.00 | |
| 328 | ███ ces Inc | 2,000.00 | |
| 329 | ███ ces Inc | 2,000.00 | |
| 330 | ███ Douglas | 700 | |
| 331 | ███ Douglas | 2,800.00 | |
| 332 | ███ Banuelos ( ███ 3 M | 7,500.00 | |
| 333 | ███ Enterprise Inc - ███ | 1,200.00 | |
| 334 | ███ James - ███ Legacy | 1,500.00 | |
| 335 | ███ ru Inc | 1,500.00 | |
| 336 | ███ Peterson | 300 | |
| 337 | ███ Inc. - ███ Jeannin | 5,000.00 | |
| 338 | ███ Inc. - ███ Jeannin | 500 | |
| 339 | ███ Toler dba ███ Corp | 1,000.00 | |
| 340 | ███ Media LL REF: 00000█ | | 12600 |
| 341 | ███ Media LL REF: 00000█ | | 775 |
| 342 | ███ Media LL REF: 00000█ | 10000 | |
| 343 | ███ Flynn | 1,600.00 | |
| 344 | ███ Flynn | 1,600.00 | |
| 345 | ███ Banuelos ███ | 500 | |
| 346 | ███ Nobles | 350 | |
| 347 | ███ Hill | 350 | |
| 348 | ███ Cuculich dba ███ | 500 | |

| | | |
|---|---:|---|
| Pabon | 1000 | |
| Hase | 1500 | |
| Engst | 300 | |
| Engst | 250 | |
| McKenzie. | 5500 | |
| McKenzie. | 4000 | |
| Jordan | 250 | |
| Inc. - Correro | 2800 | |
| LLC - Marion | 1500 | |
| et | 68006.95 | Exclude |
| (Euro) | 84.14 | Exclude |
| (Euro) | 29554.04 | Exclude |
| (Euro) | 21776.05 | Exclude |
| (Euro) | 109678.52 | Exclude |
| (Euro) | 57493.75 | Exclude |
| (Euro) | 47659.74 | Exclude |
| (Euro) | 42652.96 | Exclude |
| Kft (US) / | 4000 | Exclude |
| Herschfelt | 1200 | |
| Rother | 1300 | |
| Montesi | 350 | |
| Habig (Texas | 1000 | |
| Nobles | 350 | |
| Sanchez | 1500 | |
| Modeling | 200 | Agency Fee for OC M |
| Modeling | 200 | |
| Rodriquez | 1000 | |
| Rodriquez | 1300 | |
| Gonia | 1000 | |
| Gonia dba Inc | 1000 | |
| Fan dba Media | 10700 | |
| Fan dba Media | 1500 | |
| Sage | 1700 | |
| Flynn | 4800 | |
| Sullivan dba LLC | 1500 | |
| Janetsian | 1400 | |
| Janetsian | 1700 | |
| Caro dba | 1000 | |
| Caro dba | 2200 | |
| Flores | 250 | |
| Productions ( Ramirez) | 1500 | |
| LLC - Hancock | 1500 | |
| Rau | 3000 | |
| Hafkemeyer | 1500 | |

016783

Audited by: STATE COMPENSATION INSURANCE FUND on 09/21/2022    4770302-WcAT / Content Talent 2021 Pivot Table-VXN / Sheet2 / Page (33 of 36)
Page 535 of 837 _ Joint MSJ Appendix

| | |
|---|---|
| Bowser | 1700 |
| Cumming | 1200 |
| RX Inc | 1800 |
| Khadjaev dba | 1000 |
| Khadjaev dba | 2900 |
| O Moon | 3000 |
| Murray | 350 |
| Oxley | 2200 |
| Castro | 250 |
| Leitner dba LLC | 1500 |
| Deere | 1200 |
| Jones | 1000 |
| Fong | 1500 |
| Johnson | 2000 |
| Martinez | 5100 |
| Elmore | 1400 |
| Cowel | 300 |
| Campbell | 1600 |
| Bell | 850 |
| Evans | 400 |
| Evans | 300 |
| Evans | 1000 |
| Evans | 1300 |
| Evans | 1000 |
| Swanson dba | 1200 |
| Banuelos | 1500 |
| Banuelos ( | 3800 |
| Banuelos ( X3 | 1500 |
| Banuelos ( X3 M | 13600 |
| LLC - Doudna | 1000 |
| Turcios | 300 |
| Maetnyi dba Corp / | 2300 |
| Mackenzie Anne Thoma | 1000 |
| Mackenzie Anne Thoma | 16500 |
| Mackenzie Anne Thoma | 8600 |
| Mackenzie Anne Thoma | 8000 |
| Mackenzie Anne Thoma | 4000 |
| Zoeller | 1400 |
| Sokolowski | 1500 |
| Johanson | 5400 |
| Prive - Holdings | 1200 |
| Mattioli | 1500 |
| Pabon | 1300 |
| Pabon | 1300 |

Audited by: STATE COMPENSATION INSURANCE FUND on 09/21/2022    016784    4770302-WcAT / Content Talent 2021 Pivot Table-VXN / Sheet2 / Page (32 of 36)

Page 336 of 857 _ Joint MSJ Appendix

## WCIRB Classification Inspection Report



**Inspected Operations - Production Employees**

**Class code**     **9610(00)**

| | |
|---|---|
| Key Factors for Class Assignment | • Produces motion pictures, television features, commercials, music videos, videotaped depositions, videotaped court proceedings or industrial films that are recorded on motion picture film stock, videotape, digital or other media |
| Type of Customer | • General public |
| Finished Products, Goods or | • *Produces*:<br>   Media content |
| Where Operations are Performed | • Customer specified locations / mobile |
| Raw Materials | • Digital recording media |
| Processes | • Performs according to script to present material |
| | • Instructs actors/actresses and other personnel in performance of script |
| | • Records production on selected media |
| | • Moves equipment and materials around set |
| | • Constructs sets and backdrops |
| | • Controls audio aspects of production |
| | • Controls production lighting |
| | • Determines 'look' of production, including clothing, make-up, hair styles and similar aspects |
| | • Applies make-up and prosthetics to performers |
| | • Styles actors/actresses hair or apply wigs to achieve desired look |
| | • Provides meals and snacks during production |
| | • Ensures that only authorized personnel are allowed on set |
| | • Visits production sites to oversee operations |
| | • Oversees all financial and creative aspects of production |
| | • Directs / supervises employees |
| | • Camera dollies |
| | • Cameras |
| Tools/ Equipment | • Hand tools |
| | • Lighting equipment |
| | • Sound recording equipment |

## WCIRB Classification Inspection Report  

### References

| | |
|---|---|
| **WCIRB Assigned Classifications** | The Standard Classification System for reporting workers' compensation insurance information to the WCIRB is defined in the California Workers' Compensation Uniform Statistical Reporting Plan—1995 (USRP). The USRP has been approved by the Insurance Commissioner and is incorporated by reference into Title 10 of the California Code of Regulations at Section 2318.6. The WCIRB is bound by the USRP and does not have discretion to deviate from its express provisions. As part of the California Code of Regulations, the rules of the USRP have the force and effect of statute.<br><br>Classification assignments are based on the pure premium rates and USRP provisions in effect at the time the inspection report is issued. |
| **Est. EE's** | Estimated employee counts are based on verbal estimates at the time of the inspection. |
| **Est. P/R** | Payroll estimates are based on verbal estimates at the time of the inspection. Actual amounts are determined by the insurer at the time of final premium audit. |
| **Clerical Office Employees** | USRP - Part 3 - Standard Classification System<br>Section VII - Standard Classifications<br><br>CLERICAL OFFICE EMPLOYEES - N.O.C.<br><br>Assignment of this classification is subject to the Standard Exceptions rule. See Part 3, Section III, Rule 4, Standard Exceptions.<br><br>Clerical office employees who work more than 50% of their time at their home or other office space away from any location of their employer shall be classified as 8871, Clerical Telecommuter Employees. |
| **Clerical Telecommuter Employees** | USRP - Part 3 - Standard Classification System<br>Section VII - Standard Classifications<br><br>CLERICAL TELECOMMUTER EMPLOYEES - N.O.C.<br><br>This classification applies to Clerical Office Employees who work more than 50% of their time at their home or other office space away from any location of their employer.<br><br>Assignment of this classification is subject to the Standard Exceptions rule. See Part 3, Section III, Rule 4, Standard Exceptions. |
| **Motion Pictures-production** | USRP - Part 3 - Standard Classification System<br>Section VII - Standard Classifications<br><br>MOTION PICTURES - production - in studios and outside - all employees<br><br>The entire remuneration of actors, musicians, producers and the motion picture director shall be included subject to a maximum of $144,300 per year per person. When such employees do not work the entire year, the payroll limitation shall be prorated based upon the number of weeks in which such employees worked during the policy period.<br><br>This classification applies to companies that specialize in the production of motion pictures, television features, commercials, music videos, videotaped depositions, videotaped court proceedings or industrial films that are recorded on motion picture film stock, videotape, digital or other media.<br><br>Employees engaged exclusively in the electronic editing of digital files using computerized editing equipment are assignable to Classification 8810, Clerical Office Employees, subject to the Standard Exceptions rule. See Section III, Rule 4, Standard Exceptions.<br><br>Employees who create animation using computer or digital applications are assignable to Classification 8810, Clerical Office Employees, subject to the Standard Exceptions rule. See Section III, Rule 4, Standard Exceptions.<br><br>The payroll limitation of this classification is applicable to the director responsible for all aspects of production. The payroll for all other directors such as assistant and associate directors is not subject to |

## WCIRB Classification Inspection Report

**WCIRB** California
Objective. Trusted. Integral.

limitation.

The payroll limitation also applies to motion picture producers responsible for overseeing the financial, administrative or creative aspects of a motion picture.

Specific

USRP - Part 3 - Standard Classification System
Section III – General Classification Procedures
Rule 1 Classification Description, Paragraph a

Any business or operation specifically described by a classification shall be assigned to that classification.

Standard Exception

USRP - Part 3 - Standard Classification System
Section III – General Classification Procedures
Rule 4 Standard Exceptions (pertinent parts only)

Employees engaged in the clerical office or outside sales functions described below are referred to as Standard Exception Employees. If a standard classification specifically includes Clerical Office Employees, Clerical Telecommuter Employees or Outside Salespersons, such employees shall be assigned to the standard classification, regardless of whether the work is conducted at the same or at a separate location. It is not permissible to divide a single employee's payroll, within a single policy period, between a Standard Exception classification and any other classification, including another Standard Exception classification, with the exception of a single permanent job reassignment.

# **EXHIBIT 20**

**Top Left Form (1099-NEC)**

| Field | Value |
|---|---|
| 1 Nonemployee compensation | $ 1000.00 |
| 4 Federal income tax withheld | $ |

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

VXN GROUP LLC

11337 VENTURA BLVD

STUDIO CITY

(332) 791-4186

PAYER'S TIN

RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code

Account number (See instructions) — FATCA filing requirement

| 5 State tax withheld | 6 State/Payer's state no. | 7 State income |
|---|---|---|
| $ | CA /123-5997-2 | $ |
| $ | | $ |

2020 Form **1099-NEC**    Copy 1 For State Tax Department

**Top Right Form (1099-NEC)**

| Field | Value |
|---|---|
| 1 Nonemployee compensation | 1500.00 |
| 4 Federal income tax withheld | $ |

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

p ;t ; ; ; .LLC

§1337 VENTURA BLV.D::7

STUDIO CITY    CA    91604

(332) 791-4186

PAYER'S TIN
84-3988614

RECIPIENT'S TIN

Account number (See instructions) — FATCA filing requirement

| 5 State tax withheld | 6 State/Payer's state no. | 7 State income |
|---|---|---|
| $ | CA /123-5997-2 | $ |
| $ | | $ |

2020 Form **1099-NEC**    Copy 1 For State Tax Department

Aatrix Rev. 1/11/21

**Bottom Left Form (1099-NEC)**

☐ VOID    ☐ CORRECTED

| Field | Value |
|---|---|
| 1 Nonemployee compensation | $ 10000.00 |
| 4 Federal income tax withheld | $ |

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

VXN GROUP LLC

11337 VENTURA BLVD

STUDIO CITY    CA    91604

(332) 791-4186

| PAYER'S TIN | RECIPIENT'S TIN |
|---|---|
| 84-3988614 | 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 |

RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code

MACKENZIE ANNE THOMA

4324 PROMENADE WAY #314

MARINA DEL REY    CA    90292

Account number (See instructions) — FATCA filing requirement

| 5 State tax withheld | 6 State/Payer's state no. | 7 State income |
|---|---|---|
| $ | CA, f123-5997-2 | |
| $ | | $ |

2020 Form **1099-NEC**    Copy 1 For State Tax Department

**Bottom Right Form (1099-NEC)**

☐ VOID    ☐ CORRECTED

| Field | Value |
|---|---|
| 1 Nonemployee compensation | $ 1500.00 |
| 4 Federal income tax withheld | $ |

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

VXN GROUP LLC

11337 VENTURA BLVD

STUDIO CITY    CA    91604

(332) 791-4186

| PAYER'S TIN | RECIPIENT'S TIN |
|---|---|
| 84-3988614 | |

Account number (See instructions) — FATCA filing requirement

| 5 State tax withheld | 6 State/Payer's state no. | 7 State income |
|---|---|---|
| $ | CA /123-5997-2 | $ |
| $ | | $ |

2020 Form **1099-NEC**    Copy 1 For State Tax Department

Record Copy Do Not File

| 1 Nonemployee compensation | | |
|---|---|---|
| $ | | 75600.00 |
| 4 Federal income tax withheld | | |
| $ | | |

PAYER's name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

VXN GROUP LLC

11337 VENTURA BLVD

STUDIO CITY          CA     91604

(323) 791-4186

| PAYER's TIN | RECIPIENT's TIN |
|---|---|
| 84-3988614 | ▮ |

RECIPIENT's name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code

| 5 State tax withheld | 6 State/Payer's State no. | 7 State income |
|---|---|---|
| $ | CA/ | $ |
| $ | / | $ |

2021 Form 1099-NEC          Copy 1 For State Tax Department

| 1 Nonemployee compensation | | |
|---|---|---|
| $ | | 800.00 |
| 4 Federal income tax withheld | | |
| $ | | 0 |

PAYER's name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

rXN GROUP LLC

§1337 VENTURA BLV.::7

STUDIO CITY          CA     91604

(323) 791-4186

| PAYER's TIN | RECIPIENT's TIN |
|---|---|
| 84-3988614 | ▮ |

| 5 State tax withheld | 6 State/Payer's State no. | 7 State income |
|---|---|---|
| $ | CA/ | $ |
| $ | / | $ |

2021 Form 1099-NEC          Copy 1 For State Tax Department

Aatrix Rev. 8/10/21

☐ VOID     ☐ CORRECTED

| 1 Nonemployee compensation | | |
|---|---|---|
| $ | | 9600.00 |
| 4 Federal income tax withheld | | |
| $ | | |

PAYER's name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

VXN GROUP LLC

11337 VENTURA BLVD

STUDIO CITY          CA     91604

(323) 791-4186

| PAYER's TIN | RECIPIENT's TIN |
|---|---|
| 84-3988614 | |

Account number (see instructions)

2 Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale ☐

3

| 5 State tax withheld | 6 State/Payer's State no. | 7 State income |
|---|---|---|
| $ | / | $ |
| $ | / | $ |

2021 Form 1099-NEC          Copy 1 For State Tax Department

☐ VOID     ☐ CORRECTED

| 1 Nonemployee compensation | | |
|---|---|---|
| $ | | 38290.00 |
| 4 Federal income tax withheld | | |
| $ | | |

PAYER's name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

VXN GROUP LLC

11337 VENTURA BLVD

STUDIO CITY          CA     91604

(323) 791-4186

| PAYER's TIN | RECIPIENT's TIN |
|---|---|
| 84-3988614 | 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 |

RECIPIENT's name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code

MACKENZIE ANNE THOMA

4324 PROMENADE WAY #314

MARINA DEL REY          CA     90292

Account number (see instructions)

2 Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale ☐

3

| 5 State | 6 State/Payer's State no. | 7 State income |
|---|---|---|
| $ | / | $ |
| $ | / | $ |

2021 Form 1099-NEC          Copy 1 For State Tax Department

**CORRECTED (if checked)**

| 1 Nonemployee compensation | |
|---|---|
| $ | 11500.00 |

| 4 Federal income tax withheld |
|---|
| $ |

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.
VXN GROUP LLC
11271 VENTURA BLVD SUITE 717
STUDIO CITY, CA 91604
(323) 791-4186

| PAYER'S TIN | RECIPIENT'S TIN |
|---|---|
| 84-3988614 | ***-**-3372 |

RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code
MACKENZIE ANNE THOMA
4324 PROMENADE WAY #314
MARINA DEL REY, CA 90292

Account number (see instructions)

| 2 Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale | ☐ |
|---|---|

3

| 5 State tax withheld | 6 State/Payer's state no. | 7 State income |
|---|---|---|
| $ | CA / | $ |
| $ | | $ |

**2022** Form **1099-NEC**     To be filed with recipient's federal income tax return, when required.

---

1 Nonemployee compensation
$ 11500.00

| 4 Federal income tax withheld |
|---|
| $ |

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.
VXN GROUP LLC
11271 VENTURA BLVD SUITE 717
STUDIO CITY, CA 91604
(323) 791-4186

| PAYER'S TIN | RECIPIENT'S TIN |
|---|---|
| 84-3988614 | ***-**-3372 |

RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code
MACKENZIE ANNE THOMA
4324 PROMENADE WAY #314
MARINA DEL REY, CA 90292

| 2 Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale | ☐ |
|---|---|

3

| 5 State tax withheld | 6 State/Payer's state no. | 7 State income |
|---|---|---|
| $ | CA / | $ |

**2022** Form **1099-NEC**     Copy 2 To be filed with recipient's state income tax return, when required.

---

☐ CORRECTED (if checked)

| 1 Nonemployee compensation | |
|---|---|
| $ | 11500.00 |

| 4 Federal income tax withheld |
|---|
| $ |

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.
VXN GROUP LLC
11271 VENTURA BLVD SUITE 717
STUDIO CITY, CA 91604
(323) 791-4186

| PAYER'S TIN | RECIPIENT'S TIN |
|---|---|
| 84-3988614 | ***-**-3372 |

RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code
MACKENZIE ANNE THOMA
4324 PROMENADE WAY #314
MARINA DEL REY, CA 90292

Account number (see instructions)

| 2 Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale | ☐ |
|---|---|

3

| 5 State tax withheld | 6 State/Payer's state no. | 7 State income |
|---|---|---|
| $ | CA / | $ |

**2022** Form **1099-NEC**     Copy B For Recipient

---

☐ CORRECTED (if checked)

| 1 Nonemployee compensation | |
|---|---|
| $ | 11500.00 |

| 4 Federal income tax withheld |
|---|
| $ |

PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.
VXN GROUP LLC
11271 VENTURA BLVD SUITE 717
STUDIO CITY, CA 91604
(323) 791-4186

| PAYER'S TIN | RECIPIENT'S TIN |
|---|---|
| 84-3988614 | ***-**-3372 |

RECIPIENT'S name, street address (including apt. no.), city or town, state or province, country, and ZIP or foreign postal code
MACKENZIE ANNE THOMA
4324 PROMENADE WAY #314
MARINA DEL REY, CA 90292

Account number (see instructions)

| 2 Payer made direct sales totaling $5,000 or more of consumer products to recipient for resale | ☐ |
|---|---|

3

| 5 State tax withheld | 6 State/Payer's state no. | 7 State income |
|---|---|---|
| $ | CA / | $ |

**2022** Form **1099-NEC**     Copy 2 To be filed with recipient's state income tax return, when required.

# EXHIBIT 21

| Vendor No. | 00-000 | | | | | |
|---|---|---|---|---|---|---|
| Name | Mackenzie Anne Thoma | | | | | |

**1. Main**   **2. Additional**   **3. Statistics**   **4. Summary**   **5. History**   **6. Invoices**   **7. Transaction**

| Invoice No. | Inv Date | Inv Due Date | Curr | Amount | Balance | Comment |
|---|---|---|---|---|---|---|
| 071522 | 7/15/2022 | 7/15/2022 | USD | 5,000.00 | 0.00 | 7/15 Kenzie Ann |
| 052322 | 5/23/2022 | 5/23/2022 | USD | 1,500.00 | 0.00 | 5/23 Kenzie Anne |
| 040322 | 4/3/2022 | 4/3/2022 | USD | 5,000.00 | 0.00 | 4/3 Kenzie Anne |
| 121121 | 12/11/2021 | 12/11/2021 | USD | 4,000.00 | 0.00 | 12/11 Kenzie Anne |
| 121121ADJ | 12/11/2021 | 12/11/2021 | USD | 1,000.00 | 0.00 | 12/11 Kenzie Anne (Add on short pay) |
| 103021 | 10/30/2021 | 10/30/2021 | USD | 5,000.00 | 0.00 | 10/30 Kenzie Anne |
| 072921 | 7/29/2021 | 7/29/2021 | USD | 3,100.00 | 0.00 | 7/29 Kenzie Anne |
| 072821 | 7/28/2021 | 7/28/2021 | USD | 1,500.00 | 0.00 | 7/28 Kenzie Anne |
| 062921 | 6/29/2021 | 6/29/2021 | USD | 1,500.00 | 0.00 | 6/29 Kenzie Anne |
| 050621 | 5/6/2021 | 5/6/2021 | USD | 3,500.00 | 0.00 | 5/6 Kenzie Ann |
| 050521 | 5/5/2021 | 5/5/2021 | USD | 190.00 | 0.00 | 5/5 Kenzie Anne: Testing Reimbursement |
| 050521DIAL... | 5/5/2021 | 5/5/2021 | USD | 500.00 | 0.00 | 5/5 Mackenzie Thoma |
| 040121 | 4/1/2021 | 4/1/2021 | USD | 3,000.00 | 0.00 | 4/1 Kenzie Anne |
| 022721 | 2/27/2021 | 2/27/2021 | USD | 15,000.00 | 0.00 | 2/27 Kenzie Anne |
| 120920 | 12/9/2020 | 12/9/2020 | USD | 10,000.00 | 0.00 | 12/9 Kenzie Anne |

# **EXHIBIT 22**

**KANE LAW FIRM**
Brad S. Kane (SBN 151547)
bkane@kanelaw.la
1154 S. Crescent Heights. Blvd.
Los Angeles, CA 90035
Tel:  (323) 697-9840
Fax: (323) 571-3579

Trey Brown (SBN 314469)
trey.brown@vixenmediagroup.com
11337 Ventura Blvd.
Studio City, CA 91604

*Attorneys for Defendants*
VXN GROUP LLC and MIKE MILLER

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated, <br><br> Plaintiff, <br> v. <br><br> VXN GROUP LLC, a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 to 100, inclusive, <br><br> Defendants. | Case No. **2:23–cv–04901 WLH (AGRx)** <br><br> **DECLARATION OF TREY BROWN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Complaint Filed:  April 20, 2023 <br> Removed:          June 21, 2023 |

DECLARATION OF TREY BROWN

1    I, Trey Brown, hereby declare as follows:

2    1.    I am an attorney licensed to practice law in the State of California. I

3    am In-House counsel for Defendant VXN Group, LLC ("VXN"), as well as an

4    attorney of record for VXN and Defendant Mike Miller in this matter. I am

5    personally familiar with, and, if called upon, could and would testify to the facts

6    contained herein from my personal knowledge

7    2.    Based on my review of VXN's business records and documents

8    produced in connection with Thoma's discovery requests in this matter:

9        a.  VXN entered into a Performance Agreement with Plaintiff

10           Mackenzie Anne Thoma, a.k.a., "Kenzie Anne" ("Thoma") on

11           November 11, 2020 (the "2020 Agreement"). A true and correct

12           copy of the 2020 Agreement is attached hereto as "Exhibit 23".

13       b.  In April of 2021, Thoma and VXN amended the 2020

14           Agreement via addendum ("First Addendum"). A true and

15           correct copy of the First Addendum is attached hereto as

16           "Exhibit 24".

17       c.  A true and correct copy of emails from April 2021 between

18           VXN and Thoma's talent agents at Motley Models in

19           connection with the execution of the First Addendum is

20           attached hereto as "Exhibit 25".

21       d.  In July of 2021, before the 2020 Agreement expired, VXN and

22           Thoma entered a second contract on with an effective date of

23           August 28, 2021 ("2021 Agreement"). A true and correct copy

24           of the 2021 Agreement is attached hereto as "Exhibit 26".

25       e.  On September 28, 2011, VXN terminated the 2021 Agreement

26           by letter notice ("Termination Notice"). A true and correct copy

27           of the Termination Notice is attached hereto as "Exhibit 27".

28

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

1

DECLARATION OF TREY BROWN

3.    A true and correct copy of excerpts from Thoma's deposition transcript is attached hereto as "Exhibit 28" ("*Thoma Depo.*").

4.    In connection with this lawsuit, Defendants deposed Thoma's former talent agent, Ryan Murphy, a.k.a., "Ryan Kona" ("Murphy"). A true and correct copy of excerpts from Murphy's deposition transcript is attached hereto as "Exhibit 29" along with Plaintiff's IMDB which was introduced as an exhibit at Mr. Murphy's deposition ("*Murphy Depo.*").

5.    A true and correct copy of a screenshot of the Kenzieland.com website showing Kenzieland films for sale, which was produced in response to Thoma's discovery requests, is attached hereto as "Exhibit 30".

6.    A true and correct Web Data Collection Report for the Instagram account "kenzielandbykenzie" as it existed on August 12, 2024, which was which was produced in response to Thoma's discovery requests, is attached hereto as "Exhibit 31".

7.    A true and correct Web Data Collection Report for a September 27, 2021 post "kenzielandbykenzie" promoting Kenzieland.com, which was which was produced in response to Thoma's discovery requests, is attached hereto as "Exhibit 32".

8.    Defendants produced each of the below listed documents in response to Thoma's discovery requests, which I obtained from the California Secretary of State's website:

a.    A true and correct copy of an Application to Register a Foreign Limited Liability Company for KENZIELAND LLC dated September 7, 2021, attached hereto as "Exhibit 33".

b.    A true and correct copy of the Statements of Information for KENZIELAND LLC dated October 14, 2021 and dated January 20, 2022 are attached hereto as "Exhibit 34".

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

2

DECLARATION OF TREY BROWN

c. A true and correct copy of the Articles of Organization for LOLA MARCH LLC dated January 13, 2022 and a true and correct copy of the Statement of Information for LOLA MARCH LLC dated January 20, 2022 are attached hereto as "Exhibit 35".

9. In connection with this lawsuit, Defendants deposed Thoma's former accountant with Artists Business Management Group, Inc., Larry Lerner ("Lerner"). A true and correct copy of excerpts from Lerner's deposition transcript is attached hereto as "Exhibit 36".

10. A true and correct copy of text messages sent between Thoma and VXN's Casting Director, Michael "Moz" Mosney ("Mosney") is attached hereto as "Exhibit 37".

11. A true and correct copy of text messages sent between Murphy and Mosney in connection with the scheduling of Thoma's scenes with VXN, introduced as an exhibit during Murphy's deposition is attached hereto as "Exhibit 38".

12. A true and correct copy of text messages sent between Murphy and Mosney in connection with seeking approval for co-stars in Thoma's scenes with VXN, introduced as an exhibit during Murphy's deposition is attached hereto as "Exhibit 39".

13. A true and correct copy of a November 11, 2020 email from Chris Applebaum indicating Thoma's preferred co-stars and planning for Thoma's first VXN scene, which was which was produced in response to Thoma's discovery requests and a true and correct copy of December 2020 emails exchanged between VXN and Applebaum relating to Thoma's preferred props and wardrobe, which was which was produced in response to Thoma's discovery requests, is attached hereto is attached hereto as "Exhibit 40".

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

3

DECLARATION OF TREY BROWN

14.    A true and correct copy of Kenzieland film titles released in the year 2021, introduced as an exhibit during Murphy's deposition is attached hereto as "Exhibit 41".

15.    A true and correct copy of Thoma's Internet Movie Database credits adult film credits obtained from the Internet Adult Film Database (iafd.com) is attached hereto as "Exhibit 42".

16.    A true and correct copy of excerpts from Mosney's deposition transcript is attached hereto as "Exhibit 43".

17.    The W-9s submitted by Plaintiff indicated various payees, including Plaintiff herself, Kenzieland LLC, and Lola March LLC are attached hereto as "Exhibit 44".

18.    Plaintiff never received a Form W-2 from VXN.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 21, 2024, at Los Angeles, California.


*/s/   Trey Brown*

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

4

DECLARATION OF TREY BROWN

# EXHIBIT 23

# PERFORMANCE AGREEMENT

This Performance Agreement ("**Agreement**") is entered into on the 11th day of November, 2020 and is between **VXN GROUP, LLC**, a Delaware limited liability company ("**Producer**"), and **Mackenzie Thoma a/k/a Kenzie Anne**, an individual located at c/o 8730 Wilshire Blvd., Suite 350, Beverly Hills, CA 90211 ("**Performer**") (together the "**Parties**" or "**Party**").

## RECITALS

WHEREAS Producer is the creator of adult motion pictures and photographs for commercial sale through various distribution outlets and platforms;

WHEREAS Performer is a model and actor in the adult entertainment industry;

WHEREAS Producer wishes to contract with Performer for Performer's services as an actor and model on an exclusive basis in connection with the production of adult motion pictures and photographs and in exchange for the consideration outlined below;

WHEREAS Performer agrees to provide her services on a temporary exclusive basis for the duration of the Term as set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the foregoing recitals, the mutual promises and agreements herein contained, and for good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged by the Parties, each of the Parties, intending to be legally bound hereby, do promise and agree as follows, and enter into this Agreement.

1. **Engagement.** Producer hereby engages Performer to act, model and provide other services ("**Services**") to Producer for Producer's adult motion pictures and photographs ("**Scene**" or "**Scenes**") for the brands and websites Vixen.com and Blacked.com ("**Brand**" or "**Brands**").

2. **Compensation**. Producer will pay Performer $10,000.00 for Performer's first girl/girl Scene with Producer, which will include a three-way girl/girl/girl Scene to be shot in December 2020. Producer then has the option and right of first refusal, but not the obligation, during the Term, to pay Performer $15,000.00 for Performer's first boy/girl Scene with Producer. Additionally, for any subsequent girl/girl Scenes, to be mutually agreed upon by Producer and Performer, Producer will pay Performer $3,000 per Scene. For any subsequent boy/girl Scenes, to be mutually agreed upon by Producer and Performer, Producer will pay Performer $5,000 per Scene.

Performer waives the right to receive any other consideration for the Services performed under this Agreement, including royalties, residuals, or commissions. Performer acknowledges that no further sums are payable by Producer by reason of exploitation of the content or the results and proceeds of Performer's services under this agreement.

3. **Nature of Services**. As part of the Services, Performer will appear nude and semi-nude in connection with the creation of motion pictures and photographic content by Producer. Performer will perform multiple, explicit sexual acts, as set forth above in paragraphs 1 and 2. These sexual acts may include the

1

use of sexual aids. Performer knowingly and willingly consents to rendering these services and understands the nature of the services this agreement requires her to perform. Performer and Producer will mutually agree on directors and other talent that will appear or perform in Performer's Scenes.

4. **Hours and Obligations for Services**. Performer will provide the services on an as-needed basis, including nights, weekends, and holidays. Performer understands and agrees that the filming session during the Term of this agreement may take up to ten hours.

5. **Ownership; Copyright; Publicity**. Performer hereby grants Producer the worldwide, irrevocable, perpetual, right to photograph and re-photograph Performer (still and moving) and to record and re-record, double, and dub Performer's voice and performances, by any present or future methods or means, and to use and to license the use of Performer's approved name (including all stage names and aliases), approved biography, resume, signature, caricature, voice, and likeness (collectively, the "*name and likeness*") for and in connection with the creation of or the exploitation of the content created hereunder, including the promotion and advertising of the content in any media, throughout the universe, and in perpetuity. Producer will own the results and proceeds of Performer's Services under this agreement, including the copyrights of it. As the owner, Producer will have the worldwide, irrevocable, perpetual, exclusive right to use, license, and exploit the results and proceeds of Performer's Services—including all derivative works—in any manner, for any purpose, including the right to edit, televise, broadcast, record, publish, copy, print, sell, or distribute the content in any manner and in any medium, format, form, or forum, whether now known or later devised, without any further compensation than as specified in section 2. Performer acknowledges that the works created from the Services performed by Performer in performing this agreement constitute "works made for hire" under the United States Copyright Act of 1976 and, at all stages of development, the works will be and remain the sole and exclusive property of Producer. At Producer's sole discretion, Producer may make any changes in, deletions from, or additions to the works. If for any reason the results and proceeds of Performer's services under this agreement are determined not to be a work made for hire, Performer hereby irrevocably transfers and assigns to Producer all right, title, and interest in the work, including all copyrights, as well as all renewals and extensions to that work. Performer acknowledges Producer's sole ownership of all stage names, aliases, pseudonyms, characters, ideas, or other matters or materials that may be created during the term of this agreement. Performer will sign all documents that Producer may reasonably require to record and perfect its ownership rights. Performer will retain all rights in the stage name "Kenzie Anne" however during and after the term of this Agreement, Producer and Producer's assigns and licensees may use Performer's name and likeness. Performer hereby expressly waives and relinquishes to Producer any moral rights or "droit morale" in and to any content produced from the Services Performer provided under this agreement, including all of Performer's performances. Performer further hereby waivers and relinquishes to Producer all right of publicity claims, invasion of privacy claims, defamation claims, sexual harassment claims, injuries (both physical and emotional), negligence, Intellectual Property, and any liability for and by virtue of blurring, distortion, alteration, and optical illusion. "*Intellectual Property*" means all rights, title, interest, and benefit of a party to this Agreement in intellectual property of every nature, whether registered or unregistered. Intellectual property includes trademarks, copyrights, patents, trade secrets, publicity rights, moral rights, rights against unfair competition, and any other rights commonly considered intellectual property.

6. **Credit**. Producer does not have an obligation to give Performer credit in advertising or publicity, but

2

shall afford Performer customary performer credit in all content created under this Agreement.

## 7. Exclusivity and Appearance

7.1 **Exclusivity of Services**. During the Term of this Agreement, Performer will not film with any third party producer or production company that competes directly with Producer; provided that nothing herein shall restrict Performer from (i) creating (alone or with others) and exploiting photos and short-form content for Performer's social media channels, (ii) doing 'live' webcam channel shows (with the exclusion of CamSoda) and live OnlyFans shows , or (iii) doing photoshoots and media appearances with any other individual or entity. Performer understands that a breach of this provision will entitle Producer to terminate this Agreement for Cause and seek any related damages if the parties cannot resolve the breach by agreement within 48 hours of the breach.

7.2 **Appearance**. Performer understands that Producer is entering into this Agreement with Performer based on Performer's current physical appearance, including the current measurements of Performer's body, level of physical fitness, hairstyle, and overall appearance of Performer's body. During the term of this Agreement, Performer will maintain Performer's physical appearance, and Performer will submit to the reasonable personal grooming requests of Producer, as such may be considered a norm in the adult entertainment industry. Performer acknowledges that if Performer should change her physical appearance during the term of this Agreement (including adding or subtracting tattoos or piercings) without first obtaining written permission by Producer, Producer may terminate this Agreement for Cause if the Parties cannot resolve the breach by agreement within 48 hours of the breach.

8. **Additional Services after Expiration of Agreement**. Performer will provide additional Services after expiration of this Agreement at Producer's reasonable request if Producer requires the additional Services in connection with retakes, added scenes, trailers, or changes to content initially created during the term of this Agreement.

9. **Use of Social Media**. Performer agrees during the Term of this Agreement to reasonably promote Producer's Brands and its affiliate Brands on her social media accounts including but not limited to Twitter, Instagram and any others reasonably requested by Producer to the best of her abilities, consistent with Performer's other professional photo shoots and media appearances. Instagram promotion shall be limited to Producer's safe for work Instagram verified accounts, @vixenxofficial & @blackedxofficial. Performer will promote Producer's Brands at Producer's reasonable direction and under Producer's guidelines and recommendations.

Additionally, during the Term of this Agreement, Performer will not do any of the following without first obtaining written consent from Producer:

- post, tag, or comment on any photographs of anyone under 18-years old regardless of state of dress or context of the photographs; or
- post anything about a scene not yet released until notified in writing to do so.

10. **Health Testing**. Performer warrants and represents that to the best of Performer's knowledge, Performer is in good health and has no condition that would inhibit Performer's ability to perform or that

3

would endanger Performer or any other person. If Producer requests, and at Producer's expense, Performer will immediately receive testing for HIV, hepatitis, COVID-19, or any other medical condition—mental or physical—that may impact Performer's ability to safely perform Performer's duties under this Agreement. Additionally, each time Performer provides the Services contemplated by this Agreement, before providing the Services, Performer will provide Producer with documents disclosing the results of all health testing, which must have occurred within the immediately preceding 30-day period. Performer acknowledges that this information may reside in verifiable third party, HIPAA compliant databases.  Producer will fully cover the testing costs.

11. **Non-Union Affiliation**. Producer states that it is not a signatory to the Screen Actors Guild collective bargaining agreement or any other union or guild agreement. Performer states that Performer is not a member of any union or guild that would prevent Performer from performing the services contemplated by this agreement.

12. **Independent Contractor Status**. Performer is an independent contractor. Performer will not be deemed an employee of Producer. Performer will be responsible for payment of all local, state, and federal taxes, including making self-employment tax payments. Producer will not be responsible for, nor will Producer withhold, local, state, federal, social security, Medicare, unemployment, disability, or any other kind of taxes. Performer will be responsible for providing Performer's own disability and worker's compensation plans for Performer's own benefit. In addition, Performer represents that they do not meet the conditions as set forth in Assembly Bill 5 (A.B.5.) to be classified as an employee.

13. **Term and Termination**

13.1 *Term*. The Term of this Agreement is for six (6) months from the date the Parties enter into the Agreement and shall renew upon successful completion of each Scene contemplated by this agreement.

13.2 *Termination*. Producer may terminate this Agreement at any time for Cause. "***Cause***" means Performer's (1) material, uncured breach of this Agreement; (2) inability to meet Producer's subjective artistic expectations; (3) failure to follow any framework; (4) violation of Producer's rules; (5) violation of any applicable laws, rules, or regulations; or (6) failure to follow Producer's directions; (7) unreasonable unavailability; (8) or as otherwise set forth throughout this Agreement. Unless otherwise terminated by Producer under this section 13, this Agreement will terminate on the expiration of the Term.

13.3. **Force Majeure Event**. The Term may be terminated by Company upon notice to Performer if the performance of this Agreement or any obligations hereunder is prevented, restricted or interfered with by reason of fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, health risks, disease, law (including any federal, state, local or other governmental regulations, restrictive ordinances, statutes or by common law) lock-out, boycott, work stoppage, strikes (including but not limited to union/guild strikes), or labor controversy (including but not limited to threat of walkout, boycott, or strike) or any similar cause beyond the reasonable control of Company (each, a "***Force Majeure Event***"). Company shall, upon giving prompt notice to Performer, be excused from such performance during such prevention, restriction or interference, and any failure or delay resulting therefrom shall not be considered a breach of this Agreement. If such Force Majeure Event continues for a period of more than 60 days, Company may terminate this Agreement by providing written

4

notice to Performer. In the event of a termination due to a Force Majeure Event, Company shall have no further obligations to Performer other than the obligation of Company to pay any accrued obligations hereunder.

14. **Ethics and Non-Disparagement.** Performer agrees to abide by the ethical policies and practices of Producer at all times during the term of this Agreement and, within the scope of applicable laws and regulations, to act in the best interests of Producer and abide by the highest ethical standards in performing the duties set forth in this Agreement. If at any time during the course of the Agreement, Performer is involved in any situation or occurrence which subjects Performer to public scandal, disrepute, widespread contempt, public ridicule, or which is widely deemed by members of the general public, to embarrass, offend, insult or denigrate individuals or groups, or that will tend to shock, insult or offend the community or public morals or decency or prejudice the Producer in general, then Producer shall have the right, in its sole discretion, to take any action it deems appropriate, including but not limited to terminating the production of the program. During and following the term of this Agreement Performer agrees not to, and, if applicable, shall cause its officers, managers, employees not to, make or encourage any disparaging or untruthful remarks or statements about Producer or its products, services, officers, directors, affiliates, or employees; provided that nothing in this Agreement shall prevent Performer from making truthful statements when required by law, court order, subpoena, or the like, to a governmental agency or body or in connection with any legal proceeding.  Notwithstanding anything in this Agreement to the contrary, Producer may terminate this Agreement at any time without notice or penalty following Performer's breach of this Section 14.

**15. Confidential Information.**  Performer agrees that all terms and conditions of this Agreement shall be maintained in strict confidence and shall not be disclosed to any third Parties unless compelled to disclose by appropriate court order or with Producer's approval. Additionally, Performer will keep confidential all Confidential Information.  "***Confidential Information***" means any information or data of a party that that party disclosed to the other party, either directly or indirectly, whether in writing, orally, or by visual means, and which the disclosing party designates (either in writing or orally) as confidential, proprietary, or another similar designation. However, a disclosing party will not need to designate information or data as confidential information if the nature of the information makes it generally considered confidential commercially, which includes information that relates to: (1) trade secrets or know-how; (2) finance or accounting; (3) technology, research, or development; (4) internal processes or procedures; (5) business, operations, or planning of it; (6) sales or marketing strategies; (7) the terms of any agreement, and the discussions, negotiations, or proposals related to it, including this Agreement. "Confidential Information" also includes the legal names and addresses of actors and models appearing in the content. "Confidential information" does not include information that (1) is publicly available or in the public domain at the time disclosed; (2) is or becomes publicly available or enters the public domain through no fault of the receiving party; (3) is rightfully communicated to the receiving party by persons not bound by confidentiality obligations for that information; or (4) is already in the receiving party's possession free of any confidentiality obligations for that information at the time of disclosure. This section will survive the termination of this Agreement.

16. **Performer Representations and Warranties**. Performer represents and warrants that Performer is 18-years old or older, has the right to enter into this Agreement and to grant to Producer all rights granted in

5

DocuSign Envelope ID: 6132ZE98-388E-4ECB-A269-222497AABF13

this Agreement, and that Performer has not entered into or will enter into any Agreement of any kind that will interfere in any way with the complete performance of this Agreement.

17. **Indemnification.** Performer will pay Producer for any loss of Producer's that is caused by Performer's reckless acts or intentional misconduct. But Performer need not pay to the extent that the loss was caused by Producer's reckless acts or intentional misconduct. "***Loss***" means an amount that a party is legally responsible for or pays in any form. Amounts include, for example, a judgment, a settlement, a fine, damages, injunctive relief, staff compensation, a decrease in property value, and expenses for defending against a claim for a loss (including fees for legal counsel, expert witnesses, and other advisers). A loss can be tangible or intangible; can arise from bodily injury, property damage, or other causes; can be based on tort, breach of contract, or any other theory or recovery; and includes incidental, direct, and consequential damages.  A loss is "***caused by***" an event if the loss would not have occurred without the event, even if the event is not a proximate cause of the loss.

18. **Dispute Resolution**

18.1 ***In General.*** Each Party will allow the other reasonable opportunity to cure any alleged breach of this Agreement. The Parties will attempt in good faith to resolve all disputes, disagreements, or claims between the Parties relating to this Agreement.

18.2 ***Mediation.*** If the Parties cannot settle a dispute through negotiation, the Parties will engage in nonbinding mediation before resorting to arbitration. The Parties will conduct mediation in Los Angeles County, California. Unless the Parties agree otherwise, the American Arbitration Association will administer the mediation according to its Commercial Mediation Procedures. Each Party will bear its own costs and expenses in mediation and the Parties will share equally between them all third-party mediation costs and expenses unless the Parties otherwise agree in a writing signed by the Party agreeing to bear the costs and expenses.

18.3 ***Arbitration***. In the event that mediation between the Parties is unsuccessful, the Parties will settle any controversy or claim arising out of or relating to this Agreement, or the breach of it, by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. A single arbitrator will preside over the arbitration and issue a final award on all issues submitted to the arbitrator. The Parties will conduct the arbitration in Los Angeles County, California. The arbitrator's award will be final and binding on the Parties. Either party may file an action in a court of competent jurisdiction to: (1) enforce this provision; (2) obtain injunctive relief; or (3) enforce the arbitrator's award.

18.4 ***Waiver of Jury Trial.*** The Parties agree that as part of their consideration for this Agreement, they waive the right to a trial by jury for any dispute arising between the Parties related to the subject matter of this Agreement. The Parties further agree that this waiver will be enforceable up to and including the day that trial is to start, and even if the arbitration provisions of this section are waived.

18.5 ***Limited Time to Bring Claims***. Unless otherwise required by applicable law without the possibility of contractual waiver or limitation, neither Party will bring legal action, regardless of form, arising out of (or related to) this Agreement or any transaction under it more than twelve (12) months after the cause of action arose. After this time limit, any legal action arising out of this Agreement (or any transaction under it) and

6

DocuSign Envelope ID: 6132ZTE98-388E-4ECB-A269-222497AABF13

all respective rights related to any action lapse.

19. **General Provisions**

19.1 *Entire Agreement*. This Agreement makes up the sole Agreement of the Parties concerning its subject matter. It supersedes all earlier written or oral discussions, negotiations, proposals, undertakings, understandings, and agreements between the Parties concerning the transactions contemplated in this agreement. No party may use any of the earlier or contemporaneous negotiations, preliminary drafts, or previous versions of this Agreement leading up to its signature and not stated in this Agreement to construe or affect the validity of this Agreement. No conditions, definitions, representations, or warranties concerning the subject matter other than as expressly stated in this Agreement will bind either party. Each party acknowledges that no party made or relied on a representation, inducement, or condition not stated in this agreement.

19.2 *Amendment*. The Parties may amend this Agreement only by a written agreement of the Parties that identifies itself as an amendment to this Agreement.

19.3 *Assignment and Delegation*. Producer may assign this Agreement and the rights granted in it to any other person. Performer may not assign Performer's rights or delegate Performer's duties under this agreement because this Agreement is a personal service contract entered into in reliance on the singular personal skill, qualifications, and representations of Performer. Any purported assignment of rights or delegation of duties by Performer in violation of this provision is void.

19.4 *Waiver*. If either party fails to require the other to perform any term of this Agreement, that failure does not prevent the party from later enforcing that term. If either party waives the other's breach of a term, that waiver is not treated as waiving a later breach of the term. No waiver by any party of any of the provisions of this Agreement will be effective unless in writing and signed by the waiving party. No waiver will operate as a waiver regarding any failure, breach, or default unless expressly identified by the written waiver. The Parties may waive compliance with this provision in a writing signed by both Parties.

19.5 *Severability*. If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

19.6 *Notices*. All notices and other communications required or permitted under this Agreement must be in writing and must be delivered personally or sent by email, certified or registered mail, or by overnight courier, postage prepaid, to the party's address listed below:

Mackenzie Thoma  a/k/a Kenzie Anne
misskenzieanne@gmail.com
cc: eric@sevnagency.com

VXN GROUP, LLC
Attn: Emilie Kennedy
emilie@vixen.com

A party may change this address by notice to the other party as stated in this Agreement. A notice is

7

considered as having been given (1) on the day of personal delivery, or (2) two days after the date of mailing.

19.7 ***Cumulative Remedies***. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the assertion by a party of any right or remedy will not preclude the assertion by the party of any other rights or the seeking of any other remedies available at law, in equity, by statute, in any other Agreement between the Parties, or otherwise.

19.8 ***Governing Law***. The Parties have signed and entered into this Agreement in the State of California. California law applies to this Agreement without regard for any choice-of-law rules that might direct the application of the laws of any other jurisdiction.

19.9 ***Jurisdiction and Venue***. Each party irrevocably and unconditionally agrees that it will not bring any proceeding against any other party arising out of this Agreement in any forum other than Los Angeles County, California. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of Los Angeles County, California and agrees to bring any proceeding only in Los Angeles County, California.

19.10 ***Enforcement Costs and Expenses***. If a party breaches this Agreement, the breaching party will reimburse the nonbreaking party for all actual legal fees and costs incurred in enforcing this Agreement.

19.11 ***Performance Costs and Expenses***. Unless otherwise stated in this Agreement, each party will pay all of the costs and expenses that party incurs regarding this Agreement and the transactions it contemplates.

19.12 ***Third-Party Beneficiaries***. This Agreement does not and is not intended to confer any rights or remedies on any person other than the Parties.

19.13 ***Relationship of the Parties.*** The Parties' relationship is that of independent contractors and not business partners. Nothing in this Agreement creates a partnership, joint venture, agency, franchise, or employment relationship between the Parties and the Parties expressly disclaim the existence of any of these relationships between them.

19.14 ***Successors and Assigns***. This Agreement inures to the benefit of, and is binding on, the Parties and their respective successors and assigns. This section does not address, directly or indirectly, whether a party may assign its rights or delegate its performance under this Agreement.

19.15 ***Further Assurances***. Each party will take any actions, or sign any documents, necessary to effect or facilitate the purpose of this Agreement.

19.16 ***Voluntary Agreement***. The Parties have signed this Agreement voluntarily and for valid reasons, and in doing so do not and have not relied on any statement or promise by any other party, except those expressed in this Agreement. The Parties acknowledge and agree that they have carefully read this Agreement, discussed it with their attorneys or other advisors, understand all of the terms and conditions, and agree to be bound by it. The Parties have relied on the advice of their attorneys or other advisors about the terms and conditions of this Agreement, and waive any claim that the terms and conditions should be construed against the drafter.

19.17 ***Corporate authority***. Each person signing this agreement on behalf of any corporate entity agrees

8

that he or she has full authority to sign this Agreement on behalf of the entity and that party has taken all necessary actions. In addition, each corporate party agrees that this Agreement does not constitute a violation or breach of that party's articles of incorporation, bylaws, or any other agreement or law by which that party is bound.

19.18 *Counterparts*. The Parties may sign this Agreement in any number of counterparts. The Parties deem each counterpart an original and all counterparts, when taken together, make up the same agreement.

20.  **Usages**. In this Agreement, unless otherwise stated or the context otherwise requires, the following usages apply:

20.1 Actions permitted under this agreement may be taken at any time and from time to time in the actor's sole discretion.

20.2 References to a statute will refer to the statute and any successor statute, and to all regulations promulgated under or implementing the statute or successor, as in effect at the relevant time.

20.3 References to numbered sections in this Agreement also refer to all included sections. For example, references to section 6 also refer to sections 6.1, 6.1(A), etc.

20.4 In computing periods from a specified date to a later specified date, the words "from" and "commencing on" (and the like) mean "from and including," and the words "to," "until," and "ending on" (and the like) mean "to but excluding."

21.  **Signatures.** The Parties agree that they may deliver signatures on this Agreement by fax or electronically instead of an original signature and agree to treat fax or electronic signatures as original signatures that bind them to this Agreement.

The Parties signed this Agreement on the date listed on the first page.

**Producer:   VXN GROUP, LLC,** a Delaware Limited Liability Company

By: Mike Miller, Executive Producer

Signature: _____ *Mike Miller* _____
                    10AD78EF1BDE429...

Date: ___ 12/1/2020 _____

Performer: **MACKENZIE THOMA a/k/a KENZIE ANNE**, an individual

Signature: _____
                    1183CE222482413...

Date: ___ 11/30/2020 _____

9

# **EXHIBIT 24**

## ADDENDUM TO PERFORMANCE AGREEMENT

This Addendum ("Addendum") is attached to and forms part of the Performance Agreement ("Agreement") between VXN Group, LLC ("Producer") and Mackenzie Thoma a/k/a Kenzie Anne ("Performer"). Producer and Performer are collectively referred to as the "Parties."

### RECITALS

On November 11, 2020 ("Effective Date") the Parties entered into the Agreement for the purpose of contracting with Performer for Performer's services as an actor and model on an exclusive basis in connection with the production of motion pictures and photographs.

In January and February of 2021, Performer was filmed and created content with third-party directors and producers that directly competed with Producer's Brands, including Producer's then current and now former Director, Marc Roussel a/k/a 'Chef', who filmed Performer for his own professional gain and without permission from Producer.

In this Addendum, to become effective on April 15, 2021, the Parties wish to amend Section 2, Section 7.1 and Section 13.1 of the Agreement.

In consideration of the Parties agreeing to amend their obligations in the existing Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to amend the Agreement as follows:

### AMENDMENTS

*2. Compensation*. Producer will pay Performer $1,500.00 for Performer's all girl Scenes with Producer. Producer will pay Performer $3,000.00 for Performer's boy/girl Scenes with Producer. Performer waives the right to receive any other consideration for the Services performed under this Agreement, including royalties, residuals, or commissions. Performer acknowledges that no further sums are payable by Producer by reason of exploitation of the content or the results and proceeds of Performer's services under this agreement.

*7.1. Exclusivity of Services*. During the Term of this Agreement, Performer will not film with any third party producer or production company that competes directly with Producer; provided that nothing herein shall restrict Performer from (i) creating (alone or with others) and exploiting photos and short-form content for Performer's social media channels which includes her OnlyFans, ("Performer's Channels") (ii) doing 'live' webcam channel shows (with the exclusion of CamSoda) and live OnlyFans shows , or (iii) doing photoshoots and media appearances with any other individual or entity. Performer understands that a breach of this provision will entitle Producer to terminate this Agreement for Cause and seek any related damages if the parties cannot resolve the breach by agreement within 48 hours of the breach.

Additionally, Performer may not film with any models that appear in any of the Scenes arising from the Agreement for at least six months from release of the Scene and Performer agrees not to shoot with any of Company's current and/or former directors and/or exclusive talent for Performer's Channels without the express written consent of



Scanned with CamScanner

**CONFIDENTIAL** **VXN0001**

of the date of signing, are listed on Exhibit A, and for the avoidance of doubt, Performer may also not shoot with any new exclusive talent signed by Company for Performer's Channels during the course of this Agreement.

### *13.1 Term*

In consideration of signing this Addendum, instead of extending the Term to six months from Performer's successful completion of her last Scene on March 31, 2021, which extends the Term to October 1st, 2021, Producer agrees the Term shall end on August 28th, 2021 with the agreement that Performer will pay back Producer $1,500 for overpayment of her last Scene, or alternatively perform one all girl Scene for Producer without compensation. No further renewals of the term will occur upon subsequent completion of Scenes contemplated by the Agreement.

### NO OTHER CHANGE

Except as otherwise expressly provided in this Addendum, all of the terms and conditions of the Agreement remain unchanged and in full force and effect. To the extent that any of the terms and conditions contained in this Addendum may contradict or conflict with any of the terms or conditions of the Agreement, it is expressly understood and agreed that the terms of the Addendum shall take precedence and supersede the attached Agreement.

### AGREED AND ACCEPTED:

VXN Group, LLC
Anne

By: Mackenzie Anne Thoma

Mike Miller

Date:

Mackenzie Thoma a/k/a Kenzie

By:

Mackenzie Thoma
Date: 4/15/2021

### EXHIBIT A

List of Exclusive VMG Performers

Scanned with CamScanner

CONFIDENTIAL

VXN0002

# **EXHIBIT 25**

CONFIDENTIAL



**From:** Emilie ███████ ███████
**Subject:** Fwd: Kenzie Anne VXN Group Addendum
**Date:** April 15, 2021 at 5:16 PM
**To:** Mike Miller ██████████████ Moz ██████████

Wow she signed it
---------- Forwarded message ---------
From: dave@motleymodels.com <dave@motleymodels.com>
Date: Thu, Apr 15, 2021 at 5:13 PM
Subject: Re: Kenzie Anne VXN Group Addendum
To: ███████████████████ Ryan Kona <ryan@motleymodels.com>

**Hi Emilie,**

**Please find the attached signed addendum from Kenzie Anne. Let me know if you have any questions.**

**dR**

Dave Rock

President & CEO



C: 818.388.3322 *(texts okay)*

O: 818.483.6525 *(no texts)*

  

**From:** Emilie ██████
**Sent:** Wednesday, April 14, 2021 4:56:07 PM
**To:** Ryan Kona <ryan@motleymodels.com>; Mike Miller ██████████

017350

CONFIDENTIAL

**Subject:** Kenzie Anne VXN Group Addendum

Ryan,

Please find attached the addendum that we propose for Kenzie to sign.  Per our current offer, if she signs this addendum the term of her agreement would expire on August 28, 2020, and she is welcome to continue to film with us until that time, with no expectation of renewal. Otherwise, the term will remain until October 1st, 2021.

If you have any questions, please feel free to contact me.

Sincerely,

Emilie ███████
General Counsel
Vixen Media Group

███████████

## ADDENDUM TO PERFORMANCE AGREEMENT

This Addendum ("Addendum") is attached to and forms part of the Performance Agreement ("Agreement") between VXN Group, LLC ("Producer") and Mackenzie Thoma a/k/a Kenzie Anne ("Performer").  Producer and Performer are collectively referred to as the "Parties."

### RECITALS

On November 11, 2020 ("Effective Date") the Parties entered into the Agreement for the purpose of contracting with Performer for Performer's services as an actor and model on an exclusive basis in connection with the production of motion pictures and photographs.

In January and February of 2021, Performer was filmed and created content with third-party directors and producers that directly competed with Producer's Brands, including Producer's then current and now former Director, Marc Roussel a/k/a 'Chef', who filmed Performer for his own professional gain and without permission from Producer.

In this Addendum, to become effective on April 15, 2021, the Parties wish to amend Section 2, Section 7.1 and Section 13.1 of the Agreement.

In consideration of the Parties agreeing to amend their obligations in the existing Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to amend the Agreement as follows:

### AMENDMENTS

*2. Compensation*. Producer will pay Performer $1,500.00 for Performer's all girl Scenes with Producer. Producer will pay Performer $3,000.00 for Performer's boy/girl Scenes with Producer. Performer waives the right to receive any other consideration for the Services performed under this Agreement, including royalties, residuals, or commissions. Performer acknowledges that no further sums are payable by Producer by reason of exploitation of the content or the results and proceeds of Performer's services under this agreement.

*7.1. Exclusivity of Services*. During the Term of this Agreement, Performer will not film

017351

with any third party producer or production company that competes directly with Producer; provided that nothing herein shall restrict Performer from (i) creating (alone or with others) and exploiting photos and short-form content for Performer's social media channels which includes her OnlyFans, ("Performer's Channels") (ii) doing 'live' webcam channel shows (with the exclusion of CamSoda) and live OnlyFans shows , or (iii) doing photoshoots and media appearances with any other individual or entity. Performer understands that a breach of this provision will entitle Producer to terminate this Agreement for Cause and seek any related damages if the parties cannot resolve the breach by agreement within 48 hours of the breach.

Additionally, Performer may not film with any models that appear in any of the Scenes arising from the Agreement for at least six months from release of the Scene and Performer agrees not to shoot with any of Company's current and/or former directors and/or exclusive talent for Performer's Channels without the express written consent of



Producer with the exception of Chris Applebaum. Company's current exclusive talent, as of the date of signing, are listed on Exhibit A, and for the avoidance of doubt, Performer may also not shoot with any new exclusive talent signed by Company for Performer's Channels during the course of this Agreement.

*13.1 Term*

In consideration of signing this Addendum, instead of extending the Term to six months from Performer's successful completion of her last Scene on March 31, 2021, which extends the Term to October 1st, 2021, Producer agrees the Term shall end on August 28th, 2021 with the agreement that Performer will pay back Producer $1,500 for overpayment of her last Scene, or alternatively perform one all girl Scene for Producer without compensation. No further renewals of the term will occur upon subsequent completion of Scenes contemplated by the Agreement.

**NO OTHER CHANGE**

Except as otherwise expressly provided in this Addendum, all of the terms and conditions of the Agreement remain unchanged and in full force and effect. To the extent that any of the terms and conditions contained in this Addendum may contradict or conflict with any of the terms or conditions of the Agreement, it is expressly understood and agreed that the terms of the Addendum shall take precedence and supersede the attached Agreement.

**AGREED AND ACCEPTED:**

VXN Group, LLC
Anne

Mackenzie Thoma a/k/a Kenzie

By: Mackenzie Anne
Thoma

By: _____

Mike Miller

Mackenzie Thoma

Date:

Date: 4/15/2021

CONFIDENTIAL
ID #:8765

## EXHIBIT A

List of Exclusive VMG Performers



# **EXHIBIT 26**

## PERFORMANCE AGREEMENT

This Performance Agreement ("*Agreement*") is entered into on the 13th day of July, 2021 and is between **VXN GROUP, LLC**, a Delaware limited liability company ("*Producer*"), and **Mackenzie Thoma a/k/a Kenzie Anne**, an individual located at 4324 Promenade Way # 314, Marina Del Ray, CA 90282 ("*Performer*") (together the "*Parties*" or "*Party*").

## RECITALS

WHEREAS Producer is the creator of adult motion pictures and photographs for commercial sale through various distribution outlets and platforms;

WHEREAS Performer is a model and actor in the adult entertainment industry represented by Twice Baked Media, Inc. d.b.a Motley Models ("Agent").

WHEREAS Producer wishes to contract with Performer for Performer's services as an actor and model on a non-exclusive basis in connection with the production of adult motion pictures and photographs and in exchange for the consideration outlined below;

WHEREAS Performer agrees to provide her services on a non-exclusive basis for the duration of the Term as set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the foregoing recitals, the mutual promises and agreements herein contained, and for good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged by the Parties, each of the Parties, intending to be legally bound hereby, do promise and agree as follows, and enter into this Agreement.

1. **Engagement.** Producer hereby engages Performer to act, model and provide other services ("*Services*") to Producer for Producer's adult motion pictures and photographs ("*Scene*" or "*Scenes*") for Producer's brands and websites Vixen.com, Tushy.com, Blacked.com, BlackedRaw.com, TushyRaw.com, Deeper.com and Slayed.com ("*Brand*" or "*Brands*"). Performer agrees to make herself reasonably available to Producer throughout the Term of the Agreement and will not enter into any exclusive agreements that would prevent Performer from performing this Agreement. If Performer is not available on the date proposed by Producer to film a Scene, Performer will provide an alternative date within two weeks of Producer's originally proposed date.

2. **Compensation**. As compensation for the Services, Producer agrees to pay Performer $5,000 per boy-girl (which may include additional partners) Scene completed for the first ten (10) Scenes. If Performer opts to perform an anal scene during the Term of the Agreement, the rate shall remain $5,000. In addition to the ten Scenes listed above, Producer may book and shoot Performer for girl-girl Scenes at a rate of $1,500 per Scene. If Performer opts to perform in any additional boy-girl Scenes beyond the initial 10 agreed above, that rate shall be $2,500 per additional Scene.

Agent shall receive a flat rate of $100 per Scene completed by Performer.

3. **Nature of Services**. As part of the Services, Performer will appear nude and semi-nude in connection

1

CONFIDENTIAL
VXN0003

with the creation of motion pictures and photographic content by Producer. Performer will perform multiple, explicit sexual acts, as set forth above in paragraphs 1 and 2. These sexual acts may include the use of sexual aids. Performer knowingly and willingly consents to rendering these services and understands the nature of the services this agreement requires her to perform.  Producer will choose the performer(s) that Performer will perform with in the Scenes and each Scene's director.

4. **Hours and Obligations for Services**. Performer will provide the services on an as-needed basis, including nights, weekends, and holidays. Performer understands and agrees that the filming session during the Term of this agreement may take up to ten hours.

5. **Ownership; Copyright; Publicity**. Performer hereby grants Producer the worldwide, irrevocable, perpetual, right to photograph and re-photograph Performer (still and moving) and to record and re-record, double, and dub Performer's voice and performances, by any present or future methods or means, and to use and to license the use of Performer's approved name (including all stage names and aliases), approved biography, resume, signature, caricature, voice, and likeness (collectively, the "***name and likeness***") for and in connection with the creation of or the exploitation of the content created hereunder, including the promotion and advertising of the content in any media, throughout the universe, and in perpetuity. Producer will own the results and proceeds of Performer's Services under this agreement, including the copyrights of it. As the owner, Producer will have the worldwide, irrevocable, perpetual, exclusive right to use, license, and exploit the results and proceeds of Performer's Services—including all derivative works—in any manner, for any purpose, including the right to edit, televise, broadcast, record, publish, copy, print, sell, or distribute the content in any manner and in any medium, format, form, or forum, whether now known or later devised, without any further compensation than as specified in section 2. Performer acknowledges that the works created from the Services performed by Performer in performing this agreement constitute "works made for hire" under the United States Copyright Act of 1976 and, at all stages of development, the works will be and remain the sole and exclusive property of Producer. At Producer's sole discretion, Producer may make any changes in, deletions from, or additions to the works. If for any reason the results and proceeds of Performer's services under this agreement are determined not to be a work made for hire, Performer hereby irrevocably transfers and assigns to Producer all right, title, and interest in the work, including all copyrights, as well as all renewals and extensions to that work. Performer acknowledges Producer's sole ownership of all stage names, aliases, pseudonyms, characters, ideas, or other matters or materials that may be created during the term of this agreement. Performer will sign all documents that Producer may reasonably require to record and perfect its ownership rights. Performer will retain all rights in the stage name "Kenzie Anne" however during and after the term of this Agreement, Producer and Producer's assigns and licensees may use Performer's name and likeness. Performer hereby expressly waives and relinquishes to Producer any moral rights or "droit morale" in and to any content produced from the Services Performer provided under this agreement, including all of Performer's performances. Performer further hereby waivers and relinquishes to Producer all right of publicity claims, invasion of privacy claims, defamation claims, sexual harassment claims, injuries (both physical and emotional), negligence, Intellectual Property, and any liability for and by virtue of blurring, distortion, alteration, and optical illusion.  "***Intellectual Property***" means all rights, title, interest, and benefit of a party to this Agreement in intellectual property of every nature, whether registered or unregistered. Intellectual property includes trademarks, copyrights, patents, trade secrets, publicity rights, moral rights, rights against unfair competition, and any other rights commonly considered intellectual property.

2

CONFIDENTIAL

VXN0004

6. **Credit**. Producer does not have an obligation to give Performer credit in advertising or publicity, but shall afford Performer customary performer credit in all content created under this Agreement.

7. **Exclusivity and Appearance**

7.1 *Non-Exclusivity of Services*. During the Term of this Agreement, Performer will provide Services to Producer on a non-exclusive basis. However, Performer will afford Producer the right of first refusal for Performer's first anal scene ("First Anal Scene") and will not shoot an anal scene with any other producer or company until she has filmed the First Anal Scene with Producer or the Term has expired, whichever is first. Additionally, Performer will remain exclusive for <u>anal only,</u> for three months from the date that Producer shoots Performer's First Anal Scene in order for Producer to release and promote the Scene.

7.2 *Appearance*. Performer understands that Producer is entering into this Agreement with Performer based on Performer's current physical appearance, including the current measurements of Performer's body, level of physical fitness, hairstyle, and overall appearance of Performer's body. During the term of this Agreement, Performer will maintain Performer's physical appearance, and Performer will submit to the reasonable personal grooming requests of Producer, as such may be considered a norm in the adult entertainment industry. Performer acknowledges that if Performer should change her physical appearance during the term of this Agreement (including adding or subtracting tattoos or piercings) without first obtaining written permission by Producer, Producer may terminate this Agreement for Cause if the Parties cannot resolve the breach by agreement within 48 hours of the breach.

8. **Additional Services after Expiration of Agreement**. Performer will provide additional Services after expiration of this Agreement at Producer's reasonable request if Producer requires the additional Services in connection with retakes, added scenes, trailers, or changes to content initially created during the term of this Agreement.

9. **Use of Social Media**. Performer agrees during the Term of this Agreement to promote Producer's Brands and its affiliate Brands on her social media accounts including but not limited to Twitter, Instagram and any others reasonably requested by Producer to the best of her abilities, consistent with Performer's other professional photo shoots and media appearances. Performer will promote Producer's Brands at Producer's reasonable direction and under Producer's guidelines and recommendations including by promoting each Scene that Performer appears in when it is released.

Additionally, during the Term of this Agreement, Performer will not do any of the following without first obtaining written consent from Producer:

- post, tag, or comment on any photographs of anyone under 18-years old regardless of state of dress or context of the photographs; or
- post anything about a scene not yet released until notified in writing to do so.

10. **Health Testing**. Performer warrants and represents that to the best of Performer's knowledge, Performer is in good health and has no condition that would inhibit Performer's ability to perform or that would endanger Performer or any other person. If Producer requests, and at Producer's expense, Performer will immediately receive testing for HIV, hepatitis, COVID-19, or any other medical condition—mental or

3

physical—that may impact Performer's ability to safely perform Performer's duties under this Agreement. Additionally, each time Performer provides the Services contemplated by this Agreement, before providing the Services, Performer will provide Producer with documents disclosing the results of all health testing, which must have occurred within the immediately preceding 30-day period. Performer acknowledges that this information may reside in verifiable third party, HIPAA compliant databases.  Producer will fully cover the testing costs.

11. **Non-Union Affiliation**. Producer states that she is not a signatory to the Screen Actors Guild collective bargaining agreement or any other union or guild agreement. Performer states that Performer is not a member of any union or guild that would prevent Performer from performing the services contemplated by this agreement.

12. **Independent Contractor Status**. Performer is an independent contractor. Performer will not be deemed an employee of Producer. Performer will be responsible for payment of all local, state, and federal taxes, including making self-employment tax payments. Producer will not be responsible for, nor will Producer withhold, local, state, federal, social security, Medicare, unemployment, disability, or any other kind of taxes. Performer will be responsible for providing Performer's own disability and worker's compensation plans for Performer's own benefit. In addition, Performer represents that they do not meet the conditions as set forth in Assembly Bill 5 (A.B.5.) to be classified as an employee.

13. **Term and Termination**

13.1 *Term*. The term of this Agreement (the "Term") shall take effect from August 29, 2021 and last for twelve (12) months until August 29, 2022 (the "Expiration Date").

13.2 *Termination*. Producer may terminate this Agreement at any time for Cause. "*Cause*" means Performer's (1) material breach of this Agreement; (2) inability to meet Producer's subjective artistic expectations; (3) failure to follow any framework; (4) violation of Producer's rules; (5) violation of any applicable laws, rules, or regulations; or (6) failure to follow Producer's directions; (7) unreasonable unavailability; (8) or as otherwise set forth throughout this Agreement. Unless otherwise terminated by Producer under this section 13, this Agreement will terminate on the expiration of the Term.

13.3. **Force Majeure Event**. The Term may be terminated by Producer upon notice to Performer if the performance of this Agreement or any obligations hereunder is prevented, restricted or interfered with by reason of fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, health risks, disease, law (including any federal, state, local or other governmental regulations, restrictive ordinances, statutes or by common law) lock-out, boycott, work stoppage, strikes (including but not limited to union/guild strikes), or labor controversy (including but not limited to threat of walkout, boycott, or strike) or any similar cause beyond the reasonable control of Producer (each, a "***Force Majeure Event***"). Producer shall, upon giving prompt notice to Performer, be excused from such performance during such prevention, restriction or interference, and any failure or delay resulting therefrom shall not be considered a breach of this Agreement. If such Force Majeure Event continues for a period of more than 60 days, Producer may terminate this Agreement by providing written notice to Performer. In the event of a termination due to a Force Majeure Event, Producer shall have no further obligations to Performer other than the obligation of Producer to pay any accrued obligations

4

    CONFIDENTIAL    VXN0006

hereunder.

14. **Ethics and Non-Disparagement.** Performer agrees to abide by the ethical policies and practices of Producer at all times during the term of this Agreement and, within the scope of applicable laws and regulations, to act in the best interests of Producer and abide by the highest ethical standards in performing the duties set forth in this Agreement. If at any time during the course of the Agreement, Performer is involved in any situation or occurrence which subjects Performer to public scandal, disrepute, widespread contempt, public ridicule, or which is widely deemed by members of the general public, to embarrass, offend, insult or denigrate individuals or groups, or that will tend to shock, insult or offend the community or public morals or decency or prejudice the Producer in general, then Producer shall have the right, in its sole discretion, to take any action it deems appropriate, including but not limited to terminating the production of the program. During and following the term of this Agreement Performer agrees not to, and, if applicable, shall cause its officers, managers, employees not to, make or encourage any disparaging or untruthful remarks or statements about Producer or its products, services, officers, directors, affiliates, or employees; provided that nothing in this Agreement shall prevent Performer from making truthful statements when required by law, court order, subpoena, or the like, to a governmental agency or body or in connection with any legal proceeding. Notwithstanding anything in this Agreement to the contrary, Producer may terminate this Agreement at any time without notice or penalty following Performer's breach of this Section 14.

15. **Confidential Information.** Performer agrees that all terms and conditions of this Agreement shall be maintained in strict confidence and shall not be disclosed to any third Parties unless compelled to disclose by appropriate court order or with Producer's approval. Additionally, Performer will keep confidential all Confidential Information. "*Confidential Information*" means any information or data of a party that that party disclosed to the other party, either directly or indirectly, whether in writing, orally, or by visual means, and which the disclosing party designates (either in writing or orally) as confidential, proprietary, or another similar designation. However, a disclosing party will not need to designate information or data as confidential information if the nature of the information makes it generally considered confidential commercially, which includes information that relates to: (1) trade secrets or know-how; (2) finance or accounting; (3) technology, research, or development; (4) internal processes or procedures; (5) business, operations, or planning of it; (6) sales or marketing strategies; (7) the terms of any agreement, and the discussions, negotiations, or proposals related to it, including this Agreement. "Confidential Information" also includes the legal names and addresses of actors and models appearing in the content. "Confidential information" does not include information that (1) is publicly available or in the public domain at the time disclosed; (2) is or becomes publicly available or enters the public domain through no fault of the receiving party; (3) is rightfully communicated to the receiving party by persons not bound by confidentiality obligations for that information; or (4) is already in the receiving party's possession free of any confidentiality obligations for that information at the time of disclosure. This section will survive the termination of this Agreement.

16. **Performer Representations and Warranties**. Performer represents and warrants that Performer is 18-years old or older, has the right to enter into this Agreement and to grant to Producer all rights granted in this Agreement, and that Performer has not entered into or will enter into any Agreement of any kind that will interfere in any way with the complete performance of this Agreement.

5

CONFIDENTIAL                                                      VXN0007

**17. Indemnification.** Performer will pay Producer for any loss of Producer's that is caused by Performer's reckless acts or intentional misconduct. But Performer need not pay to the extent that the loss was caused by Producer's reckless acts or intentional misconduct. *"Loss"* means an amount that a party is legally responsible for or pays in any form. Amounts include, for example, a judgment, a settlement, a fine, damages, injunctive relief, staff compensation, a decrease in property value, and expenses for defending against a claim for a loss (including fees for legal counsel, expert witnesses, and other advisers). A loss can be tangible or intangible; can arise from bodily injury, property damage, or other causes; can be based on tort, breach of contract, or any other theory or recovery; and includes incidental, direct, and consequential damages. A loss is *"caused by"* an event if the loss would not have occurred without the event, even if the event is not a proximate cause of the loss.

## 18. Dispute Resolution

**18.1 *In General*.** The Parties will attempt in good faith to resolve all disputes, disagreements, or claims between the Parties relating to this Agreement.

**18.2 *Mediation*.** If the Parties cannot settle a dispute through negotiation, the Parties will engage in nonbinding mediation before resorting to arbitration. The Parties will conduct mediation in Los Angeles County, California. Unless the Parties agree otherwise, the American Arbitration Association will administer the mediation according to its Commercial Mediation Procedures. Each Party will bear its own costs and expenses in mediation and the Parties will share equally between them all third-party mediation costs and expenses unless the Parties otherwise agree in a writing signed by the Party agreeing to bear the costs and expenses.

**18.3 *Arbitration*.** In the event that mediation between the Parties is unsuccessful, the Parties will settle any controversy or claim arising out of or relating to this Agreement, or the breach of it, by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. A single arbitrator will preside over the arbitration and issue a final award on all issues submitted to the arbitrator. The Parties will conduct the arbitration in Los Angeles County, California. The arbitrator's award will be final and binding on the Parties. Either party may file an action in a court of competent jurisdiction to: (1) enforce this provision; (2) obtain injunctive relief; or (3) enforce the arbitrator's award.

**18.4 *Waiver of Jury Trial*.** The Parties agree that as part of their consideration for this Agreement, they waive the right to a trial by jury for any dispute arising between the Parties related to the subject matter of this Agreement. The Parties further agree that this waiver will be enforceable up to and including the day that trial is to start, and even if the arbitration provisions of this section are waived.

**18.5 *Limited Time to Bring Claims*.** Unless otherwise required by applicable law without the possibility of contractual waiver or limitation, neither Party will bring legal action, regardless of form, arising out of (or related to) this Agreement or any transaction under it more than six months after the cause of action arose. After this time limit, any legal action arising out of this Agreement (or any transaction under it) and all respective rights related to any action lapse.

## 19. General Provisions

6

19.1 *Entire Agreement*. This Agreement makes up the sole Agreement of the Parties concerning its subject matter. It supersedes all earlier written or oral discussions, negotiations, proposals, undertakings, understandings, and agreements between the Parties concerning the transactions contemplated in this agreement. No party may use any of the earlier or contemporaneous negotiations, preliminary drafts, or previous versions of this Agreement leading up to its signature and not stated in this Agreement to construe or affect the validity of this Agreement. No conditions, definitions, representations, or warranties concerning the subject matter other than as expressly stated in this Agreement will bind either party. Each party acknowledges that no party made or relied on a representation, inducement, or condition not stated in this agreement.

19.2 *Amendment*. The Parties may amend this Agreement only by a written agreement of the Parties that identifies itself as an amendment to this Agreement.

19.3 *Assignment and Delegation*. Producer may assign this Agreement and the rights granted in it to any other person. Performer may not assign Performer's rights or delegate Performer's duties under this agreement because this Agreement is a personal service contract entered into in reliance on the singular personal skill, qualifications, and representations of Performer. Any purported assignment of rights or delegation of duties by Performer in violation of this provision is void.

19.4 *Waiver*. If either party fails to require the other to perform any term of this Agreement, that failure does not prevent the party from later enforcing that term. If either party waives the other's breach of a term, that waiver is not treated as waiving a later breach of the term. No waiver by any party of any of the provisions of this Agreement will be effective unless in writing and signed by the waiving party. No waiver will operate as a waiver regarding any failure, breach, or default unless expressly identified by the written waiver. The Parties may waive compliance with this provision in a writing signed by both Parties.

19.5 *Severability*. If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

19.6 *Notices*. All notices and other communications required or permitted under this Agreement must be in writing and must be delivered personally or sent by email, certified or registered mail, or by overnight courier, postage prepaid, to the party's address listed below:

Mackenzie Thoma a/k/a Kenzie Anne
misskenzieanne@gmail.com
4324 Promenade Way # 314,
Marina Del Ray, CA 90282


VXN GROUP, LLC
Attn: Emilie Kennedy
emilie@vixen.com
11271 Ventura Blvd. #717
Studio City, CA 91604

A party may change this address by notice to the other party as stated in this Agreement. A notice is considered as having been given (1) on the day of personal delivery, or (2) two days after the date of mailing.

7

CONFIDENTIAL

**VXN0009**

19.7 *Cumulative Remedies*. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the assertion by a party of any right or remedy will not preclude the assertion by the party of any other rights or the seeking of any other remedies available at law, in equity, by statute, in any other Agreement between the Parties, or otherwise.

19.8 *Governing Law*. The Parties have signed and entered into this Agreement in the State of California. California law applies to this Agreement without regard for any choice-of-law rules that might direct the application of the laws of any other jurisdiction.

19.9 *Jurisdiction and Venue*. Each party irrevocably and unconditionally agrees that it will not bring any proceeding against any other party arising out of this Agreement in any forum other than Los Angeles County, California. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of Los Angeles County, California and agrees to bring any proceeding only in Los Angeles County, California.

19.10 *Enforcement Costs and Expenses*. If a party breaches this Agreement, the breaching party will reimburse the nonbreaking party for all actual legal fees and costs incurred in enforcing this Agreement.

19.11 *Performance Costs and Expenses*. Unless otherwise stated in this Agreement, each party will pay all of the costs and expenses that party incurs regarding this Agreement and the transactions it contemplates.

19.12 *Third-Party Beneficiaries*. This Agreement does not and is not intended to confer any rights or remedies on any person other than the Parties.

19.13 *Relationship of the Parties*. The Parties' relationship is that of independent contractors and not business partners. Nothing in this Agreement creates a partnership, joint venture, agency, franchise, or employment relationship between the Parties and the Parties expressly disclaim the existence of any of these relationships between them.

19.14 *Successors and Assigns*. This Agreement inures to the benefit of, and is binding on, the Parties and their respective successors and assigns. This section does not address, directly or indirectly, whether a party may assign its rights or delegate its performance under this Agreement.

19.15 *Further Assurances*. Each party will take any actions, or sign any documents, necessary to effect or facilitate the purpose of this Agreement.

19.16 *Voluntary Agreement*. The Parties have signed this Agreement voluntarily and for valid reasons, and in doing so do not and have not relied on any statement or promise by any other party, except those expressed in this Agreement. The Parties acknowledge and agree that they have carefully read this Agreement, discussed it with their attorneys or other advisors, understand all of the terms and conditions, and agree to be bound by it. The Parties have relied on the advice of their attorneys or other advisors about the terms and conditions of this Agreement, and waive any claim that the terms and conditions should be construed against the drafter.

19.17 *Corporate authority*. Each person signing this agreement on behalf of any corporate entity agrees that he or she has full authority to sign this Agreement on behalf of the entity and that party has taken all necessary actions. In addition, each corporate party agrees that this Agreement does not constitute a

8

CONFIDENTIAL

violation or breach of that party's articles of incorporation, bylaws, or any other agreement or law by which that party is bound.

19.18 *Counterparts*. The Parties may sign this Agreement in any number of counterparts. The Parties deem each counterpart an original and all counterparts, when taken together, make up the same agreement.

20. **Usages**. In this Agreement, unless otherwise stated or the context otherwise requires, the following usages apply:

20.1 Actions permitted under this agreement may be taken at any time and from time to time in the actor's sole discretion.

20.2 References to a statute will refer to the statute and any successor statute, and to all regulations promulgated under or implementing the statute or successor, as in effect at the relevant time.

20.3 References to numbered sections in this Agreement also refer to all included sections. For example, references to section 6 also refer to sections 6.1, 6.1(A), etc.

20.4 In computing periods from a specified date to a later specified date, the words "from" and "commencing on" (and the like) mean "from and including," and the words "to," "until," and "ending on" (and the like) mean "to but excluding."

21. **Signatures.** The Parties agree that they may deliver signatures on this Agreement by fax or electronically instead of an original signature and agree to treat fax or electronic signatures as original signatures that bind them to this Agreement.

The Parties signed this Agreement on the date listed on the first page.

**Producer: VXN GROUP, LLC,** a Delaware Limited Liability Company

By: Mike Miller, Executive Producer.

Signature: _____ *Mike Miller* _____
9CB5D39D52CD429...

Date: _____ 7/13/2021 _____

Performer: **MACKENZIE THOMA a/k/a KENZIE ANNE**, an individual

Signature: _____
1183CF222482413...

Date: _____ 7/16/2021 _____

9

 CONFIDENTIAL **VXN0011**

# **EXHIBIT 27**

# VIXEN

MEDIA GROUP

Reply to:
Emilie Kennedy
Emilie@vixen.com

September 28, 2022

Attn: Mackenzie Thoma a/k/a Kenzie Anne
misskenzieanne@gmail.com
4324 Promenade Way #314
Marina Del Ray, CA 90282

*Delivery via email*

Re: Notice of Termination of Performance Agreement

Dear Ms. Thoma:

Please be advised that VXN Group, LLC ("VXN Group") is exercising its right to terminate its "Performance Agreement" with you and all associated addendums for cause in accordance with Paragraph 13.2 of the Agreement. This letter is to serve as notice pursuant to Paragraph 19.6 of the Agreement.

Paragraph 13.2 states:

13.2 *Termination*. Producer may terminate this Agreement at any time for Cause. "*Cause*" means Performer's (1) material breach of this Agreement; ... (7) unreasonable unavailability.

Paragraph 7.2 states that any body modifications by Performer can result in a material breach of the Agreement where Producer may terminate for cause.

VXN Group is terminating the Agreement "for cause" because of your "material breach of this Agreement" by failing to perform the scenes as scheduled because you were receiving body modifications without notifying us, as well as your "unreasonable unavailability" which has forced VXN Group to cancel planned shoots after it incurred costs, causing significant damages. To date, VXN Group estimates it has incurred over $50,000 in damages because of last minute scene cancellations by you.

CONFIDENTIAL



Specifically, in June 2022, VXN Group planned its yearly showcase to feature you. The company contracted specific locations, had its writers create a customized script, began building intricate set designs and scheduled its directors, crew, and staff for five performances with you. Just days before the scheduled scenes, your agent notified us you were no longer able to perform because of body modifications you made immediately before the scheduled shoots without notifying us. To date, we have incurred non-refundable locations costs, missed the production window for the 2023 AVN Awards deadline, and have otherwise been unable to utilize the resources we committed to those performances.

Despite our losses, we agreed to give you another opportunity to fulfill the Agreement and on June 20, 2022 we entered into the Addendum extending the Agreement. We scheduled you for a BlackedRaw shoot on August 12, 2022. Unfortunately, again, your agent notified us of your inability to perform the scene just days before it was scheduled to take place, despite having known for some time you were likely to cancel. Again, we incurred damages for having to cancel at the last minute.

Because of the damages that have occurred from last minute cancellations and failure to commit to scheduled scenes, we no longer can risk scheduling any additional engagements between you and VXN Group. Your failure to appear on scheduled shoot dates and for specific projects constitutes a material breach and we are exercising our right to terminate the Agreement to avoid incurring additional damages.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

VXN GROUP, LLC

By: _Emilie Kennedy_
Emilie Kennedy

Cc: Mike Miller
    Motley Models

CONFIDENTIAL

# **EXHIBIT 28**

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

3    _____

4    MACKENZIE ANNE THOMA, A.K.A.

5    KENZIE ANNE, an Individual and

6    on Behalf of All Others

7    Similarly Situated,

8              Plaintiff,

9       v.                              Case No.

10   VXN GROUP, LLC, a Delaware         2:23.cv.04901

11   Limited Liability Company and      WLH (AGRx)

12   MIKE MILLER, an Individual; and

13   DOES 1 to 100, Inclusive,

14             Defendants.

15   _____

16         DEPOSITION OF MACKENZIE ANNE THOMA

17   DATE:        Tuesday, August 13, 2024

18   TIME:        10:36 a.m.

19   LOCATION:    Veritext Legal Solutions

20                707 Wilshire Boulevard, Suite 3500

21                Los Angeles, CA 90017

22   OFFICIATED BY: John Canfield

23   JOB NO.:     6861393

24

25

                                        Page 1

```
 1              Did you believe that you would have more

 2    success in adult entertainment as opposed to mainstream

 3    modeling?

 4                    MS. COHEN:  Objection.  Vague as to

 5    "success."

 6    BY MR. BROWN:

 7        Q    Did you believe that you would have more

 8    monetary success in the adult entertainment world as

 9    opposed to the mainstream modeling world?

10        A    Outside of monetization, I believed that I

11    could work more being in the adult entertainment

12    industry.

13        Q    Outside of finances?

14        A    Yes.

15        Q    So to clarify, you're saying that you would be

16    able to work more hours in the adult entertainment

17    industry than you would in the modeling industry?

18        A    No, sir.  That is not what I said.

19        Q    Can you clarify your answer?

20        A    I was interested in having an appearance more

21    relevant.

22        Q    I see.  So in that sense you believed that you

23    would be more successful in adult entertainment because

24    you would be more visible to the public as opposed to in

25    mainstream modeling?
```

<div align="right">Page 23</div>

```
 1        Q      And what would be the reason that you no
 2   longer use those platforms?
 3        A      The reason to leave a platform is lack of
 4   traffic.
 5        Q      And when you say "lack of traffic," is it fair
 6   to say that you also mean lack of revenue?
 7        A      Yes, traffic equates to revenue.
 8        Q      Okay.  Which of those platforms generates the
 9   most traffic for you?
10        A      Over time it would be OnlyFans.
11        Q      And prior to your work with Vixen how much
12   revenue would you estimate that you made camming in a
13   monthly period?
14        A      Roughly 50,000 a month.
15        Q      And this is prior to your starting to work
16   with Vixen?
17        A      Yes, sir.
18        Q      Okay.  And were you also camming during the
19   time in which you were working with Vixen?
20        A      No, sir because I was asked not to.
21        Q      Who asked you not to?
22        A      That would've been Mike Miller or whoever
23   drafted up my contract with Vixen.
24        Q      Whoever drafted the contract?
25        A      Mh-hmm.
```

Page 19

1      Q     Did anyone else besides Sid Vision or Dave

2  Rock or Ryan Kona influence you to bring this lawsuit?

3      A     Yes, Vixen.

4      Q     What's your relationship with Chris Applebaum?

5      A     I have known Chris Applebaum -- I was probably

6  22, 23.  He is the owner of a website called Eats.  It's

7  just sexy girls eating food, and I had worked with him a

8  lot.

9      Q     How'd you first meet him?

10     A     For a shoot where I ate ice cream.

11     Q     And how did you come to be on that shoot?

12     A     Through Instagram.

13     Q     So did he see you on Instagram and solicit you

14 to come for that shoot, or did it work the other way

15 around?

16     A     I don't remember.

17     Q     Around what time would that have been?

18     A     I mean the timeline of me being 22, my early

19 twenties, I guess maybe like 2016.

20     Q     Okay.  Who directed your first scene with

21 Vixen?

22     A     Chris did under the name of Halston.

23     Q     And did you play any part in Chris Applebaum

24 being the director for your first Vixen scene?

25     A     I am not sure.

Page 58

1          Q     Did you introduce Chris Applebaum to Vixen?

2          A     I don't believe I was who introduced them.

3          Q     Do you know the circumstances -- do you know

4      what the circumstances were around Chris Applebaum being

5      introduced to Vixen?

6          A     I do not.

7          Q     Do you still work with Chris Applebaum?

8          A     I did a video shoot with Chris -- when did we

9      do it?  Maybe four months ago.

10         Q     And do you enjoy working with Chris Applebaum?

11         A     I do.

12         Q     Do you think that Chris Applebaum would've

13     been the director of your first scene with Vixen if you

14     had not prior worked with Chris Applebaum?

15                    MS. COHEN:  Objection.  Calls for

16     speculation.

17         A     The network of the industry that -- like

18     floods very large and ambiguously.  I don't know because

19     I'm not sure how they met.  And Chris is very popular on

20     Instagram.  Vixen also chooses different directors and

21     videographers often.  So I don't how to answer that

22     question for you.

23         Q     Did you request that Chris Applebaum be the

24     director for your first Vixen scene?

25         A     I did not request it.  I do believe I

                                                   Page 59

```
 1    suggested it.
 2         Q    To your knowledge, did Chris Applebaum -- had
 3    he directed a hardcore sex scene prior to your first
 4    scene with Vixen?
 5         A    I'm sorry, rephrase that.
 6         Q    To your knowledge, had Chris Applebaum been a
 7    director for a scene where two people are having sex
 8    prior to your first scene?
 9         A    I am not sure.
10         Q    Do you know who Lauren Bonner is?
11         A    I do know who Lauren Bonner is.
12         Q    What is your relationship with Lauren Bonner?
13         A    I don't have one.
14         Q    Did you ever have a relationship with Lauren
15    Bonner?
16         A    She was a personal assistant on set.
17         Q    A personal assistant to whom?
18         A    To Chris.
19         Q    To Chris.  And when you say "onset," do you
20    mean on each set?
21         A    Yes.
22         Q    Did you and Lauren ever work together?
23         A    If by adjusting things I was wearing means
24    working together, yes.
25         Q    Did Lauren -- was Lauren around and working in
```

Page 60

1        A    I initially just started Kenzieland without

2    the knowledge of an LLC and just had a brand that I

3    called my own.  I was trying to make content that was

4    digestible for many of its OnlyFans, and I wanted to

5    have a professional camera instead of an iPhone for that

6    content, to take amateur to a professional view.

7        Q    So Kenzieland was an idea or a thing before

8    you actually incorporated Kenzieland, LLC?

9        A    Yes.

10       Q    Who came up with the concept for Kenzieland?

11       A    I did.

12       Q    And the concept -- can you talk about that a

13   little bit more, like what the concept was for

14   Kenzieland?

15       A    I marketed it as glamorously dirty.  I wanted

16   a glam detail of sexual acts on camera.

17       Q    And so how did you get Kenzieland off the

18   ground?  In other words, it started as an idea in your

19   head to produce dirty glam.  And how did you put that

20   into motion?

21       A    I had hired Chris as my videographer to shoot

22   my concepts.

23       Q    And when you say you hired Chris as your

24   videographer, did you hire him as an employee, a partner

25   of yours?

Page 62

```
 1        A    Again, at the time I didn't know much about
 2   the legal parts of that, so I just hired him out of
 3   pocket.
 4        Q    Okay.  And when we say Chris, we mean Chris
 5   Applebaum?
 6        A    Yes, Chris Applebaum.
 7        Q    And so to get Kenzieland -- to get this vision
 8   off the ground, you hired Chris Applebaum as your
 9   videographer?
10        A    Yes.
11        Q    And what was the first thing y'all did
12   together under this banner of Kenzieland?
13        A    I don't recall.
14        Q    Is Kenzieland an ongoing thing?
15        A    Kenzieland website works.  I had a guy create
16   a website where I sell the videos that I made.  So it
17   does produce a small amount of revenue.  I actually
18   can't remember if I renewed that LLC this year.
19        Q    Who created the website for you?
20        A    What was his name?  I can't think of his name
21   right now.
22        Q    If you happen to remember, let me know any
23   time.
24        A    Okay.
25        Q    So Kenzieland is an ongoing thing?
```

Page 63

1    that you look?

2         A    Being the star of every film I did, yes.

3         Q    And what was the first movie that you created

4    for Kenzieland?

5         A    I don't recall.

6         Q    Do you know when you might have made the first

7    film for Kenzieland?

8         A    I do not.

9         Q    What role would you play in a typical

10   Kenzieland film?

11        A    I did creative directing, which I also had

12   hired Chris for, Chris Applebaum.  I picked out what the

13   wardrobe was, hair and makeup, location, and being in

14   the film.

15        Q    So you were jack of all trades in this

16   Kenzieland business?

17        A    Yes.

18        Q    You were creative director, stylists for -- I

19   guess wardrobe, right?  I assume that you weren't the

20   actual stylist.  Did you have makeup artists and things

21   like that?

22        A    Yes.

23        Q    Would it be fair to say that you were the

24   executive producer of Kenzieland films?

25        A    Yes.

Page 65

1    misskenzieanne.com.

2        Q    And how much do you sell the movies for?

3        A    I honestly don't know.

4        Q    And are the movies for sale outright?  In

5    other words, if I buy a movie on kenzieland.com, do I

6    own that movie forever, or do I need to go to Kenzieland

7    to watch it?

8        A    I believe I did it so that you have to go to

9    Kenzieland to watch it, but I -- I don't know that for

10   sure.

11       Q    Does Kenzieland obtain revenue via like a

12   subscription service or is it per movie?

13       A    It's per movie.

14       Q    Okay.  The money that you generated from

15   Kenzieland movies, what did you put that -- did that

16   money go back into Kenzieland, LLC?  How was that money

17   used?

18       A    Almost all of the money for Kenzieland was

19   either cut even based off of production costs or put

20   into the next film.

21       Q    Okay.  And when you say, "production costs,"

22   you mean paying the various people that were involved in

23   the production of the movie?

24       A    Yes.

25       Q    And payment for the props and the wardrobe?

Page 68

1          A     Yes.

2          Q     And payment for the locations?

3          A     Yes.

4          Q     I'm going to show you a list of movies

5     produced under Kenzieland that I pulled from the

6     internet adult film database.  I'm going to introduce

7     this as deposition Exhibit 1.

8                Does this list look accurate to you in terms

9     of the titles of the movies and the year of production?

10                   (Exhibit 1 was marked for

11                    identification.)

12         A     To my knowledge, yes.

13         Q     Okay.  So it looks like there are 23 movies on

14    here; is that correct?

15         A     That's what it says.

16         Q     But earlier you said that sometimes you break

17    up a movie into separate parts, and that's why we might

18    get something like we see on the exhibit, Maid 1, Maid

19    2, and Maid 3?

20         A     Yes.

21         Q     Okay.  Did you engage other performers to

22    perform on Kenzieland movies?

23         A     I did, yes, but they were not all sex.

24         Q     Okay.  So other performers beyond you

25    performed in many of these movies?

Page 69

1      A     It would be -- I believe six, seven.

2      Q     Seven of these movies?

3      A     Yes.

4      Q     Do you recall which ones?

5      A     Kenzie and Jax, Maid 1, 2, and 3, The

6    Sleepover, Vanna Bardot and Codey Steele.

7      Q     Okay.  And the year of production is accurate?

8      A     I -- I believe so.

9      Q     Okay.  Did you enter into agreements with the

10   performers who worked on the Kenzieland movies?

11            MS. COHEN:  Objection.  Calls for expert

12   opinion, legal conclusion.  Vague as to "agreements."

13   BY MR. BROWN:

14     Q     Did you enter into any written contracts with

15   the performers who performed on the Kenzieland movies?

16            MS. COHEN:  Same objections.

17     A     No, I did not.

18     Q     So just to be clear, for the performers that

19   worked on these Kenzieland pictures with you, none of

20   them did so pursuant to a signed agreement?

21     A     We traded content.

22     Q     Traded content?

23     A     So when I filmed with them, they were also

24   allowed to use what I produced to sell.

25     Q     Did you pay any of the performers money --

Page 70

```
 1        A     No.

 2        Q     -- in exchange for appearing in the Kenzieland

 3   movies?

 4        A     No.

 5        Q     And when you say you "traded content," can you

 6   be a little bit more specific in terms of what that

 7   exchange looked like?

 8        A     The outcome of video content produced in

 9   anything they were in, they get full legal rights too.

10        Q     So in other words, if, let's take for example,

11   Vanna Bardot and the Codey Steele Submit film, Vanna

12   Bardot and Codey Steele have a full license to use that

13   content any way they want?

14        A     I sent it to them, yes.

15        Q     And have they used that content?

16        A     I have no idea.

17        Q     And does the trade work both ways?  In other

18   words, did you perform in films for these performers and

19   also have the ability to use that content as you saw

20   fit?

21        A     No.

22        Q     So it's kind of a one-way trade in terms of

23   you say, "Hey Vanna, come work on this film with me and

24   in exchange you can just use this content for your own

25   purposes"?
```

Page 71

1        A    Yes.

2        Q    Are they able to monetize the content that

3    they use, or are they just using it -- are they able to

4    package it and sell it on their own?

5        A    They're able to package and sell the content

6    I've provided them to get revenue.

7        Q    And the content that you provide them, is that

8    the finished movie?

9        A    Yes, and some behind the scenes.  So iPhone

10   things we -- photos we took.

11       Q    And does this same thing -- does that same

12   arrangement apply for the male actors as well?

13       A    Yes.

14       Q    So Jax Slayer -- just to be clear, you had no

15   agreement with Jax Slayer to perform in the Kenzieland

16   movies -- in other words, you had no written contract

17   with Jax Slayer in connection with Kenzieland movies?

18       A    No, I did not.

19       Q    You had a written contract with Rob Piper

20   pursuant to acting in Kenzieland movies?

21       A    No, I did not.  Where was Rob Piper?

22       Q    Did Rob Piper perform in a Kenzieland movie?

23       A    No, I don't believe he did.

24       Q    No.  Did Codey Steele perform in a Kenzieland

25   movie?

                                              Page 72

```
 1        A    Yes, Codey Steele did.

 2        Q    And Codey Steele did not perform under a

 3    written agreement with you?

 4        A    No, he did not.

 5        Q    Okay.  And was Jax Slayer paid any money in

 6    connection with his performance on the Kenzieland

 7    Worship video?

 8        A    No, he was not.

 9        Q    Was Codey Steele paid any money in connection

10    with the Kenzieland video that he acted in?

11        A    No, he was not.

12        Q    Was Vanna Bardot paid any money in connection

13    with the Kenzieland movie?

14        A    No, she was not.

15        Q    Was Charly Summer?

16        A    No, she was not.

17        Q    How about Kendra Sunderland?

18        A    No, she was not.

19        Q    Did Scarlett Scandal act in a Kenzieland movie

20    with you?

21        A    Oh, yeah.  Scarlet was in a video.  I don't

22    think we ever released that video.  I think we just took

23    pictures.  I -- yeah, I don't think that video ever came

24    out.

25        Q    Would that have been the Afternoon Delight
```

Page 73

```
 1    video or was that a solo video?

 2         A    I believe Afternoon Delight was solo.  I don't

 3    know.

 4         Q    Okay.

 5         A    I'm not sure.

 6         Q    I'll just say these last names.  But to your

 7    knowledge, did any of Kim Kerotika, Lily Andrews, or

 8    Ashley Lane act in Kenzieland videos?

 9         A    Ashley Lane.

10         Q    She did?

11         A    Yeah.

12         Q    Did Lily Andrews act in any Kenzieland videos?

13         A    Oh, yes.  Lily Andrews was Sleepover Eats.

14         Q    And did Kim Kerotika act with you in any

15    Kenzieland movies?

16         A    Oh, she did too.  Yes.  I don't remember which

17    one that is.

18         Q    And just to be clear, you didn't enter into a

19    signed -- Kenzieland, LLC or you didn't enter into a

20    signed agreement with Kim Kerotika or Lily Andrews or

21    Ashley Lane?

22         A    No, we did not.

23         Q    Okay.  So the products and service -- the

24    products offered by Kenzieland, were they just movies?

25         A    Okay.  So now I'm remembering.  I don't know
```

Page 74

```
 1   services to multiple companies.
 2            MS. COHEN:  I don't think that has
 3   anything to do with phase one.
 4   BY MR. BROWN:
 5       Q    Are you going to abide by your Counsel's
 6   advice not to answer the question?
 7       A    I am.
 8       Q    So in 2022, were you really active as far as
 9   being an adult performer?
10            MS. COHEN:  Objection.  Vague.
11       A    I was working often, yes.  Yes, I was working
12   a good amount at that point.
13       Q    And what were you working on in 2022?
14       A    Scenes.
15       Q    And were these scenes for adult entertainment
16   companies, studios?
17       A    Yes, and myself.
18       Q    And when you say yourself, do you mean
19   Kenzieland movies, or do you mean content produced for
20   your OnlyFans?
21       A    I mean content produced for my OnlyFans.
22       Q    Okay.  And would it be fair to say that 2022
23   was your most active year in performing as an adult film
24   actress?
25       A    Yes.  I would say 2022 was my most active
```

Page 79

```
 1    year.

 2         Q    Did you do over a hundred scenes that year?

 3         A    I have no idea.

 4         Q    Would it have been over a hundred scenes to

 5    your knowledge?

 6         A    I have no idea.

 7         Q    Would it have been fewer than a hundred scenes

 8    to your knowledge?

 9         A    I have no idea.

10         Q    But you were -- would you agree that you were

11    pretty prolific during 2022?

12         A    Can you define that word?

13         Q    Prolific meaning very active, prolific

14    meaning --

15         A    So the same question again?

16         Q    Sure.  Would you say that you were prolific in

17    2022?

18         A    I -- I -- yes.  It was my most active year as

19    I stated earlier.

20         Q    And did you get nominated for a lot of awards

21    that year?

22         A    "A lot" is an ambiguous term.  I had some

23    nominations.

24         Q    What awards in general have you won for being

25    an adult performer?
```

Page 80

1    so confusing because I was on Euphoria playing a

2    stripper and was totally naked, so mainstream ...

3        Q    I see what you're saying.  But you performed

4    on a television series that was aired on a major

5    network, namely Euphoria; is that correct?

6        A    Yes.

7        Q    Okay.  Are you a member of SAG-AFTRA?

8        A    No, but I have SAG credit, and I just have not

9    created an account to be one because I like my insurance

10   better.

11       Q    I see.  Were you ever offered membership with

12   SAG-AFTRA?

13       A    Yes.

14       Q    And how did that offer come about?

15       A    They -- they sent a letter in the mail with my

16   -- I guess resume.

17       Q    And was the offer that SAG-AFTRA made to you

18   to join that union, and was it related to some acting

19   that you had done?

20       A    Yes.

21       Q    What was it related to?

22       A    It was hours spent on set for Euphoria, and

23   I'm trying to think of what the other one was.  It may

24   have been a Jeep commercial.  I don't remember.

25       Q    Do you recall what the letter from SAG-AFTRA

Page 84

```
 1   said?

 2       A    No.

 3       Q    But SAG-AFTRA basically told you that you were

 4   invited to join the union?

 5       A    Yes, that I qualified.

 6       Q    And you said that you decided not to join the

 7   union because you didn't like their insurance?

 8       A    SAG-AFTRA has like a fee you pay.  There was a

 9   lot I didn't understand about it, and I just didn't

10   really care to go through the paperwork.

11       Q    Okay.

12            MS. COHEN:  Counsel, we've been going

13   about an hour since we got back from lunch.  Are you

14   okay with a few minutes break, five minutes?

15            MR. BROWN:  I'm okay with a five minute

16   break.

17            MS. COHEN:  Great.

18            THE VIDEOGRAPHER:  We are going off the

19   record.  The time is 2:37 p.m.

20            (Off the record.)

21            THE VIDEOGRAPHER:  This is media six.  We

22   are going back on the record.  The time is 2:48 p.m.

23   BY MR. BROWN:

24       Q    I want to talk a little bit -- go back and

25   talk a little bit more about Kenzieland for a second.
```

Page 85

```
 1   How would you attract customers or viewers for

 2   Kenzieland content?

 3        A    Through Instagram or Twitter.

 4        Q    And when you say through Instagram or Twitter,

 5   what would the actual engagement on those platforms look

 6   like in order to attract customers to Kenzieland?

 7        A    Posting a link that would take you directly to

 8   the site.

 9        Q    And you would use your personal social media

10   accounts to do that?  Or did Kenzieland have a separate

11   social media account?

12        A    Both.  Kenzieland had a -- or Kenzieland had

13   an Instagram and a Twitter, but it's inactive now.  I

14   mean they -- they exist, I guess.  Inactive is the

15   incorrect term.  They haven't posted in years.  I don't

16   even think I have the Twitter handle anymore.

17        Q    So you would post something on Twitter or

18   Instagram -- let's just take for example Instagram.

19   You're going to post some content that's going to

20   attract -- the goal of it's to attract people to

21   Kenzieland?

22        A    Yes.

23        Q    What does that Instagram post look like?

24        A    I don't remember.  Instagram flags everything,

25   so more often than not it's an appropriate photo.  We
```

Page 86

1    would.

2        Q    Just one last question on Kenzieland.  Did you

3    ever use any pictures or stills from Vixen content in

4    the context of Kenzieland?

5        A    Not anything I recollect.

6        Q    Okay.  Your contract with Vixen, was that a

7    negotiated contract?

8        A    I did not get much back and forth except for

9    fighting for my five-minute videos to be able to use my

10   OnlyFans in some way.

11       Q    And was that successful?

12       A    I did get the five minutes.  I was allowed to

13   have that.

14       Q    Did someone negotiate the contract on your

15   behalf?

16       A    There was a man named Eric Galen who I used as

17   somebody on my behalf to do any negotiating.  I didn't

18   really know much about him.  It was kind of just a lack

19   of understanding any legal things for the industry.  I

20   was very fresh.

21       Q    How did you meet Eric Galen?

22       A    Through Chris Applebaum.

23       Q    Okay.  And you said that he negotiated -- he

24   negotiated other contracts besides the Vixen contract

25   for you?

Page 88

```
 1          A     No, just that one.

 2          Q     Did he provide any services to you beyond

 3     negotiating the Vixen contract?

 4          A     No.

 5          Q     Did Eric -- is it Galen or Galen?

 6          A     I always said Galen.  Maybe I'm wrong.  Galen,

 7     I guess there's -- I guess there's only one L.

 8          Q     Did Eric Galen ever discuss the Vixen contract

 9     with you?

10          A     Yes, 'cause he was the one who was trying to

11     get me my rates and what I had tried to negotiate, I

12     guess in terms of my OnlyFans.

13          Q     And when you say that he was trying to get you

14     your rates, what do you mean by that?

15          A     I didn't know what a debut cost was.  I had no

16     idea how much money I would be making.  I'd never talked

17     to anybody in the past.  So I set my -- my first scenes

18     high because I knew that they were an exclusive part of

19     my coming out in the industry.  So yeah, he got my first

20     -- I believe, just my first two scene rates for me.

21          Q     And so when you say that you wanted to set

22     your first scene rates high, can you explain a little

23     bit more what you mean by "first scene rates"?

24          A     What I would be paid for my first job with

25     Vixen.
```

Litigation Services

A Veritext Company                    www.veritext.com

1      Q      And so the amount that you would be paid for

2   your first job would be more than you would get paid on

3   subsequent jobs with Vixen?

4      A      I didn't know the difference.

5      Q      And you relied on Eric Galen to navigate the

6   negotiation for you?

7      A      Yes.

8      Q      Okay.  Was there any part of the agreement

9   that you did not understand when you were discussing the

10  agreement with Eric Galen?

11     A      There was a lot of it.

12     Q      Do you recall what specific parts of the

13  agreement you did not understand?

14     A      No.  I just don't really understand legal

15  contracts in general.  So the verbiage, I guess.

16     Q      So would it be fair to say that you trusted

17  Eric Galen to negotiate not just the rates in the

18  contract, but all of the other requirements of the

19  contract for you?

20     A      Yes.

21     Q      And do you know what Eric Galen does for a

22  living?

23     A      I do not.

24     Q      Do you know who he works for?

25     A      I do not.

Page 90

 1    outfit.

 2         Q    Did you participate in choosing that gown at

 3    all?

 4         A    I participated in trying on many gowns and

 5    pointing the stylist into what fit me better.

 6         Q    Did you play any role in the overall aesthetic

 7    of that first scene?

 8         A    No, I did not.

 9         Q    Did you -- I guess, were you happy that you

10    were working with Emily Willis and Alina Lopez as part

11    of your first scene?

12         A    Yes, I was.

13         Q    Was any part of you dissatisfied that you were

14    working with Emily Willis and Alina Lopez on that first

15    scene?

16         A    No, it was one of my only Vixen scenes that I

17    actually got to pick my actors.  And last minute, one

18    female was replaced with another one as well.

19         Q    On that first scene?

20         A    On that first scene.

21         Q    So you said that you got to pick the actors

22    for the first scene.  You picked Emily Willis?

23         A    I picked Emily Willis.

24         Q    You did not pick Alina Lopez?

25         A    I don't remember who I picked, but it was not

                                                    Page 93

 1    form?

 2        A    You want me to go over what I'm comfortable

 3    with when I'm getting fucked in front of you right now?

 4        Q    We don't have to, but I --

 5        A    Okay.  Then I'm not going to answer that

 6    question.

 7        Q    Let's clarify.  You were given a document that

 8    were basically your do's and don'ts?

 9        A    Yes.

10        Q    And you were given documents that the other

11    performers filled out with their do's and don'ts?

12        A    Yes.

13        Q    Okay.  Did those documents tell you how to

14    perform on camera?

15        A    I don't believe so.

16        Q    So would it be fair to say that you were not

17    given a document that told you how to perform?

18        A    Outside of -- I mean I was given scripts that

19    had performance notes, yes.

20        Q    When were you given the scripts?

21        A    On set.  Sometimes they were emailed the night

22    before, maybe a week before, depending on when they

23    finished the script, really.

24        Q    Did you generally read the scripts?

25        A    Yes.  Always.

                                              Page 95

1      Q    Always?

2      A    Yeah.

3      Q    Did you ever read a script, and you didn't

4   like it?

5      A    Yes.

6      Q    What would you do if you didn't like the

7   script?

8      A    I would try to suggest something different to

9   be done to whoever was directing that day.

10     Q    Would you suggest it to them in an email or a

11   phone call or when you got to set?

12     A    When I got to set.

13     Q    Was any director ever receptive to the changes

14   that you wanted to make to the scripts?

15     A    Typically, no.  They were always set in how

16   they wanted things done.

17     Q    Did they listen to your complaints?

18     A    If I said things out loud, I think there were

19   ears listening, yes.

20     Q    Were you ever forced to like reshoot a scene

21   because the director didn't like your performance on a

22   certain scene?

23     A    I had been -- do you mean in the case of

24   leaving and coming back?

25     Q    I mean in the case of -- for example, they

Page 96

```
 1    shoot a scene, they wrap the shoot, some days later you

 2    get a call and say "We can't do this.  We have to redo

 3    it."  Did that ever happen?

 4        A    There were times where dialogue was pushed to

 5    other dates.  So if it wasn't finished or we ran over --

 6    like, you know, we're sitting there at 4 a.m., like you

 7    would with Vixen sets, they would send us home and

 8    continue on another day.

 9        Q    The dialogue, right?

10        A    The dialogue.

11        Q    But they never said "Your performance acting

12    isn't up to par, so we need to do a re-shoot of that"?

13    Did that ever happen?

14        A    No.  I don't believe I ever had to redo a sex

15    scene with Vixen.

16        Q    Have you ever heard of General Media Systems,

17    LLC?

18        A    No.

19        Q    Have you ever heard of Strike 3 Holdings, LLC?

20        A    No.

21        Q    I will introduce this as Exhibit Number 2.

22    Have you ever seen this document before?

23                   (Exhibit 2 was marked for

24                    identification.)

25        A    I mean it looks similar to other -- I don't
```

                                                        Page 97

1          A     Really closely after Kenzieland.  I had

2     realized that there's a lot of personal information when

3     you have an LLC and that it should not be related to

4     your business.  So I had -- a lawyer at the time advised

5     me to get a new LLC and sort of just stop using

6     Kenzieland.

7          Q     And so what was the purpose behind forming

8     Lola March, LLC?

9          A     The safety of where I lived and where I

10    regulated.

11         Q     I see.  So you wanted to use Lola March, LLC

12    as a buffer between your personal information and

13    business?

14         A     Yes.

15         Q     And what did Lola March, LLC do?

16         A     It served as a method for people to pay me so

17    I could do my taxes as an independent contractor.

18         Q     Are you familiar with the term "loan out

19    company"?

20         A     No.

21         Q     Okay.  Is Lola March still active?

22         A     Yes.

23         Q     Did Lola March to your knowledge file a

24    separate tax return?

25         A     Yes.

Page 127

```
 1        A    Yes, I did.

 2        Q    And what was the result of that?  Did Vixen

 3   give you the opportunity to not perform the scene?

 4        A    No.  In fact, they tried to convince me it was

 5   the -- I was not thinking of the right person when I had

 6   the man's name and photo in front of me.

 7        Q    Okay.  And ultimately because of those actions

 8   of Vixen, would you say -- what happened?  Did you

 9   perform the scene with that person that was on the no

10   list?

11        A    I did perform with him.

12        Q    So I just want to ask you a couple of

13   questions about the LLCs that were discussed earlier.

14   So earlier Mr. Brown had asked you about Kenzieland, do

15   you recall?

16        A    Yes.

17        Q    Okay.  Was Kenzieland ever an LLC?

18        A    Kenzieland became an LLC after I became a

19   Vixen contract star.  I --

20        Q    Sorry, I didn't hear the middle of that.

21        A    So Kenzieland became an LLC after I had become

22   a Vixen contract star.  I ran Kenzieland my business --

23   I ran Kenzieland my business without an LLC because I

24   didn't know any better and it was recommended to me to

25   continue to work to have an LLC.  And that was where
```

Page 151

1    right?  What kind of ideas did Mike Miller -- well first

2    of all, did you see Mike Miller present his ideas?

3         A    Yes.  He would be on set having -- having --

4    putting and suggesting how we set up props, backdrops,

5    lighting.

6         Q    Okay.  And ultimately the director was in

7    charge of those things; right?  They were suggestions to

8    the director on set?

9         A    The director had no say over Mike Miller.

10        Q    Okay.  And how many times during the time you

11   worked there was Mike Miller there on set?

12        A    I'm not sure of the number, but I can think of

13   more than five times.

14        Q    Okay.  And how many scenes did you produce --

15   or how many days did you work for -- during the period

16   you worked for Vixen, how many days did you work?

17        A    I don't know that number.

18        Q    Okay.  Would you say it's more than a hundred?

19        A    No.

20        Q    More than 50?

21        A    No.

22        Q    Okay.  I'm sure the call sheets will tell us.

23             Now your booker, Ryan Murphy, did he tell

24   Vixen what days you were available to work and what days

25   you weren't?

Page 153

1        A     Yes.

2        Q     Okay.  And so you had complete discretion as

3    to what days you were going to work; right?

4        A     Yes.

5        Q     And you also gave them a list of people that

6    you didn't want to work with, except possibly on the

7    occasion of the Turks and Caicos event, that was

8    honored; correct?

9        A     No, that's not correct.  I was not able to

10   choose my performers except for the first two shoots.

11   Moving forward I had -- my agents had a no list.

12       Q     I understand that.

13             MR. KANE:  And I'm going to strike that

14   as nonresponsive.

15   BY MR. KANE:

16       Q     My question was the no list was honored except

17   for the one time you said that Turks and Caicos there

18   was a problem with it; correct?

19             MS. COHEN:  Objection.  Misstates the

20   testimony.

21       A     Yes.  My -- I was dishonored by having my no

22   list not respected in Turks and Caicos.

23       Q     Okay.  But all other occasions you worked the

24   no list was honored; correct?

25       A     I am not sure 'cause I never saw my agent's no

                                          Page 154

1    outfit.

2        Q    Did you participate in choosing that gown at

3    all?

4        A    I participated in trying on many gowns and

5    pointing the stylist into what fit me better.

6        Q    Did you play any role in the overall aesthetic

7    of that first scene?

8        A    No, I did not.

9        Q    Did you -- I guess, were you happy that you

10    were working with Emily Willis and Alina Lopez as part

11    of your first scene?

12        A    Yes, I was.

13        Q    Was any part of you dissatisfied that you were

14    working with Emily Willis and Alina Lopez on that first

15    scene?

16        A    No, it was one of my only Vixen scenes that I

17    actually got to pick my actors.  And last minute, one

18    female was replaced with another one as well.

19        Q    On that first scene?

20        A    On that first scene.

21        Q    So you said that you got to pick the actors

22    for the first scene.  You picked Emily Willis?

23        A    I picked Emily Willis.

24        Q    You did not pick Alina Lopez?

25        A    I don't remember who I picked, but it was not

Page 93

1    her.

2         Q    And what happened with the other performer

3    that you wanted to use?

4         A    I have no idea.

5         Q    Was -- okay.  And Chris Applebaum directed

6    that scene?

7         A    Yes, he directed it.

8         Q    Was there anybody else that worked on that

9    scene that you worked with prior to working with Vixen?

10        A    Oh, my makeup artist.  I -- I brought Stacy

11   Salazar.

12        Q    Okay.  And when you say you "brought her," did

13   she show up unannounced with you, or did you say, "Hey,

14   I want to use Stacy"?

15        A    I said, "Hey, I want to use Stacy."

16        Q    Okay.  When you were performing with Vixen

17   generally, did anyone ever give you any documents that

18   guided you on how to perform intercourse on camera?

19        A    We were given consensual lists to tag what

20   other performers were okay with.

21        Q    I see.  So a consensual list, like they would

22   give you a document that says, "Tell us what you're okay

23   with and what you're not okay with?"

24        A    Mm-hmm.

25        Q    Do you recall what you would've put on that

Page 94

```
 1    form?
 2         A    You want me to go over what I'm comfortable
 3    with when I'm getting fucked in front of you right now?
 4         Q    We don't have to, but I --
 5         A    Okay.  Then I'm not going to answer that
 6    question.
 7         Q    Let's clarify.  You were given a document that
 8    were basically your do's and don'ts?
 9         A    Yes.
10         Q    And you were given documents that the other
11    performers filled out with their do's and don'ts?
12         A    Yes.
13         Q    Okay.  Did those documents tell you how to
14    perform on camera?
15         A    I don't believe so.
16         Q    So would it be fair to say that you were not
17    given a document that told you how to perform?
18         A    Outside of -- I mean I was given scripts that
19    had performance notes, yes.
20         Q    When were you given the scripts?
21         A    On set.  Sometimes they were emailed the night
22    before, maybe a week before, depending on when they
23    finished the script, really.
24         Q    Did you generally read the scripts?
25         A    Yes.  Always.
```

Page 95

1      Q      Always?

2      A      Yeah.

3      Q      Did you ever read a script, and you didn't

4  like it?

5      A      Yes.

6      Q      What would you do if you didn't like the

7  script?

8      A      I would try to suggest something different to

9  be done to whoever was directing that day.

10     Q      Would you suggest it to them in an email or a

11  phone call or when you got to set?

12     A      When I got to set.

13     Q      Was any director ever receptive to the changes

14  that you wanted to make to the scripts?

15     A      Typically, no.  They were always set in how

16  they wanted things done.

17     Q      Did they listen to your complaints?

18     A      If I said things out loud, I think there were

19  ears listening, yes.

20     Q      Were you ever forced to like reshoot a scene

21  because the director didn't like your performance on a

22  certain scene?

23     A      I had been -- do you mean in the case of

24  leaving and coming back?

25     Q      I mean in the case of -- for example, they

                                                    Page 96

```
 1    shoot a scene, they wrap the shoot, some days later you
 2    get a call and say "We can't do this.  We have to redo
 3    it."  Did that ever happen?
 4         A    There were times where dialogue was pushed to
 5    other dates.  So if it wasn't finished or we ran over --
 6    like, you know, we're sitting there at 4 a.m., like you
 7    would with Vixen sets, they would send us home and
 8    continue on another day.
 9         Q    The dialogue, right?
10         A    The dialogue.
11         Q    But they never said "Your performance acting
12    isn't up to par, so we need to do a re-shoot of that"?
13    Did that ever happen?
14         A    No.  I don't believe I ever had to redo a sex
15    scene with Vixen.
16         Q    Have you ever heard of General Media Systems,
17    LLC?
18         A    No.
19         Q    Have you ever heard of Strike 3 Holdings, LLC?
20         A    No.
21         Q    I will introduce this as Exhibit Number 2.
22    Have you ever seen this document before?
23                   (Exhibit 2 was marked for
24                   identification.)
25         A    I mean it looks similar to other -- I don't
```

                                              Page 97

```
 1        A      Really closely after Kenzieland.  I had
 2   realized that there's a lot of personal information when
 3   you have an LLC and that it should not be related to
 4   your business.  So I had -- a lawyer at the time advised
 5   me to get a new LLC and sort of just stop using
 6   Kenzieland.
 7        Q      And so what was the purpose behind forming
 8   Lola March, LLC?
 9        A      The safety of where I lived and where I
10   regulated.
11        Q      I see.  So you wanted to use Lola March, LLC
12   as a buffer between your personal information and
13   business?
14        A      Yes.
15        Q      And what did Lola March, LLC do?
16        A      It served as a method for people to pay me so
17   I could do my taxes as an independent contractor.
18        Q      Are you familiar with the term "loan out
19   company"?
20        A      No.
21        Q      Okay.  Is Lola March still active?
22        A      Yes.
23        Q      Did Lola March to your knowledge file a
24   separate tax return?
25        A      Yes.
```

Page 127

```
 1        Q    Did you sign that tax return?

 2        A    If we're talking about 2021, I'm not sure.

 3        Q    Any tax year?

 4        A    Yes.

 5        Q    Okay.  Did Lola March take business deductions

 6   to your knowledge?

 7        A    No.  Business deductions like write-offs?

 8        Q    Yeah.

 9        A    Yes.

10        Q    What kind of write-offs?

11        A    Things such as --

12             MS. COHEN:  Actually, hold on a second.

13   That's -- I'm going to instruct my client not to answer,

14   financial privacy.

15   BY MR. BROWN:

16        Q    So Lola March did take business deductions?

17        A    Yes.

18        Q    Did you take business deductions in connection

19   with Lola March, LLC related to the work that you

20   performed for Vixen?

21        A    I do not know.

22        Q    Okay.  What jurisdiction was Lola March formed

23   in?

24        A    Does that mean what -- what state?

25        Q    Yes.
```

Page 128

```
 1        A    Yes, I did.

 2        Q    And what was the result of that?  Did Vixen

 3   give you the opportunity to not perform the scene?

 4        A    No.  In fact, they tried to convince me it was

 5   the -- I was not thinking of the right person when I had

 6   the man's name and photo in front of me.

 7        Q    Okay.  And ultimately because of those actions

 8   of Vixen, would you say -- what happened?  Did you

 9   perform the scene with that person that was on the no

10   list?

11        A    I did perform with him.

12        Q    So I just want to ask you a couple of

13   questions about the LLCs that were discussed earlier.

14   So earlier Mr. Brown had asked you about Kenzieland, do

15   you recall?

16        A    Yes.

17        Q    Okay.  Was Kenzieland ever an LLC?

18        A    Kenzieland became an LLC after I became a

19   Vixen contract star.  I --

20        Q    Sorry, I didn't hear the middle of that.

21        A    So Kenzieland became an LLC after I had become

22   a Vixen contract star.  I ran Kenzieland my business --

23   I ran Kenzieland my business without an LLC because I

24   didn't know any better and it was recommended to me to

25   continue to work to have an LLC.  And that was where
```

Page 151

```
 1        A    Yes.

 2        Q    Okay.  And so you had complete discretion as

 3   to what days you were going to work; right?

 4        A    Yes.

 5        Q    And you also gave them a list of people that

 6   you didn't want to work with, except possibly on the

 7   occasion of the Turks and Caicos event, that was

 8   honored; correct?

 9        A    No, that's not correct.  I was not able to

10   choose my performers except for the first two shoots.

11   Moving forward I had -- my agents had a no list.

12        Q    I understand that.

13             MR. KANE:  And I'm going to strike that

14   as nonresponsive.

15   BY MR. KANE:

16        Q    My question was the no list was honored except

17   for the one time you said that Turks and Caicos there

18   was a problem with it; correct?

19             MS. COHEN:  Objection.  Misstates the

20   testimony.

21        A    Yes.  My -- I was dishonored by having my no

22   list not respected in Turks and Caicos.

23        Q    Okay.  But all other occasions you worked the

24   no list was honored; correct?

25        A    I am not sure 'cause I never saw my agent's no
```

Page 154

# **EXHIBIT 29**

```
 1
 2                  UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
 3                     WESTERN DIVISION
 4
 5    MACKENZIE ANNE THOMA,      )
      a.k.a. KENZIE ANNE, an     )
 6    individual and on behalf   )
      of all others similarly    )
 7    situated,                  )
              Plaintiff,         ) Case No.
 8                               ) 2:23-cv-04901 WLH (AGRx)
      v.                         )
 9                               )
      VXN GROUP LLC, a           )
10    Delaware limited           )
      liability company;         )
11    STRIKE 3 HOLDINGS, LLC,    )
      a Delaware limited         )
12    liability company;         )
      GENERAL MEDIA SYSTEMS,     )
13    LLC, a Delaware limited    )
      liability company; MIKE    )
14    MILLER, an individual;     )
      and DOES 1 to 100,         )
15    inclusive,                 )
              Defendants.        )
16
17
18        VIDEOTAPED DEPOSITION OF RYAN GERONA MURPHY
19                    Las Vegas, Nevada
20                  Monday, July 22, 2024
21                       10:09 a.m.
22
23
24    Reported by:  Jill E. Shepherd, RPR, NV CCR 948
25    Job No. 6814499; Firm No. 068F
```

                                            Page 1

```
 1        you involved in the negotiations for her different

 2        shoots?

 3                MS. COHEN:  Objection, overbroad.  Vague

 4        and ambiguous.

 5            A.   Can you rephrase that?  In -- like, what do

 6        you mean by "negotiations"?

 7        BY MR. KANE:

 8            Q.   Sure.

 9                Well, did you communicate with VXN about

10        money, for example?

11                MS. COHEN:  Same objections.

12            A.   I mean, yeah; we had a rate and that's what

13        we discussed.

14        BY MR. KANE:

15            Q.   So you would discuss the rate with VXN?

16            A.   Um-hum.

17            Q.   Okay.

18                And is it correct that during the time that

19        Kenzie Anne worked for VXN, she also worked for

20        other companies?

21                MS. COHEN:  Objection.  Calls for a legal

22        conclusion, expert opinion.  Vague, ambiguous,

23        overbroad.

24            A.   Yes.

25        BY MR. KANE:
```

Page 44

```
 1         Q.   Okay.

 2              What other companies did she work for?

 3              MS. COHEN:  Same objections.

 4         A.   I can't fully name all of them off the top

 5    of my head.

 6    BY MR. KANE:

 7         Q.   Any of that come to mind?

 8              MS. COHEN:  Same objections.

 9         A.   I mean --

10              MS. COHEN:  Calls for speculation.

11              MR. KANE:  Okay.  Counsel, I'll give you a

12    standing objection so you don't have to state it

13    every single time.  Let's go forward.

14              MS. COHEN:  Counsel, I'll just make my

15    objections.  And if you have an issue with it, we

16    can meet and confer.

17              MR. KANE:  Okay.  If it continues for the

18    next five minutes, we'll call the magistrate judge.

19              MS. COHEN:  Fine with me.

20    BY MR. KANE:

21         Q.   All right.

22              So who did you negotiate with on behalf of

23    Kelsey Anne -- of Kenzie Anne during the time that

24    she was also providing services to VXN?

25              MS. COHEN:  Same objections.
```

                                         Page 45

1          A.   I mean, I can't fully -- without a record

2     in front of me, which I no longer have access to, I

3     can't fully answer that question.

4     BY MR. KANE:

5          Q.   More than one?

6          A.   Yeah.

7          Q.   More than five?

8          A.   I -- like I said, without a full record in

9     front of me, I can't -- and I do not have access to

10    those records, I can't answer that question.

11         Q.   Okay.

12              But you have a recollection of negotiating

13    on her behalf other entities for her services,

14    correct?

15         A.   Correct.

16         Q.   And can you -- as you sit here today, can

17    you give me an estimate -- not give me the names,

18    but estimate of the other engagements she had while

19    she was working for Vixen Media Group?

20         A.   That stated, without a full record in front

21    of me, which I no longer have access to, I can't

22    answer that question.  I don't -- with any type

23    of -- any answer would be vague and may not be fully

24    truthful; so I can't answer that question.

25         Q.   Okay.

Page 46

```
 1                 Now, I don't need you to be truthful 100

 2      percent accurate, but if you have a recollection,

 3      I'm entitled to your best estimate.

 4                 Do you think it is more than five?

 5           A.    I --

 6                 MS. COHEN:  Hold on.

 7                 Objection.  Asked and answered.

 8           A.    I don't recall.

 9      BY MR. KANE:

10           Q.    Okay.

11                 Does Brazzers, is that a company she worked

12      for?

13                 MS. COHEN:  Objection.  Vague.

14           A.    I mean, yes.

15      BY MR. KANE:

16           Q.    Okay.

17                 MindGeek?

18           A.    That's the same as Brazzers.

19                 MS. COHEN:  Same objections.

20                   (Reporter clarification.)

21           A.    Yes.

22      BY MR. KANE:

23           Q.    Okay.

24                 Jules Jordan?

25           A.    Yes.
```

Page 47

```
1         Q.    Luxury Companion?

2         A.    I am not aware of that.

3         Q.    Wicked Pictures?

4         A.    Yes.

5         Q.    Okay.

6               So that's at least three.

7               Now, when you were representing Kenzie Anne

8    in her dealings with Vixen Media Group, did Vixen

9    Media Group dictate the dates or did Kenzie Anne say

10   when she was available?

11        A.    In the scope of booking, they would ask for

12   available dates, and I would give them, and they

13   would choose the date.

14        Q.    Okay.

15              But it wasn't, like, we want her on

16   November 11th and she has to show up on that date,

17   correct?

18        A.    That has happened, yes.

19        Q.    Okay.

20              Was that after the date was agreed upon?

21        A.    No.  No.  Not -- those were -- there were

22   times in which, yes, they were agreed-upon dates.

23   There was other times in which we need Kenzie Anne

24   on this date.

25        Q.    Okay.
```

Page 48

```
 1              And do you have any awareness or knowledge

 2     of how much time in the booked day that the still

 3     photo shoot to promote an adult film would take?  Is

 4     it 10 percent of the day?  Is it 75 percent of the

 5     day?

 6         A.   I never wanted to be on set interfering or

 7     being in that position, so I couldn't tell you.

 8         Q.   Okay.

 9              Now, you also handled Kenzie Anne's photo

10     shoots, correct?

11         A.   Yes.

12         Q.   Her scenes, as we called them?

13         A.   Yes.

14         Q.   Her appearances?

15         A.   Yes.

16         Q.   Okay.

17              And is there any other category of booking

18     that I've left out?

19         A.   I mean, anything to do with anything within

20     the adult and mainstream entertainment industry; so

21     just all per bookings mostly in general.

22         Q.   Right.

23              And the bookings with, like, MindGeek and

24     Gamma are all handled the same way?

25         A.   Yes.
```

Page 57

1          Q.    Are you aware she went to the labor

2     commissioner?

3          A.    Yes.

4          Q.    Okay.

5                And you're aware that the labor

6     commissioner validated her contract?

7          A.    Somebody did send that to me.  But I didn't

8     care, to be honest with you.  I was so far out.  I

9     want nothing else to do with this industry anymore.

10         Q.    Okay.

11               And did you -- who was the person that sent

12    it to you?

13         A.    It was a personal friend of mine.

14         Q.    Okay.

15               Is that person in the industry?

16         A.    No.

17         Q.    Okay.

18               Going back to Kenzie Anne, did she consider

19    herself to be a professional actress?

20         A.    To be honest, they all did.

21         Q.    Okay.

22               And in Kenzie Anne's case, didn't she book

23    a role on the show Euphoria?

24         A.    Yeah, I booked that role for her.

25         Q.    Excellent.  Good job.

                                          Page 67

1          I bet she was very excited about that.

2     A.    She was, yeah.

3     Q.    Okay.

4          And, you know, I believe that's listed on

5     her IMDb?

6     A.    Correct.

7     Q.    Okay.

8          MR. KANE:  Can you pull up the IMDb?

9     BY MR. KANE:

10    Q.    While we're doing that I'm going to ask you

11    another question.

12         While you were working with Kenzie Anne,

13    did she ever decline an engagement?

14    A.    Like work?

15         MS. COHEN:  Objection.  Vague.

16    BY MR. KANE:

17    Q.    Yes.

18    A.    Without the record in front of me, I don't

19    know, but I'm sure she did.  Everybody had a right

20    to decline any type of -- any type of booking.

21    Q.    And did she ever do that, that you are

22    aware of, because she didn't like the male talent

23    involved?

24    A.    I mean, these women are using their bodies,

25    if they are uncomfortable with the person that they

                                        Page 68

```
 1        are supposed to be engaged in sexual contact with,

 2        they can say no.

 3             Q.    Right.    That's understood.

 4                   And when she worked at VXN, the same policy

 5        applied, correct?

 6             A.    Yes.

 7             Q.    Okay.

 8                   And if she didn't like a director, she

 9        could decline an engagement; is that correct?

10             A.    If she didn't like a director?    I mean,

11        if -- it's by the same thing, her body, all talents'

12        bodies, if they didn't like somebody that was on

13        set, they could decline to shoot, yeah.

14             Q.    Okay.

15                   And if they didn't like the plot, that was

16        also another reason they could decline?

17             A.    There was some pretty bad things that were

18        put in these scenes; and if they did not agree with

19        them, then yes, they could decline that, that

20        situation.

21             Q.    Okay.

22                   And the same go for the location?

23             A.    Unsafe locations, yes.

24             Q.    Okay.

25                   And -- okay.
```

Page 69

1          Now, I'm going to show you what I want to

2     mark as Exhibit 1.

3               (Exhibit 1 marked.)

4          MR. KANE:  I want to give a copy to your

5     counsel before we go on just in case she has any

6     concerns about --

7          MS. COHEN:  Thank you.

8     BY MR. KANE:

9          Q.   Are you familiar with IMDb?

10         A.   Yes.

11         Q.   What is IMDb?

12         A.   It's the Internet movie database.

13         Q.   And, you know, Kenzie Anne has a profile?

14         A.   Um-hum.

15         Q.   Is that what Exhibit 1 is?

16         A.   Yes.

17         Q.   Okay.

18              And it lists her as an actress, correct?

19         A.   Um-hum.

20         Q.   It has a bunch of credits.

21              Could you just look through the credits on

22     there, and it lists a number of films that she was

23     in?

24         A.   Okay.

25         Q.   And -- because we talked earlier about, you

                                        Page 70

```
 1      know, the different companies that she worked for.

 2              And number 1, does anything on there strike

 3      you as something she didn't do?

 4          A.   A lot of these IMDb pages are made by fans.

 5      I have a fan that made a IMDb page for me.  So, you

 6      know, a lot of stuff that they put on there is not

 7      verified a lot of the times.  So, I mean, by looking

 8      at some of the stuff, yes, like VXN, Deeper.  You

 9      know, yeah.  But the titles of the movies, I had no

10      idea, outside of if the company's listed, such as

11      Naughty America.  But that's it.  I don't know.

12              So I can't verify the accuracy of the IMDb

13      page.

14          Q.   Okay.  All right.

15              But the things that were for VXN on the

16      page, you are pretty confident of?

17          A.   I mean, I know she obviously -- we're here,

18      so yes, I do know that she worked for VXN.  But,

19      like, a lot of these are much -- titles of movies

20      that, you know, I have no idea.

21          Q.   Right.

22              But the Euphoria episode, that one you can

23      verify because you booked that engagement?

24          A.   Oh, yeah, anything mainstream obviously,

25      you know, that's on there.
```

Page 71

```
 1          Q.   Right.

 2               Did she have aspirations of going

 3     mainstream?

 4          A.   You know, eventually.  I mean, they all

 5     kind of want to, if they have the ability to.  I did

 6     believe that Kenzie had the ability to.  But, you

 7     know, in regards to, like, that's her eventual goal,

 8     I can't recall at that point.

 9          Q.   Okay.

10               Was Motley Models Kenzie Anne's exclusive

11     agent during the period that she was with Motley

12     Models?

13          A.   Yes.

14          Q.   Do you know if she did any work as an adult

15     actress outside of the work procured by Motley

16     Models?

17               MS. COHEN:  Objection.  On calls for expert

18     opinion, legal conclusion.  Calls for speculation.

19          A.   I can't answer that.

20     BY MR. KANE:

21          Q.   Okay.

22               Did you ever procure work for Kenzie Anne

23     outside of the Motley Models brand?

24          A.   Meaning -- can you rephrase that?

25          Q.   Sure.  Thank you for listening to what I
```

Page 72

1      Q.   Okay.

2           So there were times where she was not

3  working during the 14 hours?

4      A.   Well, I mean, it's just like any movie set.

5  You know, we're working mainstream where there's a

6  lot of hurry up and waiting.  It's the same thing;

7  camera setups, changes, photo shoots, rearranging of

8  the sets, dialogue, which is part of the scene.

9           But, you know, just like when she was

10  booked with Euphoria, she was paid overtime for the

11  two days on the shoot because they went over and

12  that was automatic and that was something she

13  obviously asked for.

14      Q.   It was automatic in her contract?

15      A.   If that's how they paid, it was -- you

16  know, after eight hours they paid time and a half.

17  That was automatic, when you're on a mainstream set.

18      Q.   Okay.

19           And that's because they have a collective

20  bargaining agreement, correct?

21      A.   Correct.

22           MS. COHEN:  To that last question,

23  objection, calls for expert opinion, legal

24  conclusion.

25           MR. KANE:  Okay.

Page 87

```
 1            Q.    Then he asked you where she is.  Apparently
 2       she's in Hawaii.
 3            A.    Yeah.
 4            Q.    So they accept when she's not available; is
 5       that fair to say?
 6            A.    I mean, they kind of have to if she's not
 7       in town.
 8            Q.    Right.
 9                  But it's not like an angry face, it's just
10       a straight line happy face?
11            A.    Yeah.  I mean -- yeah.
12            Q.    Okay.
13                  It says here -- and we're looking at 007 --
14       midway down the page, "Fuck, was Emily 20 or
15       21st...my calendar is fucked."
16                  What were you referring to?
17            A.    (No audible response.)
18            Q.    007.  There's --
19            A.    No, I'm looking.  I don't even recall.
20       This is with a different model.  This is with Emily
21       Willis.
22            Q.    Okay.
23                  Well, going up to here, "...November
24       availability, please."
25                  You see you provided dates?
```

Page 96

```
 1              And so do you keep in touch with any of the
 2      models -- I'm sorry -- any of the talent from Motley
 3      Models since you left there?
 4          A.   Very, very, small few.
 5          Q.   Okay.
 6              And how do you communicate with them?
 7          A.   You know, I rarely communicate with
 8      anybody.  But phone call, text.
 9          Q.   Okay.
10              So you would expect that that sort of stuff
11      would be in your text messages?
12          A.   I mean -- but, yeah, we don't talk about
13      work.  We don't talk about -- you know, the people
14      that I talk with are my friends and, like I said,
15      maybe three at this point, and we just -- you know,
16      we talk about life; we talk about how things are
17      going, maybe make plans to see each other.  You
18      know, that's how it works.
19          Q.   Okay.
20              Is Kenzie one of those people?
21          A.   Not really directly as much as we used to,
22      no.
23          Q.   Well, how many times have you communicated
24      with Kenzie this year?
25          A.   Maybe less than a handful.
```

Page 104

1          And if she hadn't done that, do you believe
2     that they would have terminated her contract?
3          A.   I mean, at that time of these dates right
4     here, she was not under any type of contract.  There
5     was no exclusive or nonexclusive contract with her
6     at these times of these dates.
7          A lot of times it would be Mike Moz doing
8     it as a favor for me, you know; or, you know, she
9     has to understand this is a huge, huge thing right
10    now that we're trying to put together.  I got this
11    other model that's coming in from maybe overseas or
12    I got this big-named model talent that's coming in,
13    and they would be completely insistent of it.
14          If it's a hard no, it's a hard no.  But,
15    you know, a lot of times it would be, Listen, please
16    get this done, we need to make it happen.  You don't
17    know how many times Mike would say that to me,
18    Please make this happen.
19         Q.   Okay.  All right.
20          I'm just organizing my documents, one
21    second.
22          Now, during this scheduling period, did she
23    have a pretty busy calendar?
24         A.   As you kind of see from there, the dates
25    were really open.  She was very, very particular

                                        Page 109

 1      about what she did.

 2          Q.   Okay.

 3               But she was also working for other studios

 4      as well doing other projects, yes?

 5          A.   Yes.

 6          Q.   Okay.

 7               And -- okay.

 8               I'd like to show you Exhibit 3.

 9                    (Exhibit 3 marked.)

10      BY MR. KANE:

11          Q.   Now, Exhibit 3 is five pages.  They appear

12      to be texts between Ryan Kona, and I will let you

13      know I believe the other person is Moz again.

14          A.   Okay.

15          Q.   Okay.

16               And so here we have on May 17, 2021, it

17      says -- and I believe it's -- you're on the left --

18      "Kenzie Anne is sick and can't make it tonight."

19               Do you see that?

20          A.   Yes.

21          Q.   And it says, "Copy.  Hope she feels

22      better..."

23               Was this a non-filming event?

24          A.   If he didn't ask why, then more likely yes,

25      it was.  Typically, if I'm saying -- What's wrong

                                          Page 110

```
1        scope to any additional documents that are produced
2        and limited in time as well.  We can meet and confer
3        further.
4                Okay.  So anything further before I start?
5                No?  All right.
6                          * * * * *
7                        EXAMINATION
8        BY MS. COHEN:
9            Q.   Okay, Mr. Murphy, do you understand that
10       you are still under oath?
11           A.   Yes.
12           Q.   All right.
13               I'm just going to ask you a few follow-up
14       questions; shouldn't take too long.
15           A.   Okay.
16           Q.   Okay.
17               So you had testified earlier that while
18       working as a booking agent for Motley Models, you
19       would communicate the times that models were
20       available for shoots for VXN; is that correct?
21           A.   Correct.  Yes.
22           Q.   Okay.
23               And then VXN would then have to choose from
24       those available times that the models were
25       available; is that accurate?  That's been your
```

Page 172

```
 1      what the models wore, whether they could take

 2      breaks?  Those examples?

 3           A.   Only from my understanding that it was all

 4      delegated down from him to Mike Moz.

 5           Q.   Okay.

 6                So is it accurate to say that it was Mike

 7      Moz and Mike Miller that had this level of control

 8      during the shoots?

 9           A.   Yes.

10           Q.   Okay.

11                And you had also testified earlier that

12      while Ms. Thoma, who is -- do you understand that if

13      I refer to Kenzie Anne or Ms. Thoma that I'm

14      referring to the named plaintiff in this case,

15      Mackenzie Anne Thoma?

16           A.   Yes.

17           Q.   Okay.

18                You had testified earlier that while under

19      a contract performed work for VXN, Kenzie Anne was

20      also performing work that you had an involvement in

21      with booking with other adult entertainment

22      companies; is that accurate?

23           A.   Correct.  Yes.

24           Q.   Okay.

25                Even so, would this work be on the same day
```

Page 175

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

 **IMDb**

Sign In    **Use app**

# Kenzie Anne

Actress   Writer

Buxom and shapely blonde bombshell Kenzie Anne was born on March 9, 1993 in Newbury Park, California. Anne grew up in the Los Angeles suburb of Newbury Park. Kenzie was the Penthouse Pet of the Month for November, 2020. Anne was introduced to Playboy by photographer Tina Louise and posed for her first nude shoot for Playboy Plus in January, 2021.

**Born** March 9, 1993

IMDbPro
STARMETER   See rank

**Add photos, demo reels** ☑

Add to list

📞 **View contact info at IMDbPro** ☑

| | |
|---|---|
| **Awards**  6 wins & 25 nominations | › |

## Known for





**Hot Girl Summer**
★ 7.7  Video
Actress
2021

**Oopsie!**
★ 5.2  TV Series
Actress
2022 · 1 ep

**Naughty America**
★ 5.9  TV Series
Actress
2021–2022 · 3 eps

**Black & White Vol. 19**
★  Video
Actress
2021

# Credits

Actress 51  ✕    Writer 1  ✕    Self 3    Archive Footage 1    IMDbPro

Expand below    All credits

## Actress

**Upcoming**  1                                                                               ⌄

**Transfixed: Muses Vol. 2**
Video
2024

**Take Care of Yourself**
Video
Amy
2023

**Stars 11**
Video
2023

**Reckless**
★ 6.8   TV Mini Series
Avena    Dino's Daughter Avena
3 episodes  2023

**Lexington Steele: The Connoisseur**
Video
2023

**Trouble in Paradise**
Video
2023

**JaxSlayher**
★ 6.8   TV Series
1 episode  2023

**If It Feels Good Vol. 4**
Video
2023

**Double Love Vol. 1**
Video
2023

**Pure Taboo**
★ 6.6   TV Series
Amy    Casey
2 episodes  2022–2023

**Girlsway Originals**
★ 7.8   TV Series
Kenzie
4 episodes  2022–2023

**Jules Jordan**
★ 5.8   TV Series
3 episodes  2021–2023

**Treating Ourselves ...Again!**
Video
2023

**Loyal Service**
Video
2023

**The Cum Sauna**
Video
2023

**ManyVids**
★ 6.6   TV Series
**2 episodes**  2022

**Transfixed**
★ 7.0   TV Series
**2 episodes**  2022

**Naughty America**
★ 5.9   TV Series
**3 episodes**  2021−2022

**Deeper**
★ 7.1   TV Series
Kenzie    Kenzie Anne
**3 episodes**  2021−2022

**Love Her Feet**
★ 7.4   TV Series
**4 episodes**  2022

**Sex and Submission**
★ 6.9   TV Series
**1 episode**  2022

**Together at Last**
Video
2022

**Blacked**

★ 7.4  TV Series
Kenzie
**2 episodes**  2021–2022

---

**Sexual Icons 2**
Video
2022

---

**Vagitarians 3 Oil Edition**
Video
2022

---

**Tushy**
★ 7.4  TV Series
Kenzie
**1 episode**  2022

---

**Oopsie!**
★ 5.2  TV Series
**1 episode**  2022

---

**Super Stacked**
Video
2022

---

**RK Prime**
★ 6.9  TV Series
**1 episode**  2022

---

**Blacked Raw**
★ 6.8  TV Series
Kenzie
**2 episodes**  2021–2022

---

**Deep Lush**
★ 5.0  TV Series
**1 episode**  2022

---

**Icons Vol. 5**
Video
2022

**Poetics for Tramps**
★ 7.1   Video
2022

ⓘ

**Big Cock Bully**
★ 2.6   TV Series
**1 episode**  2022

ⓘ

**VR Cosplay X**
★ 3.1   TV Series
Thena
**1 episode**  2022

ⓘ

**Blondes on Dredd**
Video
2022

ⓘ

**SexLikeReal**
★ 4.0   TV Series
**1 episode**  2022

ⓘ

**Lesbian Sex 25**
Video
2022

ⓘ

**Drip: Vol. 1**
Video
2022

ⓘ

**Property Sex**
★ 6.0   TV Series
**1 episode**  2022

ⓘ

**If It Feels Good Vol. 3**
2022

ⓘ

**VR Bangers**
★ 7.6   TV Series
**1 episode**  2022

ⓘ

**Euphoria**

★ 8.3  TV Series
Stripper
**1 episode**  2022                                       ⓘ

---

**Real Wife Stories**
★ 6.5  TV Series
**1 episode**  2022                                       ⓘ

---

**Vixen**
★ 7.3  TV Series
**2 episodes**  2021                                      ⓘ

---

**Wild on Cam**
★ 5.9  TV Series
**1 episode**  2021                                       ⓘ

---

**Swallowed**
★ 5.6  TV Series
**1 episode**  2021                                       ⓘ

---

**Hot Girl Summer**
★ 7.7  Video
2021                                                      ⓘ

---

**Black & White Vol. 19**
Video
2021                                                      ⓘ

---

**Slayed**
★ 6.9  TV Series
Kenzie
**2 episodes**  2021                                      ⓘ

---

Close ✕

# Writer

**Previous**   1                                          ⌄

# **EXHIBIT 30**

# KENZIELAND.

HOME.   BIO.   VIDEOS.   ONLYFANS.   CALENDAR.   GEAR.   THE END.   LOGIN   



## Kenzie and Jax Slayer – The Worship Video

$35.00

Kenzie and Jax had a lot of practice time when Kenzie made her vixen debut and they couldn't get enough of each other. She immediately needed to make a KENZIELAND video with him on her own. You have seen them on Blacked, you've seen them shooting iPhone content, but you have never seen the KENZIELAND worshipping that happens in this video. They fuck all over the hotel room.

1   Add to cart

Category: Tier 3   Tags: Intense, Jax Slayer, Worship

Share  f  𝕏  in  P

## Related products



### Vanna Bardot and Codey Steele Submit

$30.00



### Too Busy Earnin

$20.00 **$10.00**



### Match Point

$20.00 **$10.00**

# KENZIELAND.

Buy Videos   Exclusive Merch   Privacy Policy   Contact Us

Powered By PROJECT model

Need Help? Email: support@kenzie.promodel.vip

© 2021 Kenzieland. All rights reserved.
016546

# **EXHIBIT 31**

CONFIDENTIAL

# Web Data Collection Report

**Page Title**

Kenzie Ann Case - KENZIELAND (@kenzielandbykenzie) • Instagram photos and videos

**URL**

https://www.instagram.com/kenzielandbykenzie/

**Collection Date**

Mon Aug 12 2024 17:20:54 GMT-0700 (Pacific Daylight Time)

**Collected by**



**IP Address**

172.27.0.1

**Browser Information**

Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/127.0.0.0 Safari/537.36

**Digital Signature (SHA256 / PKCS#1v1.5)**

7a214e6b9f5efce9856026bcf904ec2b6b4ca5e9b43c79c077a454b93777b8fcf551df90
a65c93e52bf5668acb994038b6e9cc98a9dbd4feb9d23bab7248d252dd23dd4df5571bb0
0288879255c44bb8cfd298fb887ebdd77768eca13e7f6cddeb199726db4c3bfdf26df4d4
f843fcbc082eaaa0c6d3eb7cd312ae81b9378ced8c8c9c4e18e4e6523e0e6705886131b4
157d61c40c1fac325f0c20bd88b3913dc5cb553193a40a892575ea93c05d8a44d772accb
87ae15d007810050e8464b8162b86a07afed7305b153718ce03829aa0f8e59c425714808
65579afce214fdeea8e03b28f4ba9d610b5a7a3275273176beced8c58fbe640394a04325
9f40586d

000402

CONFIDENTIAL
ID #:3831

# File Signatures

## SCREEN CAPTURE

### MHTML

**File Name**

https-www.instagram.com-kenzielandbykenzie-Aug-12-24-17-20-54-GMT-0700-(PDT).mhtml

**Hash (SHA256)**

6c0bc31bddd49c59d8ac642c3b6a76670d68f0239798250faa9818fb454171d8

**Signature (PKCS#1v1.5)**

5dad530375451d6c75f8101ef0f1ca5d549aaa9cd245a730d5ad33e42bc376d2601779d01
4919433ffc23716468f0656f480ffb2222627239b219b466f324517f12b8a4eeb84e47ec0e
8872fb304a4fa16091ab7cdd8a9f6756887eae32414f4fafae56c2989460c8f501e78f2b5
ef8368301bf3813d418d29690e60aaddcac5003d958b48e01ec99d716f2d89ca1c5e20d4c
11ecc85ca456f857e2b30a7851d93ecfd0c80142ee17f9efb4da7f0642708df88faa21c5ad
d92a60b355c2e48f7bd2d9891fb597e6e8e6afe13be4d48cd5b8bd585d553e84bdf410bd2
9444ff2ae8fca75cc1f92a0a1fdf3678c19220b9b130ce525b9c209a1dc9559caa9de6fb

CONFIDENTIAL
ID #:3856





**File Name**
https-www.instagram.com-kenzielandbykenzie-Aug-12-24-17-20-54-GMT-0700-(PDT)_0.jpg

**URL**
https://www.instagram.com/kenzielandbykenzie/

**Hash (SHA256)**
198f372da47cfcf367798a520eefa263bbe95b8aca7881efa49d6f4f7cefeee8

**Timestamp**
Mon Aug 12 2024 17:20:54 GMT-0700 (Pacific Daylight Time)

**Signature (PKCS#1v1.5)**
6c92e59dcaadf1e155841230dbf97a8e930c4931a2ea4d4863e93984380177312ac19b4bd5d517f489
c5fe84ca0844aeedeeff0c2d625b480ca47c83bbb4599e1661ccf82f8b88293dbe2ef0fdfd6332d5bc
f4490937e782fcff94ed0c95f7483718e000005bf0e5056a1d6122ae8b0fd44f985ca4e6bb8c69858b
30d6231aa95cc402e37df77e80c48258d8af61ef04a489360351916ad1b4e7a8bc4c525555dd8bb6dc7
b263e91b2499fdf2931aceda020648d3b264fc5439758046fba76e5a3f9d4c494138fda735f1fe098735
ce65ff574f3771f7220971124c43f7f3731b561fd4696cfe63ec00c9083d6adf7f3791eb40d784fc479a4
fdab5efe4d8ecc

CONFIDENTIAL











**File Name**
https-www.instagram.com-kenzielandbykenzie-Aug-12-24-17-20-54-GMT-0700-(PDT)_1.jpg

**Hash (SHA256)**
2f026b13fabff938e6b79fe69974086ff6361e7820ce14741fb9083a33a7676e

**URL**
https://www.instagram.com/kenzielandbykenzie/

**Timestamp**
Mon Aug 12 2024 17:20:54 GMT-0700 (Pacific Daylight Time)

**Signature (PKCS#1v1.5)**
1d5d3b7fed7316328fecb427e9fb1257eb14ab0a2b55c35bd055ddfcf7f21f10c7b465f45ce7252dbd
1379b67de3a53abe66ee6a5569f39b9636eeeaaa5ce47f9748cc9691bd67f5ca4c05b1fce02db1257c
8af2e801beaf8791f1b2008d97cc0fb9be087990d6e1c647edf1ac07cc5f54573543b4822518d82422
b8168035a0b80554a0bb9e34ff957178cd60ef61433875ec20bf247438ce2cad4eb3544d7f2656d06f
771a7a4a42482cffacf4ec1e42306f37772de17ee9a1246bd3e91ee41d696cef43f39cb34b7606c720
1c30696947bb129a59f549ecd73dc4a15273bba916249744dd6a61de7f5d76464d14c7ac315965c0f
88cc5b4c2db43ba512905

000405

CONFIDENTIAL
ID #:3838



**File Name**
https-www.instagram.com-kenzielandbykenzie-Aug-12-24-17-20-54-GMT-0700-(PDT)_2.jpg

**Hash (SHA256)**
a7215d71797b16436cc30d42bd8a93fef7ac1d454adfd21cd18ba8448e011cc7

**Signature (PKCS#1v1.5)**
1aec83b9e8f9c63c948a5bff19c65835210a2e8458d108374da68ea12260a80c79d18ed4431e39d0d81b
4fa1a193075ed3caff146248c652a82c6a4e908036769f8e6ba72b4f72ff4efa27eadce340fe17f2df3
af0b5f84938d4438361dd0c299312aee67a468678904f8f92b51a675c377f019c722b9a115764535534
0f71aa1f408cea431c03ffe1ca6c8e47145b17fd17f0b356ef6e47f8e21ea8021fcf1a3f7b8a44d237d
b1ec25ee284a4036114770aacf5d9f7cb80e1035880a3d2a8e39ee7fa37e158653badf6b2821a06ab
f3b9f0c2acb5afcba29901fec61776dbf2238625e30732474269083678f02cd0d6532c31209db631d
87a6270428035197db

**URL**
https://www.instagram.com/kenzielandbykenzie/

**Timestamp**
Mon Aug 12 2024 17:20:54 GMT-0700 (Pacific Daylight Time)

CONFIDENTIAL



**File Name**
https://www-instagram-com-kenzielandbykenzie-Aug-12-24-17-20-54-GMT-0700-(PDT)_3.jpg

**URL**
https://www.instagram.com/kenzielandbykenzie/

**Hash (SHA256)**
34ce6fa6e87d3ad2d89a176d9be02196b9ccca547394a7d2cadbcc5050465099

**Timestamp**
Mon Aug 12 2024 17:20:54 GMT-0700 (Pacific Daylight Time)

**Signature (PKCS#1v1.5)**
4794ea9dc84f04b6136a3d78b1822d0e1b91082f6b32b640c26c38f043ef6c2472153f9a4bc564e7f
85e4631552aba98988d15412c6381ced74b4373992d1ae808196ed6b8e84b6cbe1b83de18354d41d6
5c6e7d374370f853692e4481e2b5b988eeb23796c006f88ab2bca95d91736'cfbd2112d71e8e8e08e5
9e5c8f619244881fafe0f193c5e4ebf6265b6c16b53b82bad479b55065663b7c8aca91e8ad3218743b
06308f85109817cc915703e8f66cb00a73f56332395590a8020cfdf5f7d94641f656272116e0828f3a
ef1d6625b1cc31ffc7654fe086a966e6f4c50de5b998c2a6118aa9dd866fb1295c261d0e91a67d68ec
cad9107dc669f70aa86e79

CONFIDENTIAL



**File Name**
https-www.instagram.com-kenzielandbykenzie-Aug-12-24-17-20-54-GMT-0700-(PDT)_4.jpg

**Hash (SHA256)**
b061c2e96f4d2cf5d4059b8fe398be14046e5a832428f60cc06c11ae3f6e293a

**Signature (PKCS#1v1.5)**
07c74559ef7f7fade582926aca26c9a1a51ead7066167020bc53e451728e544acabb21840b30bf8682
2289fcac43d4812beac1c8e93af70d6b8d3b92f6b93dca7e3239fc179eb5fe6f555ef2150089f2db39
e736fbf6dbfac349dba49029ec865fa0b708264bcff02a93be94d2df086cf5ca243ff05098a2a19e67
a754a2010f008ebb1c4dba1088efb205a6ec8e879739937025a375aabf7f1ff2b7b798df9b31a697e62
90de703e04c37e0dbcf92c4ece1fef8da8fe128ff5e6b1815d81356c47f0c2a75f39048f7f8cc0a7a7b
085f9a96c28a28a7c788afb74fc69d27dd93d2ece9087b78a95dbae25dff272a92118f1d91a806bc8
41c9960233ee7d68c78

**URL**
https://www.instagram.com/kenzielandbykenzie/

**Timestamp**
Mon Aug 12 2024 17:20:54 GMT-0700 (Pacific Daylight Time)

000408

# **EXHIBIT 32**

CONFIDENTIAL

# Web Data Collection Report

**Page Title**

KENZIELAND | Thank you so much @avn for the interview highlighting the importance KENZIELAND will play in future films/content/education. I'm so happy... | Instagram

**URL**

https://www.instagram.com/p/CUV99gWvFzN/

**Collection Date**

Mon Aug 12 2024 17:30:48 GMT-0700 (Pacific Daylight Time)

**Collected by**

 @█████████████  █████  @███████████)

**IP Address**

172.27.0.1

**Browser Information**

Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/127.0.0.0 Safari/537.36

**Digital Signature (SHA256 / PKCS#1v1.5)**

68879392aa98ef6283773a60d31fb7e65abdd6736cfd0d600b95ed990c025f43480b21b7
87efcfddb85f6e8b8425fe898fb592dd4693ed455eb72bc14f2141bf2c7b3b34e6e5902d0
c6d86c07298b226e1389ce6ef89a5a74ef12d22a6003657a4b48a734faba5d92fb3f159b1
7f2122f07b16c05f4bfb5d6b1e0db7b4661556dca6fcb5223bd66c3a62f4bd140681e3a1
3b068bb57cae95b190374de9852978b03e20e282a448e1fd1fcd8578e23d45adfc403e22
cfe1892850b446326676e8dc694d38c2155bf82eecd3679eb1b14401ceeee7ac1ab695b0
6df0bd385645cdc8c5d5d41587305eec766269a692bd51a017a1fc5679514d27bf519fce4
94467

CONFIDENTIAL

# File Signatures

## SCREEN CAPTURE

### MHTML

**File Name**

https://www.instagram.com-p-CUV99gWvFzN-Aug-12-24-17-30-48-GMT-0700-(PDT).mhtml

**Hash (SHA256)**

581aa348fec8bad77eac9dbc74e7c4a0eb53f16a9df61a2507f644b81dfc10bc

**Signature (PKCS#1v1.5)**

6e46f324ff163dad65c804c599ead2257518027ceee0623d304fc8540422e4ef82e121584
b257a96bc817c016af6c1df694c45dc18b869ba530c0977403977dcc2f2a21b0ab1259a36
eff0b32b0dca3ad4ec961942b165ac14d681c66ff7bf49516018095a7a2a748686953cdb7
ad56ec9b6a401c25ec8c7e2bc60b9d0ccfb4584bd2d47bfcaf60c1aedf24610abea19270f
6fca400b9dc2febd5d819c56dc3622041431958ece2bb35c6a0a0cf92f3bc05de281cfa53
8129a397d2ab75c1863505f74dbc0407e28b6644f3140ad0e7d2b479713c1294339b16267
f47f846414b6d327ea5c7bfd54a6d4713a36b7d191209b32d47fdabc1dfb6bc46a98d40f53

000790

CONFIDENTIAL
ID #:3864



**File Name**
https-www.instagram.com-p-CUV99gWvFzN-Aug-12-24-17-30-48-GMT-0700-(PDT)_0.jpg

**Hash (SHA256)**
afd7c9638882b04a806d94c3f2a99f9774879cf85eb96ce9882162aa4eeb3be9

**Signature (PKCS#1v1.5)**
18ee38cbbb652e870dcd5b5d220bc167708ad7f7b6f525d005ee16a28157a6d104cd5c95032a63b16
6d39cd221e2d58378ca8fd5cc97523371272b5dad4c96cf80b84d9bec947a9f62cb54495e77de5ffd
44cf8e9a9c7a64eee06defc4d2e95892185764b43a61030616380be99b69957148f4c5f17200af9d13
da4d13ae0062096e0102be87a00d48a5ac253bbee0809938151812ef077abb38bc6c2817a0f0a38614
402cff21511efde4bce6774d0d1561cddea5e53829ec2ae403d9a79b5e6cd8510a78fb799b53eafd08
cba6dc07eef89a9fcc40fe25d6ce191ff4a0a6c1574948a5bf0ab641710a2a72f165d3fab3b0a291c8a
c53455e2af2e8654d4956

**URL**
https://www.instagram.com/p/CUV99gWvFzN/

**Timestamp**
Mon Aug 12 2024 17:30:48 GMT-0700 (Pacific Daylight Time)

000791

CONFIDENTIAL
ID #:3865





**File Name**
https-www.instagram.com-p-CUV99gWvFzN-Aug-12-24-17-30-48-GMT-0700-(PDT)_1.jpg

**URL**
https://www.instagram.com/p/CUV99gWvFzN/

**Hash (SHA256)**
b16580c535185ea8410e098a291dde292f45d11371dcaff6f042d131c2557214

**Timestamp**
Mon Aug 12 2024 17:30:48 GMT-0700 (Pacific Daylight Time)

**Signature (PKCS#1v1.5)**
64b5e0fd8968a0f2aafd6d7a4f4fc3fe507e7a67a5e9c5e1d38a078b0f219d57e61afcfd17b9dcd693
4584e16099b6f0cb98be60f8361dc1931d8208c75a9cd470a49ca986b2f838365148fd88bcca0d115
0f1d2391a692fc6c1830b8c8d9daa3543741d3443a014bc33fbd6524e2bba8f2b939d222e6b445c9
896c374aab9d791a1bf0096c4b07d1fc7b049218b8835f98ec3a0b4ba2111344ca3f4beadcdbfcc2b
e6736e6348fb4bd955acc9165ce06d8ea86057cff85cd900aaba20871efd7515a5e1b44eeb79d299d
903fb369a4bbf2a62c80dd21e3e2e09a7741f45fe48c6c2083c454efa29a9cced25a64c605857f546
341e5ae504be63831f80cc99b

CONFIDENTIAL
ID #:8866



**File Name**
https-www.instagram.com-p-CUV99gWvFzN-Aug-12-24-17-30-48-GMT-0700-(PDT)_2.jpg

**Hash (SHA256)**
4f299f236d920767c5585d0c665da3379c5a13b81524b8a3cc515ea2f06e46a2

**Signature (PKCS#1v1.5)**
3e31e064457854ba5459fefa4ae345aaf37882d52b426a34a70f5d9a186fa751fbe36c3899ad9c23f
44a2a53fa0b459696d6d998e33b83eb76815c916be23792135cc8dacbc8077448667a23cebd0d32fc
1259c3c6022cbb8563c4104cc98900b1763ff5cf4940c08dd591ab9850c63379b65e31242c81c6c6f
e04def54faaf8fd83d55368eafe0f9f43fb072d8d376943d5e215b3d192f64967f7b03c7b4ca0978c
beedeecab79c5d1389c9a38272aed5f2a2c6482c7bb7b786a67558fd9289019e8029ab70f695ff209
8f0cfdb13197cb2dee494068ae7c0ee3b173050446d9872934aed3dd2823284ca8319cb76f7da999d
13e1529ca1fd9e0a41d04edcf3

**URL**
https://www.instagram.com/p/CUV99gWvFzN/

**Timestamp**
Mon Aug 12 2024 17:30:48 GMT-0700 (Pacific Daylight Time)

CONFIDENTIAL













**File Name**
https-www.instagram.com-p-CUV99gWvFzN-Aug-12-24-17-30-48-GMT-0700-(PDT)_3.jpg

**URL**
https://www.instagram.com/p/CUV99gWvFzN/

**Hash (SHA256)**
508282d4c348534ae05214d207514d47bc9ca271064e7c614eff963aceace549

**Timestamp**
Mon Aug 12 2024 17:30:48 GMT-0700 (Pacific Daylight Time)

**Signature (PKCS#1v1.5)**
1d192793aafb026e0fda2c1c83e8e1ce119dcdccfed00d3351f190d1dfad807789a5497285545fd0e
efa73996526e3f83852ce60215171ccd265234546039d33fc7cec8c76e95786e6eea85da2054d7264
b805a856c3e9af53d5289dd9a96bc9339e3fba312e91706c129066c37714a30cd303a619ac9c76830
c46a670878ad13926ce1cd0370090eec91ecc52c8ce557050715fed2a777c1e0792adb51b55544382a
8497dcc2580e42bf049dafa376b068bf6e882d0a3762fed43654a889ba4cb6672529c01800b85204d5
1d808c1f1f98811f918764b3bd7ef0c05bf662281c1a008391159cc89ea817c3dfa79f0b900d6cf665fdc
ff887a13abee32c66667

CONFIDENTIAL



**File Name**
https-www.instagram.com-p-CUV99gWvFzN-Aug-12-24-17-30-48-GMT-0700-(PDT)_4.jpg

**URL**
https://www.instagram.com/p/CUV99gWvFzN/

**Hash (SHA256)**
1cff2dadb61a24107f9d267dce2411e01a261d48029fac892bd23a685d676c13

**Timestamp**
Mon Aug 12 2024 17:30:48 GMT-0700 (Pacific Daylight Time)

**Signature (PKCS#1v1.5)**
3a076c4aea9f9418419f91d1af993e7e3701f5fa45e8b9c8beb925542b943855106e70610cb3ef4ba0
8f331d81fb0dd63b31b8ca6697e8217fe6f45a7fe609f4ee3d4684e112568e0dff26aac5aaf78125ef
4305058d7adb707fef20c8ab24dd7887b87cfd9a079eb49e11f66953b6943eec129e8cd54b104f0af
5b79dff18b30d6ee5cb81cc8a0532ab48409f0b2346c08d0674e830c6dc1b5bef4c418fea80ad1f22a
d06b58a30df02f74a54d59d79dbb6e3eb7dbab16c3b837cf08f24f6583ba390038e23967cefa567c
266089c498d1c0477bab90460b44e2d1b98037e92116e0a24eb36fb934bb66de4518878f04d1e5bc5
9ce3f87fa060a6fa18869621e

000795

# **EXHIBIT 33**



**Secretary of State**
**Application to Register a Foreign Limited**
**Liability Company (LLC)**

LLC-5

**FILED**
Secretary of State
State of California

202125210297
Filing Number
09/07/2021
Filing Date

**IMPORTANT — Read Instructions before completing this form.**
Must be submitted with a current Certificate of Good Standing issued by the government agency where the LLC was formed. See Instructions.

**Filing Fee** — **$70.00**

**Copy Fees** — First page $1.00; each attachment page $0.50; Certification Fee - $5.00

Note: Registered LLCs in California may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to https://www.ftb.ca.gov.

This Space For Office Use Only

**1a. LLC Name** (Enter the exact name of the LLC as listed on your attached Certificate of Good Standing.)

Kenzieland LLC

**1b. California Alternate Name, If Required** (See Instructions — Only enter an alternate name if the LLC name in 1a not available in California.)

**2.  LLC History** (See Instructions — Ensure that the formation date and jurisdiction match the attached Certificate of Good Standing.)

| a. Date LLC was formed in home jurisdiction (MM/DD/YYYY) | b. Jurisdiction (State, foreign country or place where this LLC is formed.) |
|---|---|
| 4 / 30 / 2021 | Wyoming |

**c. Authority Statement** (Do not alter Authority Statement.)
This LLC currently has powers and privileges to conduct business in the state, foreign country or place entered in Item 2b.

**3.  Business Addresses** (Enter the complete business addresses. Items 3a and 3b cannot be a P.O. Box or "in care of" an individual or entity.)

| a. Street Address of Principal Executive Office - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 4324 Promenade Way #314 | marina del Rey | CA | 90292 |
| b. Street Address of Principal Office in California, if any - Do not enter a P.O. Box | City (no abbreviations) | State CA | Zip Code |
| c. Mailing Address of Principal Executive Office, if different than Item 3a | City (no abbreviations) | State | Zip Code |

**4.  Service of Process** (Must provide either Individual OR Corporation.)
INDIVIDUAL – Complete Items 4a and 4b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Elyssia | | Musolino | |
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
| 1055 W. seventh st. suite 2400 | Los Angeles | CA | 90017 |

CORPORATION – Complete Item 4c only.  Only include the name of the registered agent Corporation.

**c. California Registered Corporate Agent's Name** (if agent is a corporation) – Do not complete Item 4a or 4b

**5.  Read and Sign Below** (See Instructions.  Title not required.)
By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized to sign on behalf of the foreign LLC.

Signature

Mackenzie Thoma
Type or Print Name

LLC-5 (REV 11/2020)

Clear Form    Print Form

2020 California Secretary of State
bcfile.sos.ca.gov

Scanned with CamScanner

CONFIDENTIAL

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, SECRETARY OF STATE of the STATE OF WYOMING, do hereby certify that according to the records of this office,

## KENZIELAND LLC

is a

## Limited Liability Company

formed or qualified under the laws of Wyoming did on **April 30, 2021**, comply with all applicable requirements of this office.  Its period of duration is Perpetual.  This entity has been assigned entity identification number **2021-001001432**.

This entity is in existence and in good standing in this office and has filed all annual reports and paid all annual license taxes to date, or is not yet required to file such annual reports; and has not filed Articles of Dissolution.

I have affixed hereto the Great Seal of the State of Wyoming and duly generated, executed, authenticated, issued, delivered and communicated this official certificate at Cheyenne, Wyoming on this 30th day of August, 2021 at 2:08 PM.  This certificate is assigned ID Number 046645325.



_Edward A. Buchanan_
Secretary of State

202125210297

Notice:  A certificate issued electronically from the Wyoming Secretary of State's web site is immediately valid and effective.  The validity of a certificate may be established by viewing the Certificate Confirmation screen of the Secretary of State's website https://wyobiz.wyo.gov and following the instructions displayed under Validate Certificate.

016555

# **EXHIBIT 34**



**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**LLC-12**

CONFIDENTIAL

**21-F31299**

**FILED**

In the office of the Secretary of State
of the State of California

**OCT 14, 2021**

---

**IMPORTANT — Read instructions before completing this form.**

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**This Space For Office Use Only**

| 1. Limited Liability Company Name (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.) |
|---|
| KENZIELAND LLC |

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 202125210297 | WYOMING |

**4. Business Addresses**

| a. Street Address of Principal Office - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |
| b. Mailing Address of LLC, **if different than item 4a** | City (no abbreviations) | State | Zip Code |
| 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |
| c. Street Address of **California** Office, if Item 4a is not in California - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
| 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Mackenzie | | Thoma | |
| b. Entity Name - Do not complete Item 5a | | | |
| | | | |
| c. Address | City (no abbreviations) | State | Zip Code |
| 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Elyssia | | Musolino | |
| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
| 1055 West Seventh Street, Suite 2400 | Los Angeles | CA | 90017 |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7. Type of Business**

| a. Describe the type of business or services of the Limited Liability Company |
|---|
| Adult entertainment |

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| b. Address | City (no abbreviations) | State | Zip Code |
| | | | |

**9. The Information contained herein, including any attachments, is true and correct.**

| 10/14/2021 | Elyssia Musolino | Legal representative | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

LLC-12 (REV 01/2017)

016553

2017 California Secretary of State
www.sos.ca.gov/business/be

CONFIDENTIAL

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**LLC-12**

**22-A37304**

# FILED

**In the office of the Secretary of State
of the State of California**

**JAN 20, 2022**

**IMPORTANT —** This form can be filed online at
bizfile.sos.ca.gov.

Read instructions before completing this form.

**Filing Fee  - $20.00**

**Copy Fees -** First page $1.00; each attachment page $0.50;
    Certification Fee - $5.00 plus copy fees

This Space For Office Use Only

| | |
|---|---|
| **1. Limited Liability Company Name** (Enter the **exact** name of the LLC.  If you registered in California using an alternate name, see instructions.) <br><br> KENZIELAND LLC | |

| **2. 12-Digit Secretary of State Entity Number** | **3. State, Foreign Country or Place of Organization** (only if formed outside of California) |
|---|---|
| 202125210297 | WYOMING |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box <br> 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |
| b. Mailing Address of LLC, **if different than item 4a** <br> 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |
| c. Street Address of **California** Office, if Item 4a is not in California Do not list a P.O. Box <br> 578 Washington Blvd #590 | Marina Del Rey | **CA** | 90292 |

**5. Manager(s) or Member(s)**

If no managers have been appointed or elected, provide the name and address of each member. At least one name and address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an additional managers/members, enter the names(s) and address(es) on Form LLC-12A.

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Mackenzie | | Thoma | |

| b. Entity Name - Do not complete Item 5a |
|---|
| |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |

LLC-12 (REV 12/2021)

016556

**Page 1 of 2**

2021 California Secretary of State
bizfile.sos.ca.gov

CONFIDENTIAL

**6. Service of Process** (Must provide either Individual **OR** Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Elyssia | | Musolino | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 555 South Flower Street, 24th Floor | Los Angeles | **CA** | 90071 |

**CORPORATION** – Complete Item 6c only.  Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7. Type of Business**

| Describe the type of business or services of the Limited Liability Company |
|---|
| Film and digital content production |

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9. Labor Judgment**

| Does a Manager or Member have an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code? | ☐ Yes  ☑ No |
|---|---|

**10.** By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

| 01/20/2022 | Mackenzie Thoma | Member | |
|---|---|---|---|
| Date | Type or Print Name | Title | Signature |

# EXHIBIT 35

 **California Secretary of State**
Electronic Filing



# LLC Registration – Articles of Organization

|  |  |
|---|---|
| Entity Name: | Lola March LLC |

| | |
|---|---|
| Entity (File) Number: | 202201810548 |
| File Date: | 01/13/2022 |
| Entity Type: | Domestic LLC |
| Jurisdiction: | California |

Detailed Filing Information

1. Entity Name: Lola March LLC

2. Business Addresses:

   a. Initial Street Address of
      Designated Office in California:

                                              578 Washington Blvd #590
                                            Marina Del Rey, California 90292
                                            United States

   b. Initial Mailing Address:

                                              578 Washington Blvd #590
                                            Marina Del Rey, California 90292
                                            United States

3. Agent for Service of Process:

                                            Elyssia Musolino
                                          1055 West Seventh Street, Suite 2100
                                          Los Angeles California 90017
                                          United States

4. Management Structure: All LLC Member(s)

5. Purpose Statement: The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

Electronic Signature:

The organizer affirms the information contained herein is true and correct.

Organizer: Mackenzie Thoma

CONFIDENTIAL

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

LLC-12

22-A37293

# FILED

**In the office of the Secretary of State**
**of the State of California**

**JAN 20, 2022**

**IMPORTANT —** This form can be filed online at bizfile.sos.ca.gov.

Read instructions before completing this form.

**Filing Fee  - $20.00**

**Copy Fees -** First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

This Space For Office Use Only

---

**1. Limited Liability Company Name** (Enter the **exact** name of the LLC.  If you registered in California using an alternate name, see instructions.)

LOLA MARCH LLC

---

| **2. 12-Digit Secretary of State Entity Number** | **3. State, Foreign Country or Place of Organization** (only if formed outside of California) |
|---|---|
| 202201810548 | CALIFORNIA |

---

**4. Business Addresses**

| a. Street Address of Principal Office - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |
| b. Mailing Address of LLC, **if different than item 4a** | City (no abbreviations) | State | Zip Code |
| 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |
| c. Street Address of **California** Office, if Item 4a is not in California Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
| 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |

---

**5. Manager(s) or Member(s)**

If no managers have been appointed or elected, provide the name and address of each member. At least one name and address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an additional managers/members, enter the names(s) and address(es) on Form LLC-12A.

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Mackenzie | | Thoma | |

| b. Entity Name - Do not complete Item 5a |
|---|
| |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 578 Washington Blvd #590 | Marina Del Rey | CA | 90292 |

---

LLC-12 (REV 12/2021)

016539

**Page 1 of 2**

2021 California Secretary of State
bizfile.sos.ca.gov

**6. Service of Process** (Must provide either Individual **OR** Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Elyssia | | Musolino | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 555 South Flower Street, 24th Floor | Los Angeles | **CA** | 90071 |

**CORPORATION** – Complete Item 6c only.  Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7.  Type of Business**

| Describe the type of business or services of the Limited Liability Company |
|---|
| Film and digital content production |

**8.  Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9.  Labor Judgment**

| Does a Manager or Member have an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code? | ☐ Yes   ☑ No |
|---|---|

**10.** By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

| 01/20/2022 | Mackenzie Thoma | Member | |
|---|---|---|---|
| Date | Type or Print Name | Title | Signature |

LLC-12 (REV 12/2021)          016540          Page 2 of 2          2021 California Secretary of State
bizfile.sos.ca.gov
Page 483 of 857 _ Joint MSJ Appendix

# **EXHIBIT 36**

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4

5    MACKENZIE ANNE THOMA, a.k.a.   )
     KENZIE ANNE, an individual and )
6    on behalf of all others       )
     similarly situated,           )
7                                  ) Case No.
                  Plaintiff,       ) 2:23-cv-04901 WLH
8                                  ) (AGRx)
     V.                            )
9                                  )
                                   )
10   VXN GROUP LLC, a Delaware      )
     limited liability company;    )
11   MIKE MILLER, an individual;    )
     and DOES 1 to 100, inclusive, )
12                                 )
                  Defendants.      )
13   _____)

14

15

16

17

18           VIDEO-RECORDED DEPOSITION OF:

19                   LARRY LERNER

20           Tuesday, September 10, 2024

21

22

23

3          Q. So your -- your testimony is that, regardless

4     of whether a payment went to Lola March LLC or was going

5     to Mackenzie Thoma individually, that they were treated

6     the same?

7          A. Absolutely.  They still go on her personal tax

8     return.

9          Q. And so, there was no real differentiation in

10    terms of the business income.  If she obtained

11    non-employee compensation as an individual or received a

12    non-employee compensation through the LLC, there was no

13    real distinction between the types of income --

14            (Overlapping speakers.)

15         A. Correct.  Correct.

16         Q. Okay.

17         A. Single-member LLCs are treated as regular

18    personal income.

19         Q. And can you turn to the next page following?

20         A. Page 9 is Fly By Night Films, Incorporated.

21    That one's to Lola March.

22         Q. Actually, the page -- the page before that.

23         A. The page before that is ICF Technology.

24         Q. And do you see an LLC noted as the payee or --

25         A. No, I don't.  No, I don't.

25

1    Q. And so, that payment went to her as an

2    individual independent contractor; is that correct?

3    A. Yes.

4    Q. Okay.  Based on your services that you provided

5    to Mackenzie Thoma and which -- which included services

6    for Lola March LLC, what was the -- what was the primary

7    source of income for Lola March LLC in 2020?

8    A. I don't think Lola March was even in a -- hang

9    on one second.  Let me -- I saw something earlier on

10   this.

11        Okay.  Look at the California Articles of

12   Organization for Lola March.  The entity number is

13   202208 and so forth.

14        The "2022" means that it was established in

15   2022.  So Lola March didn't exist before January 13th of

16   '22.

17        Q. Were you at all involved in the formation of

18   Lola March?

19        A. No, I wasn't.  She had someone else do that.

20        Q. Did you talk with Mackenzie Anne Thoma about

21   forming Lola March or why she did?

22        A. No, I did not.  I mean, I was surprised that

23   she had formed it and not told me about it.

23      A. She ignored us.  And all she kept doing was

24  calling and saying, "Where's my tax return?  Where's my

25  tax return?  I need my tax return.  I have to get it to

                                                                45

1  the bank."

2           I said, "Not so fast.  We are not done figuring

3  out what the true numbers are."

4           "No, I need it right now.  I need it right

5  now."

6           "Nope, you're not getting it right now."

7       Q. So, looking at these deductions and her tax

8  returns, is it fair to say that the deductions that

9  Kenzie would take for any particular category are

10  basically interchangeable expenses between herself

11  personally as a sole proprietor, Lola March LLC, and

12  Kenzieland LLC?

13      A. Yeah.  It's all one and the same.

14      Q. Thank you.

15          Can I ask you a little bit about your

16  credentials?

17      A. Yeah.  What would you like to know?

18      Q. What is the the -- how would you state your

# **EXHIBIT 37**

CONFIDENTIAL



016975

CONFIDENTIAL
ID #:3887



CONFIDENTIAL
ID #:3838



015977

# **EXHIBIT 38**



























# **EXHIBIT 39**





Apr 28, 2022 at 5:47 PM

Have a Slayed with Kenzie coming up on the 3rd.

There is going to be a stripper pole in the scene. Can you make sure she's ok with that. Want to make sure she doesn't have a phobia or anything like that

Yup all good

4pm need Kenzie on a call with marketing

That's fine...aria callsheet coming?

Copy

Hey still no aria callsheet

KGB have a good connection I want to keep them working together. He's on the 12th
👍

Great

Booking a BGGG – does Kenzie work with Jax?

She can, who are the other girls

Don't have the others booked yet.

Lexi Sample available

Melissa Stratton

I have a month will let you know  who they want. Kenzie will for sure be the focus per usual













# **EXHIBIT 40**

Kodify Mail - Fwd: Kenzie Anne x Vixen    Case 2:23-cv-04901-WLH-AGR    Document 131    Filed 01/10/25    Page 213 of 252    Page 7/25/24, 3:42 PM

CONFIDENTIAL

ID #:3914

## kodify



Courtney

---

# Fwd: Kenzie Anne x Vixen

1 message

**Stephanie**       >
To: Courtney       >

Thu, Jul 25, 2024 at 12:52 PM

---------- Forwarded message ----------
From: **Matt**       >
Date: Thu, Nov 12, 2020 at 12:02 PM
Subject: Fwd: Kenzie Anne x Vixen
To: Stephanie       >

Begin forwarded message:

> **From:** Chris Applebaum <chris@chrisapplebaum.com>
> **Date:** November 11, 2020 at 9:08:16 AM PST
> **To:** Mike Miller
> **Cc:** misskenzieanne@gmail.com, Eric Galen <eric@sevnagency.com>, Matt
>       >, Alexandra       Steve
>      
> **Subject: Re: Kenzie Anne x Vixen**
>
> Mike & Team,
>
> Good morning and Thank You for the warm welcome. It's a distinct pleasure to have this opportunity to
> create something truly memorable with you. Kenzie could not be more enthusiastic to work with VMG as
> this is a dream come true for her. Thank you again for having her.
>
> To kick off things from our side, let me serve up a few entrée items…
>
> **DATES**
>
> We are clear from Nov 30 on…
>
> **TALENT**
>
> In terms of talent for Kenzie's Vixen debut, she has a short list of possibilities that we'd love you to
> consider. This is without any idea of availability, etc., but if Kenzie could have her dream team it would
> be 2 of the following:
>
> Gianna Dior
> Emily Willis

Haley Reed
Lika Star
Tori Black
Jill Cassidy
Natalia Star
Jessa Rhodes
Adria Rae
Naomi Swan

Once again, these suggestions are without knowing about any of the logistics on your side, availability, branding concerns, etc. So consider this list as a springboard to work from - for further collaboration.

## PRODUCTION

I think it would be helpful if we could have a chat today or Thursday about production specifics so I can better orient the creative to your resources. On the call you mentioned that you have a DTLA location for a few more weeks, which would be great for us to take advantage of. In general, I like to have a small crew so we can move fast. I both Direct and DP everything myself along with 2 assts (camera + general PA). Everything is lit so it pops (even interior daylight scenes). I like having great Hair & MU and have options that are super-affordable. I don't want to weigh this email down with logistics so let's sidebar on that...

## CREATIVE PART I

I think our brands are aligned under the vision of 'high end luxury art porn' that's more on the erotica side. Fusing this sophisticated, elevated look with Kenzie's insatiable desire for pleasure, very explicit sex, and making bodies look like the slickest, shiniest car commercial is where my head is at. While this is the Fantasy, the Vixen brand always has a story to set everything up. I think Kenzie's real-life story is great - simultaneously a fashion model and secret cam girl - until she decided one day to say fuck it and just shoot porn. I imagine a set up where (hypothetically) Gianna and Emily are getting ready for an elegant event (award show), wearing evening gowns. Chic. Yves Saint Laurent vibes. Red lips. Glossy red nails. Emily's friend Kenzie is going to pick them up in her Uber Black so they can all go to the event together. Since Gianna hasn't met Kenzie yet, she asks Emily to tell her a little more about her. Emily takes out her phone and shows her Kenzie's Instagram, explaining that she wants to get into porn and it will be fun for two pro's to give her advice. As the doorbell rings, Gianna asks (not in a bitchy way) if she's got what it takes to really make it. After all, it's not all about good looks…

Kenzie enters and the three look gorgeous together. "So this is the fashion model that wants to do porn?" Gianna asks. Let's just say that they leave the Uber in the driveway for the next hour as Gianna and Emily initiate Kenzie to see if she's got what it takes. This is a set up to have Kenzie need to "prove" herself to both Gianna and Emily. I imagine the sex to have a tinge of Andrew Blake…high heels and pearl necklaces stay on the whole time. One of the girls may simply hike up her dress but leaves it on. Kenzie ravages Gianna and Emily in impressive fashion but the initiation isn't complete. The girls need to see how far this fashion model will take it. Gianna and Emily brandish dildos, Kenzie shows them her impressive skills at blow jobs, and the two treat Kenzie to a dildo double-penetration in a final, memorable scene. In a perfect world this would be done with Kenzie standing, her hands steadying her while she holds onto a chandelier. We can work on this more if this isn't a possibility, but whatever the art direction, it should be clear to everyone by the end of this scene that Kenzie is certainly ready for the big time...

## CREATIVE PART II

As we mentioned on our call, Kenzie would certainly love to do a B/G scene to follow, especially with a Black performer (she's a subscriber to Blacked - her favorite). I feel like this could potentially link to this Premiere scene if we continue with the 'fashion model secret cam girl' theme. For instance, Jason Luv is back from work, sits down on his couch with a drink and finds Kenzie's cam show. He's dressed in a black tailored suit, like he runs a record label. He's blown away with Kenzie and since it's a 2-way cam-

017307

chat where Kenzie sees Jason...she's in luv. Jason asks her why she doesn't do porn and when Kenzie tells him she doesn't have any connections in LA, he lets her know he can help…

As I mentioned before, these creative ideas are to get the ball rolling, and I'll look forward to your comments and notes. I know you've seen a lot of Kenzie but I included a couple of new images we're about to release for her new G/G OnlyFans KENZIELAND so you can have more specific visual references for what I describe as 'high end luxury art porn'. Looking forward to pushing the conversation forward!

All the best,

Chris



CHRIS APPLEBAUM
CHIEF CREATIVE OFFICER
EATS MEDIA GROUP



On Nov 10, 2020, at 3:44 PM, Mike Miller ██████████ > wrote:

Hi Everyone,

On behalf of my partner Steve, myself and everyone at Vixen Media Group I want to give a warm welcome to Miss Kenzie Anne and Mr Chris Applebaum for putting their faith in the Vixen team to make this exciting project a reality.  This is an amazing way to end the year and Kenzie is a perfect fit for the Vixen brand!

As discussed on our call last Friday, this email will serve as the official kick off to the project for VMG creative team and Chris leading the way with treatment.

For reference, the following people from last week's call are included on this thread:

Kenzie Anne - @misskenzieanne
Chris Applebaum - Director
Eric Gallen - Sevn Agency

Matt ██ - VMG Creative Director
Alexandra ██████ - VMG Marketing Director

Looking forward to working with everyone on this!

Best,
Mike Miller

--
Co-founder
Vixen Media Group

 kodify

Courtney ███████████████████

## Fwd: VXN STYLING: KENZIE x VIXEN

1 message

To: Jessica ███████████████████                    Tue, Jun 18, 2024 at 12:55 PM

Courtney ████████

Begin forwarded message:

**From:** Lauren Bonner <laurenbonner101@gmail.com>
**Subject: Re: VXN STYLING: KENZIE x VIXEN**
**Date:** December 7, 2020 at 10:44:05 AM PST
**To:** Stephanie ███████████████
**Cc:** Haley ███████████████        Matt ██████████████
"chris@chrisapplebaum.com" <chris@chrisapplebaum.com>

Thank you Stephanie! See you tomorrow 11am studio city xx

On Mon, Dec 7, 2020 at 10:41 AM Stephanie ████████████> wrote:
  Hello all,

  After getting down and dirty with your feedback, I am confident we are truly on the same page! When
  pulling I was picturing Emily and Alina both in black and Kenzie contrasting and standing out! I am so
  glad you liked the metallics as those were my top picks as well!

  We will edit the pull in the morning when we pick up to match with your selections and re-work the
  shoe pull too. After the fitting, we will return what does not work.

  Really looking forward to meeting Kenzie tomorrow!

  Our office address is ████████████   ███████████████  Just text me when you pull up to the
  grey gate and I will buzz you in. You can park anywhere in the first parking lot on the left.

  Thank you!

  On Mon, Dec 7, 2020 at 8:34 AM chris@chrisapplebaum.com <chris@chrisapplebaum.com> wrote:
    👍👍👍

    Best,

    Chris

        On Dec 7, 2020, at 7:13 AM, Stephanie ███████████████> wrote:

This is great, thank you so much! I'm going to go over everything in detail as soon as I'm in office this morning and get back to you with any questions.

Lauren, 11am fitting w/ Kenzie tmrw works perfect!

Thank you guys so much! Talk to you soon.

On Sun, Dec 6, 2020 at 10:47 PM Chris Applebaum <chris@chrisapplebaum.com> wrote:

> Hey Stephanie
>
> This is an amazing pull. You did an amazing job! Thank you for so many killer options.
>
> Since you have a lot of lingerie and shoes/accessories in-house I will not worry about these categories as much but I'll give you feedback. Overall, accessories are a must and earrings, necklaces, bracelets. etc are critical because these are the only things that will stay on the whole film. I feel the vibe could also include a gold watch…or Rolex…something Alina or Emily could wear to signify their more "professional/successful" status compared to Kenzie.
>
> For shoes, I've attached a jpg with a few things crossed out that I dislike. There are a few things that don't read High End enough (that's the problem with Prada it's so "of the moment") and another one - I feel the polka dots are too strong a statement and I wouldn't want to distract from opulent furs, for instance.
>
> Dresses - You created a problem because I love almost everything. With that being said, I added X marks over ones I wasn't really loving. I also added a couple stars to ones I would love to see at the Fitting. Also, I don't see long sleeves. I feel this is a short sleeve vibe. More skin. I understand the concern with returns & restocking so the only thing I'd suggest is to pare down dresses in a certain category, such as black. I see black working for everyone, but especially Emily and Alina. It would be great for Kenzie to have something that pops/stands out a little more from the other 2. I keep thinking about a promo shot of the 3 girls with Kenzie in the middle. It could be as simple as Kenzie in the red fur coat while everyone else is in black. Or she's in a metallic dress or something with a sheen. Keep in mind Kenzie is bustier than the other girls. Since there are so many options I hope this gives you some insight as to my preferences and you can thin things out based on what you think will FIT the best, since it's all about seeing the dresses on…
>
> Furs - I pared this down and eliminated a few options that didn't feel as opulent. Also, there's an ostrich feather one that has thin lines that will buzz on-camera so I put an X over that one.
>
> Since there are so many details just call me with any questions. I'd rather we talk than go over-budget because you're guessing about something.
>
> 213.321.6215 - if I don't pick up text me and I'll call you back.
>
> Once again, fantastic work!
>
> Chris

017148

&lt;Lingerie.png&gt;
&lt;Dresses 2.png&gt;
&lt;Dresses 3.png&gt;
&lt;Shoes 2.png&gt;
&lt;Dresses 1.png&gt;
&lt;Furs.png&gt;
&lt;Shoes 1.png&gt;

CHRIS APPLEBAUM
CHIEF CREATIVE OFFICER
EATS MEDIA GROUP

&lt;Pink copy.jpeg&gt;

> On Dec 4, 2020, at 5:20 PM, Stephanie ██████████████ &gt;
> wrote:
>
> Hello all,
>
> Please check out this Dropbox Link to review the wardrobe selects from today's general pull. Let me know if you are feeling the direction and if you want more or less of anything in particular.
>
> I will have to cut this pull down quite a bit otherwise it will be a fortune, so please star anything you love. Of course, evening gowns are tricky and will really be dependent on fit and they do not always have the best hanger appeal, but you can get the jist from the pics.
>
> The lingerie we already own and have in-house. I will also bring plenty of Agent Provocateur lingerie not pictured in the folder. Same thing with shoes/accessories, we have TONS in our wardrobe closet in the office which I will bring to the shoot.
>
> I absolutely love feedback so please let me know all your thoughts and feelings. I want to make sure I am on the right track. If possible, please let me know your thoughts by Monday at the latest.
>
> Lastly, I would love to do a fitting with Kenzie at our HQ Tuesday, once I pick up the pull. Is that feasible?
>
> I am so looking forward to this project and meeting you lovely people! Have a wonderful weekend!
>
>
> Thanks,
>
> Stephanie

--
Thank you,

Stephanie ████████

017149

Vixen Media Group
www.VixenBrand.com

# **EXHIBIT 41**

# studios : kenzieland.com

| Movie Title ▲ | Label | Year | Rev | Buy |
|---|---|---|---|---|
| Afternoon Delight x Eats | kenzieland.com | 2021 | | |
| Burning Desire | kenzieland.com | 2021 | | X |
| Came Back Haunted | kenzieland.com | 2021 | | |
| Car Wash x Eats | kenzieland.com | 2021 | | |
| Eternal Summer x Eats | kenzieland.com | 2021 | | |
| Feather | kenzieland.com | 2021 | | X |
| Glass Sauna | kenzieland.com | 2021 | | |
| I Only Lie When I Love You x Eats | kenzieland.com | 2021 | | |
| Kenzie and Jax Slayer - the Worship Video | kenzieland.com | 2021 | | |
| Lolita | kenzieland.com | 2021 | | |
| Love To Love You | kenzieland.com | 2021 | | |
| Maid 1 | kenzieland.com | 2021 | | |
| Maid 2 | kenzieland.com | 2021 | | |
| Maid 3 | kenzieland.com | 2021 | | |
| Match Point (II) | kenzieland.com | 2021 | | |
| Mirror | kenzieland.com | 2021 | | |
| Slave for Love | kenzieland.com | 2021 | | |
| Sleepover x Eats | kenzieland.com | 2021 | | |
| Too Busy Earnin | kenzieland.com | 2021 | | |
| Up | kenzieland.com | 2021 | | |
| Vanna Bardot and Codey Steele Submit | kenzieland.com | 2021 | | |
| Worship | kenzieland.com | 2021 | | |
| Young and Beautiful | kenzieland.com | 2021 | | X |

Showing 1 to 23 of 23 entries

Do another search...

Copyright 1999-2024 iafd.com

Archiving, reproduction, re-distribution or transmission
this site by any means without the prior permission of
iafd.com is prohibited. All rights reserved



# **EXHIBIT 42**

# Kenzie Anne



Photo Copyright/Courtesy of
vixen.com

**PERFORMER AKA**

Kenzie Ann
Miss Kenzie Anne

**BIRTHDAY**

March 9, 1993 (31 years old)

**ASTROLOGY**

Pisces

**BIRTHPLACE**

Newbury Park, CA, USA

**YEARS ACTIVE**

2020-2024 (Started around 27 years old)

**WEBSITE**

Telegram

Official website

Playboy Centerfold

Twitch

Chaturbate

**SOCIAL NETWORK**

**DIGITAL DISTRIBUTION PLATFORM**

Vital Stats | Comments | Awards | Credited With | Filter

**ETHNICITY**

Caucasian

**NATIONALITY**

American

**HAIR COLORS**

Brown/Dark Blond/Dirty Blond

**EYE COLOR**

Hazel

**HEIGHT**

5 feet, 6 inches (168 cm)

**WEIGHT**

121 lbs (55 kg)

**MEASUREMENTS**

34D-23-34

**TATTOOS**

None

**PIERCINGS**

Tongue; Nipples; Navel

Performer Credits (196)    Check Scene Pairings

Titles in YELLOW are Webscenes; Blue are Bi/All-Male titles and Grey are compilations.

| Movie Title | Year | Distributor | Notes | Rev | Formats ❓ |
|---|---|---|---|---|---|
| Pet Of The Month November 2020 | 2020 | penthousegold.com | | | O |
| Absolute Dime | 2021 | blacked.com | Squirt Bald Creampie | | O |
| Afternoon Delight x Eats | 2021 | kenzieland.com | Bald NonSex | | |
| Best Friends Always Help Each Other Get Naked Live | 2021 | cherrypimps.com | LezOnly Bald | | O |
| Black and White 19 | 2021 | Pulse Distribution | Bald Creampie | 2 | D |
| Blacked Raw V46 | 2021 | Pulse Distribution | Squirt Bald Creampie | 4 | D |
| Blonde Bombshell Kenzie Anne Teaches Young Black Damion Dayski The Pleasures Of A Real Woman | 2021 | julesjordan.com | Facial Squirt Bald | | O |
| Breaking Through | 2021 | vixen.com | LezOnly Bald AnalToy | | O |
| Burning Desire | 2021 | kenzieland.com | LezOnly Bald | | O |
| Calling For Kenzie | 2021 | Brazzers Network | Squirt Bald Creampie | | O |
| Came Back Haunted | 2021 | kenzieland.com | LezOnly Bald | | |
| Car Wash x Eats | 2021 | kenzieland.com | Bald NonSex | | |
| Defiance | 2021 | slayed.com | LezOnly Bald | | O |
| Dressed to Impress | 2021 | badoink.com | Bald VR | | O |
| Eternal Summer x Eats | 2021 | kenzieland.com | Bald NonSex | | |
| Feather | 2021 | kenzieland.com | Bald MastOnly | | DO |
| Florentine 1 | 2021 | deeper.com | NonSex | | O |
| Florentine 2 | 2021 | deeper.com | Facial Squirt Bald | | O |
| Glass Sauna | 2021 | kenzieland.com | Bald MastOnly | | |
| Halloween 2021 (II) | 2021 | penthousegold.com | NonSex | | |
| Halston Presents: Kenzie Anne Interracial Threesome | 2021 | julesjordan.com | Facial Bald | | O |
| Hot Girl Summer | 2021 | Jules Jordan Video | Facial Bald | | D |
| I Only Lie When I Love You x Eats | 2021 | kenzieland.com | LezOnly | | |
| Kenzie and Jax Slayer - the Worship Video | 2021 | kenzieland.com | Facial Bald Footjob | | |
| Kenzie Anne Lets Her Juicy Pussy Get Destroyed | 2021 | bang.com | Bald Creampie | | O |
| Kenzie Anne: Big Dreams Do Come True | 2021 | julesjordan.com | Facial Squirt Bald | | O |
| Kenzie's Showcase of Sluttiness | 2021 | mikeadriano.com | BJOnly Facial Bald | | O |
| Labor Day 2021 | 2021 | penthousegold.com | NonSex | | |
| Lolita | 2021 | kenzieland.com | LezOnly Bald | | |
| Love To Love You | 2021 | kenzieland.com | LezOnly Bald | | |
| Maid 1 | 2021 | kenzieland.com | LezOnly Bald | | |
| Maid 2 | 2021 | kenzieland.com | LezOnly Bald | | |
| Maid 3 | 2021 | kenzieland.com | LezOnly Bald | | |
| Match Point (II) | 2021 | kenzieland.com | LezOnly Bald | | |
| Mirror | 2021 | kenzieland.com | Bald MastOnly | | |
| Party Girls 30810 | 2021 | naughtyamerica.com | Bald VR | | O |
| Primal Heat | 2021 | slayed.com | LezOnly Squirt Bald | | |
| Sexy Kenzie Anne Oiled Up and Creampied | 2021 | manyvids.com | Bald Creampie | | |
| Should I Stay | 2021 | vixen.com | Facial Bald Footjob | | O |
| Slave for Love | 2021 | kenzieland.com | Facial Squirt Bald CumSwap | | |
| Sleepover x Eats | 2021 | kenzieland.com | LezOnly Bald | | |
| Static Electricity | 2021 | playboyplus.com | Bald NonSex | | |
| Supercharged | 2021 | playboyplus.com | Bald NonSex | | O |
| This Is Not A Drill | 2021 | blacked.com | Bald Creampie | | O |
| Tonight's Girlfriend 30788 | 2021 | naughtyamerica.com | Facial Bald VR | | O |
| Too Busy Earnin | 2021 | kenzieland.com | Bald MastOnly | | |
| Up | 2021 | kenzieland.com | Bald MastOnly | | |
| Vanna Bardot and Codey Steele Submit | 2021 | kenzieland.com | Bald CumSwap | | |

| Movie Title | Year | Distributor | Notes | Rev | Formats ❓ |
|---|---|---|---|---|---|
| Worship | 2021 | kenzieland.com | Bald MastOnly | | |
| Young and Beautiful | 2021 | kenzieland.com | LezOnly Bald | | DO |
| 3some with Kenzie Anne and Emma Hix | 2022 | manyvids.com | Facial Bald CumSwap Swallow | | O |
| Aiden Ashley's House Party | 2022 | bellesaplus.co | Bald | | O |
| Aiden Ashley's House Party: Main Room | 2022 | bellesaplus.co | Bald | | O |
| Aiden Ashley's House Party: Waiting Room | 2022 | bellesaplus.co | Bald | | O |
| Anal Models 11 | 2022 | Pulse Distribution | Anal Facial Bald A2M | 1 | D |
| Angela's House Of Hedonism 3 | 2022 | Brazzers Network | Facial Bald CumSwap | | O |
| Badoink Studios: Super Bundle Compilation | 2022 | badoink.com | Bald VR | | O |
| Behind the Scenes - Feet Party for Club Girls | 2022 | loveherfilms.com | | | |
| Behind the Scenes - Flashing for the Role | 2022 | loveherfilms.com | | | |
| Belle Says Kenzie Must Cum First | 2022 | bellesaplus.co | Bald | | O |
| Bellesa House Blowjob Compilation 1 | 2022 | bellesaplus.co | BJOnly Bald | | O |
| Best New Starlets 2022 | 2022 | Elegant Angel | LezOnly Bald | | D |
| Big Cock Bully 30929 | 2022 | naughtyamerica.com | Facial Bald | | |
| Big Cock Bully 31393 | 2022 | naughtyamerica.com | Bald VR | | O |
| Blind Date 38: Kenzie and Quinton | 2022 | bellesaplus.co | Bald | | O |
| Blondes on Dredd | 2022 | Jules Jordan Video | Facial Squirt Bald | | D |
| Bushless Bubble Butts 2 | 2022 | ASM (Adult Source Media) | Facial Bald | 1 | O |
| Busty Nympho Kenzie Anne Has an Appetite for Large Cocks | 2022 | julesjordan.com | Facial Bald | | O |
| Casting Call | 2022 | loveherfilms.com | Bald Footjob | | DO |
| Clinic In Romance | 2022 | girlsway.com | LezOnly Bald | | O |
| Cosplay Supergirl and Wonder Woman Get Freaky | 2022 | camsoda.com | LezOnly Bald | | |
| Cum Sauna | 2022 | AdultTime.com | Bald | | DO |
| Date Nights Vol. 10 - Kenzie Anne | 2022 | manyvids.com | Facial Bald Swallow | | |
| Deep Diving Into Kenzie Anne | 2022 | cherrypimps.com | Bald | | O |
| Dirty Wives Club 30849 | 2022 | naughtyamerica.com | Bald | | O |
| Drip 1 | 2022 | Pulse Distribution | LezOnly Bald | | D |
| Electric Chemistry | 2022 | deeplush.com | Squirt Bald Creampie | | O |
| Episode 74: Kenzie and Damon | 2022 | bellesaplus.co | Bald | | O |
| Eternals: Thena A XXX Parody | 2022 | badoink.com | Bald VR | | O |
| Feet Party for Club Girls | 2022 | loveherfilms.com | LezOnly Bald | | O |
| Flashing for the Role | 2022 | loveherfilms.com | Bald | | O |
| Fun in the Sun | 2022 | badoink.com | Bald VR | | O |
| GFE: Naughty Cowgirls | 2022 | sexlikereal.com | Bald Creampie VR | | |
| Girl Crush 6 | 2022 | Pulse Distribution | LezOnly Bald | | D |
| Going Viral | 2022 | propertysex.com | Bald | | O |
| Heiress | 2022 | tushy.com | Anal Facial Bald A2M | 1 | DO |
| Helping You Unwind | 2022 | AdultTime.com | Bald | | |
| I Have a Wife 31214 | 2022 | naughtyamerica.com | Bald | | O |
| Icons 5 | 2022 | Pulse Distribution | Facial Bald Footjob | 1 | D |
| If It Feels Good 3 | 2022 | Pulse Distribution | Facial Squirt Bald | 1 | D |
| Interview with Cherry Of The Month Kenzie Anne | 2022 | cherrypimps.com | NonSex | | O |
| JOI Tease with Kenzie Anne | 2022 | loveherfilms.com | Bald MastOnly | | O |
| Kenzie 4 You | 2022 | dorcelclub.com | Facial Bald | | |
| Kenzie Anne - The Big Facial | 2022 | manyvids.com | BJOnly Facial | | |
| Kenzie Anne and Zac Wild | 2022 | fangearplus.vip | Facial Bald | | |
| Kenzie Anne Gets A Keiran Lee Facial | 2022 | fangearplus.vip | Facial Bald | | |
| Kenzie Anne Takes a Huge Cock Balls Deep And Loves It | 2022 | bang.com | Facial Bald | | O |
| Kenzie Anne Takes a Huge Cock Balls Deep and Loves It BTS | 2022 | bang.com | Bald | | |

| Movie Title | Year | Distributor | Notes | Rev | Formats ❓ |
|---|---|---|---|---|---|
| Kenzie Anne Takes On Dredd's Monster Cock | 2022 | fangearplus.vip | Facial Bald | | |
| Kenzie Anne's Dick Sucking Plan | 2022 | blowpass.com | BJOnly Facial Bald | 1 | O |
| Kenzie Anne: Oil- and Semen-Soaked | 2022 | evilangel.com | Facial Bald Swallow | | O |
| Kenzie Taylor Gets Rammed and Scoops Up A Cumshot To Eat | 2022 | bang.com | NonSex | | O |
| Kenzie Taylor Gets Rammed and Scoops Up A Cumshot To Eat BTS | 2022 | bang.com | NonSex | | |
| Les Amants de ma Femme | 2022 | Canal+ | Facial Bald | | |
| Lesbian Sex 25 | 2022 | Girlfriends Films | LezOnly Bald | 1 | D |
| Looking For Trouble | 2022 | blacked.com | Facial Squirt Bald | | O |
| Lucky Man | 2022 | Bellesa Films | Bald | | D |
| Make Sweet Music with Kenzie | 2022 | cherrypimps.com | Bald MastOnly | | |
| Making Him Stay | 2022 | loveherfilms.com | Bald Footjob | | O |
| Massage My Body and Soul | 2022 | modelmediaus.com | Bald | | |
| Money | 2022 | Pulse Distribution | Facial Bald | | D |
| Money: Chop Shop | 2022 | wicked.com | Facial Bald | | O |
| Muses: Ariel Demure | 2022 | AdultTime.com | Facial Bald | | O |
| My Favorite Customer | 2022 | teamskeet.com | Facial Bald | | O |
| My First Sex Teacher 31398 | 2022 | naughtyamerica.com | Bald VR | | O |
| Naughty America 31510 | 2022 | naughtyamerica.com | Facial Squirt Bald | | O |
| Naughty Blonde Wife Kenzie Anne Fucks Her Man to Dreamland | 2022 | spizoo.com | Bald | | O |
| Naughty Office 30809 | 2022 | naughtyamerica.com | Facial Squirt Bald Swallow | | O |
| Oliver Flynn Gives Kenzie Anne A Creampie | 2022 | fangearplus.vip | Bald Creampie | | |
| Pair Of Blonde Beauties Kenzie Anne and Kayley Gunner Get Wet In The Shower | 2022 | elegantangel.com | LezOnly Bald | | O |
| Poetics for Tramps | 2022 | Pulse Distribution | Facial Bald CumSwap | 2 | D |
| Pre-Fucking Interview With Skinny Blonde Kenzie Anne | 2022 | vlogxxx.com | Bald | | O |
| Pretty Pink Bombshell Gets A Sweet Treat | 2022 | xempire.com | Facial Bald | | O |
| Queen of Sticks | 2022 | vrbangers.com | Bald Footjob VR | | O |
| Raw 43 | 2022 | Jules Jordan Video | Facial Bald | 1 | O |
| Robot Tells Kenzie and Quinton What to Do | 2022 | bellesaplus.co | Bald | | O |
| Roommate Wars | 2022 | AdultTime.com | Bald | | |
| Seducing My Husband | 2022 | ASM (Adult Source Media) | Bald | | D |
| Serial Breeder | 2022 | puretaboo.com | Bald Creampie | | O |
| Sex and Submission 103723 | 2022 | kink.com | Facial Bald | | O |
| Sex Without Love | 2022 | deeper.com | Facial Bald CumSwap | | O |
| Sexual Icons 2 | 2022 | Mile High | Facial Bald | 1 | D |
| Sharing Fantasies... and a Big Dick | 2022 | realitykings.com | Bald Creampie | | O |
| Smoking Hot Babe Kenzie Anne Makes Codey Lose Control Fucking Live | 2022 | cherrypimps.com | Bald | | O |
| Steamy Shower Dildo Riding | 2022 | cherrypimps.com | Bald MastOnly | | O |
| Super Model Kenzie Fucks Pornstar | 2022 | pornbox.com | Facial Bald Swallow | | |
| Super Stacked | 2022 | Jules Jordan Video | Facial Bald | | DRO |
| Supersonic | 2022 | hollyrandall.com | Bald MastOnly | | O |
| Sweat | 2022 | blacked.com | Facial Bald | | DO |
| Tailor Made | 2022 | deeper.com | Facial Bald CumSwap | | O |
| Together At Last | 2022 | Girlfriends Films | LezOnly Bald | | D |
| Tonight's Girlfriend 31084 | 2022 | naughtyamerica.com | Facial Bald Swallow | | O |
| Tonight's Girlfriend 31408 | 2022 | naughtyamerica.com | Bald VR | | O |
| TOTM - How to Make Her Blush | 2022 | twistysnetwork.com | LezOnly Bald | | O |
| TOTM - Sun Kissed | 2022 | twistysnetwork.com | Bald MastOnly | | O |
| Treating Ourselves... Again | 2022 | AdultTime.com | Bald | | O |
| Trouble In Paradise 1 | 2022 | girlsway.com | LezOnly Bald | | O |
| Trouble In Paradise 2 | 2022 | girlsway.com | NonSex | | O |

| Movie Title | Year | Distributor | Notes | Rev | Formats ❓ |
|---|---|---|---|---|---|
| True Bombshell | 2022 | hollyrandall.com | *Bald MastOnly* | | O |
| Vagitarians 3: Oil Edition | 2022 | Evil Angel | *Facial Bald* | 1 | D |
| Who's Your Daddy 20 | 2022 | Zero Tolerance | *Bald* | | D |
| Zero to Hero 5: Kenzie Anne | 2022 | bellesaplus.co | *Bald* | | O |
| All For Money | 2023 | Wicked Pictures | *Facial Bald* | | |
| Behind the Scenes - Casting Call | 2023 | loveherfilms.com | *Bald* | | |
| Behind the Scenes - Making Him Stay | 2023 | loveherfilms.com | *Bald Footjob* | | |
| Best Feet Cumshot Compilation 2022 | 2023 | loveherfilms.com | *Bald Footjob* | | O |
| Big Cock Bully 14 | 2023 | Pure Play Media | *Facial Bald* | | D |
| Blonde Ravaged | 2023 | jaxslayher.com | *Facial Bald Swallow* | | |
| Busty Wife Fantasies 5 | 2023 | Pulse Distribution | *Bald* | | D |
| Dirty Wives Club 41 | 2023 | Pure Play Media | *Bald* | | D |
| Double Love 1 | 2023 | Girlfriends Films | *LezOnly Bald* | | |
| Double, Double Date and Trouble | 2023 | girlsway.com | *LezOnly Bald* | | O |
| Freeuse Fantasies | 2023 | Pulse Distribution | *Facial Bald* | | D |
| Fucking My Biggest Toy for the First Time | 2023 | sextpanther.com | *Bald MastOnly* | | |
| Gorgeous Blonde Vixen Kenzie Anne Lust For Dark Lord Lexington Steele | 2023 | julesjordan.com | *Facial Squirt Bald Swallow* | | O |
| If It Feels Good 4 | 2023 | Pulse Distribution | *Facial Bald CumSwap* | 1 | D |
| Interracial Tendencies | 2023 | ASM (Adult Source Media) | *Bald Creampie* | | |
| Kenna James Kenzie Anne Colorfuck Threesome | 2023 | manyvids.com | *Bald CumSwap* | | |
| Kenzie Anne Can't Stop Cumming | 2023 | MrLuckyPOV.com | *Bald* | | O |
| Kenzie Anne Is A Blonde Flirt Who Swallows Cum | 2023 | mrluckyvip.com | *Facial Bald Swallow* | | O |
| Lexington Steele: The Connoisseur | 2023 | Jules Jordan Video | *Facial Squirt Bald* | | D |
| Loyal Service | 2023 | Pulse Distribution | *LezOnly Bald* | | D |
| MILF 3 | 2023 | Pulse Distribution | *Facial Bald* | | D |
| Morning Sex | 2023 | manyvids.com | *Bald* | | D |
| One Night Stand | 2023 | manyvids.com | *Bald Creampie* | | DO |
| Oopsie! The Cum Sauna | 2023 | Pulse Distribution | *Bald* | | |
| Playtime With Belle | 2023 | Bellesa Films | *Bald* | | D |
| Reckless | 2023 | Pulse Distribution | *Facial Bald Swallow* | | DO |
| Reckless 2 | 2023 | Pulse Distribution | *LezOnly Bald* | | DRO |
| Reckless: Did You Come Here to Seduce Me | 2023 | wicked.com | *LezOnly Bald* | | O |
| Reckless: What I Didn't Kill Anyone | 2023 | wicked.com | *Facial Bald Swallow* | | O |
| Reckless: What's Up With This Sudden Interest | 2023 | wicked.com | *NonSex* | | O |
| Sex Friends Las Vegas | 2023 | Fred Coppula Prod | *LezOnly Bald* | | |
| Sex Friends Los Angeles | 2023 | Fred Coppula Prod | *Bald* | | |
| Stars 11 | 2023 | Pulse Distribution | *Facial Bald* | | D |
| Take Care of Yourself (II) | 2023 | Pulse Distribution | *Squirt Bald* | | D |
| Transfixed: Treating Ourselves . . . Again | 2023 | Pulse Distribution | *Bald* | | D |
| Treat Yourself | 2023 | Pulse Distribution | *Bald MastOnly* | | D |
| Trouble in Paradise | 2023 | Girlfriends Films | *LezOnly Bald* | | |
| What Others Want: A Kenzie Anne Story | 2023 | puretaboo.com | *Squirt Bald* | | O |
| Working Up A Lather | 2023 | twistysnetwork.com | *LezOnly Bald* | | O |
| Beg For Breeding Video | 2024 | sextpanther.com | *Bald MastOnly* | | |
| Blind Dates 8 | 2024 | Bellesa Films | *Bald* | | D |
| Tonight's Girlfriend 32667 | 2024 | naughtyamerica.com | *Bald VR* | | O |
| Transfixed: Muses 2 | 2024 | Pulse Distribution | *Facial Bald* | | D |
| When Girls Play 46 | 2024 | Pulse Distribution | *LezOnly Bald* | | D |

Showing 1 to 196 of 196 entries

Copyright 1999-2024 iafd.com

Archiving, reproduction, re-distribution or transmission of this site by any means without the prior permission of iafd.com is prohibited. All rights reserved

# EXHIBIT 43

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4    MACKENZIE ANN THOMA, a.k.a    )  CASE No:
      KENZIE ANNE, an individual and )  2:23-cv 04901 WLH
 5    on behalf of all others      )  (AGRx)
      similarly situated,          )
 6                                 )  VOLUME I
              Plaintiff,           )
 7                                 )
      VS.                          )
 8                                 )
      VXN GROUP, LLC, a Delaware   )
 9    limited liability company;   )
      STRIKE 3 HOLDINGS, LLC, a    )
10    Delaware limited liability   )
      company; GENERAL MEDIA       )
11    SYSTEMS, LLC, a Delaware      )
      limited liability company;   )
12    MIKE MILLER, an individual;  )
      and DOES 1 through 100,      )
13    inclusive,                   )
                                   )
14            Defendants.          )
      _____)

15

16

17

18              DEPOSITION OF MICHAEL MOSNY

19              Monday, September 16, 2024

20

21

22    Reported by:  Brandi Wilson

23               CSR No. 13760

24

25    Job No.:      306811
```

                                                            1

1    there.  So Ryan was the bulk of it.  And the owner,

2    David Bacon, was -- would be available.

3        Q.    Okay.  So let's say that you wanted to start

4    narrowing down the logistics and getting something

5    solidified for an upcoming shoot --

6        A.    Yes, ma'am.

7        Q.    -- or film or shoot or whatever it may be?

8        A.    Yes, ma'am.

9        Q.    What would happen?  You would call, email,

10   text Ryan Kona?  How would you initiate the

11   communication?

12       A.    Be typically one of two ways.  I would be

13   handed down or communicating information internally to

14   where they had this availability throughout said days.

15   We would like to find out if Kenzie was available and

16   like to shoot on those days if she's in town, if she's

17   not, you know, working for herself or other people or

18   anything like that.  We want to make sure that it works

19   out well for her.

20            Or the agent would reach out and say, "Hey" --

21   preemptively, like, "Hey, she's going to be in town in

22   the next month from here to here.  Is there anything you

23   think you would put together within this window?"

24            I would then take those dates and reverse

25   engineer and go to production and say, "Hey, is there

52

1    something we can -- we can put together here for

2    Kenzie?"

3        Q.    Okay.  Got it.  So when you say internally --

4    you would communicate internally, is that to the

5    production team?

6        A.    Yes, ma'am.

7        Q.    Okay.  And what is it that the production team

8    is basing off of?  Is that preset days that they have

9    scheduled to do a shoot, for example, or do a film, for

10   example?

11       A.    There's a lot of different factors that would

12   come into play -- availability on team members, the

13   production team, equipment variability, location

14   availability.  It could be the weather, depending if

15   you're looking to do something nice and sunny outside,

16   it wouldn't be best to plan something like that in a

17   gloomy month.

18            So there's a lot of different things that come

19   into play when it comes to putting something together.

20   But, yes, that production would say "We can -- we have

21   all the assets, all the aspects of what we need, so you

22   can move forward with talent."

23       Q.    Got it.  And exactly how that plays out over

24   in the production department, who would be the head

25   person over there that would know all the details of the

                                                              53

1    Q.    That apply to her that she needs to abide by,

2    for example.

3    A.    I mean, in theory, on paper, there are

4    guidelines that you're -- that you're trying to

5    implement so you can carry on your business in a way

6    that everybody can anticipate it's going to move

7    forward.  So you're trying to stick to that.

8    Q.    Okay.  So you mentioned a couple things there.

9    You mentioned "in theory" and "on paper"; right?  What

10    do you mean by that there are guidelines in theory?

11    A.    Well, number 7, "All policies which would

12    apply to Plaintiff during the claim period while she

13    rendered services to Defendant, including, but not

14    limited to tattoos, body piercings, and cosmetic-related

15    [sic] alterations."

16          When you are putting together a film -- stop

17    me if I'm going outside of the scope -- you are

18    presented, in reference to casting, images of how the

19    principals will appear on this visual medium.  So what's

20    presented to you is what you would be expecting to show

21    up on set.

22          There's been a lot of planning, creative

23    logistics.  And all things tend to revolve around the

24    appearance of your principal actress -- actresses and

25    the stars of the film.

57

Basia Lew                                                                September 18, 2024

```
 1      A    It's a preference of how we would like talent to

 2   arrive on set for the Blacked Raw shoot.

 3      Q    Okay.  Is this also a preference.  Then, just below

 4   that sentence, "Natural or French mani-pedi nails only,

 5   please no gel polish."  That's a preference?

 6      A    Yes.

 7      Q    Okay.  What does it say next, though, if they don't

 8   do that?

 9      A    "Job is canceled if model does not arrive with

10   proper nails."

11      Q    Okay.  Thanks.  Let's read about eyelashes then.

12   "No eyelash extensions allowed for shoot.  Please remove any

13   and all eyelash extensions."  What does it say after that?

14      A    "Job is canceled if model arrived with eyelash

15   extensions."

16      Q    It doesn't really seem like a preference then, it

17   seems like a requirement or the job is canceled.  That's what

18   it's saying.

19      A    It says, "Job is canceled."

20      Q    Great.  Thank you.  Let's go back to Exhibit 5, the

21   first-performance agreement.  Look at Page 3, Section 9,

22   Paragraph No. 9:  "Performer agrees during the term of this

23   agreement to reasonably promote producer's brands and it's

24   affiliate brands on their social media accounts.

25          "Including but not limited to Twitter, Instagram,
```

                                                              104

Basia Lew                                                                September 18, 2024

1    and others reasonably requested by producer, to the best of

2    her abilities consistent with performer's other professional

3    photo shoots and media appearances?"

4          What does this mean -- actually, I'll ask you:  Is

5    this requiring plaintiff to promote producer's brands, the

6    ones that you listed for me earlier today, to promote those

7    on her social media?

8        A    Yes.

9        Q    Did plaintiff fulfill that obligation?  Did she

10   actually do it, because, you know, we'll talk about what

11   happened in practice?

12       A    I don't know if she fulfilled the social media

13   aspect.

14       MS. COHEN:  I'm going to introduce as Exhibit 9.

15           (Plaintiff's Exhibit 9 was marked for

16           identification.)

17   BY MS. COHEN:

18       Q    Have you seen this photograph before?

19       A    Yes.

20       Q    Do you see the date at the bottom -- do you agree

21   that this is an Instagram post on Ms. Kenzie Anne's

22   Instagram?

23       A    Yes.

24       Q    Do you see the date here of the post December 13th,

25   2021?

                                                            105

```
 1        A    Yes.

 2        Q    Was that while plaintiff was contracted to work for

 3   Vixen?

 4        A    Yes.

 5        Q    Can you describe what this Instagram post is, what

 6   is depicted in the photograph?

 7        A    Kenzie Anne is in a pink bathtub with a pink rotary

 8   telephone, in what looks to be pink, I don't know if that's

 9   Styrofoam, but something to resemble a bubble bath, and she

10   is laughing.

11        Q    What are the words printed across the photograph?

12        A    Vixen.

13        Q    And why don't we read -- go ahead and read me the

14   caption for this post, which is right here (indicating), Ms.

15   Kenzie Anne, what does that caption say?

16        A    "New, new with at Vixen X, official coming this

17   Friday," heart eyes, heart eyes, kiss emoji.

18        Q    What's Vixen X Official, is that related to your

19   company?

20        A    Yes.

21        Q    Okay.  So this is -- this is you guys?

22        A    Yes.

23        Q    This is Vixen --

24        A    Yes.

25        Q    -- Group, LLC?
```

106

Basia Lew                                                                September 18, 2024

1       A    Before the scene is shot, yes.

2       Q    Before the scene is shot, okay.  Which scene?  I'm

3    trying to help us get to when plaintiff provided Vixen with a

4    W9?

5       A    Yes.  So the W9 is part of the paperwork process on

6    set that all of our actors are required to fill out prior to

7    any active live shooting -- film shooting.

8       MS. COHEN:  I'm sorry, madam court reporter, could you

9    please read back the witness's answer.

10          (Record read.)

11   BY MS. COHEN:

12      Q    Okay.  And you're not sure, as you sit here today,

13   whether -- what plaintiff had put on the W9?

14      A    Correct.

15      Q    Maybe I can help you, do you know if it said,

16   Mackenzie Anne Thoma?

17      A    W9s typically require a full legal name, so I would

18   expect her full legal name would be on the paperwork.

19      Q    Did it say Kenzie Land, LLC?

20      A    I don't know.

21      Q    Did it say Lola March, LLC?

22      A    I don't know.

23      Q    So based on your testimony that the court

24   reporter -- that madam court reporter helpfully read back, it

25   was part of required paperwork?

                                                              132

1      A.    And Kenzie Anne is all of those things -- a

2    star, an actress, an influencer.  These terms.  So she

3    would always present herself as such.

4      Q.    Okay.  Are you familiar with the circumstances

5    surrounding any termination of Plaintiff's contract with

6    Defendants?

7      A.    Could you -- are you asking -- could you

8    rephrase?  Am I --

9      Q.    Are you familiar with any -- do you have any

10   information on how Plaintiff's relationship with Vixen

11   came to an end?

12     A.    I can speak on specific production things that

13   occurred.

14     Q.    Sure.

15     A.    This goes -- well, I can talk about

16   "Kenzieland."  "Kenzieland" was our biggest production

17   of the year that -- obviously, with the name

18   "Kenzieland," this was extremely Kenzie-centric.  This

19   was -- as a matter of fact, we would call it a showcase

20   where one actor is involved in every part of the

21   production based on the strength of their performance

22   and their popularity.  And it's your star.

23          When we were doing a "Kenzieland" movie, I

24   know a lot of prep went into that.  That did not happen

25   due to her unavailability.

139

1    with us, that she had posted a boy-girl scene on her

2    social media platforms with Jax -- and other areas --

3    that were seen.  And people had seen this.

4            And that's what brought up the addendum.

5    Because, yeah, she had, in fact, shot her first boy-girl

6    scene with Jax after there was a meeting discussing what

7    she would do and how she wanted the scene to go for

8    Vixen.  And she was involved in the creative planning of

9    it.  And then before that scene happened, she linked up

10   with the male talent through Chef and shot it before.

11       Q.   Okay.  So it's the same performer the company

12   cast -- the same performer that Vixen cast for Kenzie's

13   first boy-girl scene was also the same performer that

14   Kenzie performed with in the boy-girl scene that she

15   filmed prior to filming the first boy-girl scene with

16   Vixen; is that correct?  The same actor?

17       A.   True.

18       Q.   Is that correct?

19       A.   Yeah.

20       Q.   Okay.  And, to your knowledge, was that a

21   release for Kenzie's own platforms, or was that a

22   release for some other company?

23       A.   I don't know.

24       Q.   Okay.  Was Vixen concerned about advance

25   notice of body modifications based on the fact that

164

# **EXHIBIT 44**

# **FILED UNDER SEAL**

# EXHIBIT 45

**KANE LAW FIRM**
Brad S. Kane (SBN 151547)
bkane@kanelaw.la
1154 S. Crescent Heights. Blvd.
Los Angeles, CA 90035
Tel:  (323) 697-9840
Fax: (323) 571-3579

Trey Brown (SBN 314469)
trey.brown@vixenmediagroup.com
11337 Ventura Blvd.
Studio City, CA 91604

*Attorneys for Defendants*
VXN GROUP LLC and MIKE MILLER

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated, | Case No. **2:23–cv–04901 WLH (AGRx)** |
| Plaintiff, | **DECLARATION OF LARRY LERNER** |
| v. | |
| VXN GROUP LLC, a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 to 100, inclusive, | Complaint Filed:  April 20, 2023<br>Removed:          June 21, 2023 |
| Defendants. | |

DECLARATION OF LARRY LERNER

*KANE LAW FIRM*
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

I, Larry Lerner, hereby declare as follows:

1.    I am a tax professional licensed by the Internal Revenue Service as an Enrolled Agent. As an Enrolled Agent, I have provided professional tax services in California for approximately 40 years. I have served as the CEO of Artists Business Management Group, Inc., ("ABMG") since its inception in 1989.  I am personally familiar with, and, if called upon, could and would testify to the facts contained herein from my personal knowledge

2.    In 2019, an acquaintance referred Mackenzie Anne Thoma ("Thoma") to me as a client for tax services, and I, along with other ABMG employees, began providing bookkeeping and tax preparation services for Thoma and her various business entities.

3.    To prepare Thoma's federal tax returns, ABMG required, and received from Thoma certain financial information, including tax forms listing income (e.g., W-2s and 1099s), and Thoma's personal accounting of business expenses related to her business activities.

4.    ABMG prepared and filed Thoma's federal tax returns for the years 2020, 2021, and 2022. In addition to Thoma's individual taxes, these tax returns included Schedule C's related to Thoma's businesses.

5.    For the 2023 tax year, Thoma again engaged ABMG for tax preparation services. However, after ABMG began work on her file, Thoma refused to answer inquiries seeking to clarify her claimed business expenses. Instead, Thoma communicated to me that she wanted ABMG to manipulate her taxes to artificially inflate her income in hopes of qualifying for a loan to finance a home mortgage.

6.    The tax manipulation requested by Thoma presented a serious professional risk to me and ABMG. It is not uncommon for individuals to artificially inflate income to obtain favorable loan terms. When such a borrower

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

1

DECLARATION OF LARRY LERNER

defaults on their mortgage, banks who underwrote the loan often pin liability on accountants who prepared fraudulent tax returns.

7.    Because I refused to perpetrate the fraud requested of me and ABMG by Thoma, she refused to cooperate with ABMG and obtained tax services elsewhere. Although ABMG expended nearly 15 hours preparing Thoma's 2023 tax returns, Thoma refused to pay ABMG's invoice of approximately $1,500.

8.    On or about August 22, 2024, I was served with a subpoena for my personal deposition and, on behalf of ABMG, a subpoena to produce documents related to Thoma.

9.    On or about August 23, 2024, I received a telephone call from Thoma, during which she pleaded with me not to comply with subpoena. Thoma claimed that if I were to comply with the subpoena by producing documents, "it would harm her case." In response, I informed Ms. Thoma that I had no legal basis to disobey the subpoena and reminded her that ABMG's bill remained unpaid.

10.    Around that same time, I also received a letter from Thoma's counsel, Sarah Cohen ("Cohen"), dated August 23, 2024, which informed me that Ms. Cohen intended to file a Motion to Quash the subpoenas directed to me and ABMG, and that producing documents in response to the subpoena could subject me to civil liability, court sanctions, and contempt of court.

11.    A true and correct copy of Ms. Cohen's August 23, 2024 letter to me was previously filed on the docket in this matter – **Dkt. # 107-1** at p. 42.

12.    I was skeptical of Ms. Cohen's letter because of my past experience where Thoma asked me to commit fraud on her behalf. I also knew that my legal obligations required me to comply with the subpoena and that absent a court order or formal withdrawal of the subpoena, it was still necessary for me to comply.

13.    In response to Ms. Cohen's letter, on August 23, 2024, I emailed Ms. Cohen and informed her that "I have no way of knowing if your information is

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

2

DECLARATION OF LARRY LERNER

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

correct and have no trust in your information." I said that "[i]f your client wishes my assistance she will need to clear up her balance with our firm." I said this because I did not want to pay an attorney to help me find a way to avoid legal compliance for Thoma who I did not trust who did not value my time or work. I ended the email by saying "when and if I receive a release from the court we will comply. Until then we will calendar it to meet the deadline we were served with."

14.    A true and correct copy of my August 23, 2024, email reply to Ms. Cohen was previously filed on the docket in this matter – **Dkt. 107-1** at p. 44.

15.    Subsequently, I received a telephone call from Ms. Cohen during which she threatened to send me to jail if I complied with the subpoena. In response, I told Ms. Cohen that unless and until I received a court order to the contrary, I was going to comply with the subpoena. I did not appreciate her bullying me.

16.    On August 29, 2024, I received an email from defense counsel Trey Brown ("Brown"), informing me of an Order from this Court upholding the validity of subpoenas. I did not, however, receive any such communication from Ms. Cohen informing me of the Order or that she never filed a Motion to Quash as represented in her letter.

17.    In response to Mr. Brown's email, I produced via email 5 documents to Mr. Brown that contained my notes and information concerning Ms. Thoma's business deductions and income from the 2022 tax year.

18.    On September 3, 2024, I was deposed in this matter. During the deposition, Mr. Brown asked a me series of questions regarding the nature of Ms. Thoma's business deductions. Although Mr. Brown did not specifically request Thoma's tax returns, rather than cross reference the returns in response to each question, I emailed Mr. Brown Thoma's tax returns for the years 2020, 2021, and 2022, which were prepared and filed by ABMG.

3

DECLARATION OF LARRY LERNER

19.    During my deposition, Ms. Cohen revisited my email and accused me of blackmail, which I found offensive and extremely unfair. She claimed I was blackmailing Thoma by asking her to pay her outstanding bill with my firm. I believe she was trying to scare me into changing my testimony.  However, I told the truth about her bullying and Thoma's fraud and would not be further intimidated into changing my testimony.

20.    I have never blackmailed anyone. I take my reputation, my professional license and my business very seriously. I also take compliance with the law very seriously. As a tax professional, I know that the law must be followed and I have a legal and ethical duty to comply with the law. I feel that Ms. Cohen attempted to use her status as a licensed legal professional to do just the opposite - coerce me into unlawful behavior.

21.    A true and correct copy of redacted excerpts from Thoma's 2020 Tax Return, including a Schedule C filed therewith is attached hereto as "**Exhibit 46**."

22.    A true and correct copy of redacted excerpts from Thoma's 2021 Tax Return, including a Schedule C filed therewith is attached hereto as "**Exhibit 47**."

23.    A true and correct copy of redacted excerpts from Thoma's 2022 Tax Return, including a Schedule C filed therewith is attached hereto as "**Exhibit 48**."

24.    To prepare Thoma's tax returns, ABMG requested that Thoma provide any W-2 forms, 1099s, and a categorized grouping of business deductions. ABMG then uses this information to generate a tax return. All documents generated, produced, and reviewed to prepare tax returns are shared with or possessed by our clients, and Thoma is no exception. Accordingly, since we furnished Thoma her 2020, 2021, and tax returns promptly after each filing, and her lawsuit was filed on April 20, 2023, Thoma has possessed, at all times since the filing of her lawsuit, all of the 1099's, Schedule C's, and business deduction information produced by ABMG in response to the Defendants' subpoenas.

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

4

DECLARATION OF LARRY LERNER

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 18, 2024, at Los Angeles, California.

_____
Larry Lerner

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

5
DECLARATION OF LARRY LERNER

# EXHIBIT 46

# FILED UNDER SEAL

# **EXHIBIT 47**

# **FILED UNDER SEAL**

# **EXHIBIT 48**

# **FILED UNDER SEAL**