**KANE LAW FIRM**
Brad S. Kane (SBN 151547)
*bkane@kanelaw.la*
1154 S. Crescent Heights. Blvd.
Los Angeles, CA 90035
Tel:  (323) 697-9840; Fax: (323) 571-3579

Trey Brown (SBN 314469)
*trey.brown@vixenmediagroup.com*
11271 Ventura Blvd. #717
Studio City, CA 91604

*Attorneys for Defendants*
VXN GROUP LLC and MIKE MILLER

**BIBIYAN LAW GROUP, P.C.**
David D. Bibiyan (SBN 287811)
*david@tomorrowlaw.com*
Sarah H. Cohen (SBN 330700)
*sarah@tomorrowlaw.com*
Rafael Yedoyan (SBN 351499)
*rafael@tomorrowlaw.com*
1460 Westwood Blvd.
Los Angeles, CA 90024
Tel: (310) 438-5555; Fax: (310) 300-1705


Attorneys for MACKENZIE ANNE THOMA, on behalf of herself
and all others similarly situated

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

i

JOINT BRIEF REGARDING DEFENDANTS' MSJ

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

| | |
|---|---|
| MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>VXN GROUP, LLC, a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 to 100, inclusive,<br><br>          Defendants. | Case No. **2:23–cv–04901 WLH (AGRx)**<br><br>**JOINT BRIEF REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Filed concurrently with: (1) Notice of Motion and Motion for Summary Judgment; (2) Joint Appendix of Facts; (3) Joint Appendix of Evidence; (4) Joint Appendix of Objections; and (5) Proposed Order]<br><br><br>Date:         February 28, 2025<br>Time:         11:00 a.m.<br>Courtroom: 9B |

ii

JOINT BRIEF REGARDING DEFENDANTS' MSJ

1

# **TABLE OF AUTHORITIES**

2

## **Statutory Authority**

3

### California Statutes

4

<u>Cal. Code Regs</u>. tit. 8, § 11040 ........................................................................19, 22

5

<u>Cal. Code Regs</u>. tit. 8, § 11070 ...............................................................................19

6

<u>Cal. Code Regs</u>. tit. 8, § 11100 (3)(G) ...................................................................16

7

<u>Cal. Code Regs</u>. tit. 8, § 11120 ......................................................13, 14, 15, 19, 24

8

<u>Cal. Code Regs</u>. tit. 8, § 11120 (M) .......................................................................14

9

<u>Cal. Code Regs</u>. tit. 8, § 11120(1)(C) ....................................................................14

10

<u>Cal. Gov. Code</u> § 3521.5 ........................................................................................24

11

<u>Cal. Lab. Code</u> § 2775 ............................................................................................40

12

<u>Cal. Lab. Code</u> § 2776(a)(7) ..................................................................................33

13

<u>Cal. Lab. Code</u> § 515(b) .........................................................................................14

14

### Federal Statutes

15

<u>U.S. Code</u> § 2257 ..............................................................................................21, 24

16

17

## **Case Authority**

18

### California Cases

19

*Antelope Valley Press v. Poizner*,

20

    162 Cal.App.4th 839 (Cal. Ct. App. 2008) ......................................................35

21

*Arnold v. Mut. of Omaha Ins. Co.*,

22

    135 Cal.Rptr.3d 213 (Cal. App. 2011).............................................................29

23

*Ashdown v. Dep't of Emp.*,

24

    135 Cal.App.2d 291, 287 P.2d 176 (1955) ......................................................14

25

*Augustus v. ABM Sec. Servs., Inc*.,

26

    2 Cal. 5th 257 (2016) .......................................................................................19

27

iii

28

<div style="writing-mode: vertical-rl;">**KANE LAW FIRM**<br>1154 S. Crescent Heights Blvd.<br>Los Angeles, CA 90035</div>

*Ayala* v. *Antelope Valley Newspapers, Inc.*,

    59 Cal.4th 522 (2014) ......................................................................... 30, 45

*Beaumont–Jacques v. Farmers Group, Inc.*,

    217 Cal.App.4th 1138 (June 12, 2013) ....................................................... 38

*Brinker Rest. Corp. v. Superior Court of San Diego Cnty.*,

    53 Cal.4th 1004 (Cal. 2012) ....................................................................... 39

*Cotran v. Rollins Hudig Hall Internat., Inc.*,

    17 Cal. 4th 93 (1998) .................................................................................. 49

*Durae v. Indus. Acci. Com.*,

    206 Cal. App. 2d 691 (1962) ...................................................................... 46

*Dynamex Operations W. v. Superior Court*,

    4 Cal. 5th 903 (2018) .................................................................2, 39, 40, 45

*Estrada v. FedEx Ground Package Sys., Inc*,

    154 Cal.App.4th 1 (Ct. App. 2007) ............................................................ 35

*Ferra v. Loews Hollywood Hotel, LLC*,

    11 Cal. 5th 858 (2021) ................................................................................ 18

*Garcia v. Border Transp. Grp., LLC*,

    28 Cal.App.5th 558 (Ct. App. 2018) .......................................................... 27

*Gonzales v. San Gabriel Transit, Inc.*,

    40 Cal. App. 5th 1131 (2019) ............................................................... 39, 40

*Hennighan v. Insphere Ins, Sols., Inc.*,

    38 F.Supp.3d 1083, 1104 (N.D. Cal. 2014) .............................................. 35

*Miles v. City of Los Angeles*,

    56 Cal.App.5th 728 (2020) .................................................................. 13, 19

*Missions Ins. Co. v. Workers' Comp. Appeals Bd.*,

    123 Cal.App.3d 211 (Ct. App. 1981)........................... 29, 31, 33, 37, 38, 48

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

iv

JOINT BRIEF REGARDING DEFENDANTS' MSJ

*Morales v. 22nd Dist. Agric. Ass'n*,

    25 Cal.App.5th 85 (2018) .................................................................... 15

*Ramirez v. Yosemite Water Co.*,

    20 Cal. 4th 785 (1999) ......................................................................... 23

*Rodriguez v. E.M.E., Inc.*,

    246 Cal.App.4th 1027 (2016) ............................................................. 15

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*,

    48 Cal. 3d 341 (1989) .......................................... 2, 27, 28, 36, 37, 44

*Schaller v. Indus. Acci. Com.*,

    11 Cal. 2d 46 (1938) ............................................................................ 45

*State Comp. Ins. Fund v. Brown*,

    32 Cal.App.4th 188 ............................................................................. 30

*Tieberg v. Unemployment Ins. App. Bd.*,

    2 Cal.3d 943 (1970) ..................................................................... 30, 36, 45

### Federal Cases

*Abdullah v. U.S. Sec. Assocs.*,

    731 F.3d 952 (9th Cir. 2013) .............................................................. 23

*Alberty–Velez v. Corporacion de Puerto Rico Para La Difusion Publica*,

    361 F.3d 1 (1st Cir. 2004) .......................................... 31, 33, 35, 36

*Alexander v. FedEx Ground Package System, Inc.*,

    765 F.3d 981 (9th Cir. 2014) ............................................................. 32

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242 (1986) ............................................................................ 12

*BedRoc Ltd., LLC v. United States*,

    541 U.S. 176 (2004) ............................................................................ 16

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

JOINT BRIEF REGARDING DEFENDANTS' MSJ

*Bloom v. Make-Up Artists & Hairstylists Loc.*

    706, No. CV 99-3408-AHM, 1999 WL 909817 (C.D. Cal. Aug. 18, 1999) ...17

*Bowerman v. Field Asset Servs., Inc.*,

    2013 WL 6057043 (N.D. Cal. 2013) ................................................................38

*Bowerman v. Field Asset Servs., Inc.*,

    60 F.4th 459 (9th Cir. 2023) ...............................................................27, 31

*Campbell v. PricewaterhouseCoopers, LLP*,

    642 F.3d 820 (9th Cir. 2011) .......................................................................15

*Celotex Corp v Catrett*,

    477 U.S. 317 (1986)......................................................................................12

*Cotter v. Lyft, Inc.*,

    60 F. Supp. 3d 1067 (N.D. Cal. 2015) ....................................................29, 35

*Desimone v. Allstate Ins. Co.*,

    2000 U.S. Dist. LEXIS 18097 (N.D. Cal. Nov. 7, 2000)..............................47

*Desimone v. Allstate Ins. Co.*,

    2000 WL 1811385 (N.D. Cal. 2000) .................................................31, 33, 38

*Flaaen v. Principal Life Ins. Co.*,

    2017 WL 4286358 (W.D. Wash. Sept. 27, 2017)..........................................14

*Garcia v. Google, Inc.*,

    786 F.3d 733 (9th Cir. 2015) .......................................................................31

*Haitayan v. 7-Eleven, Inc*,

    2021 WL 4078727 (C.D. Cal. Sept. 8, 2021) ..........................................34, 38

*Haitayan v. 7-Eleven, Inc.*,

    2021 U.S. Dist. LEXIS 170331 (C.D. Cal. Sep. 8, 2021).............................51

*Harper v. Wallingford*,

    877 F.2d 728 (9th Cir. 1989) .......................................................................12

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

vi

JOINT BRIEF REGARDING DEFENDANTS' MSJ

*Harris v. Vector Mktng. Corp.*,

    656 F.Supp.2d 1128 (N.D. Cal. 2009) .............................................................. 35

*Hennighan v. Insphere Ins. Sols., Inc.*,

    38 F. Supp. 3d 1083 (N.D. Cal. 2014) ........................................................ 29, 33

*Herrera v. Zumiez, Inc.*,

    953 F.3d 1063 (9th Cir. 2020) ......................................................................... 13

*Hill v. Walmart Inc.*,

    32 F.4th 811 (9th Cir. 2022) ...................................................................... 17, 39

*Hoffman v. Cap. Cities/ABC, Inc.*,

    255 F.3d 1180 (9th Cir. 2001) ......................................................................... 18

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*,

    617 F.3d 1146 (9th Cir. 2010) ......................................................................... 17

*Ladore v. Ecolab Inc.*,

    2013 WL 12246340 (C.D. Cal. Jan. 22, 2013) ................................................ 17

*Lawson v. Grubhub, Inc.*,

    302 F.Supp.3d 1071 (N.D. Cal. 2018) ............................................................ 30

*Lawson v. Grubhub, Inc.*,

    665 F.Supp.3d 1108 (N.D. Cal. 2023) ............................................................ 34

*Lockhart v. Cnty. of Los Angeles*,

    2007 WL 9627609 (C.D. Cal. Oct. 16, 2007) ................................................. 15

*Lockheed Martin Corp. v. Network Sols., Inc.*,

    194 F.3d 980 (9th Cir. 1999) ........................................................................... 13

*Lujano v. Piedmont Airlines, Inc.*,

    2024 WL 2873627 (C.D. Cal. May 16, 2024) ................................................. 14

*Matsushita Electric Indus Co v Zenith Radio Corp*,

    475 U.S. 574 (1986)......................................................................................... 12

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

vii

JOINT BRIEF REGARDING DEFENDANTS' MSJ

*Morgan Creek Prods., Inc. v. Cap. Cities/ABC, Inc.*,

    1991 WL 352619 (C.D. Cal. Oct. 28, 1991)................................................17

*Ortolivo v. Precision Dynamics Int'l, LLC,*

    2023 WL 7440249 (N.D. Cal. Nov. 9, 2023) ....................................31, 32, 34

*Owino v. CoreCivic, Inc.*,

    2018 WL 2193644 (S.D. Cal. May 14, 2018)................................................16

*Poland v. United States Att'y Gen.*,

    2012 WL 13001837 (C.D. Cal. 2012)................................................31

*Pukowsky v. Caruso*,

    312 N.J. Super. 171 (App. Div. 1998) ................................................38

*Richards v. Nielsen Freight Lines*,

    602 F. Supp. 1224 (E.D. Cal. 1985)................................................12

*Ruiz v. Affinity Logistics Corp.*,

    654 F.3d 1093 (9th Cir. 2014) ................................................32

*Salazar v. McDonald's Corp.*,

    2017 WL 950986 (N.D. Cal. Mar. 10, 2017)................................................16

*Salter v. Quality Carriers, Inc.*,

    2021 WL 5049054 (C.D. Cal. 2021)................................................27

*Smith v. Montoro*,

    648 F.2d 602 (9th Cir. 1981) ................................................17, 18

*Sportsman v. A Place for Rover, Inc.*,

    537 F. Supp. 3d 1081 (N.D. Cal. 2021) ................................................34

*United States v. Diebold, Inc.*,

    369 U.S. 654 (1962)................................................12

*United States v. Town of Colo. City*,

    935 F.3d 804 (9th Cir. 2019) ................................................23

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

viii

JOINT BRIEF REGARDING DEFENDANTS' MSJ

*Urena v. Earthgrains Dist.*,

    2017 WL 4786108 (S.D. Cal. 2017) ................................................................ 30

## **<u>Other Authorities</u>**

IWC Wage Order 12 ................................................................ 1, 13, 15

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

   A.  Defendants' Introduction ................................................................. 1

   B.  Plaintiff's Introduction .................................................................... 1

II.   STATEMENT OF FACTS ....................................................................... 2

   A.  Defendants' Statement of Facts ...................................................... 2

   B.  Plaintiff's Statement of Facts ......................................................... 7

     1.   The Beginning of the Relationship Between Plaintiff and Defendants..... 7

     2.   The Performance Agreements ................................................. 8

     3.   The Course of Plaintiff's Employment With Defendants ...................... 10

     4.   The Termination of Plaintiff's Employment ............................ 11

III.  LEGAL STANDARD............................................................................... 12

   A.  Defendants' Position on Legal Standard ....................................... 12

   B.  Plaintiff's Position on Legal Standard .......................................... 12

IV.  ANALYSIS................................................................................................ 13

   A.  Defendants' Argument 1 ................................................................ 13

     1.   Summary Judgment Should be Granted Because Plaintiff is a Professional Actor ................................................................... 13

       i.   IWC Wage Order 12 Applies to Plaintiff's Claims ........................... 13

       ii.  Professional Actors Are Exempt........................................ 13

       iii. The Professional Actor Exemption is Not Limited............................. 14

       iv.  Photography Is a Part of Film Production............................ 17

     2.   Plaintiff's Response.................................................................. 19

       i.   Summary Judgment Should Not Be Granted Because Plaintiff is Not Exempt as a Professional Actor ..................... 19

x

JOINT BRIEF REGARDING DEFENDANTS' MSJ

a.  Wage Order 12 Should Not Govern Because Defendants' Purpose
Was Not the Production of Motion Pictures ..............................19

b.  Plaintiff Was Not A "Professional" Actor ...................................23

B.  Defendants' Argument 2.................................................................................27

1.  Summary Judgment Should be Granted Because Plaintiff is an
Independent Contractor....................................................................27

i.  Borello Governs Plaintiff's Employment Status..................................27

ii.  Judicial Economy Warrants Summary Adjudication of Plaintiff's
Employment Status ............................................................................28

iii.  Under Borello Plaintiff is an Independent Contractor as a Matter of
Law .........................................................................................................29

a.  The Control Factor Favors an Independent Contractor
Designation.. ...............................................................................29

1)  Plaintiff Was Not Subject to "At-Will" Discharge...................30

2)  Plaintiff Controlled Her Own Work Schedule .........................31

3)  Defendant's Control Was Results-Oriented .............................31

4)  Exclusivity Does Not Convert Plaintiff into an Employee........33

b.  Plaintiff Was Engaged in a Distinct Occupation and Business ....34

c.  Plaintiff Was Engaged in a Skilled Profession ...........................35

d.  Plaintiff Was Paid on a Per-Scene Basis.......................................36

e.  The Instrumentalities and Tools Factor is Neutral.......................36

f.  The Part-of-Regular-Business Factor is Neutral ..........................37

g.  Both Plaintiff and VXN Understood and Relied on the
Independent Contractor Relationship..........................................38

2.  Plaintiff's Response.........................................................................39

i.  ABC Test Governs Plaintiff's Claims...................................................39

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

xi

JOINT BRIEF REGARDING DEFENDANTS' MSJ

ii.    Under ABC Test, Plaintiff is an Employee...........................................40

    a.    Plaintiff was not free from control or direction in contract or in fact......................................................................................................41

      1)    Defendants controlled and directed the manner in which Plaintiff would perform her work. .....................................................................41

      2)    Defendants controlled and directed in fact the manner Plaintiff completed her work. ...............................................................................42

    b.    Plaintiff performed work solely within the usual course of Defendant's business........................................................................44

    c.    Plaintiff was not engaged in an independently established trade or occupation .......................................................................................44

iii.    Even under the Borello Test, Plaintiff Would Be Considered an Employee ..........................................................................................45

    a.    Manner & Means Control Favors Employee Designation............45

      1)    Defendants retained control over Plaintiff's appearance...........46

      2)    Defendants could terminate Plaintiff for not following their directions...........................................................................................47

      3)    Defendants retained control over how Plaintiff could use her social media ....................................................................................47

      4)    Defendants exercised control over the manner and means in which Plaintiff would complete her job duties .........................48

    b.    Defendants Could Terminate Plaintiff For Nearly Any Reason ...49

    c.    Defendants Controlled the Instrumentalities, Tools, and Location of Work. .................................................................................50

    d.    The Work Performed by Plaintiff Was Normal For the Course of Business For Defendants.............................................................51

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

xii

e.   Plaintiff Was Not Engaged in a Distinct Occupation & Business 51

f.   Plaintiff's Length of Time Working With Defendants Was Nearly Limitless .......................................................................52

g.   Plaintiff Was Required to Be Paid Through a Loan Out Company ...............................................................................52

**V.  CONCLUSION**.............................................................**53**

A.  Defendants' Conclusion...............................................53

B.  Plaintiff's Conclusion .................................................53

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

# I.    INTRODUCTION

## A.    Defendants' Introduction

Defendants seek summary judgment against Plaintiff's remaining claims based on: (i) Plaintiff falls under the professional actor exemption of IWC Wage Order 12 ("IWC 12"), since she played a specific character with speaking lines and featured role in each VXN movie; and (ii) under the *Borello* test, Plaintiff is an independent contractor as a matter of law.

## B.    Plaintiff's Introduction

Defendants misstate the applicable law, misstate the factual evidence, omit crucial factual evidence, and attempt to mislead this court to support its baseless Motion for Summary Judgment. Defendants' contention that Plaintiff falls under the professional actor exemption of Wage Order 12 and is an independent contractor under the *Borello* test completely fail for several reasons.

First, Wage Order 12 does not govern. Defendants have made it clear on a global scale that they are not exclusively a motion picture company, but they are a "lifestyle brand" that is not in the business of just selling and creating motion pictures, but are in the business of selling the "Vixen" brand. Defendants only classify themselves as an exclusive "motion picture" company to this Court in an ill-fated attempt to skirt liability on properly compensating its employees. Additionally, for reasons that will be discussed, Plaintiff is not a "professional" actor.

Second, Defendants argue that Plaintiff is an independent contractor and not an employee. This is untrue. Defendants first fail to apply correct test in determining whether Plaintiff was misclassified. Defendants rely on the *Borello* test, whereas both the California legislature and Supreme Court of the State of California found that the ABC test from *Dynamex* is the appropriate test when

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

determining whether an individual is misclassified. *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989) and *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903 (2018). Regardless, even under *Borello*, Plaintiff was misclassified.

## II.    STATEMENT OF FACTS

### A.    Defendants' Statement of Facts

VXN produces motion pictures for commercial distribution. (JAF 1-2).  Its movies are registered as motion pictures with the United States Copyright Office. (JAF 3). Its unique cinematic films have won many awards. (JAF 10).  VXN employs a film production team, a post-production team, a marketing team, a production accountant, and in-house film and entertainment lawyers. (JAF 11). VXN owns state of the art motion picture production equipment. (JAF 15).  It routinely rents film locations and obtains film industry permits. (JAF 16-17).

During motion picture productions, VXN directors or photographers take "stills" which are photographs of actors in its movies in character.  (JAF 8). The stills enable the actors to rehearse the scene and determine which sex positions feel comfortable, as well as determine what looks best from a cinematic perspective. (JAF 18-19). The stills are later used as covers for DVDs, thumbnails for the movies on VXN's websites and to promote the movies. (JAF 20). The stills are never individually nor commercially sold and are only made available on VXN's websites to paid subscribers as bonus content with the correlating movie. (JAF 21).  The stills are not separately registered with the United States Copyright Office. (JAF 9). Production of VXN stills accounts for only a small portion of the time spent making the motion picture. (JAF 22).

VXN contracted with Plaintiff a "decorated and well-known adult film actress who performs under the stage name "Kenzie Anne" to act in VXN's films

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

from December 2020 to November 2022. (JAF 23) [**Dkt. 53**, at ¶ 7]. During that time, Plaintiff acted in a featured role in 18 VXN films with speaking lines. (JAF 4, 6-7). Plaintiff was paid for each film production. (JAF 5). She often chose the actors she would perform with, her director, and collaborated on the film's concept. (JAF 24). While VXN and Plaintiff collaborated on wardrobe, Plaintiff retained and exercised her right to approve her physical appearance in each film. (JAF 25). VXN even planned a showcase film featuring Plaintiff. (JAF 26).

According to Plaintiff's IMDB, she has been an actress in over 50 films and TV shows, including mainstream shows such as HBO's Euphoria. (JAF 27). She has received SAG credit and is eligible to be a member. (JAF 28). Plaintiff has won awards in the industry for professional acting in motion pictures, including four films she starred in for VXN. (JAF 29-30). Plaintiff's agent, Ryan Murphy, admitted Plaintiff considered herself a "professional actress". (JAF 38).

Two contracts governed Plaintiff's relationship with VXN, each amended by an addendum (collectively, the "Agreements"). (JAF 39). Plaintiff's agents negotiated her VXN contracts. (JAF 40). The first contract began on November 11, 2020. In April 2021, Plaintiff's agent renegotiated the first contract's termination date to August 28, 2021. Upon the expiry of the first contract, the parties entered a second contract ending on August 29, 2022. A June 2022 addendum extended the term to December 31, 2023. The Agreements explicitly state that Plaintiff was being engaged as an independent contractor. (JAF 41).

As per the Agreements, VXN paid Plaintiff on a per-scene basis. (JAF 42). Upon on-set arrival, Plaintiff submitted a form W-9 to VXN. (JAF 43). Plaintiff's W-9s indicated various payees, including Plaintiff herself, and her loan out companies: Kenzieland LLC, and Lola March LLC. (JAF 44). Following the

3

completion of filming for each scene, VXN paid Plaintiff the relevant contractual amount. (JAF 5). VXN issued Plaintiff form 1099s reflecting her gross compensation for the 2020, 2021, and 2022 tax years. (JAF 45). Plaintiff never received a Form W-2 from VXN. (JAF 46).

The Agreements required Plaintiff to "maintain [her] physical appearance" and to "submit to the reasonable personal grooming requests of [VXN], as such may be considered a norm in the adult film industry." (JAF 47). The purpose of these requirements was to allow VXN to properly plan ahead for film shoots, and to ensure the safety of other performers, including against infectious diseases and potential complications from cosmetic surgery. (JAF 48–49).

Plaintiff had complete discretion as to what days she worked for VXN. (JAF 50). To schedule Plaintiff's work, VXN's casting director asked Plaintiff's agent for Plaintiff's available dates or proposed dates for her agent to accept or decline on Plaintiff's behalf. (JAF 51). Plaintiff's agent testified that if Plaintiff was not available, VXN had no power to force her appearance. (JAF 52). Plaintiff possessed absolute discretion to decline any proposed date. (JAF 53).

Plaintiff exercised considerable discretion over the work she performed for VXN. For example, the first Agreement provided Plaintiff and VXN mutual approval over directors and costars. (JAF 54). As her agent testified, Plaintiff always had the right to decline work if she didn't approve a certain director or cast member. (JAF 55). VXN routinely provided Plaintiff with scripts prior to a shoot date. (JAF 56). If she did not approve of the script or personnel, Plaintiff was free to suggest changes or decline the scene altogether. (JAF 57). In fact, prior to working with VXN, Plaintiff routinely worked with director Chris Applebaum ("Applebaum") and suggested him to direct her first VXN scene.

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

(JAF 58-60). Applebaum and Plaintiff jointly proposed, and VXN accepted, Plaintiff's preferred co-stars for her first scene. (JAF 61-62). Applebaum characterized Plaintiff's engagement with VXN as a "collaboration" and expressed excitement that Plaintiff's and VXN's "brands are aligned[.]" (JAF 63). Thus, in the spirit of collaboration, VXN coordinated with Applebaum to plan the creative elements of Plaintiff's scenes. (JAF 64). The value of Plaintiff's performances was that they are all unique – VXN did not provide Plaintiff with any training or documents instructing her on how to perform. (JAF 65). Indeed, VXN never requested or forced Plaintiff to reshoot a scene due to due to dissatisfaction with her performance. (JAF 66).

Under the Agreements, VXN could only terminate for-cause, including "uncured material breach" and "unreasonable unavailability." (JAF 67). In the event of a breach, Plaintiff had the opportunity to cure. (JAF 68). On September 28, 2022, VXN notified Plaintiff that it was terminating her contract for-cause basis, citing her "unreasonable unavailability." (JAF 69). The Termination Notice noted that (i) in June of 2022, Plaintiff cancelled "just days before" a scheduled scene; (ii) in August of 2022, Plaintiff again cancelled "just days before" a scheduled scene, causing VXN to incur losses; and (iii) VXN was terminating "to avoid incurring additional damages" due to Plaintiff's "failure to appear on scheduled shoot dates."

Prior to working with VXN, Plaintiff was independently established and earned "roughly $50,000 per month" providing adult entertainment services via several different streaming platforms. (JAF 70). In addition, Plaintiff sold access to self-produced pornographic films on her website, "Kenzieland". (JAF 71). Kenzieland films featured Plaintiff in solo masturbation scenes, as well as alongside other established adult film actors. (JAF 76). Although Plaintiff

formally incorporated Kenzieland LLC in April 2021, she ran Kenzieland as a business prior to contracting with VXN. (JAF 72-73). Thus, before VXN engaged Applebaum as Plaintiff's preferred director, Plaintiff hired Applebaum in connection with Kenzieland films. (JAF 74). In addition to performing, Plaintiff was executive producer on all Kenzieland films. (JAF 75). In that capacity, she had control over storylines, scripts, and filming locations, in addition to booking talent and performing. However, Plaintiff did not obtain written agreements with Kenzieland actors, nor did she pay them any money or wages in exchange for their acting services. In other words, she engaged the actors as independent contractors. (JAF 77-79). Plaintiff used revenue generated by the films to pay her production crew. (JAF 80). While under contract with VXN, Plaintiff produced and released at least 23 Kenzieland films. (JAF 81). Kenzieland films, like VXN's films, were likewise released for internet streaming on her website.

Prior to and during her contract with VXN, Plaintiff actively marketed Kenzieland to the public through dedicated social media channels to attract potential customers. (JAF 82). Additionally, Plaintiff provided acting services to numerous other mainstream and adult film studios while under contract with VXN. (JAF 83).[1]

In addition to Kenzieland LLC, Plaintiff formed Lola March LLC in January 2022. (JAF 84). Plaintiff formed Lola March expressly to file her taxes as an independent contractor. (JAF 85). Indeed, Plaintiff took business deductions under Lola March on her taxes in connection with her adult entertainment and acting services. (JAF 86). In her personal tax filings for each of 2020, 2021, and

---

[1] For example, in 2021, Plaintiff appeared in at least 14 separate films for studios other than VXN, including Cherry Pimps, Jules Jordan, Penthouse, Playboy, and Brazzers. In 2022, Plaintiff appeared in five films released by VXN, whereas she appeared in no fewer than 68 films for other studios.

2022, Plaintiff identified as self-employed and filed a Schedule C indicating business profits and expenses. (JAF 87-88). However, Plaintiff did not declare any W-2 employee income from any of the adult studios for which she performed from 2020 to 2022. (JAF 89).

Plaintiff's business profits and expenses were substantial.[2] Plaintiff treated all payments the same for tax purposes, including those from VXN, whether they were received individually or through an LLC. (JAF 93). Likewise, all Plaintiff's business expenses, whether incurred individually or through an LLC were presented on a single return. (JAF 94).

## B.    Plaintiff's Statement of Facts

### 1.    The Beginning of the Relationship Between Plaintiff and Defendants

Prior to working with Defendants, Plaintiff was a model who worked with a variety of mainstream and adult companies. (**Undisputed Fact ("UF") 155**.) Plaintiff was also a hairdresser and supplemented her living through her "camming." (**UF No. 155**.)  As Plaintiff's modeling and camming career began to develop, Plaintiff realized that she wanted more from her career. In or around early 2020, Plaintiff wanted a new level of "sexual liberation." (**UF No. 141**.)  Because of this newfound desire for sexual liberation, Plaintiff decided to enter the adult entertainment industry. (**UF No. 141**.)

---

[2] For example, in 2020, Plaintiff claimed $149,867 in gross income against $124,000 in business deductions, including $50,400 for business rent, $25,000 for "props and wardrobe," $3,600 for supplies, and $7,200 for insurance. (JAF 90). In 2021, Plaintiff claimed $317,665 in gross income against $250,055 in business deductions, including $59,200 for business rent, $30,590 for "props and wardrobe," $59,900 for "appearance," and $28,710 for supplies. (JAF 91). And in 2022, Plaintiff claimed $318,689 in gross income, and $228,428 in business deductions, including $54,000 in business rent, $17,070 for "props and wardrobe," $16,800 for "appearance," and $66,379 for "production." (JAF 92).

7

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

On or around November 11, 2020, Plaintiff began her working relationship with Defendants. Defendants are a "Global Entertainment & Lifestyle Brand" that creates adult motion pictures and photographs for sale and sells various merchandise with the names and logos of their various brands. (**UF No. 97, 98, 158, 159, 160, 161, and 203.**) Defendants sell bras, lingerie, t-shirts, swimwear, sweatpants, and other clothing that their performers, including Plaintiff, model. (**UF Nos. 162 and 163.**)

2. <u>The Performance Agreements</u>

Plaintiff's employment relationship with Defendants was governed by two agreements and one addendum to each agreement. In Plaintiff's original Performance Agreement ("Agreement One") that was signed on November 11, 2020, the Parties agreed that she was a "**model** and actor in the adult entertainment industry" and that Defendants intended to contract with Plaintiff through her capacity as an actor **and model**. (**UF Nos. 95 and 99.**) On July 13, 2021, the Parties renewed the Agreement and Plaintiff was once again referred to as an "actor **and model**" and was contracted to provide acting **and modeling** services ("Agreement Two," with Agreement One "Agreements"). (**UF Nos. 96 and 100.**) The Agreements also state that <u>Defendants create photographs for the purpose of commercial sale</u>. (**UF Nos. 97 and 98.**) The two addendums place additional restrictions on Plaintiff, adding more terms to the exclusivity clause (**UF No. 201.**)

The Agreements also allow Defendants to retain and exercise broad power over Plaintiff's personal autonomy. Agreement One provided for an **<u>exclusivity clause</u>** that prevents Plaintiff from "filming with any third party producer or production company that competes directly with [Defendants]" and forbids Plaintiff from "camming" with a company called CamSoda. (**UF No. 102.**) This clause was enforced verbally to Plaintiff by Defendants' managers, who instructed

8

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

Plaintiff not to film any sexual content longer than five minutes alone and to not film sexual content with another individual. (**UF No. 144.**) Had Plaintiff breached this exclusivity clause, Defendants would have grounds to terminate Plaintiff. (**UF No. 103.**) Agreement Two contains another exclusivity clause that forbade Plaintiff from filming "anal" scenes with other companies throughout the time of Agreement Two or three months after Plaintiff shoots an "anal" scene with Defendants. (**UF No. 200.**)

Through the terms of the Agreements, Plaintiff was required to give Defendants the right to "photograph and re-photograph" her in relation to the content created under the Agreements. (**UF Nos. 117 and 121.**) The Agreements also granted Defendants the right to retain the license of any and all Plaintiff's approved names and aliases, resume, caricature, voice, and likeness. (**UF Nos. 119 and 123.**) The Agreements even gave Defendants the right to retain Plaintiff's voice and performance by any "present or future methods or means." (**UF No. 118 and 122.**) In essence, Defendants gained ownership over more than just the product the Plaintiff produced, but Defendants also owned the persona and likeness that Plaintiff used to create these adult materials.

Furthermore, while Plaintiff was only paid on a scene-by-scene basis, Plaintiff's duties extended past producing adult materials for Defendants. Plaintiff was <u>contractually required to promote Defendants "brands and affiliated brands"</u> throughout the contract period. (**UF Nos. 108 and 111.**) Even while not actively on set and working for Defendants' scenes, Plaintiff was expected to abide by Defendants' ethical policies and practices "at all times." (**UF No. 115.**) Also, the Agreements possess a provision stating that the relationship between Plaintiff and Defendants continues after the expiration of the term of the Agreements, should

Defendants require more services with retakes, more scenes, **trailers, or changes to content**. (**UF No. 106.**)

Next, the Agreements state that Plaintiff will provide services "on an as-needed basis, including nights, weekends, and holidays." (**UF No. 125 and 127.**) The Agreements further specify that shoots may take ten hours. (**UF No. 126 and 128.**) If Plaintiff was unavailable for any shoots, she needed to provide availability for a new date that was within two weeks of the original shoot date set by Defendants. (**UF Nos. 145, 146, 147.**) The Agreements even state that "unreasonable unavailability," along with failing to meet the producer's **subjective** artistic expectations, failure to follow any framework, and violation of Defendants' rules or directions, are grounds for termination. (**UF Nos. 137 and 155.**)

The Agreements also severely limited Plaintiff's personal bodily autonomy. The Agreements state that Plaintiff cannot make changes to her physical appearance without written permission from Defendants. (**UF Nos. 104 and 105.**) This includes changes to her physical fitness, hairstyle, and *body measurements.* (**UF Nos. 104 and 105.**) This gives Defendants a near unprecedented level of control over Plaintiff's personal autonomy, including haircut she can get, the piercings she can get, and even whether or not she could become pregnant.

### 3.  The Course of Plaintiff's Employment With Defendants

In accordance with the Agreements, Plaintiff provided *modeling* and acting services to Defendants, along with *promoting Defendants' brands on her social media.* (**UF Nos. 31 and 167.**) Generally, Plaintiff's Day on set would begin around 7:00am, and she would spend around two hours getting her hair and makeup done by Defendants' hair and makeup artists. (**UF Nos. 101 and 132.**) Plaintiff spent up to another six hours per day modeling for still photoshoots that were unrelated to live action scenes filmed at a future time. (**UF No. 130.**) Before engaging in any of

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

10

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

these shoots, Plaintiff would have to sign two documents. The first would be a **"Model Release Agreement" that stated Plaintiff was being hired for the purposes of creating, among other materials, photographs." (UF No. 187 and 188.)** These agreements stated that "Model's performance is for adult oriented entertaining and will be used to create and market adult oriented content and products." **(UF No. 190).** <u>Nowhere in this agreement was it specified that Plaintiff would produce content only for motion pictures.</u> The second was an "18 U.S.C Section 2257 Records Keeping for Models" agreement. **(UF No. 197).** <u>This second agreement only ever categorized Plaintiff as a "model" and *not* an actress or performer.</u> **(UF No. 198).**

As for the filming, Plaintiff would receive scripts ahead of time and she would suggest changes, but these suggestions were never listened to as Defendants were "set in their ways" in accordance with their "artistic vision." **(UF No. 137, 142, 155.)** There was always a director on set that would instruct Plaintiff and other talent on how to perform scenes. **(UF No. 154.)** Plaintiff received absolutely no formal acting training by Defendants. **(UF No. 153.)** Regardless, Plaintiff was named a "Vixen Angel," an honor given by Defendants to high quality artists within the adult entertainment industry that "break down walls and defy stereotypes." **(UF No. 156.)**

4.   <u>The Termination of Plaintiff's Employment</u>

In or around mid 2022, Plaintiff informed Defendants that she would not be able to attend a shoot in June 2022 because she suffered from monkeypox. **(UF No. 166).** <u>In response, Defendants sent Plaintiff a termination letter, citing her alleged unauthorized body modification and unavailability to attend shoots</u> as the reasons for her termination. **(UF Nos. 148 and 149.)**

III.    **LEGAL STANDARD**

   A.    **Defendants' Position on Legal Standard**

   Summary judgment is proper if the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court must examine all summary judgment evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Nevertheless, it is the nonmoving party's obligation to produce factual predicates from which an inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

   B.    **Plaintiff's Position on Legal Standard**

   In reviewing a summary judgment motion, the court must determine whether there are genuine disputed issues of material fact, **<u>resolving any doubt in favor of the party opposing the motion.</u>** *Matsushita Electric Indus Co v. Zenith Radio Corp*, 475 U.S. 574, 587 (1986). The court views the facts in the light most favorable to the non-moving party and draws "all justifiable inferences" in the non-moving party's favor. *Id.* The burden of establishing that there are no genuine issues of material fact lies with the moving party. *Celotex Corp v Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment is appropriate only if no genuine issues of material fact remain and the non-moving party is entitled to judgment as a matter

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

of law. *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 983 (9th Cir. 1999).

## IV.    ANALYSIS

### A.    Defendants' Argument 1

#### 1. Summary Judgment Should be Granted Because Plaintiff is a Professional Actor

##### i.    *IWC Wage Order 12 Applies to Plaintiff's Claims*

The California Industrial Wage Commission ("IWC") Wage Order 12 governs the Motion Picture Industry. *See* Cal. Code Regs. tit. 8, § 11120. "'Motion Picture Industry' means any industry, business, or establishment operated for the purpose of motion picture or television film production." *Id*. "California's 'wage orders are to be accorded the same dignity as statutes.'" *Herrera v. Zumiez, Inc*., 953 F.3d 1063, 1070 (9th Cir. 2020).

IWC 12 governs Plaintiff's claims because the main purpose of Defendants' business is to create motion pictures. (JAF 1-3, 8-22). "[T]he 'main purpose of the business, not the job duties of the employee, determines which wage order applies in any given case." *Miles v. City of Los Angeles*, 56 Cal.App.5th 728, 737 (2020). "The primary function of the employer is to be the determining factor in establishing the proper IWC order applicable to the employees." *Id*.

##### ii.    *Professional Actors Are Exempt*

IWC 12 exempts professional actors from its overtime, wage statement, and meal and rest break period requirements. ("PA Exemption" or "PAE"). *See*

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

Cal. Code Regs. tit. 8, § 11120(1)(C).[3] Although IWC 12 does not define "[p]rofessional actor," the addition was considered a term "well known to those in the industry." (JAF 37). The PAE was designed to distinguish featured actors from extra-players, who receive more protections.[4] (JAF 38); *Ashdown v. Dep't of Emp.*, 135 Cal.App.2d 291, 300, 287 P.2d 176, 182 (1955) ("[W]ork as an extra . . . is not suitable work for an actress . . . whose work has been confined to spoken parts.") In other contexts, courts have defined "professional actor" simply as a person who is paid to act. *Flaaen v. Principal Life Ins*. Co., 2017 WL 4286358, at *5 (W.D. Wash. Sept. 27, 2017). Plaintiff qualifies as a professional actor because VXN paid her to act in a featured role, with speaking lines, in its films. (JAF 4). She won multiple acting awards for her films. (JAF 29-30).

### iii.    *The Professional Actor Exemption is Not Limited*

Plaintiff's contention that she spent "75%" of her time taking still photos on set is untrue (JAF 22) and, most importantly, irrelevant. The PAE does not require an individual to be "primarily" engaged in a role, *i.e.* "more than one-half the employee's work time" to qualify for the exemption. Cal. Code Regs. tit. 8, § 11120 (M). The executive, administrative, and professional exemptions ("general

---

[3] "Although the California Labor Code added overtime requirements in 1999, the Code expressly retained all exemptions within valid wage orders in effect before 1997." *Lujano v. Piedmont Airlines, Inc.*, 2024 WL 2873627, at *5 (C.D. Cal. May 16, 2024) (citing Cal. Lab. Code § 515(b)). The "professional actor" exemption was adopted in 1957. (JAF 36).

[4] The IWC 12 history states: "There was discussion of the difficulty of defining an 'extra player' as distinguished from an 'actor' or 'actress' despite the fact that the distinction is well known to those in the industry." *Id*. "[E]xtra-players" are defined as "any person employed by an employer in the production of motion pictures to perform any work, including but not limited to that of a general extra, stand-in, photographic double, sports player, silent bit, or dress extra; or as extras employed in dancing, skating, swimming, diving, riding, driving, or singing; or as extras employed to perform any other actions, gestures, facial expressions, or pantomime." Cal. Code Regs. tit. 8, § 11120.

exemptions") in Section 1(A) of IWC 12 have this requirement but not the PAE.

Indeed, IWC 12 contains a variety of exemptions with different tests and restrictions. For example, the "public employee exemption"[5] in IWC12(1)(B) is straight forward while the "professional exemption" at § 12(1)(A)(3)(a)–(i) includes "a veritable hotbed . . . about the employee's actual job duties and whether those duties meet the requirements." *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 828 (9th Cir. 2011).

The PAE is not complex. It only states: "(C) Except as provided in Sections 1, 2, 4, 10, and 20, the provisions of this order shall not apply to professional actors." *Id* at 1(C). The language of the PAE is almost identical to the public employee exemption before it in 1(B). Courts have interpreted the "public employee" exemption as a blanket exemption. *Lockhart v. Cnty. of Los Angeles*, 2007 WL 9627609, at *6 (C.D. Cal. Oct. 16, 2007) ("Had the IWC intended to act contrary to its policy of a blanket exemption and create coverage of some public employees who otherwise do not fall within the wage orders, it presumably would have done so more explicitly"); *Morales v. 22nd Dist. Agric. Ass'n*, 25 Cal.App.5th 85, 97 (2018) (public employees were exempt regardless of the purpose of their work).

IWC 12 lists the PAE on its own, aligning its language only with other blanket exemptions. Limitations present in other exemptions should not be applied to the PAE. "Judicial construction that renders any part of the wage order meaningless or inoperative should be avoided." *Rodriguez v. E.M.E., Inc.*, 246

---

[5] The Public Employee exemption states: "(B) Except as provided in Sections 1, 2, 4, 10, and 20, the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district." Cal. Code Regs. tit. 8, § 11120

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

Cal.App.4th 1027, 1034 (2016). If the "professional actor" exemption is read to incorporate requirements from other exemptions, it would swallow the exemption, rendering it meaningless. "The rules of statutory construction provide that [u]nder the guise of construction, a court should not rewrite the law, [nor] add to it what has been omitted." *Salazar v. McDonald's Corp.*, 2017 WL 950986, at *3 (N.D. Cal. Mar. 10, 2017), *aff'd*, 939 F.3d 1051 (9th Cir. 2019). If the IWC intended actors to be exempt only when acting for a certain amount of time, it would have so specified.[6] "[The] legislature says in a statute what it means and means in a statute what it says there.' If the statutory text is unambiguous, *the inquiry ends there*." *Owino v. CoreCivic, Inc.*, 2018 WL 2193644, at *5 (S.D. Cal. May 14, 2018) (citing *BedRoc Ltd., LLC v. United States,* 541 U.S. 176, 183 (2004)) (emphasis added). Analyzing the PAE based on rules in separate exemptions would "materially affect its operation so as to make it conform to a presumed intention not expressed or otherwise apparent in the law." *Id*.

　　　　Logically, it does not make sense to impose limitations to the PAE because the true nature of acting lends itself to many roles. An actor's role may be to drive a car, play a nurse saving a life, or act as a lawyer in court. But these portrayals do not make actors subject to different wage order requirements. Likewise, for an actor to succeed, an actor needs to do more than just act. This may be to memorize lines in a script, change into a costume, give an interview, or take photographs. Such activities do not make an actor a reader, a journalist or a model

---

[6] For example, IWC 10, explicitly qualifies "motion picture projectionist" as "[e]mployees whose duties are *exclusively* those" in order for an overtime exemption to apply. Cal. Code Regs. tit. 8, § 11100 (3)(G) (emphasis added).

when such actions are done because of the actor's role in the movie.

### iv. *Photography Is a Part of Film Production*

An actor does not become a model because photographs are taken of her on film sets. *See Ladore v. Ecolab Inc.,* 2013 WL 12246340, at *4 (C.D. Cal. Jan. 22, 2013) (exterminator did not become a "driver" under regulations because he drove to a job site - the task was incidental to his duties). Plaintiff was only photographed as the subject of VXN's movies because she was acting in them. In contrast, when a retailer hires a model, it creates a superficial association between the model and its retail goods. Those photos are designed to showcase the retailers' goods, not the model herself. *See Hill v. Walmart Inc.*, 32 F.4th 811, 821 (9th Cir. 2022). VXN would not use a photo of a random model on the cover of its movies. It always uses a photo of a featured actor in the movie so that the audience knows that actor performed in the actual movie.[7]

VXN only took photographs of Plaintiff for the common motion picture industry purposes of: (1) creating motion pictures;[8] (JAF 18-19) (2) displaying motion pictures (i.e. on DVD covers); (JAF 20) (3) advertising the motion pictures;[9] (JAF 20) and (4) marketing Plaintiff as a professional actor to draw fans

---

[7] Ironically, Plaintiff could have a claim against VXN if VXN used a photo of someone else to advertise her movies. *Smith v. Montoro*, 648 F.2d 602, 607 (9th Cir. 1981) (finding actor had a claim because movie advertisements advance an actor's career).

[8] *See Bloom v. Make-Up Artists & Hairstylists Loc*. 706, No. CV 99-3408-AHM, 1999 WL 909817, at *2 (C.D. Cal. Aug. 18, 1999). ("These photographs are commonly referred to in the industry as 'continuity photographs,' used by hair and make-up artists in an ongoing production to replicate an actor's look from week to week.").

[9] *See, e.g., Morgan Creek Prods., Inc. v. Cap. Cities/ABC, Inc*., 1991 WL 352619, at *1 (C.D. Cal. Oct. 28, 1991) ("Plaintiff's advertising campaign for YOUNG

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

17

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

to her movies. All the photographs are extensions of Plaintiff's professional acting. *See Jules Jordan Video, Inc. v. 144942 Canada Inc*., 617 F.3d 1146, 1154 (9th Cir. 2010) ("[T]he covers of the DVDs are likely component parts of the copyrighted DVD[.]") (citing Nimmer on Copyright § 2.04); *see also* 17 U.S.C. § 106(5) (including "individual images of a motion picture or other audiovisual work" under the display right).

Stills from motion pictures connect the actor to the movie and aid in making the actor famous. *See Hoffman v. Cap. Cities/ABC, Inc*., 255 F.3d 1180, 1182–83 (9th Cir. 2001) (describing a "memorable" still of Dustin Hoffman in the movie Tootsie). Plaintiff posted stills on her social media so everyone would know she was acting in Defendants' films. (JAF 31). Vixen Angel was an honorary title and celebration designed to shine a spotlight on Plaintiff as a professional actor. (JAF 32). Plaintiff transformed from a model to a professional actor "to become more relevant." (JAF 34). This is part of the motion picture process and benefits Plaintiff. "[Professional actors] are built, in part, through being prominently featured in popular films and by receiving appropriate recognition in film credits and advertising." *Smith v. Montoro*, 648 F.2d 602, 607 (9th Cir. 1981). Because Plaintiff was photographed with VXN only in her capacity as a professional actor, as part of the motion picture process, the professional actor exemption should apply to Plaintiff's claims.

---

GUNS included a widely distributed poster featuring a photograph of the six young protagonists in costume with the film's title.")

JOINT BRIEF REGARDING DEFENDANTS' MSJ

2. <u>Plaintiff's Response</u>

    i.    *<u>Summary Judgment Should Not Be Granted Because</u>*
        *<u>Plaintiff is Not Exempt as a Professional Actor</u>*

    **a.**   **Wage Order 12 Should Not Govern Because Defendants' Purpose Was Not the Production of Motion Pictures**

In furtherance of the legislators' intended purpose for the Labor Code, which is to protect the interests and working conditions of employees, Wage Orders and the Labor Code are to be **<u>liberally construed</u>** in favor of the employee. *Ferra v. Loews Hollywood Hotel, LLC*, 11 Cal. 5th 858, 856 (2021). Furthermore, the Supreme Court of California held that "[w]hile [the DLSE] opinion letters are not controlling, they reflect the type of experience and considered judgment that may properly inform [the court's] judgment." *Augustus v. ABM Sec. Servs., Inc*., 2 Cal. 5th 257, 267 (2016).

Wage Order 12 applies to the "motion picture industry," which is an "industry, business, or establishment operated **<u>for the purpose</u>** of motion picture or television film production." <u>Cal. Code Regs</u>., tit. 8, 11120**.** Wage Order 7 applies to companies whose purpose is the purchasing, selling, or distributing goods or commodities at wholesale or retail. <u>Cal. Code Regs</u>. tit. 8, § 11070**.** Wage Order 4 applies to individuals that are in professional, technical, clerical, mechanical, and similar occupations and are not covered by any industrial wage orders, including models. <u>Cal. Code Regs</u>. tit. 8, § 11040. According to the DIR, some Wage Orders, such as 7 and 12 are industry orders, while others, such as 4, are occupational orders. (**UF 191**.) To determine which Wage Order applies, one must first determine if any Wage Order applies to a specific company. If that company is not covered by a specific industry order, then the occupational order will apply to the employee. (**UF 191-193**.)

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

To determine which Wage Order is binding on an employee, the primary factor to consider is the *primary purpose* of the business itself. *Miles v. City of L.A.*, 56 Cal. App. 5th 728, 737-738 (2020). Furthermore, the DIR states that determining the nature of a company is not about auditing receipts to compare income from sales and service, but by using "simple observation and common sense." **(UF 193).** Businesses may conduct a variety of operations, but if those operations are a part of the main business, then one order will apply. The DIR gives this example:

> "A business's main purpose is operating a warehouse and incidental thereto employs a separate sales staff to sell goods. IWC Order 9 covers this operation even though sales are covered under IWC Order 7 because the main purpose of the business is to operate a warehouse." **(UF 192)**

In *Miles,* the court found that just because a sanitation worker for the local municipality drove trash collection trucks from one area to another does not mean that individual is a transportation worker rather than a sanitation worker. *Miles v. City of L.A.*, 56 Cal. App. 5th 728, 737-738 (2020). The court found that the driving was simply incidental to the *primary purpose* of the defendant, which was sanitation work. *Ibid.* However, the court notes that this analysis would have been different if the city maintained a separate division for the purpose of transporting people or property from one place to another. *Ibid.* In other words, if the Wastewater Division or Sanitation Bureau maintained a different department that would focus on the transportation of people or property, including waste, from one location to another, then that employee would be considered a transportation worker and *not* a sanitation worker. The court then says any other analysis is irrelevant because the defendant's *only* purpose is sanitation, and transportation of waste is merely incidental to this purpose. *Id at 738.*

Defendants argue that Wage Order 12 should govern because Defendants make motion pictures. Yet, the only time Defendants have held themselves out to be a company whose **primary** and **main** purpose is to release motion pictures is in this case, **not** to Plaintiff or the general public at large. It is true Defendants may

20

JOINT BRIEF REGARDING DEFENDANTS' MSJ

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

have filed some copyrights and other documents for their movies and Defendants may have won some of awards for the movies they released, but the comportment with Copyright law and winning awards **does not dictate the intended purpose of Defendants' company,** and Defendants have thus far failed to produce any evidence or law stating otherwise. The Agreements themselves state that Defendants create and sell **both** photographs and motion pictures. (**UF Nos. 97 and 98.**) Plaintiff signed several "Model Release Agreements" throughout her tenure with Defendants, and each and every one of these agreements state that Plaintiff's performance is oriented towards adult oriented content and products, *not* just adult oriented motion pictures. (**UF No. 190.**) These agreements also explicitly state that Plaintiff is being hired for, among other services, adult oriented photographs. (**UF No. 188**). Furthermore, Defendants required Plaintiff to sign multiple agreements stating Plaintiff and Defendants are in compliance with U.S. Code § 2257. (**UF 197**). However, in **all** of these agreements Plaintiff is categorized as a "model," **not** an actress. (**UF 198**). Defendants' own Person Most Qualified categorized Vixen as an "online entertainment" company, not a motion picture company. (**UF 205**)

Furthermore, Defendants market themselves as a "Global Entertainment and Lifestyle Brand" to the general public, *not* a "motion picture" company. (**UF No. 158.**) On Defendants' social media, there are various links to various websites where Defendants promote and sell merchandise that have the names of Defendants' various brands. (**UF No. 159-163.**) On Defendants' Twitter, there is yet another link that leads to a website where Defendants sell merchandise. (**UF No. 164**.) Artists that are "Vixen Angels," a title which was bestowed on Plaintiff, can be seen in various merchandises sold by Defendants modeling them on Defendants' websites. (**UF No 161.**)

Defendants' attempts to mislead this court that they are primarily a motion picture company is an ill-attempted rouse to skirt on liability. Defendants cannot market themselves as a "Lifestyle Brand" to the public at large and to Plaintiff;

have Vixen Angels, **like Plaintiff,** model merchandise for their "Lifestyle Brand;" categorize Plaintiff as a model in every single agreement she signed; and have performers model for up to six hours every single shoot be considered a company whose "**primary purpose**" is to produce motion pictures.

Defendants will likely argue that just because Defendants operate different businesses does not change the primary purpose of Defendants and try to more closely relate the current action to cases like *Miles.* Yet, the factual pattern in *Miles* is entirely inapposite here. The *Miles* court explicitly stated that the defendant's primary purpose was its *only* purpose, the transportation of waste from one area to another is a mere necessary extension of the waste removal process. Similarly, in the DIR's example, the employer does not operate as a warehouse, but rather is a retail service who owns a warehouse to support the retail goods being sold. It is inefficient and nearly impossible to operate a high-volume retail space without warehouses. Here, the modeling and selling of merchandise has nothing to do with the creation of motion pictures. Defendants are not using these models to promote their motion pictures, rather Defendants **sell** these goods and make money from these sales. There is nothing incidental about this separate stream of income for Defendants' motion pictures. By Defendants' own admission, the motion pictures released by Defendants are extremely successful and have won many awards, so Defendants do not need a supplemental source of income to support their motion picture venture.

It is clear that Defendants' do not operate a business whose purpose is the creation and release of motion pictures, but rather Defendants main purpose is to create a global brand for consumption. Defendants do not *just* want to create motion pictures, otherwise they would not waste the time creating all of these brands, having performers model every kind of merchandise from t-shirts to pants to swimwear with the name of Defendants various brands on them, have their Vixen Angels model merchandise, require models like Plaintiff to promote Defendants

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

22

brands, categorize Plaintiff as a model rather than an actor, not limit Defendants purpose as a motion picture company in every agreement with Plaintiff, and hold themselves out to the general public as a "Global Entertainment and Lifestyle brand." Indeed, the product Defendants want to sell are not the motion pictures that Vixen releases, *but Vixen itself.* As such, Wage Order 12 is completely inapplicable in this case, as is any other industry Wage Order. Thus, Wage Order 4 would apply to this case, as models and other "kindred occupations" are listed as being covered under this wage order. Cal. Code Regs. tit. 8, § 11040.

### b.    Plaintiff Was Not A "Professional" Actor

As an initial matter, "the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption." *Ramirez v. Yosemite Water Co*., 20 Cal. 4th 785, 794-795 (1999). When interpreting legislation, a court's role is to apply the statute **as is written**, even if the court believes a different approach might be in accordance with good policy. *United States v. Town of Colo. City*, 935 F.3d 804, 811 (9th Cir. 2019). Furthermore, "[t]he IWC's wage orders are to be accorded the same dignity as statutes." *Abdullah v. U.S. Sec. Assocs*., 731 F.3d 952, 958 (9th Cir. 2013).

Assuming *arguendo* this court finds that Wage Order 12 *is* applicable, Plaintiff is not exempt as a "professional actor." Defendants make many arguments as to why Plaintiff should be considered an actor. Yet, Defendants completely fail to show that Plaintiff was, in fact, a "professional" in the field. The Minutes for Discussing Wage Order 12 in 1957, which is the first time there was definition section included in the Wage Order, makes clear distinction as to the term "actor" and "professional actor." In section one, the DLSE uses the term "professional" actors and actresses as those who shall be exempt from the order and states that only "**professional** minors," not just minors who are actors, should also be exempt. (**UF No. 167.**) Furthermore, later in the letter, the DLSE distinguishes the term

JOINT BRIEF REGARDING DEFENDANTS' MSJ

"extra-player" from "actor or actress," **_not_** from the term "professional actor" or "professional actress." (**UF No. 168.**) When combining these distinctions with the plain language of Wage Order 12 which covers "persons employed in the motion picture industry…" there is a clear distinction between a "professional" actor and just an "actor". As such, this court **must** interpret Wage Order 12 to have two different distinctions for actors, one for those who are professionals and others who are not.

Wage Order 12 provides some clarification as to what a professional is, as it does define "professional exemption." A professional under Wage Order 12 is someone who:

> 1) who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or 2) who is primarily engaged in an occupation commonly recognized as a learned or artistic profession; 3) Who customarily and regularly exercises discretion and independent judgment in the performance of duties set forth in numbers 1 or 2; 4) who earns a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Cal. Code Regs., tit. 8, 11120

Cal Gov Code § 3521.5 provides further clarification as to what a "professional" is:

> "The term 'professional employee' means (a) any employee engaged in work (1) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (2) involving the consistent exercise of discretion and judgment in its performance; (3) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (4) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes…"

Neither under Wage Order 12 nor under Cal Gov Code § 3521.5 does Plaintiff qualify as a professional. First, it **must** be noted that Plaintiff's only duties

24

JOINT BRIEF REGARDING DEFENDANTS' MSJ

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

were not that of an actor's while working for Defendants. Plaintiff was *also* a model, **per the express written terms** of the Agreements. Plaintiff would spend up to six (6) hours a day modeling for still photographs in ways that are completely unrelated to the videos. Plaintiff is further categorized as a "model" in every single U.S. Code § 2257 agreement. In the discovery conducted thus far, both sides have produced a multitude of photographs from Vixen sponsored photo shoots that do not correspond to motion pictures. Rather, they promote Defendants' brands and companies, and exhibit Plaintiff's work as a model. (**UF No. 165.**). For example, Plaintiff worked under direction of Defendants to model in a "Vixen Angel Photoshoot" in Joshua Tree on one occasion. The shoot only involved "photography and filming," with no acting services or reading lines on camera. (**UF No. 169**).

Next, Plaintiff received no special instruction or course and received no licenses or certification set forth in Wage Order 12. Plaintiff did not receive any professional acting training prior to or during her work with Defendants. (**UF Nos. 151-153.**). Second, while Plaintiff did do *some* acting in the films Defendants would produce, most of the time on camera for filming was spent having sex where there would be no acting. Wage Order 12 defines "artistic profession" as follows:

> (i) Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or work that is an essential part of or necessarily incident to any of the above work; or (ii) Work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee or work that is an essential part of or necessarily incident to any of the above work; and (iii) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

produced or the result accomplished cannot be standardized in relation to a given period of time.

Defendants have yet to produce any evidence or law that specifically states having sex on camera in the way Defendants produce their films is in a "recognized field of artistic endeavor." Thus, Plaintiff is not a "professional" under the second prong of Wage Order 12. Even if Defendants could satisfy this prong, Defendants cannot meet the third, which requires discretion and judgment to be used by Plaintiff. Plaintiff was given scripts to read and act out, had a director on stage at all times telling her what to do and how to move while being filmed, and exercised little to no judgment on how to scenes would play out, the way she would act, and the way she would have sex. Plaintiff was not allowed to have her hairstyle and makeup be done in her own way, as someone working for Defendants would do her makeup for her. (**UF Nos 104, 105, 132, 170.**) Plaintiff could not change her body measurements without Defendants express written permission. (**UF Nos 104 and 105**). Given that Plaintiff works in a visual medium where her appearance is the primary way to achieve whatever goal the adult materials may have, Plaintiff's lack of control as to her own physical appearance strips her of her ability to exercise her own discretion or judgment in the completion of her tasks. Furthermore, the express terms of the Agreements state that if Plaintiff does not meet the intended goals or vision of Defendants, or if she fails to follow Defendants' directions, then she can be terminated. (**UF Nos 137 and 155**).

Defendants may argue that the legislator did not intend for a "professional actor" to be tested as a "professional," as professionals are exempt from Wage Order 12 anyways. However, a closer look at Wage Order 12 shows clear differences in the exemptions "professional actors" are subject to, as opposed to the exemptions other "professionals" are subject to. For example, other "professionals" are exempt from *all* provisions in sections 3-12, while "professional actors" have sections 4 and 10 apply to them. The legislature set a

clear distinction over which exemptions "professionals" are subject to versus which exemptions "professional actors" are subject to. Therefore, Plaintiff cannot be considered a "professional" actor.

### B.    Defendants' Argument 2

1. <u>Summary Judgment Should be Granted Because Plaintiff is an Independent Contractor</u>

    i.    *<u>Borello Governs Plaintiff's Employment Status</u>*

Assuming *arguendo,* that Plaintiff was VXN's employee, as explained above, IWC 12's PAE would apply entitling VXN to summary adjudication on Plaintiff's overtime, wage statement, meal, and rest penalty claims. Further, VXN would likewise be entitled to summary adjudication of her remaining waiting time penalty claim as it is merely derivative of those claims.[10] As a result, any other potential claims held by Plaintiff, for example, misclassification, would fall outside the scope of the wage order.

California's worker classification tests hinge on whether claims are rooted in a wage order or derived solely from the Labor Code. Whereas the ABC test applies to wage order-based claims, the test from *S.G. Borello & Sons, Inc. v. Dep't of Indus. Rels*., 48 Cal.3d 341 (1989), applies outside of the wage order context. See *Bowerman v. Field Asset Servs., Inc*., 60 F.4th 459, 472 (9th Cir. 2023) (holding that Borello applies to non-wage order claims); see also *Garcia v. Border Transp. Grp*., LLC, 28 Cal.App.5th 558, 570–71 (Ct. App. 2018) (same).

---

[10] IWC 12 does not address final wage payments or waiting time penalties. *Cf. Salter v. Quality Carriers, Inc.*, 2021 WL 5049054 (C.D. Cal. 2021) (finding *Borello* applicable to waiting time penalty claims as Wage Order No. 9 does not impose such penalties).

JOINT BRIEF REGARDING DEFENDANTS' MSJ

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

1    Thus, for any other conceivable labor code claims held by Plaintiff, the Borello

2    test applies to determine whether she was misclassified.

3              ii.    _Judicial Economy Warrants Summary Adjudication of_

4                     _Plaintiff's Employment Status_

5         If this Court determines that Plaintiff falls under the PAE, all class action

6    claims could be properly adjudicated in favor of Defendants. However, Plaintiff's

7    state court action under the Private Attorneys General Act ("PAGA"), filed *after*

8    Defendant's removal of this action to federal court, would continue. Recognizing

9    that Plaintiff's class action claims likewise form the basis for her PAGA standing,

10   the Superior Court stayed Plaintiff's PAGA case "in its entirety pending

11   determination in Federal Court of the claims pending there." *See* [**Dkt.** 58-2].

12   Thus, if Plaintiff's class action is dismissed, the only remaining basis for

13   Plaintiff's PAGA standing is a Labor Code claim for misclassification.

14        Judicial efficiency strongly favors this Court's resolution of Plaintiff's

15   employment classification. California's recent PAGA amendments, including the

16   passage of AB 2288, were explicitly aimed at curbing litigation abuses and

17   streamlining the adjudication of labor disputes. Allowing this matter to proceed in

18   state court after a comprehensive evaluation by this Court would invite

19   duplicative and unnecessary litigation. This Court, having already been apprised

20   of the full factual record and legal arguments, is uniquely positioned to determine

21   Plaintiff's employment status under *Borello*. A state court's subsequent

22   adjudication would require re-litigation of identical facts and issues, wasting

23   judicial resources and imposing undue costs on the parties. Resolving Plaintiff's

24   classification in this forum not only aligns with principles of judicial economy but

25   also ensures a consistent and fair application of the law without redundancy.

26   Accordingly, Defendant's respectfully request the Court also adjudicate

JOINT BRIEF REGARDING DEFENDANTS' MSJ

27

28

Plaintiff's employment status to avoid piecemeal litigation and judicial inefficiencies.

> iii.   *Under Borello Plaintiff is an Independent Contractor as a Matter of Law*

Under *Borello*, "the principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." 48 Cal.3d 341, 350. Additional factors include: (a) the right to discharge at will, without cause; (b) whether the worker operates a distinct occupation or business; (c) the level of supervision exercised by the principal; (d) the skill required in the occupation; (d) which party provides the tools, equipment, and workspace; (e) the length of the engagement; (f) the method of payment, whether by the time or by the job; (g) whether the work is part of the principal's regular business; and (h) whether the parties intended an independent contractor relationship. *Id*.

"All factors need not point in one direction for a court to rule as a matter of law about a worker's proper classification." *Cotter v. Lyft, Inc.,* 60 F. Supp. 3d 1067, 1077 (N.D. Cal. 2015); *Arnold v. Mut. of Omaha Ins. Co.*, 135 Cal.Rptr.3d 213, 221 (Cal. App. 2011) (noting that, even if all factors are not aligned, "summary judgment is nevertheless proper" when the factors are "considered as a whole" to establish an individual as an independent contractor).

### a.   The Control Factor Favors an Independent Contractor Designation

"[W]here an employer is more concerned with the quality of the result rather than the manner in which the work is done, that is evidence of an independent-contractor relationship." *See Hennighan v. Insphere Ins. Sols., Inc.*, 38 F. Supp. 3d 1083, 1098 (N.D. Cal. 2014), *aff'd*, 650 F. App'x 500 (9th Cir.

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

2016) (citing *Missions Ins. Co. v. Workers' Comp. Appeals Bd.*, 123 Cal.App.3d 211, 224 (Ct. App. 1981). Conversely, an employer-employee relationship exists when the employer has the right to direct both *how* the work is done *and* its result. *Id.* "But this rule requires that the right to exercise complete or authoritative control, rather than mere suggestion as to detail, must be shown." *Id.* Here, Defendants controlled only the results of Plaintiff's services as a professional actress, not the manner or means of her performance.

1) <u>Plaintiff Was Not Subject to "At-Will" Discharge.</u>

Plaintiff's Agreements allowed termination only "for Cause." UF 59. The right to terminate at-will without cause constitutes "[s]trong evidence in support of an employment relationship." *Tieberg v. Unemployment Ins. App. Bd.*, 2 Cal.3d 943, 949 (1970). Under the Agreements, "Cause" included Plaintiff's "*uncured* material breach" and "unreasonable unavailability." (JAF 67–68). The opportunity to cure contradicts at-will termination and is strong evidence of an independent contractor relationship. *See Ayala* v. *Antelope Valley Newspapers, Inc.*, 59 Cal.4th 522, 531 (2014) (the "strongest evidence of the right to control" is the hirer's ability to discharge without cause, as termination power is a means of control). Here, Plaintiff was free to make her own creative choices without fear of reprisal. VXN's termination of Plaintiff was due to repeated failures to meet specific contractual commitments, not an attempt to control her performance. The Termination Notice referenced a "material breach" arising from *two* last-minute cancellations, which caused VXN significant losses due to unrecoverable production costs. (JAF 69). VXN's willingness to reschedule in the first instance shows Plaintiff's discretion over availability and participation, supporting an independent contractor designation. *See Urena v. Earthgrains Dist.*, 2017 WL

30

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

4786108 * 5-6 (S.D. Cal. 2017) (contractual "right to cure" "is consistent with an independent contractor relationship").

### 2) Plaintiff Controlled Her Own Work Schedule

Plaintiff had full control over whether and when to perform for VXN. VXN scheduled work dates through Plaintiff's agents, and if her agent indicated she was unavailable, VXN had no ability to command her appearance. (JAF 50-52). *See Lawson v. Grubhub, Inc.*, 302 F.Supp.3d 1071, 1084 (N.D. Cal. 2018) (delivery driver deemed independent contractor partly due to "complete control of his work schedule"); *State Comp. Ins. Fund v. Brown*, 32 Cal.App.4th 188, 202 (truck drivers held as independent contractors where they were "entirely free to accept or reject an assignment without reprisal."). The Agreements did not mandate a minimum number of scenes, allowing Plaintiff to accept as many or few as she chose. (JAF 53). *See Desimone v. Allstate Ins. Co.*, 2000 WL 1811385, at *13 (N.D. Cal. 2000) (insurance agents considered independent contractors where they "exercise[d] discretion as to which promotions to participate in or whether to participate at all.").

### 3) Defendant's Control Was Results-Oriented

The control factor must be evaluated considering the nature of the work and the relationship between the parties. *See*, *Poland v. United States Att'y Gen.*, 2012 WL 13001837, at *11 (C.D. Cal. 2012) ("[A]ny control exercised" must be "considered in light of the work performed and the industry at issue.") (quoting *Alberty–Velez v. Corporacion de Puerto Rico Para La Difusion Publica*, 361 F.3d 1, 9 (1st Cir. 2004). Film production, as "one of the most collaborative types of [creative] works," involves contributions from various parties: directors, costumers, and, of course, actors. *See* F. Jay Dougherty, *Not A Spike Lee Joint? Issues in the Authorship of Motion Pictures Under U.S. Copyright Law*, 49

31

UCLA L. REV. 225, 228 (2001); *cf. Garcia v. Google, Inc*., 786 F.3d 733, 742 (9th Cir. 2015) (discussing creative contributions of casts). Though creative collaborations entail some degree of oversight, Plaintiff retained control over her performances. (JAF 54–66). VXN only maintained its "right to control the results" of her performances, not "the means by work is accomplished." *See Ortolivo v. Precision Dynamics Int'l, LLC,* 2023 WL 7440249, at *5 (N.D. Cal. Nov. 9, 2023) (quoting *Bowerman*, 60 F.4th 459). Under California law, "the right to control results" encompasses "the right to inspect, the right to make suggestions or recommendations as to details of the work, [and] the right to prescribe alterations or deviations," none of which "chang[e] the relationship from that of owner and independent contractor." *Ortolivo*, 2023 WL 7440249 at *5 (citations omitted); *see Mission Ins. Co*., 123 Cal.App.3d 211, 221–22 (security technician was not an employee merely because company "prescribed performance standards").

Plaintiff's hyperbole that Defendants controlled "every aspect" of her body and performance [**Dkt. 53**, at ¶5] is refuted by evidence. Her Agreements are "silent on how [she] is to perform [her] role." *Cf. Ortolivo*, 2023 WL 7440249 at *5. Plaintiff's performances were her creative domain–outside of typical collaboration with directors and crew, VXN did not train or provide documents instructing her performance. If unsatisfied with her performance, VXN could not compel Plaintiff to return to work, and never attempted to do so. (JAF 65–66).

Moreover, appearance requirements in the Agreements merely reflect Defendants' control over the final product, *i.e.*, *Plaintiff's recorded on-screen appearance*. Requirements to "maintain [her] physical appearance" and comply with "reasonable personal grooming requests" are quality control measures to ensure films meet VXN's standards. (JAF 48-49). As VXN's Casting Director

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

32

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

testified, "all the things tend to revolve around the appearance of your principal actress." *Id*. Outside of the film industry, strict appearance standards may indicate control beyond that necessary to achieve results. For example, a dress code for delivery drivers bears no logical relation to the "timely and professional delivery of packages" and thus may indicate employment. *See, e.g., Alexander v. FedEx Ground Package System, Inc*., 765 F.3d 981, 990 (9th Cir. 2014); *Ruiz v. Affinity Logistics Corp*., 654 F.3d 1093, 1101 (9th Cir. 2014) (finding requisite control where the company managed "every exquisite detail" of the drivers' appearance, down to the "color of their socks and the style of their hair"). Here, however, appearance requirements logically relate to the end-product of Plaintiff's services. Films involve substantial investment and planning, and producers rely on continuity of an actor's appearance to fulfill their creative vision. Interpreting continuity of appearance as excessive control would, in the context of film production, "result in all actors being classified as employees, regardless of other aspects of the relationship." *Alberty–Velez*, 361 F.3d 1, at 9.

### 4) Exclusivity Does Not Convert Plaintiff into an Employee.

Plaintiff was free "to provide similar services [to other businesses] and maintain a clientele" of her own during the term of the Agreements. *Cf*. Cal. Lab. Code § 2776(a)(7). The 2021 Agreement explicitly stated that Plaintiff's services were non-exclusive. (JAF 39, 83). While VXN retained a first-right-of-refusal for Plaintiff's first anal scene, this did not restrict her from performing similar services elsewhere. *Id*. The 2020 Agreement limited Plaintiff's services to VXN exclusively, but only as to VXN's *direct* competitors. *Id*. This restriction did not prevent Plaintiff from working for non-competing entities or pursuing her own business activities.  Plaintiff was, in fact, able to–and did–perform similar

33

services on other platforms, including Kenzieland.com, during the 2020

Agreement term. (JAF 81). *See Desimone*, 2000 WL 1811385, at *14–15

(insurance agents deemed independent contractors despite being "captive agents"

barred from working for competitors without approval, as they could "engage in

any other non-competing business… subject to certain restrictions"); *Mission Ins.*

*Co.*, 123 Cal.App.3d at 224 (restriction on performing services for other

companies deemed "of little significance" as plaintiff "was not prohibited from

engaging in any other kind of business or commercial activity").

### b.    Plaintiff Was Engaged in a Distinct Occupation and Business

A worker's engagement in a distinct occupation or business supports

independent contractor status. *Hennighan,* 38 F. Supp. 3d at 1102. Defendants

need only "present evidence that [Plaintiff] established a business independent of

her relationship with [Defendants]." *Sportsman v. A Place for Rover, Inc*., 537 F.

Supp. 3d 1081, 1099 (N.D. Cal. 2021).

Before and during her work with Defendants, Plaintiff independently

operated a successful adult entertainment business centered on recorded erotic

performances, the same services she provided to VXN. She claimed to have

earned up to $50,000 per month through these ventures prior to working with

VXN. (JAF 70). Additionally, Plaintiff's website, "Kenzieland," sold access to

adult films that she both produced and starred in, often alongside established

actors. (JAF 71). As executive producer, Plaintiff hired and coordinated actors,

production, and post-production. (JAF 75). While under contract with VXN, she

released at least 23 titles on Kenzieland, actively marketing her brand through her

website and social media, entirely independent of VXN. (JAF 81–82).

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

Plaintiff did not just perform on other platforms, *cf. Lawson v. Grubhub, Inc.*, 665 F.Supp.3d 1108, 1116 (N.D. Cal. 2023), she offered her services to various producers. In 2021, she appeared in at least 14 films for other studios, while in 2022, she starred in 5 VXN films and at least 68 films for other studios. Although she did not use traditional advertisements, she promoted her services through agents, publications, and social media before, during, and "after the parties' relationship ended." *See Ortolivo*, 2023 WL 7440249 at *7 UF 64.

Moreover, Plaintiff's business was competitive with Defendants', as her website featured titles with established talent–a hallmark of her independent, competitive business. *See Haitayan v. 7-Eleven, Inc,* 2021 WL 4078727, at *14–15 (C.D. Cal. Sept. 8, 2021), *aff'd sub nom.*, 2022 WL 17547805 (9th Cir. Dec. 9, 2022) (holding that Plaintiffs were independent contractors as a matter of law where "[s]ome Plaintiffs own or owned competitive businesses", and "held themselves out as business owners").

### c.    Plaintiff Was Engaged in a Skilled Profession

"[C]ourts should apply the [*Borello*] test with an eye towards the purposes those statutes were meant to serve, and the type of person they were meant to protect", i.e. "unskilled, lower-wage employees–and the corresponding ability of employers to dictate the terms and conditions of the work." *Cotter*, 60 F. Supp. 3d at 1074–75. "Where no special skill is required of a worker, that fact supports a conclusion that the worker is an employee instead of an independent contractor." *Harris v. Vector Mktng. Corp.*, 656 F.Supp.2d 1128, 1139 (N.D. Cal. 2009).

Conversely, Plaintiff, represented by talent agents, negotiated and re-negotiated her Agreements. (JAF 40). As a "decorated and well-known adult film actress," Plaintiff appeared in over 50 films and television shows, while earning hundreds of thousands of dollars per year. (JAF 27). *See Alberty-Velez,* 361 F.3d

35

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

1, at 7 ("[A] television actress is a skilled position requiring talent and training not available on-the-job."); *cf. Antelope Valley Press v. Poizner*, 162 Cal.App.4th 839, 855 (Cal. Ct. App. 2008) ("Delivering papers requires no particular skill.").

### d.    Plaintiff Was Paid on a Per-Scene Basis

Payment by the hour indicates an employment relationship, while payment by the job supports an independent contractor relationship. *Hennighan*, 38 F.Supp.3d at 1104. Here, VXN paid Plaintiff a contractually negotiated rate per scene, regardless of the time required for filming. (JAF 42). *See Alberty-Velez,* 361 F.3d. 1 at 8 (television actress "received a lump sum fee for each episode. Her compensation was based on completing the filming, not the time consumed."); *cf. Estrada v. FedEx Ground Package Sys., Inc*, 154 Cal.App.4th 1, 12 (Ct. App. 2007) (finding that drivers paid a weekly rate, rather than by the job weighed in favor of employee status). Since the Agreements did not specify a minimum number of scenes, Plaintiff could accept as many or as few scenes as she wished. (JAF 53). *See Borello*, 48 Cal.3d 341, at 355 (citing an "alleged employee's opportunity for profit or loss" as a secondary factor).

### e.    The Instrumentalities and Tools Factor is Neutral

Courts must assess which tools are essential Plaintiff's specific duties, rather than all equipment needed for a collaborative project. *See*, e.g., *Alberty-Velez*, 361 F.3d 1, at 8 ("Others provided equipment for filming and producing the show, but these were not the primary tools that Alberty used to perform her particular function. If we accepted this argument, independent contractors could never work on collaborative projects because other individuals often provide the equipment required for different aspects of the collaboration."). For Plaintiff's acting services, the relevant "tools" for a control analysis are those used to produce her on-camera appearance, such as wardrobe, makeup, and intimacy aids.

36

JOINT BRIEF REGARDING DEFENDANTS' MSJ

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

Yet, VXN's ownership and provision of tools holds little significance, as Plaintiff maintained substantial control to select co-actors, her director, and collaborating on the film's concept. (JAF 54–64). Thus, the provision of wardrobe, makeup, and intimacy aids was a results-oriented collaboration to fulfill VXN and Plaintiff's shared vision. Even if the inquiry were narrowed to control via tool provision, Plaintiff retained and exercised the right to approve VXN-provided wardrobe, intimacy aids, and makeup. Finally, the relatively minor value of these tools does not indicate control. *See Tieberg*, 2 Cal.3d 943, 953–54 ("[T]he factor of ownership of tools is of little importance where the service to be performed is an intellectual endeavor.").

### f.    The Part-of-Regular-Business Factor is Neutral

While Plaintiff's services are integral to VXN's business, the significance of this factor is reduced when the work performed is a professional service. *See Borello*, 48 Cal.3d 341, 408–09 ("The modern tendency is to find employment when the work being done is an integral part of the regular business of the employer, and when the worker, relative to the employer, does not furnish an independent business or professional service.") (internal citations omitted). Here, Plaintiff provided a professional service to Defendants. Unlike the farmworkers in *Borello*, Plaintiff was not reliant on Defendants "for [her] subsistence and livelihood." *Id.* at 358. Plaintiff marketed her services through professional representatives and operated her own businesses. Thus, in the context of the entire relationship, this factor has limited relevance the degree of control exercised by Defendants. *See Borello*, 48 Cal.3d at 353 (holding that the independent contractor test must be applied with consideration of "the remedial purpose of the statute, the class of persons intended to be protected, and the relative bargaining positions of the parties").

### g. Both Plaintiff and VXN Understood and Relied on the Independent Contractor Relationship

Although the parties' label is not dispositive, an agreement "expressly stating that the relationship created is that of independent contractor should not be lightly disregarded when both parties have performed under the contract and relied on its provisions." *Missions Ins. Co.*, 123 Cal.App.3d at 226. Here, the Agreements negotiated by Plaintiff's agents explicitly state that Plaintiff and VXN were entering into an independent contractor relationship. (JAF 41).

Plaintiff's tax filings indicate that her agents negotiated for her services to be provided as an independent contractor in part because she sought the tax benefits of operating as a business. (JAF 85). *See Beaumont–Jacques v. Farmers Group, Inc.*, 217 Cal.App.4th 1138, 1145 (2013) (summary judgment granted where plaintiff identified as self-employed in tax returns and deducted business expenses); *Missions Ins. Co.*, 123 Cal.App.3d 211, 224 (finding plaintiff, who identified as self-employed on tax returns, an independent contractor as a matter of law); *see also Bowerman v. Field Asset Servs., Inc.*, 2013 WL 6057043, at *2–3 (N.D. Cal. 2013) (self-employment taxes and Schedule Cs relevant to "misclassification issues"); *Desimone*, 2000 WL 1811385, at *16 (filing taxes as an independent contractor supports independent contractor classification).

In her 2020, 2021, and 2022 tax filings, Plaintiff identified as self-employed and filed a Schedule C (Form 1040 – Profit or Loss from Business) as a sole proprietor, *but did not declare any W-2 employee income from any adult film studios.* (JAF 87–89). All payments received, either personally or through an LLC, were treated uniformly for tax purposes, with all business expenses, whether as a sole proprietor or through an LLC, presented on a single return. (JAF 93). Each Schedule C reported six-figure gross income and business

38

JOINT BRIEF REGARDING DEFENDANTS' MSJ

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

deductions, including thousands in business rent, "props and wardrobe," "appearance", and supplies. (JAF 90–92). *See Haitayan*, 2021 WL 4078727 at *14 ("A plaintiff who exercises discretion by 'deducting . . . costs as a business expense in her personal tax returns, and, identifying herself as self-employed in those returns,' is more likely to be an independent contractor.") (quoting *Beaumont–Jacques v. Farmers Group, Inc.*, 217 Cal.App.4th 1138, 1145 (June 12, 2013). The Court should not permit Plaintiff to have it both ways—claiming the tax advantages of an independent contractor while asserting employee status to maintain a lawsuit. *See Pukowsky v. Caruso*, 312 N.J. Super. 171, 183–84 (App. Div. 1998) ("When it suited her advantage for tax purposes, plaintiff claimed to be an independent contractor, yet she claimed to be an "employee" when it was to her advantage to maintain a lawsuit. Judicial estoppel may not be applicable to bar her complaint, but our courts have looked askance at such dichotomy.").

### 2. Plaintiff's Response

#### i. ABC Test Governs Plaintiff's Claims

The ABC test applies to Labor Code claims which are either rooted in one or more wage orders, or predicated on conduct alleged to have violated a wage order. See *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903 (2018); *Gonzales v. San Gabriel Transit, Inc*., 40 Cal. App. 5th 1131, 1157 (2019); affirmed in *Hill v. Walmart Inc*., 32 F.4th 811 (9th Cir. 2022).

Further, Defendants misstate California case law and the DLSE's intentions by claiming Plaintiff's Labor Code claims should be examined separately from those of wage orders. Wage and hour claims answer to "two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code enacted by the legislature and the wage orders issued by the IWC."… "To the extent a wage order and a statute overlap, we will seek to harmonize

them..." *Brinker Rest. Corp. v. Superior Court of San Diego Cnty.*, 53 Cal.4th 1004, 1027 (Cal. 2012).

Waiting time penalties under Labor Code 201, 202 and 203 rely upon the issue of unpaid wages that remain outstanding at the end of the employment period; the underlying unpaid wages arise from wage order violations of meal and rest periods, and failure to properly pay overtime hours, all of which are clearly delineated in all wage orders. The DLSE supported this in a persuasive letter, stating "where section 203 serves to enforce the underlying minimum wage and overtime obligations of the wage orders, application of the ABC test to these claims would be appropriate. (See, *Martinez*, supra, 49 Cal.4th at pp. 57, 64.)" The court in *Gonzalez* dealt with this very same issue and held that "failing to supply accurate wage statements and records of hours worked in violation of section 226 is encompassed by Wage Order No. 9(7), and failure to reimburse expenses and improper deductions in violation of section 2802 is encompassed by Wage Order No. 9(8) and (9)," terms within Wage Order 9 that are present within every single California Wage Order. *Gonzales v. San Gabriel Transit, Inc*., 40 Cal. App. 5th 1131, 1157 (2019). Therefore, the ABC test is necessary here.

### ii. <u>Under ABC Test, Plaintiff is an Employee</u>

Under the ABC Test, a worker is **<u>presumptively</u>** an employee, unless the hiring entity satisfies **<u>all</u>** three of the following conditions:

"(1) The worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; (2) The worker performs work that is outside the usual course of the hiring entity's business; and (3) the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed." <u>Cal. Lab. Code</u> § 2775

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

40

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

a.   **Plaintiff was not free from control or direction in contract or in fact**

    1)   <u>Defendants controlled and directed the manner in which Plaintiff would perform her work.</u>

Defendants must establish that Plaintiff was free from Defendants control and direction in connection of the work, both under contract and in fact. (*Dynamex*, 4 Cal.5th at 958.) Defendants decided every aspect of Plaintiff's means of completing her work. This includes but is not limited to particular sexual positions, the locations, the props, the tone and setting, and even if sexual aids are to be used. (**UF Nos. 17, 125, 127, and 138.**) Furthermore, Plaintiff was not free to choose *when* these shoots would take place. (**UF Nos. 125, 126 127, 127**)**.** The Agreements further state that Plaintiff's failure to comport to Defendants' **<u>subjective</u>** artistic vision, failure to follow any framework, violation of Defendants' rules, **<u>failure to follow Defendants' directions</u>**, and unreasonable unavailability are all grounds for termination. (**UF Nos. 137 and 155.**) Defendants could call Plaintiff back to film trailers and reshoot scenes after the Parties' contractual relationship ended should Defendants deem fit. (**UF No. 106.**) Plaintiff could even be terminated for not following Defendants' code of ethics throughout the time period covered by the Agreements. (**UF No. 115**)

Defendants retained so much control over Plaintiff, that Plaintiff could not decide her own hairstyle, could not receive tattoos or body piercings, and could not change her *body measurements* without Defendants' express written permission. The Agreements provide that Plaintiff cannot change her fitness level, thus even controlling her workout regime. Plaintiff works in a visual medium. Regardless of whether or not porn is an artistic medium, the primary appeal and purpose of the adult entertainment industry is to create a visually alluring product. As an adult entertainer, Plaintiff's appearance is the "means" in which she is to create this visually alluring product. Stripping Plaintiff of her ability to decide how she looks

41

essentially deprives her of her ability to decide and control how this alluring product is created. Thus, Defendants controlling how Plaintiff is supposed to look, even if just in scenes, is Defendants controlling and directing how Plaintiff completes her job duties. Plaintiff could not even control her approved alias or likeness, as these rights were signed away to Defendants. (**UF. Nos 118, 119, 120, 122, 123, 124.**)

Additionally, the Agreements required that Plaintiff work more than just on a "scene by scene" basis. The Agreements explicitly state that Plaintiff is hired for acting and modeling services, however there is another provision that requires Plaintiff to always promote Defendants' brands and affiliate brands on her social media account. (**UF Nos. 108 and 111.**) The Agreements further state that Plaintiff cannot post, tag, or comment on any photographs of anyone under 18-years old regardless of state of dress or context of photographs. (**UF Nos. 109 and 110.**) Thus, Plaintiff was required to work throughout the course of the length of the Agreements and Defendants controlled the means of which Plaintiff used her social media accounts.

2)  <u>Defendants controlled and directed in fact the manner Plaintiff completed her work.</u>

Defendants also exercised control and direction over where, when, and how Plaintiff was to complete her work in practice. For example, in the photoshoot in Joshua Tree, Defendants chose the location with no input from Plaintiff. Plaintiff testified "I hate the desert, I would never go there." (**UF No. 165.**) Defendant claims that there was input by Plaintiff rendering the process collaborative, but this is not correct. While there is evidence to show that Plaintiff discovered the shooting location in Joshua Tree, all efforts to secure the location, including booking the Airbnb, and getting the owner to sign production agreements, were done unilaterally by Defendants' team. Plaintiff even testifies that any input or changes

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

42

to script that she would recommend would fall completely on deaf ears. (**UF No 142.**)

Transportation of Plaintiff to work also indicates a high level of control by Defendants. For example, Defendants planned for Plaintiff to work on an international production. In doing so, Defendants controlled the means in which Plaintiff would arrive to the international destination. In an email, Defendants writes "full tests, COVID tests, need to check if they are vaccinated, have their nails done short and nude, bring second ID for signing documents, and of course coordinate the travel." The end result was a Turks and Caicos production, but the means of getting Plaintiff there, tested, into the country, on a plane, paying for the plane, all controlled by Defendant. (**UF No 166.**)

Plaintiff also had no real control over the individuals with whom she modeled or engaged in sexual action on camera. Plaintiff maintained a "no-list" through her modeling agency, as is standard in the industry to avoid working with "problematic people." (**UF No 172.**) On at least one occasion, Plaintiff arrived upon location to find that she was set to model and engage in filmed sex with a male on this "no list." Plaintiff objected, but she was "given no option to not perform with him" (**UF No 173.**) On another occasion, Plaintiff specifically asked that she did not work with a particular male adult entertainer given his reputation in the industry. This request was denied, and Plaintiff ultimately still participated in filmed sex acts with this male. Additionally, there were always directors on set that would tell Plaintiff how to act and what positions to be in. (**UF Nos. 54 and 154**).

Defendants argue that Plaintiff chose the director for one of her shoots, and that this is enough to show she was an independent contractor. Yet, the relationship between Chris Applebaum and Defendants extended past him being a director for Plaintiff's shoots. Mr. Applebaum's company, "Eats," had a partnership with Defendants. (**UF No. 199.**) Thus, Plaintiff's arguments that Defendants hired Mr.

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

Applebaum to be a director solely for Plaintiff's request is untrue and dishonest, as it served as a lucrative business opportunity for Defendants as well. (**UF No. 199**).

### b. Plaintiff performed work solely within the usual course of Defendant's business

Defendants consider themselves to be a "Global Entertainment and Lifestyle Brand." A part of this "brand" is the performance and modeling in adult materials by Plaintiff and other performers. Plaintiff's duties were just that; the performing and modeling in these adult materials and promotion of the Vixen brand. Defendants have yet to produce any evidence or arguments to show Plaintiff's work was not within the usual course of Defendants' business.

### c. Plaintiff was not engaged in an independently established trade or occupation

Agreement One includes a non-compete clause which, if breached, gives Defendants the right to terminate Plaintiff. (**UF No. 102 and 103.**) Throughout this time period, Plaintiff was forbidden from filming solo sex scenes longer than five minutes and was forbidden from filming any sex scenes with other individuals. Plaintiff was also forbidden from working with specific "cam" companies, such as Camsoda. (**UF No. 102.**) Plaintiff abided by the terms of this provision and there is no evidence that Plaintiff produced any materials with another company or independently throughout the terms of Agreement One. Additionally, Plaintiff released no "anal" scenes, per the express terms of Agreement Two, throughout the time Agreement Two was effective. Plaintiff *would* post photos of her in the clothing of Defendants' brands to promote those brands, but this was in accordance with the Agreements. Given Plaintiff did not breach this exclusivity clauses throughout the course the Agreements, Plaintiff was not engaged in an independently established trade or occupation throughout the course of her time with Defendants.

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

   iii.  *Even under the Borello Test, Plaintiff Would Be Considered an Employee*

  *Borello's* primary consideration is (1) the degree of control the hiring entity has over the "manner and means" by which the work is performed. *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989). However, it is a multifactor test with other factors, including (2) the employer's right to discharge the workers; (3) whether the workers are engaged in a distinct occupation or business; (4) the nature of the work performed; (5) the skill required in the particular occupation; (6) whether the employer supplies the instrumentalities, tools, and the place of work; (7) the length of time for which the services will be performed; (8) the method of payment; (9) whether the work is part of the regular business of the employer; and (10) whether the parties believed they were creating an employer-employee relationship. *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 351 (1989). However, Defendants' reliance on *Borello* is misplaced as all issues here, including whether or not employees were misclassified, falls under Wage Orders and thus the ABC Test should govern. See Generally *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903 (2018). Any arguments and case law that states otherwise either predate or ignore the Supreme Court of California in *Dynamex* and the California Legislator. Regardless, even under *Borello,* Plaintiff was misclassified.

   **a. Manner & Means Control Favors Employee Designation**

  The primary consideration of *Borello*, degree of control, strongly favors employer-employee relationship. Defendants controlled every aspect of Plaintiff's work, and the control even extends *beyond* the scope of work agreed upon by the parties. "Control over *how a result is achieved* lies at the heart of the common law test for employment." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522,

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

528 (Cal. 2014). "'[T]he fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control over it.' *Id* at 531. Furthermore, "**what matters under the common law is not how much control a hirer exercises, but how much control the hirer retains the right to exercise**." *Id* at 533.

Defendants argue that Plaintiff was an actor. There is no doubt that at least some part of Plaintiff's work required her to act to a certain extent. California courts have held that actors and other performers should be considered employees because of the level of control an employer needs to have over the workers to have a working production. *See Tieberg v. Unemployment Ins. Appeals Bd.*, 2 Cal. 3d 943, 88 Cal. Rptr. 175 (1970) (finding actors should have been considered employees, not independent contractors because of the level of control Defendants had over actors and the production); see also *Schaller v. Indus. Acci. Com.*, 11 Cal. 2d 46 (1938) (finding performers should be considered employees because of the level of control the employer had over the performances); see also *Durae v. Indus. Acci. Com.*, 206 Cal. App. 2d 691 (1962) (finding that stunt men should be considered employees and not independent contractors.)

    1)  <u>Defendants retained control over Plaintiff's appearance</u>

In line with *Tieberg, Schaller,* and *Durae,* Defendants both retained their right to exercise to control Plaintiff's work, and life beyond work, and actually exercised this power. First, Defendants controlled Plaintiff's appearance. Plaintiff could not change her hair, nails, piercings, tattoos, or body measurements without the express written permission of Defendants. The Agreements state that if Plaintiff changed her physical appearance in any way without the express written permission of Defendants, then Defendants retain the right to terminate her and her employment. (**UF No. 104 and 105).** Plaintiff ultimately performed in a visual

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

medium. To some, her work is intended to spark the arousal from the viewers, to Defendants, her work is intended to convey "art" through recorded sexual acts. In either case, Plaintiff's appearance is the key "means" in the execution of her job duties. The main purpose of the photos and videos shot by Defendants is too illicit some sort of visual response. Thus, controlling the Plaintiff's appearance controls the means to achieving these goals.

2)  Defendants could terminate Plaintiff for not following their directions

The Agreements both further state that if Plaintiff does not comport with Defendants "**subjective**" artistic vision then she would be terminated. (**UF Nos. 137 and 155.**) The same is true if she failed to follow Defendants' "frameworks." (**UF Nos. 137 and 155.**) The Agreements even state that if Plaintiff does not follow Defendants' directions, she could be terminated. (**UF Nos. 137 and 155.**)

3)  Defendants retained control over how Plaintiff could use her social media

The Agreements state that even when she is not actively performing for Defendants, that Plaintiff would be required to promote Defendants' brand on her social media. The Agreements also control what Plaintiff can do on social media, limiting her interactions with individuals under the age of 18. (**UF Nos. 109 and 110**) Plaintiff could also be terminated if she did not follow Defendants' code of ethics at all times during the period prescribed in the Agreements. (**UF No. 115**) Plaintiff could not post on social media the way she desired, she could not change her hair style, she could not gain weight, nor she could not get tattoos or piercings.

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

4)  <u>Defendants exercised control over the manner</u>
<u>and means in which Plaintiff would complete her</u>
<u>job duties</u>

Even given the high level of control retained by Defendants, Defendants actually exercised even more control over Plaintiff. There were occasions Plaintiff would have to work with talent she did not want to work with, there would always be a director on set controlling the position and acts Plaintiff would need to perform, they would control where the scenes would be shot, and they would control when the scenes would be shot. (**UF Nos. 17, 101, 125, 127, 135, 169, 174, and 175.**)

Defendants attempt to mislead this court using two cases, claiming exclusivity clauses do not show that Plaintiff is an employee rather than an independent contractor. The first case Defendants rely on is *Desimone v. Allstate Ins. Co.,* 2000 U.S. Dist. LEXIS 18097 (N.D. Cal. Nov. 7, 2000). The court in *Desimone* first states that "[t]he fact that Plaintiffs are paid solely on commission and incur their own expenses in running their agencies without any reimbursement from Defendant weighs in favor of independent contractor status under one of the enumerated *Borello* factors." *Desimone v. Allstate Ins. Co.,* 2000 U.S. Dist. LEXIS 18097 (N.D. Cal. Nov. 7, 2000) at 40-41. Yet, Plaintiff *was* reimbursed for work related costs. **(UF 139).** The court further found that the individuals in *Desimone* could even run non-competing businesses outside of the contracting parties' office. *Desimone v. Allstate Ins. Co.,* 2000 U.S. Dist. LEXIS 18097 (N.D. Cal. Nov. 7, 2000) at 42. The court held that "Plaintiffs may employ others to accomplish their duties as sales agents while engaging in other non-competing business, without Defendant's approval." *Ibid.* This was *not* an option for Plaintiff. Plaintiff could not hire someone else to complete her work for Defendants while using Defendants equipment and rented locations to conduct other business.

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

Similarly in *Mission Ins. Co.,* Defendants selectively choose which language to include in its citations to this court. The full excerpt of the quote Defendants selectively cite is as follows:

> "[W]e see little significance in the fact that the applicant was not to perform services for other burglar alarm companies. Far more significant is the fact that the applicant was not prohibited from engaging in any other kind of business or commercial activity; **his personal services were not required and he could have the services performed by persons selected, employed, trained and supervised by him if he chose to do so**." *Mission Ins. Co. v. Workers' Comp. Appeals Bd.*, 123 Cal. App. 3d 211, 224 (1981).

In other words, similar to *Desimone,* the court in *Mission Ins. Co.* did not simply state that exclusivity clauses are irrelevant in determining whether there is an employment relationship between parties, but rather the analysis is more nuanced. Courts look to see if the individual could have hired another person to perform the work in their stead, which is the reason as to why the individuals in those cases were independent contractors and not employees. Here, Plaintiff could not hire others to complete her work for her.

It should also be noted that both *Mission Ins. Co.* and *Desimone* are cases dealing with the insurance industry; an industry that is fundamentally different than the adult entertainment industry. The general principles of what makes an individual an employee is fundamentally different in these cases than cases like *Tieberg, Schaller,* and *Durae,* which held that actors, stunt doubles, and performers (jobs more similar to what Plaintiff's work) are in fact employees.

### b. Defendants Could Terminate Plaintiff For Nearly Any Reason

The Agreements contain a clause stating that Defendants could only terminate Plaintiff with Cause. Yet, when reading the definition for "Cause," it becomes apparent that Defendants could terminate Plaintiff whenever they wished. Defendants could terminate plaintiff because of Plaintiff's (1) material, uncured breach of this Agreement; (2) inability to meet Producer's subjective artistic

expectations; (3) failure to follow any framework; (4) violation of Producer's rules; (5) violation of any applicable laws, rules, or regulations; or (6) failure to follow Producer's directions; (7) unreasonable unavailability; (8) or as otherwise set forth throughout this Agreement." (**UF No. 137 and 155**). These are all extremely broad array of "causes" for termination, yet one provision is by far the worst. The second provision that states Plaintiff could be terminated if she did not meet Defendants' "**subjective** artistic expectations" serves as a catch all that would allow Defendants to terminate Plaintiff, without cause, for any reason. At its heart, "cause" has to be regulated by good faith on the part of the party excising power. *Cotran v. Rollins Hudig Hall Internat., Inc*., 17 Cal. 4th 93, 100 (1998). A subjective reason for termination automatically becomes inapposite to the idea of termination with cause, especially given the broad way it is defined here. One cannot determine if there truly is cause for termination when the terminating party can simply cite to such a broad subjective reason for termination. As such, Defendants retained a nearly endless array of reasons to terminate Plaintiff.

### c. Defendants Controlled the Instrumentalities, Tools, and Location of Work.

Defendants provided all instrumentalities, tools, and the place of work. (**UF Nos. 15, 17, 176.**) For Plaintiff to act, engage in sexual behavior, and model for Defendants, she required clothing, makeup, props, intimacy aids, set-dressing and other instrumentalities. All of these were provided by Defendants. (**UF No. 176.**) For example, in one pornographic video in which Plaintiff engaged in sex on camera, Defendants' wardrobe department provided the clothes Plaintiff wore, Defendants' art department provided the couch upon which Plaintiff performed, Defendants' general department provided sexual aids with which Plaintiff used. (**UF No. 176.**)

For the aforementioned Vixen Angel Photoshoot, instrumentalities provided by defendant included transportation, SPF, umbrellas, reflectors, angel necklace,

50

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

trash bags, and towels. **(UF No. 177)** Defendants controlled every aspect of the means to do a scene – including props like cleaning supplies for before and after photographs and videos had been produced. Finally, Defendants **always** controlled where the work was to be provided and secured these locations. Plaintiff had no say in where the shoots would take place and was even forced to go to Joshua Tree, a location that Plaintiff testified she would never willingly go to through her own volition.

### d.    The Work Performed by Plaintiff Was Normal For the Course of Business For Defendants

Plaintiff undoubtedly provided work in the usual course for Defendants. Plaintiff acted, modeled, and overall promoted the Vixen brand as Defendants wanted. Therefore, this factor also favors Plaintiff.

### e.    Plaintiff Was Not Engaged in a Distinct Occupation & Business

The "separate business" factor in the *Borello* test for determining employment status examines whether the worker is engaged in a distinct business apart from the hiring agency. There was an exclusivity clause put in place that forbade Plaintiff from modeling or acting in sexual materials for companies other than Defendants. As such, Plaintiff did not perform any such work for any entity aside from Defendants, and this factor is in Plaintiff's favor.

Defendants argue Plaintiff's situation is similar to that found in *Haitayan v. 7-Eleven, Inc,* where the court found individuals performing in a competing business are more likely to be considered independent contractors than employees. *Haitayan v. 7-Eleven, Inc.*, 2021 U.S. Dist. LEXIS 170331 (C.D. Cal. Sep. 8, 2021) at 41-42. However, in *Haitayan,* the individuals did not sign a "non-compete" agreement, while Plaintiff did. During the term of Agreement One, Plaintiff could not work with any competing companies and could not release films that compete,

otherwise Defendants could terminate the agreement. Throughout the course of Agreement Two, Plaintiff could not film any "anal" scenes with other companies at least through the course of the agreement or three months after she shot her first anal scene with Defendants. **(UF No. 200).** These non-compete clauses alone forbid Plaintiff from actively competing against Defendants. If any of the films or products Plaintiff released were "competing," then Defendants would have exercised their rights under the contract and terminated the agreement. Once again, Defendants *only* argue Plaintiff competed with Defendants now in front of the court.

### f.    Plaintiff's Length of Time Working With Defendants Was Nearly Limitless

While the Agreements do contemplate a period of time the Agreements will be in effect, a closer read of one of the provisions shows the terms of the agreement are limitless. <u>The agreement states that the relationship between the parties survives past the expiration of the contract</u>, as Defendants could call Plaintiff in to work on any of her previous works if reshoots or other modifications were necessary. Thus, there is no contemplation towards the end of the relationship between the parties.

### g.    Plaintiff Was Required to Be Paid Through a Loan Out Company

Defendants claim that Plaintiff was paid through a loan out company, and therefore this factor is in their loan out company though her own volition. Defendants *forced* Plaintiff to start a loan out company so that Defendants could pay Plaintiff through that company, rather than paying her directly. **(UF 181)**. Because it was not Plaintiff's decision to be paid through a loan out company and was required to be paid this way by Defendants, this factor is neutral.

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

# V.    CONCLUSION

## A.    Defendants' Conclusion

For the foregoing reasons, the Court should grant Summary Judgment or Summary Adjudication to Defendants on the grounds that: (1) Plaintiff is exempt as a professional actor; and (2) Plaintiff is an independent contractor.

## B.    Plaintiff's Conclusion

Defendants have failed to meet their burden of producing evidence warranting summary judgment on the issues set forth above. Indeed, several triable issue of material fact remain. Thus, this Court should deny Defendants' Motion in its entirety.

Dated:  January 10, 2025              KANE LAW FIRM

By:    /s/ Brad Kane
Brad S. Kane
Attorney for
Defendants

Dated: January 10, 2025              BIBIYAN LAW GROUP, P.C.

By:    /s/ Rafael Yedoyan
Rafael Yedoyan
Attorney for Plaintiff

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035