1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KANE LAW FIRM**
Brad S. Kane (SBN 151547)
*bkane@kanelaw.la*
1154 S. Crescent Heights. Blvd.
Los Angeles, CA 90035
Tel:  (323) 697-9840; Fax: (323) 571-3579

Trey Brown (SBN 314469)
*trey.brown@vixenmediagroup.com*
11271 Ventura Blvd. #717
Studio City, CA 91604

*Attorneys for Defendants*
VXN GROUP LLC and MIKE MILLER

**BIBIYAN LAW GROUP, P.C.**
David D. Bibiyan (SBN 287811)
*david@tomorrowlaw.com*
Sarah H. Cohen (SBN 330700)
*sarah@tomorrowlaw.com*
1460 Westwood Blvd.
Los Angeles, CA 90024
Tel: (310) 438-5555; Fax: (310) 300-1705

Attorneys for MACKENZIE ANNE THOMA, on behalf of herself
and all others similarly situated

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

MACKENZIE ANNE THOMA, a.k.a. KENZIE ANNE, an individual and on behalf of all others similarly situated,

      Plaintiff,

v.

VXN GROUP, LLC, a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 to 100, inclusive,

      Defendants.

Case No. **2:23–cv–04901 WLH (AGRx)**

**JOINT APPENDIX OF EVIDENCE REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**VOLUME IV of IV**
**Exhibits 64 – 76**
**Page 702 – 857**

**PLAINTIFF'S EVIDENCE**

[Filed concurrently with: (1) Notice of Motion and Motion for Summary Judgment; (2) Joint Brief; (3) Joint Appendix of Facts; (4) Joint Appendix of Objections; and (5) Proposed Order]

Date:      February 28, 2025
Time:      11:00 a.m.
Courtroom: 9B

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

# **TABLE OF CONTENTS**

| Exhibit | **VOLUME I of IV (Exhibits 1 – 17)** | Page |
|---|---|---|
| 1 | Declaration of Emilie Kennedy | 7 |
| 2 | United States Copyright Registration Certificates | 15 |
| 3 | Scripts from films in which Plaintiff performed | 37 |
| 4 | Screenshots from films in which Plaintiff performed | 117 |
| 5 | July 15, 2022 Production Report | 172 |
| 6 | Statements of Information for VXN Group, LLC | 175 |
| 7 | September 8, 2021 Text Message from Plaintiff re: Vixen Angel Shoot | 179 |
| 8 | Deposition Transcript Excerpts: Basia Lew | 181 |
| 9 | Legislative Intent Service, Inc.: History of The Professional Actor Exemption | 198 |
| 10 | Declaration of Basia Lew | 224 |
| 11 | Project Brief re: Plaintiff's First VXN Scene | 229 |
| 12 | Slack Messages re: Plaintiff's First VXN Scene | 232 |
| 13 | Shooting Schedule for VXN film "Kenzieland" | 281 |
| 14 | DVD Covers Featuring Stills of Plaintiff | 285 |
| 15 | Website Thumbnails Featuring Stills of Plaintiff | 290 |
| 16 | Advertising Uses of Stills Featuring Plaintiff | 307 |
| 17 | Shooting Schedule for April 22, 2022 VXN "Deeper" Film Featuring Plaintiff | 312 |
| **Exhibit** | **VOLUME II of IV (Exhibits 18 – 48)** | **Page** |
| 18 | Declaration of Belen Burditte | 318 |
| 19 | Workers Compensation Insurance Audit Records | 323 |
| 20 | Form 1099-NECs Issued by VXN to Plaintiff | 340 |
| 21 | Record of Payments from VXN to Plaintiff | 344 |

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

| 22 | Declaration of Trey Brown | 346 |
|----|---------------------------|-----|
| 23 | Performance Agreement dated November 11, 2020 | 352 |
| 24 | Addendum to Performance Agreement dated April 15, 2021 | 362 |
| 25 | April 15, 2021 Emails re: Addendum to Performance Agreement | 365 |
| 26 | Performance Agreement dated July 13, 2021 | 370 |
| 27 | Notice of Termination dated September 28, 2022 | 380 |
| 28 | Deposition Transcript Excerpts: Plaintiff | 383 |
| 29 | Deposition Transcript Excerpts: Ryan Murphy | 425 |
| 30 | Screenshot from Kenzieland.com | 455 |
| 31 | "Kenzielandbykenzie" Instagram Profile | 457 |
| 32 | Kenzieland.com Promotion Post by "Kenzielandbykenzie" | 465 |
| 33 | Kenzieland LLC Application to Register a Foreign LLC | 473 |
| 34 | Kenzieland LLC Statements of Information | 476 |
| 35 | Lola March LLC Statements of Information | 480 |
| 36 | Deposition Transcript Excerpts: Larry Lerner | 484 |
| 37 | Text Messages between Plaintiff and Michael Mosney | 489 |
| 38 | Text Messages between Mosney and Ryan Murphy re: Scheduling Plaintiff's Work Dates | 493 |
| 39 | Text Messages between Mosney and Ryan Murphy re: Seeking Approval for Co-Stars | 506 |
| 40 | December 2020 Emails from Chris Applebaum | 517 |
| 41 | Kenzieland.com Film Titles | 526 |
| 42 | List of Plaintiff's Adult Film Credits | 528 |
| 43 | Deposition Transcript Excerpts: Michael Mosney | 536 |
| 44 | Form W-9s Submitted by Plaintiff to VXN (Redacted) | 547 |
| 45 | Declaration of Larry Lerner | 551 |

2

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

| 46 | Redacted Excerpts: Plaintiff's 2020 Federal Tax Return **FILED UNDER SEAL** | 558 |
|---|---|---|
| 47 | Redacted Excerpts: Plaintiff's 2021 Federal Tax Return **FILED UNDER SEAL** | 568 |
| 48 | Redacted Excerpts: Plaintiff's 2022 Federal Tax Return **FILED UNDER SEAL** | 578 |
| **Exhibit** | **VOLUME III of IV (Exhibits 49 – 63)** **Plaintiff's Exhibits** | **Page** |
| 49 | Deposition Transcript Excerpts: Basia Lew | 589 |
| 50 | SAG-AFTRA Coverage Information | 617 |
| 51 | Declaration of Rafael Yedoyan | 620 |
| 52 | Deposition Transcript Excerpts: Mackenzie Thoma | 624 |
| 53 | Reimbursement Invoices | 643 |
| 54 | Vixen Angel Description | 644 |
| 55 | Vixen Instagram Profile | 646 |
| 56 | Vixen Threads Profile | 648 |
| 57 | Screenshots from Vixen's Website: Description | 650 |
| 58 | Screenshots from Vixen's Website: Angels | 653 |
| 59 | Screenshots from Vixen's Website: Clothing on Sale | 658 |
| 60 | Vixen Threads Profile: Shopping Screenshots | 662 |
| 61 | Emails Between VMG Regarding Travel and Coordination | 664 |
| 62 | Creative & Modeling Photographs Featuring Plaintiff | 671 |
| 63 | Invoice & Planning Documents for Vixen Angel Shoot Featuring Plaintiff | 687 |
| **Exhibit** | **VOLUME IV of IV (Exhibits 64 – 76)** **Plaintiff's Exhibits** | **Page** |
| 64 | Performance Agreement Between Plaintiff & Defendant | 702 |
| 65 | Addendum to Performance Agreement Between Plaintiff & Defendant | 712 |
| 66 | Performance Agreement Between Plaintiff & Defendant (2) | 715 |

KANE LAW FIRM
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

3

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

| 67 | Addendum to Performance Agreement Between Plaintiff & Defendant (2) | 725 |
|----|----|----|
| 68 | IWC Order Classifications | 729 |
| 69 | Prop and Set Planning by Defendant | 775 |
| 70 | Defendant's Slack Screenshot Regarding Plaintiff's Social Media | 783 |
| 71 | Email Regarding Plaintiff's Performance Agreement | 786 |
| 72 | Model Record Keeping Form | 788 |
| 73 | Model Release and Grant of Rights | 804 |
| 74 | Declaration of Mackenzie Anne Thoma | 845 |
| 75 | Documents Showing Collaberation Between Eats and Vixen | 848 |
| 76 | Excerpts from the Deposition of Michael Mosny | 853 |

Dated: January 10, 2025                    KANE LAW FIRM

                                By:   */s/ Brad Kane*
                                      Brad S. Kane
                                      Attorney for Defendants

Dated: January 10, 2025                    BIBIYAN LAW GROUP, P.C.

                                By:   */s/ Rafael Yedoyan*
                                      Rafael Yedoyan
                                      Attorney for Plaintiff

**KANE LAW FIRM**
1154 S. Crescent Heights Blvd.
Los Angeles, CA 90035

JOINT APPENDIX OF EVIDENCE RE: DEFENDANTS' MSJ

# EXHIBIT 64

# PERFORMANCE AGREEMENT

This Performance Agreement ("**Agreement**") is entered into on the 11th day of November, 2020 and is between **VXN GROUP, LLC**, a Delaware limited liability company ("**Producer**"), and **Mackenzie Thoma a/k/a Kenzie Anne**, an individual located at c/o 8730 Wilshire Blvd., Suite 350, Beverly Hills, CA 90211 ("**Performer**") (together the "**Parties**" or "**Party**").

## RECITALS

WHEREAS Producer is the creator of adult motion pictures and photographs for commercial sale through various distribution outlets and platforms;

WHEREAS Performer is a model and actor in the adult entertainment industry;

WHEREAS Producer wishes to contract with Performer for Performer's services as an actor and model on an exclusive basis in connection with the production of adult motion pictures and photographs and in exchange for the consideration outlined below;

WHEREAS Performer agrees to provide her services on a temporary exclusive basis for the duration of the Term as set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the foregoing recitals, the mutual promises and agreements herein contained, and for good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged by the Parties, each of the Parties, intending to be legally bound hereby, do promise and agree as follows, and enter into this Agreement.

1. **Engagement.** Producer hereby engages Performer to act, model and provide other services ("**Services**") to Producer for Producer's adult motion pictures and photographs ("**Scene**" or "**Scenes**") for the brands and websites Vixen.com and Blacked.com ("**Brand**" or "**Brands**").

2. **Compensation**. Producer will pay Performer $10,000.00 for Performer's first girl/girl Scene with Producer, which will include a three-way girl/girl/girl Scene to be shot in December 2020. Producer then has the option and right of first refusal, but not the obligation, during the Term, to pay Performer $15,000.00 for Performer's first boy/girl Scene with Producer. Additionally, for any subsequent girl/girl Scenes, to be mutually agreed upon by Producer and Performer, Producer will pay Performer $3,000 per Scene. For any subsequent boy/girl Scenes, to be mutually agreed upon by Producer and Performer, Producer will pay Performer $5,000 per Scene.

Performer waives the right to receive any other consideration for the Services performed under this Agreement, including royalties, residuals, or commissions. Performer acknowledges that no further sums are payable by Producer by reason of exploitation of the content or the results and proceeds of Performer's services under this agreement.

3. **Nature of Services**. As part of the Services, Performer will appear nude and semi-nude in connection with the creation of motion pictures and photographic content by Producer. Performer will perform multiple, explicit sexual acts, as set forth above in paragraphs 1 and 2. These sexual acts may include the

**EXHIBIT**

5

1

use of sexual aids. Performer knowingly and willingly consents to rendering these services and understands the nature of the services this agreement requires her to perform.  Performer and Producer will mutually agree on directors and other talent that will appear or perform in Performer's Scenes.

4. **Hours and Obligations for Services**. Performer will provide the services on an as-needed basis, including nights, weekends, and holidays. Performer understands and agrees that the filming session during the Term of this agreement may take up to ten hours.

5. **Ownership; Copyright; Publicity**. Performer hereby grants Producer the worldwide, irrevocable, perpetual, right to photograph and re-photograph Performer (still and moving) and to record and re-record, double, and dub Performer's voice and performances, by any present or future methods or means, and to use and to license the use of Performer's approved name (including all stage names and aliases), approved biography, resume, signature, caricature, voice, and likeness (collectively, the "***name and likeness***") for and in connection with the creation of or the exploitation of the content created hereunder, including the promotion and advertising of the content in any media, throughout the universe, and in perpetuity. Producer will own the results and proceeds of Performer's Services under this agreement, including the copyrights of it. As the owner, Producer will have the worldwide, irrevocable, perpetual, exclusive right to use, license, and exploit the results and proceeds of Performer's Services—including all derivative works—in any manner, for any purpose, including the right to edit, televise, broadcast, record, publish, copy, print, sell, or distribute the content in any manner and in any medium, format, form, or forum, whether now known or later devised, without any further compensation than as specified in section 2. Performer acknowledges that the works created from the Services performed by Performer in performing this agreement constitute "works made for hire" under the United States Copyright Act of 1976 and, at all stages of development, the works will be and remain the sole and exclusive property of Producer. At Producer's sole discretion, Producer may make any changes in, deletions from, or additions to the works. If for any reason the results and proceeds of Performer's services under this agreement are determined not to be a work made for hire, Performer hereby irrevocably transfers and assigns to Producer all right, title, and interest in the work, including all copyrights, as well as all renewals and extensions to that work. Performer acknowledges Producer's sole ownership of all stage names, aliases, pseudonyms, characters, ideas, or other matters or materials that may be created during the term of this agreement. Performer will sign all documents that Producer may reasonably require to record and perfect its ownership rights. Performer will retain all rights in the stage name "Kenzie Anne" however during and after the term of this Agreement, Producer and Producer's assigns and licensees may use Performer's name and likeness. Performer hereby expressly waives and relinquishes to Producer any moral rights or "droit morale" in and to any content produced from the Services Performer provided under this agreement, including all of Performer's performances. Performer further hereby waivers and relinquishes to Producer all right of publicity claims, invasion of privacy claims, defamation claims, sexual harassment claims, injuries (both physical and emotional), negligence, Intellectual Property, and any liability for and by virtue of blurring, distortion, alteration, and optical illusion.  "***Intellectual Property***" means all rights, title, interest, and benefit of a party to this Agreement in intellectual property of every nature, whether registered or unregistered. Intellectual property includes trademarks, copyrights, patents, trade secrets, publicity rights, moral rights, rights against unfair competition, and any other rights commonly considered intellectual property.

6. **Credit**. Producer does not have an obligation to give Performer credit in advertising or publicity, but

2

shall afford Performer customary performer credit in all content created under this Agreement.

### 7. **Exclusivity and Appearance**

7.1 ***Exclusivity of Services***. During the Term of this Agreement, Performer will not film with any third party producer or production company that competes directly with Producer; provided that nothing herein shall restrict Performer from (i) creating (alone or with others) and exploiting photos and short-form content for Performer's social media channels, (ii) doing 'live' webcam channel shows (with the exclusion of CamSoda) and live OnlyFans shows , or (iii) doing photoshoots and media appearances with any other individual or entity. Performer understands that a breach of this provision will entitle Producer to terminate this Agreement for Cause and seek any related damages if the parties cannot resolve the breach by agreement within 48 hours of the breach.

7.2 ***Appearance***. Performer understands that Producer is entering into this Agreement with Performer based on Performer's current physical appearance, including the current measurements of Performer's body, level of physical fitness, hairstyle, and overall appearance of Performer's body. During the term of this Agreement, Performer will maintain Performer's physical appearance, and Performer will submit to the reasonable personal grooming requests of Producer, as such may be considered a norm in the adult entertainment industry. Performer acknowledges that if Performer should change her physical appearance during the term of this Agreement (including adding or subtracting tattoos or piercings) without first obtaining written permission by Producer, Producer may terminate this Agreement for Cause if the Parties cannot resolve the breach by agreement within 48 hours of the breach.

### 8. **Additional Services after Expiration of Agreement**. Performer will provide additional Services after expiration of this Agreement at Producer's reasonable request if Producer requires the additional Services in connection with retakes, added scenes, trailers, or changes to content initially created during the term of this Agreement.

### 9. **Use of Social Media**. Performer agrees during the Term of this Agreement to reasonably promote Producer's Brands and its affiliate Brands on her social media accounts including but not limited to Twitter, Instagram and any others reasonably requested by Producer to the best of her abilities, consistent with Performer's other professional photo shoots and media appearances. Instagram promotion shall be limited to Producer's safe for work Instagram verified accounts, @vixenxofficial & @blackedxofficial. Performer will promote Producer's Brands at Producer's reasonable direction and under Producer's guidelines and recommendations.

Additionally, during the Term of this Agreement, Performer will not do any of the following without first obtaining written consent from Producer:

- post, tag, or comment on any photographs of anyone under 18-years old regardless of state of dress or context of the photographs; or
- post anything about a scene not yet released until notified in writing to do so.

### 10. **Health Testing**. Performer warrants and represents that to the best of Performer's knowledge, Performer is in good health and has no condition that would inhibit Performer's ability to perform or that

3

would endanger Performer or any other person. If Producer requests, and at Producer's expense, Performer will immediately receive testing for HIV, hepatitis, COVID-19, or any other medical condition—mental or physical—that may impact Performer's ability to safely perform Performer's duties under this Agreement. Additionally, each time Performer provides the Services contemplated by this Agreement, before providing the Services, Performer will provide Producer with documents disclosing the results of all health testing, which must have occurred within the immediately preceding 30-day period. Performer acknowledges that this information may reside in verifiable third party, HIPAA compliant databases. Producer will fully cover the testing costs.

11. **Non-Union Affiliation**. Producer states that it is not a signatory to the Screen Actors Guild collective bargaining agreement or any other union or guild agreement. Performer states that Performer is not a member of any union or guild that would prevent Performer from performing the services contemplated by this agreement.

12. **Independent Contractor Status**. Performer is an independent contractor. Performer will not be deemed an employee of Producer. Performer will be responsible for payment of all local, state, and federal taxes, including making self-employment tax payments. Producer will not be responsible for, nor will Producer withhold, local, state, federal, social security, Medicare, unemployment, disability, or any other kind of taxes. Performer will be responsible for providing Performer's own disability and worker's compensation plans for Performer's own benefit. In addition, Performer represents that they do not meet the conditions as set forth in Assembly Bill 5 (A.B.5.) to be classified as an employee.

13. **Term and Termination**

13.1 *Term*. The Term of this Agreement is for six (6) months from the date the Parties enter into the Agreement and shall renew upon successful completion of each Scene contemplated by this agreement.

13.2 *Termination*. Producer may terminate this Agreement at any time for Cause. "*Cause*" means Performer's (1) material, uncured breach of this Agreement; (2) inability to meet Producer's subjective artistic expectations; (3) failure to follow any framework; (4) violation of Producer's rules; (5) violation of any applicable laws, rules, or regulations; or (6) failure to follow Producer's directions; (7) unreasonable unavailability; (8) or as otherwise set forth throughout this Agreement. Unless otherwise terminated by Producer under this section 13, this Agreement will terminate on the expiration of the Term.

13.3. **Force Majeure Event**. The Term may be terminated by Company upon notice to Performer if the performance of this Agreement or any obligations hereunder is prevented, restricted or interfered with by reason of fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, health risks, disease, law (including any federal, state, local or other governmental regulations, restrictive ordinances, statutes or by common law) lock-out, boycott, work stoppage, strikes (including but not limited to union/guild strikes), or labor controversy (including but not limited to threat of walkout, boycott, or strike) or any similar cause beyond the reasonable control of Company (each, a "*Force Majeure Event*"). Company shall, upon giving prompt notice to Performer, be excused from such performance during such prevention, restriction or interference, and any failure or delay resulting therefrom shall not be considered a breach of this Agreement. If such Force Majeure Event continues for a period of more than 60 days, Company may terminate this Agreement by providing written

4

notice to Performer. In the event of a termination due to a Force Majeure Event, Company shall have no further obligations to Performer other than the obligation of Company to pay any accrued obligations hereunder.

14. **Ethics and Non-Disparagement.** Performer agrees to abide by the ethical policies and practices of Producer at all times during the term of this Agreement and, within the scope of applicable laws and regulations, to act in the best interests of Producer and abide by the highest ethical standards in performing the duties set forth in this Agreement. If at any time during the course of the Agreement, Performer is involved in any situation or occurrence which subjects Performer to public scandal, disrepute, widespread contempt, public ridicule, or which is widely deemed by members of the general public, to embarrass, offend, insult or denigrate individuals or groups, or that will tend to shock, insult or offend the community or public morals or decency or prejudice the Producer in general, then Producer shall have the right, in its sole discretion, to take any action it deems appropriate, including but not limited to terminating the production of the program. During and following the term of this Agreement Performer agrees not to, and, if applicable, shall cause its officers, managers, employees not to, make or encourage any disparaging or untruthful remarks or statements about Producer or its products, services, officers, directors, affiliates, or employees; provided that nothing in this Agreement shall prevent Performer from making truthful statements when required by law, court order, subpoena, or the like, to a governmental agency or body or in connection with any legal proceeding. Notwithstanding anything in this Agreement to the contrary, Producer may terminate this Agreement at any time without notice or penalty following Performer's breach of this Section 14.

15. **Confidential Information.** Performer agrees that all terms and conditions of this Agreement shall be maintained in strict confidence and shall not be disclosed to any third Parties unless compelled to disclose by appropriate court order or with Producer's approval. Additionally, Performer will keep confidential all Confidential Information. "*Confidential Information*" means any information or data of a party that that party disclosed to the other party, either directly or indirectly, whether in writing, orally, or by visual means, and which the disclosing party designates (either in writing or orally) as confidential, proprietary, or another similar designation. However, a disclosing party will not need to designate information or data as confidential information if the nature of the information makes it generally considered confidential commercially, which includes information that relates to: (1) trade secrets or know-how; (2) finance or accounting; (3) technology, research, or development; (4) internal processes or procedures; (5) business, operations, or planning of it; (6) sales or marketing strategies; (7) the terms of any agreement, and the discussions, negotiations, or proposals related to it, including this Agreement. "Confidential Information" also includes the legal names and addresses of actors and models appearing in the content. "Confidential information" does not include information that (1) is publicly available or in the public domain at the time disclosed; (2) is or becomes publicly available or enters the public domain through no fault of the receiving party; (3) is rightfully communicated to the receiving party by persons not bound by confidentiality obligations for that information; or (4) is already in the receiving party's possession free of any confidentiality obligations for that information at the time of disclosure. This section will survive the termination of this Agreement.

16. **Performer Representations and Warranties.** Performer represents and warrants that Performer is 18-years old or older, has the right to enter into this Agreement and to grant to Producer all rights granted in

5

this Agreement, and that Performer has not entered into or will enter into any Agreement of any kind that will interfere in any way with the complete performance of this Agreement.

17. **Indemnification.** Performer will pay Producer for any loss of Producer's that is caused by Performer's reckless acts or intentional misconduct. But Performer need not pay to the extent that the loss was caused by Producer's reckless acts or intentional misconduct. "*Loss*" means an amount that a party is legally responsible for or pays in any form. Amounts include, for example, a judgment, a settlement, a fine, damages, injunctive relief, staff compensation, a decrease in property value, and expenses for defending against a claim for a loss (including fees for legal counsel, expert witnesses, and other advisers). A loss can be tangible or intangible; can arise from bodily injury, property damage, or other causes; can be based on tort, breach of contract, or any other theory or recovery; and includes incidental, direct, and consequential damages. A loss is "*caused by*" an event if the loss would not have occurred without the event, even if the event is not a proximate cause of the loss.

18. **Dispute Resolution**

18.1 *In General.* Each Party will allow the other reasonable opportunity to cure any alleged breach of this Agreement. The Parties will attempt in good faith to resolve all disputes, disagreements, or claims between the Parties relating to this Agreement.

18.2 *Mediation.* If the Parties cannot settle a dispute through negotiation, the Parties will engage in nonbinding mediation before resorting to arbitration. The Parties will conduct mediation in Los Angeles County, California. Unless the Parties agree otherwise, the American Arbitration Association will administer the mediation according to its Commercial Mediation Procedures. Each Party will bear its own costs and expenses in mediation and the Parties will share equally between them all third-party mediation costs and expenses unless the Parties otherwise agree in a writing signed by the Party agreeing to bear the costs and expenses.

18.3 *Arbitration.* In the event that mediation between the Parties is unsuccessful, the Parties will settle any controversy or claim arising out of or relating to this Agreement, or the breach of it, by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. A single arbitrator will preside over the arbitration and issue a final award on all issues submitted to the arbitrator. The Parties will conduct the arbitration in Los Angeles County, California. The arbitrator's award will be final and binding on the Parties. Either party may file an action in a court of competent jurisdiction to: (1) enforce this provision; (2) obtain injunctive relief; or (3) enforce the arbitrator's award.

18.4 *Waiver of Jury Trial.* The Parties agree that as part of their consideration for this Agreement, they waive the right to a trial by jury for any dispute arising between the Parties related to the subject matter of this Agreement. The Parties further agree that this waiver will be enforceable up to and including the day that trial is to start, and even if the arbitration provisions of this section are waived.

18.5 *Limited Time to Bring Claims.* Unless otherwise required by applicable law without the possibility of contractual waiver or limitation, neither Party will bring legal action, regardless of form, arising out of (or related to) this Agreement or any transaction under it more than twelve (12) months after the cause of action arose. After this time limit, any legal action arising out of this Agreement (or any transaction under it) and

6

all respective rights related to any action lapse.

19. **General Provisions**

19.1 ***Entire Agreement***. This Agreement makes up the sole Agreement of the Parties concerning its subject matter. It supersedes all earlier written or oral discussions, negotiations, proposals, undertakings, understandings, and agreements between the Parties concerning the transactions contemplated in this agreement. No party may use any of the earlier or contemporaneous negotiations, preliminary drafts, or previous versions of this Agreement leading up to its signature and not stated in this Agreement to construe or affect the validity of this Agreement. No conditions, definitions, representations, or warranties concerning the subject matter other than as expressly stated in this Agreement will bind either party. Each party acknowledges that no party made or relied on a representation, inducement, or condition not stated in this agreement.

19.2 ***Amendment***. The Parties may amend this Agreement only by a written agreement of the Parties that identifies itself as an amendment to this Agreement.

19.3 ***Assignment and Delegation***. Producer may assign this Agreement and the rights granted in it to any other person. Performer may not assign Performer's rights or delegate Performer's duties under this agreement because this Agreement is a personal service contract entered into in reliance on the singular personal skill, qualifications, and representations of Performer. Any purported assignment of rights or delegation of duties by Performer in violation of this provision is void.

19.4 ***Waiver***. If either party fails to require the other to perform any term of this Agreement, that failure does not prevent the party from later enforcing that term. If either party waives the other's breach of a term, that waiver is not treated as waiving a later breach of the term. No waiver by any party of any of the provisions of this Agreement will be effective unless in writing and signed by the waiving party. No waiver will operate as a waiver regarding any failure, breach, or default unless expressly identified by the written waiver. The Parties may waive compliance with this provision in a writing signed by both Parties.

19.5 ***Severability***. If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

19.6 ***Notices***. All notices and other communications required or permitted under this Agreement must be in writing and must be delivered personally or sent by email, certified or registered mail, or by overnight courier, postage prepaid, to the party's address listed below:

Mackenzie Thoma a/k/a Kenzie Anne
misskenzieanne@gmail.com
cc: eric@sevnagency.com

VXN GROUP, LLC
Attn: Emilie Kennedy
emilie@vixen.com

A party may change this address by notice to the other party as stated in this Agreement. A notice is

7

considered as having been given (1) on the day of personal delivery, or (2) two days after the date of mailing.

19.7 *Cumulative Remedies*. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the assertion by a party of any right or remedy will not preclude the assertion by the party of any other rights or the seeking of any other remedies available at law, in equity, by statute, in any other Agreement between the Parties, or otherwise.

19.8 *Governing Law*. The Parties have signed and entered into this Agreement in the State of California. California law applies to this Agreement without regard for any choice-of-law rules that might direct the application of the laws of any other jurisdiction.

19.9 *Jurisdiction and Venue*. Each party irrevocably and unconditionally agrees that it will not bring any proceeding against any other party arising out of this Agreement in any forum other than Los Angeles County, California. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of Los Angeles County, California and agrees to bring any proceeding only in Los Angeles County, California.

19.10 *Enforcement Costs and Expenses*. If a party breaches this Agreement, the breaching party will reimburse the nonbreaking party for all actual legal fees and costs incurred in enforcing this Agreement.

19.11 *Performance Costs and Expenses*. Unless otherwise stated in this Agreement, each party will pay all of the costs and expenses that party incurs regarding this Agreement and the transactions it contemplates.

19.12 *Third-Party Beneficiaries*. This Agreement does not and is not intended to confer any rights or remedies on any person other than the Parties.

19.13 *Relationship of the Parties.* The Parties' relationship is that of independent contractors and not business partners. Nothing in this Agreement creates a partnership, joint venture, agency, franchise, or employment relationship between the Parties and the Parties expressly disclaim the existence of any of these relationships between them.

19.14 *Successors and Assigns*. This Agreement inures to the benefit of, and is binding on, the Parties and their respective successors and assigns. This section does not address, directly or indirectly, whether a party may assign its rights or delegate its performance under this Agreement.

19.15 *Further Assurances*. Each party will take any actions, or sign any documents, necessary to effect or facilitate the purpose of this Agreement.

19.16 *Voluntary Agreement*. The Parties have signed this Agreement voluntarily and for valid reasons, and in doing so do not and have not relied on any statement or promise by any other party, except those expressed in this Agreement. The Parties acknowledge and agree that they have carefully read this Agreement, discussed it with their attorneys or other advisors, understand all of the terms and conditions, and agree to be bound by it. The Parties have relied on the advice of their attorneys or other advisors about the terms and conditions of this Agreement, and waive any claim that the terms and conditions should be construed against the drafter.

19.17 *Corporate authority*. Each person signing this agreement on behalf of any corporate entity agrees

8

that he or she has full authority to sign this Agreement on behalf of the entity and that party has taken all necessary actions. In addition, each corporate party agrees that this Agreement does not constitute a violation or breach of that party's articles of incorporation, bylaws, or any other agreement or law by which that party is bound.

19.18 *Counterparts*. The Parties may sign this Agreement in any number of counterparts. The Parties deem each counterpart an original and all counterparts, when taken together, make up the same agreement.

20. **Usages**. In this Agreement, unless otherwise stated or the context otherwise requires, the following usages apply:

20.1 Actions permitted under this agreement may be taken at any time and from time to time in the actor's sole discretion.

20.2 References to a statute will refer to the statute and any successor statute, and to all regulations promulgated under or implementing the statute or successor, as in effect at the relevant time.

20.3 References to numbered sections in this Agreement also refer to all included sections. For example, references to section 6 also refer to sections 6.1, 6.1(A), etc.

20.4 In computing periods from a specified date to a later specified date, the words "from" and "commencing on" (and the like) mean "from and including," and the words "to," "until," and "ending on" (and the like) mean "to but excluding."

21. **Signatures.** The Parties agree that they may deliver signatures on this Agreement by fax or electronically instead of an original signature and agree to treat fax or electronic signatures as original signatures that bind them to this Agreement.

The Parties signed this Agreement on the date listed on the first page.

**Producer:   VXN GROUP, LLC,** a Delaware Limited Liability Company

By: Mike Miller, Executive Producer

Signature: _____ Mike Miller _____
10AD78EF1BDE429...

Date: ____ 12/1/2020 _____

Performer: **MACKENZIE THOMA a/k/a KENZIE ANNE**, an individual

Signature: _____
1183CE222482413...

Date: ____ 11/30/2020 _____

9

# EXHIBIT 65

## ADDENDUM TO PERFORMANCE AGREEMENT

This Addendum ("Addendum") is attached to and forms part of the Performance Agreement ("Agreement") between VXN Group, LLC ("Producer") and Mackenzie Thoma a/k/a Kenzie Anne ("Performer"). Producer and Performer are collectively referred to as the "Parties."

### <u>RECITALS</u>

On November 11, 2020 ("Effective Date") the Parties entered into the Agreement for the purpose of contracting with Performer for Performer's services as an actor and model on an exclusive basis in connection with the production of motion pictures and photographs.

In January and February of 2021, Performer was filmed and created content with third-party directors and producers that directly competed with Producer's Brands, including Producer's then current and now former Director, Marc Roussel a/k/a 'Chef', who filmed Performer for his own professional gain and without permission from Producer.

In this Addendum, to become effective on April 15, 2021, the Parties wish to amend Section 2, Section 7.1 and Section 13.1 of the Agreement.

In consideration of the Parties agreeing to amend their obligations in the existing Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to amend the Agreement as follows:

### <u>AMENDMENTS</u>

*2. Compensation.* Producer will pay Performer $1,500.00 for Performer's all girl Scenes with Producer. Producer will pay Performer $3,000.00 for Performer's boy/girl Scenes with Producer. Performer waives the right to receive any other consideration for the Services performed under this Agreement, including royalties, residuals, or commissions. Performer acknowledges that no further sums are payable by Producer by reason of exploitation of the content or the results and proceeds of Performer's services under this agreement.

*7.1. Exclusivity of Services.* During the Term of this Agreement, Performer will not film with any third party producer or production company that competes directly with Producer; provided that nothing herein shall restrict Performer from (i) creating (alone or with others) and exploiting photos and short-form content for Performer's social media channels which includes her OnlyFans, ("Performer's Channels") (ii) doing 'live' webcam channel shows (with the exclusion of CamSoda) and live OnlyFans shows , or (iii) doing photoshoots and media appearances with any other individual or entity. Performer understands that a breach of this provision will entitle Producer to terminate this Agreement for Cause and seek any related damages if the parties cannot resolve the breach by agreement within 48 hours of the breach.

Additionally, Performer may not film with any models that appear in any of the Scenes arising from the Agreement for at least six months from release of the Scene and Performer agrees not to shoot with any of Company's current and/or former directors and/or exclusive talent for Performer's Channels without the express written consent of



 CONFIDENTIAL    VXN0001

of the date of signing, are listed on Exhibit A and for the avoidance of doubt, Performer may also not shoot with any new exclusive talent signed by Company for Performer's Channels during the course of this Agreement.

### 13.1 Term

In consideration of signing this Addendum, instead of extending the Term to six months from Performer's successful completion of her last Scene on March 31, 2021, which extends the Term to October 1st, 2021, Producer agrees the Term shall end on August 28th, 2021 with the agreement that Performer will pay back Producer $1,500 for overpayment of her last Scene, or alternatively perform one all girl Scene for Producer without compensation. No further renewals of the term will occur upon subsequent completion of Scenes contemplated by the Agreement.

### NO OTHER CHANGE

Except as otherwise expressly provided in this Addendum, all of the terms and conditions of the Agreement remain unchanged and in full force and effect. To the extent that any of the terms and conditions contained in this Addendum may contradict or conflict with any of the terms or conditions of the Agreement, it is expressly understood and agreed that the terms of the Addendum shall take precedence and supersede the attached Agreement.

### AGREED AND ACCEPTED:

VXN Group, LLC
Anne

Mackenzie Thoma a/k/a Kenzie

By: _Mackenzie Anne Thoma_

By: _[signature]_

Mike Miller

Mackenzie Thoma

Date:

Date: 4/15/2021

### EXHIBIT A

List of Exclusive VMG Performers

Scanned with CamScanner

CONFIDENTIAL                          VXN0002

# EXHIBIT 66

DocuSign Envelope ID: 19C6F3C1-C279-4580-8772-8182BB34637A

## PERFORMANCE AGREEMENT

This Performance Agreement ("*Agreement*") is entered into on the 13th day of July, 2021 and is between **VXN GROUP, LLC**, a Delaware limited liability company ("*Producer*"), and **Mackenzie Thoma a/k/a Kenzie Anne,** an individual located at 4324 Promenade Way # 314, Marina Del Ray, CA 90282 ("*Performer*") (together the "*Parties*" or "*Party*").

## RECITALS

WHEREAS Producer is the creator of adult motion pictures and photographs for commercial sale through various distribution outlets and platforms;

WHEREAS Performer is a model and actor in the adult entertainment industry represented by Twice Baked Media, Inc. d.b.a Motley Models ("Agent").

WHEREAS Producer wishes to contract with Performer for Performer's services as an actor and model on a non-exclusive basis in connection with the production of adult motion pictures and photographs and in exchange for the consideration outlined below;

WHEREAS Performer agrees to provide her services on a non-exclusive basis for the duration of the Term as set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the foregoing recitals, the mutual promises and agreements herein contained, and for good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged by the Parties, each of the Parties, intending to be legally bound hereby, do promise and agree as follows, and enter into this Agreement.

1. **Engagement.** Producer hereby engages Performer to act, model and provide other services ("*Services*") to Producer for Producer's adult motion pictures and photographs ("*Scene*" or "*Scenes*") for Producer's brands and websites Vixen.com, Tushy.com, Blacked.com, BlackedRaw.com, TushyRaw.com, Deeper.com and Slayed.com ("*Brand*" or "*Brands*"). Performer agrees to make herself reasonably available to Producer throughout the Term of the Agreement and will not enter into any exclusive agreements that would prevent Performer from performing this Agreement. If Performer is not available on the date proposed by Producer to film a Scene, Performer will provide an alternative date within two weeks of Producer's originally proposed date.

2. **Compensation**. As compensation for the Services, Producer agrees to pay Performer $5,000 per boy-girl (which may include additional partners) Scene completed for the first ten (10) Scenes. If Performer opts to perform an anal scene during the Term of the Agreement, the rate shall remain $5,000. In addition to the ten Scenes listed above, Producer may book and shoot Performer for girl-girl Scenes at a rate of $1,500 per Scene. If Performer opts to perform in any additional boy-girl Scenes beyond the initial 10 agreed above, that rate shall be $2,500 per additional Scene.

Agent shall receive a flat rate of $100 per Scene completed by Performer.

3. **Nature of Services**. As part of the Services, Performer will appear nude and semi-nude in connection

1

VXN0017

DocuSign Envelope ID: 19C6F3C1-C279-4580-8772-8182BB34637A

with the creation of motion pictures and photographic content by Producer. Performer will perform multiple, explicit sexual acts, as set forth above in paragraphs 1 and 2. These sexual acts may include the use of sexual aids. Performer knowingly and willingly consents to rendering these services and understands the nature of the services this agreement requires her to perform. Producer will choose the performer(s) that Performer will perform with in the Scenes and each Scene's director.

4. **Hours and Obligations for Services.** Performer will provide the services on an as-needed basis, including nights, weekends, and holidays. Performer understands and agrees that the filming session during the Term of this agreement may take up to ten hours.

5. **Ownership; Copyright; Publicity.** Performer hereby grants Producer the worldwide, irrevocable, perpetual, right to photograph and re-photograph Performer (still and moving) and to record and re-record, double, and dub Performer's voice and performances, by any present or future methods or means, and to use and to license the use of Performer's approved name (including all stage names and aliases), approved biography, resume, signature, caricature, voice, and likeness (collectively, the "*name and likeness*") for and in connection with the creation of or the exploitation of the content created hereunder, including the promotion and advertising of the content in any media, throughout the universe, and in perpetuity. Producer will own the results and proceeds of Performer's Services under this agreement, including the copyrights of it. As the owner, Producer will have the worldwide, irrevocable, perpetual, exclusive right to use, license, and exploit the results and proceeds of Performer's Services—including all derivative works—in any manner, for any purpose, including the right to edit, televise, broadcast, record, publish, copy, print, sell, or distribute the content in any manner and in any medium, format, form, or forum, whether now known or later devised, without any further compensation than as specified in section 2. Performer acknowledges that the works created from the Services performed by Performer in performing this agreement constitute "works made for hire" under the United States Copyright Act of 1976 and, at all stages of development, the works will be and remain the sole and exclusive property of Producer. At Producer's sole discretion, Producer may make any changes in, deletions from, or additions to the works. If for any reason the results and proceeds of Performer's services under this agreement are determined not to be a work made for hire, Performer hereby irrevocably transfers and assigns to Producer all right, title, and interest in the work, including all copyrights, as well as all renewals and extensions to that work. Performer acknowledges Producer's sole ownership of all stage names, aliases, pseudonyms, characters, ideas, or other matters or materials that may be created during the term of this agreement. Performer will sign all documents that Producer may reasonably require to record and perfect its ownership rights. Performer will retain all rights in the stage name "Kenzie Anne" however during and after the term of this Agreement, Producer and Producer's assigns and licensees may use Performer's name and likeness. Performer hereby expressly waives and relinquishes to Producer any moral rights or "droit morale" in and to any content produced from the Services Performer provided under this agreement, including all of Performer's performances. Performer further hereby waivers and relinquishes to Producer all right of publicity claims, invasion of privacy claims, defamation claims, sexual harassment claims, injuries (both physical and emotional), negligence, Intellectual Property, and any liability for and by virtue of blurring, distortion, alteration, and optical illusion. "*Intellectual Property*" means all rights, title, interest, and benefit of a party to this Agreement in intellectual property of every nature, whether registered or unregistered. Intellectual property includes trademarks, copyrights, patents, trade secrets, publicity rights, moral rights, rights against unfair competition, and any other rights commonly considered intellectual property.

2

CONFIDENTIAL

DocuSign Envelope ID: 19C6F3C1-C279-4580-8772-8182BB34637A

6. **Credit**. Producer does not have an obligation to give Performer credit in advertising or publicity, but shall afford Performer customary performer credit in all content created under this Agreement.

## 7. Exclusivity and Appearance

7.1 *Non-Exclusivity of Services*. During the Term of this Agreement, Performer will provide Services to Producer on a non-exclusive basis. However, Performer will afford Producer the right of first refusal for Performer's first anal scene ("First Anal Scene") and will not shoot an anal scene with any other producer or company until she has filmed the First Anal Scene with Producer or the Term has expired, whichever is first. Additionally, Performer will remain exclusive for anal only, for three months from the date that Producer shoots Performer's First Anal Scene in order for Producer to release and promote the Scene.

7.2 *Appearance*. Performer understands that Producer is entering into this Agreement with Performer based on Performer's current physical appearance, including the current measurements of Performer's body, level of physical fitness, hairstyle, and overall appearance of Performer's body. During the term of this Agreement, Performer will maintain Performer's physical appearance, and Performer will submit to the reasonable personal grooming requests of Producer, as such may be considered a norm in the adult entertainment industry. Performer acknowledges that if Performer should change her physical appearance during the term of this Agreement (including adding or subtracting tattoos or piercings) without first obtaining written permission by Producer, Producer may terminate this Agreement for Cause if the Parties cannot resolve the breach by agreement within 48 hours of the breach.

8. **Additional Services after Expiration of Agreement**. Performer will provide additional Services after expiration of this Agreement at Producer's reasonable request if Producer requires the additional Services in connection with retakes, added scenes, trailers, or changes to content initially created during the term of this Agreement.

9. **Use of Social Media**. Performer agrees during the Term of this Agreement to promote Producer's Brands and its affiliate Brands on her social media accounts including but not limited to Twitter, Instagram and any others reasonably requested by Producer to the best of her abilities, consistent with Performer's other professional photo shoots and media appearances. Performer will promote Producer's Brands at Producer's reasonable direction and under Producer's guidelines and recommendations including by promoting each Scene that Performer appears in when it is released.

Additionally, during the Term of this Agreement, Performer will not do any of the following without first obtaining written consent from Producer:

- post, tag, or comment on any photographs of anyone under 18-years old regardless of state of dress or context of the photographs; or
- post anything about a scene not yet released until notified in writing to do so.

10. **Health Testing**. Performer warrants and represents that to the best of Performer's knowledge, Performer is in good health and has no condition that would inhibit Performer's ability to perform or that would endanger Performer or any other person. If Producer requests, and at Producer's expense, Performer will immediately receive testing for HIV, hepatitis, COVID-19, or any other medical condition—mental or

3

DocuSign Envelope ID: 19C6F3C1-C279-4580-8772-8182BB34637A

physical—that may impact Performer's ability to safely perform Performer's duties under this Agreement. Additionally, each time Performer provides the Services contemplated by this Agreement, before providing the Services, Performer will provide Producer with documents disclosing the results of all health testing, which must have occurred within the immediately preceding 30-day period. Performer acknowledges that this information may reside in verifiable third party, HIPAA compliant databases. Producer will fully cover the testing costs.

11. **Non-Union Affiliation**. Producer states that she is not a signatory to the Screen Actors Guild collective bargaining agreement or any other union or guild agreement. Performer states that Performer is not a member of any union or guild that would prevent Performer from performing the services contemplated by this agreement.

12. **Independent Contractor Status**. Performer is an independent contractor. Performer will not be deemed an employee of Producer. Performer will be responsible for payment of all local, state, and federal taxes, including making self-employment tax payments. Producer will not be responsible for, nor will Producer withhold, local, state, federal, social security, Medicare, unemployment, disability, or any other kind of taxes. Performer will be responsible for providing Performer's own disability and worker's compensation plans for Performer's own benefit. In addition, Performer represents that they do not meet the conditions as set forth in Assembly Bill 5 (A.B.5.) to be classified as an employee.

13. **Term and Termination**

13.1 *Term*. The term of this Agreement (the "Term") shall take effect from August 29, 2021 and last for twelve (12) months until August 29, 2022 (the "Expiration Date").

13.2 *Termination*. Producer may terminate this Agreement at any time for Cause. "*Cause*" means Performer's (1) material breach of this Agreement; (2) inability to meet Producer's subjective artistic expectations; (3) failure to follow any framework; (4) violation of Producer's rules; (5) violation of any applicable laws, rules, or regulations; or (6) failure to follow Producer's directions; (7) unreasonable unavailability; (8) or as otherwise set forth throughout this Agreement. Unless otherwise terminated by Producer under this section 13, this Agreement will terminate on the expiration of the Term.

13.3. **Force Majeure Event**. The Term may be terminated by Producer upon notice to Performer if the performance of this Agreement or any obligations hereunder is prevented, restricted or interfered with by reason of fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, health risks, disease, law (including any federal, state, local or other governmental regulations, restrictive ordinances, statutes or by common law) lock-out, boycott, work stoppage, strikes (including but not limited to union/guild strikes), or labor controversy (including but not limited to threat of walkout, boycott, or strike) or any similar cause beyond the reasonable control of Producer (each, a "*Force Majeure Event*"). Producer shall, upon giving prompt notice to Performer, be excused from such performance during such prevention, restriction or interference, and any failure or delay resulting therefrom shall not be considered a breach of this Agreement. If such Force Majeure Event continues for a period of more than 60 days, Producer may terminate this Agreement by providing written notice to Performer. In the event of a termination due to a Force Majeure Event, Producer shall have no further obligations to Performer other than the obligation of Producer to pay any accrued obligations

4

DocuSign Envelope ID: 19C6F3C1-C279-4580-8772-8182BB34637A

hereunder.

14. **Ethics and Non-Disparagement.** Performer agrees to abide by the ethical policies and practices of Producer at all times during the term of this Agreement and, within the scope of applicable laws and regulations, to act in the best interests of Producer and abide by the highest ethical standards in performing the duties set forth in this Agreement. If at any time during the course of the Agreement, Performer is involved in any situation or occurrence which subjects Performer to public scandal, disrepute, widespread contempt, public ridicule, or which is widely deemed by members of the general public, to embarrass, offend, insult or denigrate individuals or groups, or that will tend to shock, insult or offend the community or public morals or decency or prejudice the Producer in general, then Producer shall have the right, in its sole discretion, to take any action it deems appropriate, including but not limited to terminating the production of the program. During and following the term of this Agreement Performer agrees not to, and, if applicable, shall cause its officers, managers, employees not to, make or encourage any disparaging or untruthful remarks or statements about Producer or its products, services, officers, directors, affiliates, or employees; provided that nothing in this Agreement shall prevent Performer from making truthful statements when required by law, court order, subpoena, or the like, to a governmental agency or body or in connection with any legal proceeding. Notwithstanding anything in this Agreement to the contrary, Producer may terminate this Agreement at any time without notice or penalty following Performer's breach of this Section 14.

**15. Confidential Information.** Performer agrees that all terms and conditions of this Agreement shall be maintained in strict confidence and shall not be disclosed to any third Parties unless compelled to disclose by appropriate court order or with Producer's approval. Additionally, Performer will keep confidential all Confidential Information. "*Confidential Information*" means any information or data of a party that that party disclosed to the other party, either directly or indirectly, whether in writing, orally, or by visual means, and which the disclosing party designates (either in writing or orally) as confidential, proprietary, or another similar designation. However, a disclosing party will not need to designate information or data as confidential information if the nature of the information makes it generally considered confidential commercially, which includes information that relates to: (1) trade secrets or know-how; (2) finance or accounting; (3) technology, research, or development; (4) internal processes or procedures; (5) business, operations, or planning of it; (6) sales or marketing strategies; (7) the terms of any agreement, and the discussions, negotiations, or proposals related to it, including this Agreement. "Confidential Information" also includes the legal names and addresses of actors and models appearing in the content. "Confidential information" does not include information that (1) is publicly available or in the public domain at the time disclosed; (2) is or becomes publicly available or enters the public domain through no fault of the receiving party; (3) is rightfully communicated to the receiving party by persons not bound by confidentiality obligations for that information; or (4) is already in the receiving party's possession free of any confidentiality obligations for that information at the time of disclosure. This section will survive the termination of this Agreement.

16. **Performer Representations and Warranties.** Performer represents and warrants that Performer is 18-years old or older, has the right to enter into this Agreement and to grant to Producer all rights granted in this Agreement, and that Performer has not entered into or will enter into any Agreement of any kind that will interfere in any way with the complete performance of this Agreement.

5

CONFIDENTIAL

Case 2:23-cv-04901-WLH-AGR   Document 133-6   Filed 01/10/25   Page 26 of 162
Page ID #:5346

**17. Indemnification.** Performer will pay Producer for any loss of Producer's that is caused by Performer's reckless acts or intentional misconduct. But Performer need not pay to the extent that the loss was caused by Producer's reckless acts or intentional misconduct. *"Loss"* means an amount that a party is legally responsible for or pays in any form. Amounts include, for example, a judgment, a settlement, a fine, damages, injunctive relief, staff compensation, a decrease in property value, and expenses for defending against a claim for a loss (including fees for legal counsel, expert witnesses, and other advisers). A loss can be tangible or intangible; can arise from bodily injury, property damage, or other causes; can be based on tort, breach of contract, or any other theory or recovery; and includes incidental, direct, and consequential damages. A loss is *"caused by"* an event if the loss would not have occurred without the event, even if the event is not a proximate cause of the loss.

## 18. Dispute Resolution

**18.1 *In General.*** The Parties will attempt in good faith to resolve all disputes, disagreements, or claims between the Parties relating to this Agreement.

**18.2 *Mediation.*** If the Parties cannot settle a dispute through negotiation, the Parties will engage in nonbinding mediation before resorting to arbitration. The Parties will conduct mediation in Los Angeles County, California. Unless the Parties agree otherwise, the American Arbitration Association will administer the mediation according to its Commercial Mediation Procedures. Each Party will bear its own costs and expenses in mediation and the Parties will share equally between them all third-party mediation costs and expenses unless the Parties otherwise agree in a writing signed by the Party agreeing to bear the costs and expenses.

**18.3 *Arbitration*.** In the event that mediation between the Parties is unsuccessful, the Parties will settle any controversy or claim arising out of or relating to this Agreement, or the breach of it, by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. A single arbitrator will preside over the arbitration and issue a final award on all issues submitted to the arbitrator. The Parties will conduct the arbitration in Los Angeles County, California. The arbitrator's award will be final and binding on the Parties. Either party may file an action in a court of competent jurisdiction to: (1) enforce this provision; (2) obtain injunctive relief; or (3) enforce the arbitrator's award.

**18.4 *Waiver of Jury Trial.*** The Parties agree that as part of their consideration for this Agreement, they waive the right to a trial by jury for any dispute arising between the Parties related to the subject matter of this Agreement. The Parties further agree that this waiver will be enforceable up to and including the day that trial is to start, and even if the arbitration provisions of this section are waived.

**18.5 *Limited Time to Bring Claims.*** Unless otherwise required by applicable law without the possibility of contractual waiver or limitation, neither Party will bring legal action, regardless of form, arising out of (or related to) this Agreement or any transaction under it more than six months after the cause of action arose. After this time limit, any legal action arising out of this Agreement (or any transaction under it) and all respective rights related to any action lapse.

## 19. General Provisions

6

VXN0022

Case 2:23-cv-04901-WLH-AGR    Document 133-6    Filed 01/10/25    Page 27 of 162
Page ID #:5347

19.1 ***Entire Agreement***. This Agreement makes up the sole Agreement of the Parties concerning its subject matter. It supersedes all earlier written or oral discussions, negotiations, proposals, undertakings, understandings, and agreements between the Parties concerning the transactions contemplated in this agreement. No party may use any of the earlier or contemporaneous negotiations, preliminary drafts, or previous versions of this Agreement leading up to its signature and not stated in this Agreement to construe or affect the validity of this Agreement. No conditions, definitions, representations, or warranties concerning the subject matter other than as expressly stated in this Agreement will bind either party. Each party acknowledges that no party made or relied on a representation, inducement, or condition not stated in this agreement.

19.2 ***Amendment***. The Parties may amend this Agreement only by a written agreement of the Parties that identifies itself as an amendment to this Agreement.

19.3 ***Assignment and Delegation***. Producer may assign this Agreement and the rights granted in it to any other person. Performer may not assign Performer's rights or delegate Performer's duties under this agreement because this Agreement is a personal service contract entered into in reliance on the singular personal skill, qualifications, and representations of Performer. Any purported assignment of rights or delegation of duties by Performer in violation of this provision is void.

19.4 ***Waiver***. If either party fails to require the other to perform any term of this Agreement, that failure does not prevent the party from later enforcing that term. If either party waives the other's breach of a term, that waiver is not treated as waiving a later breach of the term. No waiver by any party of any of the provisions of this Agreement will be effective unless in writing and signed by the waiving party. No waiver will operate as a waiver regarding any failure, breach, or default unless expressly identified by the written waiver. The Parties may waive compliance with this provision in a writing signed by both Parties.

19.5 ***Severability***. If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

19.6 ***Notices***. All notices and other communications required or permitted under this Agreement must be in writing and must be delivered personally or sent by email, certified or registered mail, or by overnight courier, postage prepaid, to the party's address listed below:

Mackenzie Thoma a/k/a Kenzie Anne
misskenzieanne@gmail.com
4324 Promenade Way # 314,
Marina Del Ray, CA 90282

VXN GROUP, LLC
Attn: Emilie Kennedy
emilie@vixen.com
11271 Ventura Blvd. #717
Studio City, CA 91604

A party may change this address by notice to the other party as stated in this Agreement. A notice is considered as having been given (1) on the day of personal delivery, or (2) two days after the date of mailing.

7

19.7 *Cumulative Remedies*. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the assertion by a party of any right or remedy will not preclude the assertion by the party of any other rights or the seeking of any other remedies available at law, in equity, by statute, in any other Agreement between the Parties, or otherwise.

19.8 *Governing Law*. The Parties have signed and entered into this Agreement in the State of California. California law applies to this Agreement without regard for any choice-of-law rules that might direct the application of the laws of any other jurisdiction.

19.9 *Jurisdiction and Venue*. Each party irrevocably and unconditionally agrees that it will not bring any proceeding against any other party arising out of this Agreement in any forum other than Los Angeles County, California. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of Los Angeles County, California and agrees to bring any proceeding only in Los Angeles County, California.

19.10 *Enforcement Costs and Expenses*. If a party breaches this Agreement, the breaching party will reimburse the nonbreaking party for all actual legal fees and costs incurred in enforcing this Agreement.

19.11 *Performance Costs and Expenses*. Unless otherwise stated in this Agreement, each party will pay all of the costs and expenses that party incurs regarding this Agreement and the transactions it contemplates.

19.12 *Third-Party Beneficiaries*. This Agreement does not and is not intended to confer any rights or remedies on any person other than the Parties.

19.13 *Relationship of the Parties.* The Parties' relationship is that of independent contractors and not business partners. Nothing in this Agreement creates a partnership, joint venture, agency, franchise, or employment relationship between the Parties and the Parties expressly disclaim the existence of any of these relationships between them.

19.14 *Successors and Assigns*. This Agreement inures to the benefit of, and is binding on, the Parties and their respective successors and assigns. This section does not address, directly or indirectly, whether a party may assign its rights or delegate its performance under this Agreement.

19.15 *Further Assurances*. Each party will take any actions, or sign any documents, necessary to effect or facilitate the purpose of this Agreement.

19.16 *Voluntary Agreement*. The Parties have signed this Agreement voluntarily and for valid reasons, and in doing so do not and have not relied on any statement or promise by any other party, except those expressed in this Agreement. The Parties acknowledge and agree that they have carefully read this Agreement, discussed it with their attorneys or other advisors, understand all of the terms and conditions, and agree to be bound by it. The Parties have relied on the advice of their attorneys or other advisors about the terms and conditions of this Agreement, and waive any claim that the terms and conditions should be construed against the drafter.

19.17 *Corporate authority*. Each person signing this agreement on behalf of any corporate entity agrees that he or she has full authority to sign this Agreement on behalf of the entity and that party has taken all necessary actions. In addition, each corporate party agrees that this Agreement does not constitute a

8

violation or breach of that party's articles of incorporation, bylaws, or any other agreement or law by which that party is bound.

19.18 *Counterparts*. The Parties may sign this Agreement in any number of counterparts. The Parties deem each counterpart an original and all counterparts, when taken together, make up the same agreement.

20. **Usages**. In this Agreement, unless otherwise stated or the context otherwise requires, the following usages apply:

20.1 Actions permitted under this agreement may be taken at any time and from time to time in the actor's sole discretion.

20.2 References to a statute will refer to the statute and any successor statute, and to all regulations promulgated under or implementing the statute or successor, as in effect at the relevant time.

20.3 References to numbered sections in this Agreement also refer to all included sections. For example, references to section 6 also refer to sections 6.1, 6.1(A), etc.

20.4 In computing periods from a specified date to a later specified date, the words "from" and "commencing on" (and the like) mean "from and including," and the words "to," "until," and "ending on" (and the like) mean "to but excluding."

21. **Signatures.** The Parties agree that they may deliver signatures on this Agreement by fax or electronically instead of an original signature and agree to treat fax or electronic signatures as original signatures that bind them to this Agreement.

The Parties signed this Agreement on the date listed on the first page.

**Producer:   VXN GROUP, LLC,** a Delaware Limited Liability Company

By: Mike Miller, Executive Producer.

Signature: _____ *Mike Miller* _____
                        9CB9D39D52CD429

Date: _____ 7/13/2021 _____

Performer: **MACKENZIE THOMA a/k/a KENZIE ANNE,** an individual

Signature: _____
                        1183CF222482413

Date: _____ 7/16/2021 _____

9

# EXHIBIT 67

**ADDENDUM TO PERFORMANCE AGREEMENT**

This Addendum ("Addendum") is attached to and forms part of the Performance Agreement ("Agreement") between VXN Group, LLC ("Producer") and Mackenzie Thoma a/k/a Kenzie Anne ("Performer"). Producer and Performer are collectively referred to as the "Parties."

## RECITALS

On July 13th, 2021 ("Effective Date") the Parties entered into the Agreement for the purpose of contracting with Performer for Performer's services as an actor and model in connection with the production of motion pictures and photographs.

In this Addendum, to become effective on June 20, 2022, the Parties wish to amend Section 13.1 to coincide with Performer's Vixen Angel title which will be announced no later than September 2022.

In consideration of the Parties agreeing to amend their obligations in the existing Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to amend the Agreement as follows:

## AMENDMENTS

### *13.1 Term*

13.1 Term. The term of this Agreement (the "Term") shall take effect from August 29, 2021 and last until December 31, 2023 (the "Expiration Date").

## NO OTHER CHANGE

Except as otherwise expressly provided in this Addendum, all of the terms and conditions of the Agreement remain unchanged and in full force and effect. To the extent that any of the terms and conditions contained in this Addendum may contradict or conflict with any of the terms or conditions of the Agreement, it is expressly understood and agreed that the terms of the Addendum shall take precedence and supersede the attached Agreement.

## AGREED AND ACCEPTED:

VXN Group, LLC                                Mackenzie Thoma a/k/a Kenzie Ann

By: _____                    By: _____
      *Mike Miller*                                  
      9CB5D39D52CD429...                             1183CF222482413...

Mike Miller                                  Mackenzie Thoma
Date: 6/20/2022                              Date: 6/20/2022

1

CONFIDENTIAL                                  VXN0012

# EXHIBIT 68

# WHICH IWC ORDER?

# Classifications

DIVISION OF LABOR STANDARDS ENFORCEMENT                    MARCH 2013

This pamphlet is intended as a guide in determining the classifications of businesses and occupations under the Industrial Welfare Commission Orders.

**These guidelines and classifications of employees are general in nature and the existence of specific facts and circumstances of the employment relationship and operations of a particular employer may require a different determination of proper classification that the general one set forth herein.**

As new types of businesses and occupations are constantly coming into existence, there undoubtedly are businesses and occupations that have not been included herein. Additionally, as industry practices and business structures evolve, circumstances may dictate the change in classification of a particular occupation from one wage order to another wage order.

Employers are advised that while courts may find this pamphlet to be useful in determining the classification of business and occupations under the Industrial Welfare Commission Orders, courts are not required to follow the classifications of occupations listed herein and that compliance with the guidelines suggested herein do not establish a "safe harbor" for classifying an employee within a particular wage order.

2

# TABLE OF CONTENTS

**Page**

CLASSIFICATION OF EMPLOYEES: INDUSTRY OR OCCUPATION ORDER? ...........................................4
SEPARATE UNITS OF MULTI-PURPOSE COMPANIES ...........................................................................5
INCIDENTAL HOUSEKEEPING ACTIVITIES ........................................................................................5
CLASSIFICATION OF CROPS AND ACTIVITIES UNDER IWC ORDERS 8, 13 and 14 ...............................6
EXEMPT EMPLOYEES/OCCUPATIONS ..............................................................................................10
IWC ORDER COVERAGE ...................................................................................................................12
  Order  1 – MANUFACTURING INDUSTRY ........................................................................................12
  Order  2 – PERSONAL SERVICE INDUSTRY ......................................................................................14
  Order  3 – CANNING, FREEZING, AND PRESERVING INDUSTRY ........................................................14
  Order  4 – PROFESSIONAL, TECHNICAL, CLERICAL, MECHANICAL and SIMILAR OCCUPATIONS ...15
  Order  5 – PUBLIC HOUSEKEEPING INDUSTRY ................................................................................18
  Order  6 – LAUNDRY, LINEN SUPPLY, DRY CLEANING AND DYEING INDUSTRY.............................20
  Order  7 – MERCANTILE INDUSTRY .................................................................................................21
  Order  8 – INDUSTRIES HANDLING PRODUCTS AFTER HARVEST ....................................................22
  Order  9 – TRANSPORTATION INDUSTRY .........................................................................................23
  Order 10 – AMUSEMENT AND RECREATION INDUSTRY ...................................................................24
  Order 11 – BROADCASTING INDUSTRY ............................................................................................25
  Order 12 – MOTION PICTURE INDUSTRY ..........................................................................................26
  Order 13 – INDUSTRIES PREPARING AGRICULTURAL PRODUCTS FOR MARKET, on the FARM ........27
  Order 14 -  AGRICULTURAL OCCUPATIONS       ...............................................................................28
  Order 15 – HOUSEHOLD OCCUPATIONS ...........................................................................................30
  Order 16 – OCCUPATIONS in the CONSTRUCTION, DRILING, LOGGING and MINING INDUSTRIES....30
  Order 17 – MISCELLANEOUS EMPLOYEES .......................................................................................33
INDEX OF BUSINESS AND OCCUPATIONS ..........................................................................................34

3

## CLASSIFICATION OF EMPLOYEES:  INDUSTRY OR OCCUPATION ORDER?

In order to determine which Industrial Welfare Commission (IWC) Order applies to an employer or a business, it is first necessary to determine if a business is covered by an industry order.  An industry order (IWC Orders 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, and 13) regulates wages, hours and working conditions in specific industries.  An order is an industry order if the title of the order contains the word "industry."  Otherwise, the order is an occupational order (IWC Orders 4, 14, 15, 16 and 17).  Wage, hour and working condition regulations contained in an occupational order only apply when a business is not covered by an industry order.

**Examples of IWC Orders, industry or occupational?**

1.  IWC Order 1 (manufacturing industry) applies to an office assistant employed by a company that builds automobiles because the company is covered by an industry order.

2.  IWC Order 4 (an occupational order) applies to an office assistant employed in a law firm because a law firm is not covered by an industry order.

3.  IWC Order 5 (public housekeeping industry) applies to a nurse employed by a hospital because a hospital is covered by an industry order.

4.  IWC Order 4 (an occupational order) applies to a nurse employed by a doctor's office because a doctor's office is not covered by an industry order.

5.  IWC Order 7 (mercantile industry) applies to a bookkeeper in a retail store operation because retail stores are covered by an industry order.

6.  IWC Order 4 (an occupational order) applies to a bookkeeper in an accounting firm because and accounting firm is not covered by an industry order.

Note:   It is very important that you first determine if a business is covered by any industry order.  If not, you must look to one of the occupational orders for coverage.  Please refer to the index of businesses and occupations for examples of proper application.

A business is classified according to the main purpose of the business except in IWC Order 5 (see section below on Incidental Housekeeping Activities).  Large businesses may conduct a variety of operations and it may appear initially that different industry orders could apply.  However, when those operations are part of the main business, only one order will apply.

**Example:**

A business's main purpose is operating a warehouse and incidental thereto employs a separate sales staff to sell goods.  IWC Order 9 covers this operation even though sales are covered under IWC Order 7 because the main purpose of the business is to operate a warehouse.

## SEPARATE UNITS OF MULTI-PURPOSE COMPANIES

Distinct operations in multi-purpose businesses may be covered by different industry orders if they are operated for different business purposes, and the management is separately organized at all levels.

**Example:**

A retail department store (IWC Order 7) owns a restaurant (IWC Order 5) that is located on the department store premises but is operated as a separate corporate entity. These businesses are covered by different industry orders because they are operated for different business purposes, and the management is separately organized at all levels.

Please note that problems in determining correct order coverage occur when businesses are of a mixed nature. They are best resolved by making a broad assessment of the principal purpose of the business. This does not mean auditing receipts to compare income from sales and service, but determining the nature of the business by simple observation and common sense.

## INCIDENTAL HOUSEKEEPING ACTIVITIES

IWC Order 5 does not limit coverage to businesses whose main purpose is providing meals, housing, or maintenance services whether operated as a primary business or when incidental to other operations in an establishment not covered by an industry order.

**Examples:**

IWC Order 1 covers a factory that operates a cafeteria. IWC Order 5 does not cover it.

IWC Order 5 covers a private school which is not covered by an industry order and which provides dormitories or dining facilities.

Where a concessionaire contracts to operate lodging or dining facilities, IWC Order 5 covers the concessionaire's business, but the rest of the enterprise (school or factory) is classified otherwise.

5

**CLASSIFICATION OF CROPS AND ACTIVITIES UNDER IWC ORDERS 8, 13, and 14**

Agricultural occupations covered by Order 14 are related to the maintenance of soil, buildings and machinery which constitute the basic farm facilities, and to the cultivation and handling of farm commodities up through harvest, including field packing and transportation to the place of first processing or distribution.

Not all employees of farm employers are covered by Order 14.  If the grower has a packing or processing operation in a permanently fixed structure or moving packing plant, the packing or processing operations workers would fall under Wage Order 13.

A. Activities under Order 13 must be performed:
 1. On the farmer's own crop
 2. In a permanent structure or on a moving packing plant (lettuce, carrots, dry onions)
 3. In preparation for market (i.e. distribution)

B. Order 8 applies to similar operations on the farm if they include:
 1. Handling any agricultural products, other than the grower's own after harvest or
 2. Any packing of a purchased crop or
 3. Cooperative warehousing, cooling, grading, sorting, packing, ginning, etc., or
 4. Preparing any product for distribution except for the farmer's own product.

| Commodity | Order 14 | Order 13 |
|---|---|---|
| Almonds | Growing, spraying, knocking, gathering, sun or solar drying in the field | Hulling, shelling, sorting, grading, processing, packing, all drying in a structure including oven drying or dehydrator drying, fumigating, shipping |
| Apples | Growing, spraying, tree propping, thinning, picking | Washing, sorting, grading, fumigating, Packing, shipping |
| Apricots | Growing, spraying, thinning, picking, hand cutting, spreading, sun or solar drying in the field | Sorting, grading, moisturizing,  all drying in a structure including oven drying or dehydrator drying, packing, packaging, shipping |
| Artichokes | Planting, growing, weeding, thinning, picking, field packing | Washing, sorting, grading, trimming, packing, shipping |
| Asparagus | Planting, growing, weeding, thinning, harvesting, field packing | Washing, sorting, grading, trimming, packing, shipping |
| Avocados | Growing, spraying, tree propping, picking | Washing, sorting, grading, packing, shipping |
| Beans (dry) | Planting, growing, weeding, harvesting | Shelling, washing, sorting, grading, packing, shipping, packaging |
| Beans (snap) | Planting, growing, weeding, harvesting | Washing, sorting, grading, trimming, packing, shipping |

6

| | | |
|---|---|---|
| Broccoli | Planting, growing, weeding, thinning, harvesting, field packing | Sorting, grading, trimming, packing, shipping |
| Brussel Sprouts | Planting, growing, weeding, thinning, harvesting, field packing | Sorting, grading, trimming, packing, shipping |
| Bush Berries | Growing, tying, weeding, harvesting, field packing | No known activities under Order 13 |
| Cabbage | Planting, growing, weeding, thinning, harvesting | Sorting, grading, trimming, packing, shipping |
| Cauliflower | Planting, growing, weeding, thinning, harvesting | Sorting, grading, trimming, packing, shipping |
| Carrots | Planting, growing, weeding, thinning, harvesting | In shed or on moving packing plaint: washing, sorting, trimming, topping, packing, packaging, shipping |
| Celery | Planting, growing, weeding, thinning, harvesting | Sorting, grading, trimming, packing, shipping |
| Cherries | Growing, spraying, tree propping, picking | Sorting, grading, sizing, packing, shipping |
| Corn, sweet | Planting, growing, thinning weeding, harvesting | Sorting, grading, trimming, packing, shipping |
| Cotton | Growing, thinning, chopping, picking | Cotton gin if operated by grower on own crop |
| Cucumbers | Planting, growing, thinning, hoeing, harvesting | Washing, grading, sizing, packing, shipping |
| Dates | Growing, de-thorning, pollinating, tying down, picking, bulk packing in the field | Sorting, grading, sizing, packing, shipping |
| Eggs | All operations if no candling done | All egg room operations if candling done |
| Figs | Growing, spraying, thinning, picking, sun or solar drying in the field | Grading, sorting, packing, fumigating, all drying in a structure including oven drying or dehydrator drying, shipping |
| Flowers, cut | Planting, growing, typing, de-budding, cutting, field grading, bunching, (last two operations done in fields, sun sheds, and sheds, connected with greenhouses) | Final grading and packing for shipment, combining with any purchased plant materials in preparing for market |
| Garlic | Planting, growing, thinning, weeding, hand-topping, sacking, cracking seeds only for farmer's own use in replanting | Sorting, grading, packaging, packing, shipping, preparing seeds for market |
| Grain | Planting, cultivating, harvesting | All drying in a structure including oven drying or dehydrator drying, fumigating, weighing, grading |
| Grapefruit | Growing, spraying, thinning, | Sorting, grading, labeling, packing, |

7

|  | picking | shipping |
|---|---|---|
| Grapes, table | Growing, thinning, girdling, pruning, typing, picking, pick-packing (field) | Sorting, trimming, packing, fumigating, labeling, shipping |
| Grapes, wine | Growing, thinning, girdling, pruning, typing, picking, pick-packing (field) | Wine production – all activities or Order 8 if grapes used are not grown "on the farm" |
| Hay | Planting, growing, cutting, stacking, bailing | No known activities under Order 13 |
| Honey | Removing from hive and cone, rendering (rendering can be last operation in field or first operation in shed) | Rendering, heating, bottling, labeling, cooling, whipping, place in cartons, packing for shipment |
| Hops | Planting, growing, stringing, weaving, separating, sun or solar drying in the field, bulk bailing | Recompressing or any processing and packaging after bulk bailing |
| Lemons | Growing, spraying, thinning, picking | Sorting, grading, labeling, packing, shipping |
| Lettuce | Planting, growing, hoeing, harvesting, field packing | In shed or on moving packing plant: sorting, trimming, packing, shipping |
| Melons | Planting, capping, hoeing, picking, cutting | Sorting, sizing, labeling, packing, shipping |
| Milk | Feeding and care of livestock, milking | Cooling, separating, pasteurizing |
| Nectarines | Growing, spraying, thinning, picking, hand-cutting, spreading, sun or solar field drying | Sorting, grading, moisturizing, all drying in a structure including oven drying or dehydrator drying, packing, packaging, shipping |
| Nursery Products Cuttings | Planting, growing, tying, cutting, rooting | Grading and packing, rooted cuttings for shipment |
| Olives | Growing, spraying, thinning, picking | Curing, processing |
| Onions, dry | Growing, weeding, thinning, harvesting, hand-topping, sacking | In shed or on moving packing plant: sorting, trimming, (processing, if for frozen pack), packing, packaging, sacking, shipping |
| Onions, green | Growing, weeding, thinning, harvesting | Washing, sorting, trimming, bunching, packing, shipping |
| Oranges | Growing, spraying, picking | Sorting, grading, washing, labeling, packing, shipping |
| Peaches | Growing, spraying, thinning, picking, hand-cutting, spreading, sun or solar field drying | Sorting, grading, moisturizing, all drying in a structure including oven drying or dehydrator drying, packing, packaging, shipping |

8

| Pears | Growing, spraying, tree-propping, picking, hand-cutting, spreading, sun or solar field drying | Sorting, grading, moisturizing, all drying in a structure including oven drying or dehydrator drying, packaging, shipping |
|---|---|---|
| Peas | Planting, growing, hoeing, picking, field packing | Washing, sorting, trimming, packing, shipping |
| Peppers | Planting, growing, picking, thinning, field packing | Washing, waxing, packing, shipping |
| Plants | Planting, growing, tying, potting and repotting, transporting to market | Seasonal, fancy or decorative potting |
| Plums | Growing, spraying, thinning, picking | Sorting, grading, packing, shipping |
| Pomegranates | Growing, spraying, thinning, picking | Sorting, grading, packing, labeling, shipping |
| Potatoes | Planting, growing, weeding, harvesting, sacking | Washing, sorting, sacking |
| Potatoes, seed | Planting, growing, weeding, harvesting, sacking | Sorting and cutting for seed, sacking |
| Prunes | Growing, spraying, thinning, picking, sun or solar field drying | Sorting, grading, moisturizing all drying in a structure including oven drying or dehydrator drying, fumigating, packing, packaging, shipping |
| Raisins | Growing, girdling, pruning, harvesting, sun or solar field drying | Sorting, grading, moisturizing, all drying in a structure including oven drying or dehydrator drying, fumigating, packing, packaging, shipping |
| Rice | Planting, growing, harvesting | No known activities under Order 13 |
| Strawberries | Planting, growing, weeding, thinning, picking, boxing | Sorting, grading, packing, labeling, shipping |
| Strawberry Plants | Planting, growing, weeding | Trimming, inspecting, packaging, packing, shipping |
| Tangerines | Growing, spraying, picking | Washing, sorting, packing, shipping |
| Tomatoes | Planting, growing, weeding, thinning, harvesting, field packing | Washing, sorting, packing, shipping |
| Tomatoes, Canning | Sorting on harvesting machine | No known activities under Order 13 |
| Vegetables, Misc. | Planting, growing, weeding, thinning, harvesting, field packing | Washing, sorting, trimming, packing, shipping |
| Walnuts | Growing, spraying, knocking, gathering, sun or solar field drying | Hulling, shelling, sorting, processing, packing, all drying in a structure including oven drying or dehydrator drying, fumigating, shipping |

9

## EXEMPT EMPLOYEES/OCCUPATIONS

These employees/occupations are exempt from specified sections of the Industrial Welfare Commission Orders. They are *not* exempt from provisions of the Labor Code. Exempt occupations must meet the criteria stated in Section 1, Applicability and/or Section 2, Definitions, of the applicable IWC Orders. Each order must be reviewed carefully.

| | |
|---|---|
| Accountants | Exempt from Sections 3-12, orders 1-13, 15, and 16 |
| Actors, professional | *ONLY* Sections 1, 2, 4, 10 and 20 of Orders 10, 11, and 12 are applicable; exempt from all other provisions of Orders 10, 11, and 12 |
| Administrative, executive, professional employees | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Architects | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Attendants, personal | *ONLY* Sections 1, 2, 4, 10 and 15 of Order 15 are applicable; exempt from all other provisions of Order 15 |
| Attorneys | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Baby sitters (under 18 years, sitting for child of employer in employer's home) | Exempt from Order 15 |
| Carnival (traveling) operators (full-time) | *ONLY* Sections 1, 2, 4, 10 and 20 of Order 10 are applicable; exempt from all other provisions of Order 10 |
| Certified Public Accountants | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Dentists | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Doctors | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Engineers | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Government Employees | *ONLY* Sections 1, 2, 4, 10, and 20 of all Orders are applicable, with one exception: Irrigation District employees are covered under the provisions of Order 14 |
| Inside Salespersons | Exempt from Subsections 3(A), (B) and (C) of Orders 4 and 7, if earnings equal more than 1 ½ times the minimum wage and if more than ½ of employees compensation represents commissions |
| Individuals participating in a national service program | Exempt from all Orders |
| Employees engaged in work that is primarily intellectual, managerial, or creative in nature | Exempt from Order 14 if employee exercises discretion and independent judgment, and remuneration is not less than two times the monthly State minimum wage for full-time employment |
| Irrigators | Exempt from Subsection 3(A) or Order 14 if more than ½ of week's working time is spent as an irrigator |
| Lawyers | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Nurse, student | *ONLY* Section 1, 2, 4, 10, and 20 of Order 5 are applicable to student nurses of a bona fide nursing school, exempt from all other provisions of Order 5 |
| Minor baby sitters (under 18, sitting | Exempt from Order 15 |

10

| | |
|---|---|
| for child of employer in employer's home | |
| Oculists | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Operators, full-time, employed by traveling carnivals | *ONLY* Sections 1, 2, 4, 10 and 20 of Order 10 are applicable; exempt from all other provisions of Order 10 |
| Optometrists | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |
| Outside Salespersons | Exempt from all Orders (also Labor Code section 1171) |
| Parent, spouse, child or legally adopted child of the employer | Exempt from all Orders |
| Personal attendants | *ONLY* Sections 1, 2, 4, 10 and 15 of Order 15 are applicable; exempt from all other provisions of Order 15 |
| Professional actors | *ONLY* Sections 1, 2, 4, 10 and 20 of Orders 10, 11, and 12 are applicable; exempt from all other provisions of Orders 10, 11, and 12 |
| Salespersons, outside | Exempt from all Orders (also Labor Code section 1171) |
| Salespersons, inside | Exempt from Subsections 3(A), (B) and (C) of Orders 4 and 7, if earnings equal more than 1 ½ times the minimum wage and if more than ½ of employees compensation represents commissions |
| Sheepherders | Exempt from Sections 3, 4(A)-(D), 5, 6, 9, 11, 12, and 13 of Order 14. Entire Order is applicable to any workweek during which a sheepherder employee is engaged in any non-sheep herding agricultural or other work |
| Students in schools of beauty culture offering beauty care to the public for a fee | Exempt from Order 2 |
| Student nurses | *ONLY* Section 1, 2, 4, 10, and 20 of Order 5 are applicable to student nurses of a bona fide nursing school, exempt from all other provisions of Order 5 |
| Teachers | Exempt from Sections 3-12, Orders 1-13, 15, and 16 |

11

## IWC ORDER COVERAGE

## Order 1 – MANUFACTURING INDUSTRY

Definition, Section 2 (H)

"Manufacturing Industry" means any industry, business, or establishment operated for the purpose of preparing, producing, making, altering, repairing, finishing, processing, inspecting, handling, assembling, wrapping, bottling, or packaging goods, articles, or commodities, in whole or in part; EXCEPT when such activities are covered by Order in the : Canning, Preserving, and Freezing Industry; Industries Handling Products After Harvest; Industries Preparing Agricultural Products for Market, on the Farm; or Motion Picture Industry.

Aircraft and aircraft parts, manufacturing
Apparel products, manufacturing
Assembly (any manufacturing)
Automobile manufacturing
Auto-wrecking (non-retail)
Blueprinting
Book and magazine publishers
Cement
Ceramics
Coating lumber products
Communications equipment, manufacturing
Concrete
Copy making services
Dental laboratories
Developing, printing or editing of film (except in motion picture industry, see Order 12)
Electronic products, manufacturing
Film processing (except in motion picture industry, see Order 12)
Food manufacture (secondary processing)
Food processing
      Baby formulas (except canned fruits, etc., see Order 3)
      Bakeries (non-retail)
      Bottling (soft drinks)
      Breweries
      Candy
      Cane sugar refining (of purchased raw sugar or syrup)
      Citrus by-products
      Cottonseed oil
      Dehydrated soups and mixes
      Ice cream (beyond first processing)
      Margarine
      Meat
      Pet foods, dry
      Pizza manufacturing
      Potato and corn chip manufacturing
      Preparing fruit and vegetables for restaurants, bakeries, etc.
      Salad oil
      Soft drinks, bottling
      Tortilla manufacturing
      Yeast
Food products, manufacturing

12

Galvanizing
Garment manufacturing
Iron works
Laboratories, dental and optical
Lumber products
Machinery, metal products
Magazine and book publishers
Meat processing
Metal fabrication
Metal products, machinery
Microfilm services
Needle trades
Oil refining
Optical laboratories
Paper products
Photocopy services
Plastic products
Pre-fabricated housing (except on-site installation, see Order 16)
Public/private utilities, electrical only (for telephone, natural gas and water, utilities see Order 4)
Publishing
Records, tapes and compact disks (reproduction for wholesale)
Recycling processing plants that alter/transform material (for non-processing recycling centers, see Order 4)
Refineries, Oil
Refineries, sugar
Repacking bulk products
Reweaving (except by laundries/dry cleaners, see Order 6)
Rubber manufacturing
Sawmills
Sheet metal shops
Shipbuilding (except repair, see Order 9)
Shoe manufacturing and repair
Steel smelters/plants
Sugar refineries
Taxidermy
Textile products, manufacturing
Utilities, public/private, electrical only (for telephone, natural gas and water, utilities see Order 4)
Wastewater treatment facilities

13

## Order 2 – PERSONAL SERVICE INDUSTRY

Definition, Section 2 (J)

"Personal Service Industry" means any industry, business or establishment operated for the purpose of rendering, directly or indirectly, any service, operation or process used or useful in the care, cleansing or beautification of the body, skin, nails, or hair, or in the enhancement of personal appearance or health, including but not limited to, beauty salons, schools of beauty culture offering beauty care to the public for a fee, barber shops, bath and massage parlors, physical conditioning, weight control salons, health clubs, and mortuaries.

Barbershops
Bath parlors
Beauty shops
Body building gymnasium, facility
Funeral parlors
Gymnasiums, body building
Health clubs
Massage parlors
Mortuaries
Physical conditioning centers
Schools of beauty culture offering beauty care to the public for a fee (students are exempt)
Sun tanning parlors
Weight control salons

## Order 3 – CANNING, FREEZING, AND PRESERVING INDUSTRY

Definition, Section 2(B)

"Canning, Freezing, and Preserving Industry" means any industry, business or establishment operated for the purpose of canning soups, or of cooking, canning, curing, freezing, pickling, salting, bottling, preserving, or otherwise processing any fruits or vegetables, seafood, meat, poultry, or rabbit product, when the purpose of such processing is the preservation of the product and includes all operations incidental thereto.

Canned pet food
Canned soups, stews, hash, etc.
Canning: fish, fruit, meat, poultry, rabbit, vegetables
Fish; canning, freezing
Freezing: fish, fruit, meat, poultry, rabbit, vegetables
Fruit; canning, freezing
Fruit jellies and preserves
Hash, canned
Juice concentrates
Meat: canning, freezing
Pet foods, canned
Poultry: canning, freezing
Rabbit: canning, freezing
Vegetables: canning, freezing

14

Order 4 – PROFESSIONAL, TECHNICAL, CLERICAL, MECHANICAL and SIMILAR
        OCCUPATIONS

Definition, Section 2(O)

"Professional, Technical, Clerical, Mechanical and Similar Occupations" includes professional, semiprofessional, managerial, supervisory, laboratory, research, technical, clerical, office work, and mechanical occupations.  Said occupations shall include, but not be limited to, the following: accountants; agents; appraisers; artists; attendants; audio-visual technicians; bookkeepers; bundlers; billposters; canvassers; carriers; cashiers; checkers; clerks; collectors; communications and sound technicians; compilers; copy holders; copy readers; copy writers; computer programmers and operators; demonstrators and display representatives; dispatchers; distributors; door-keepers; drafters; elevator operators; estimators; editors; graphic arts technicians; guards; guides; hosts; inspectors; installers; instructors; interviewers; investigators; librarians; laboratory workers; machine operators; mechanics; mailers; messengers; medical and dental technicians and technologists; models; nurses; packagers; photographers; porters and cleaners; process servers; printers; proof readers; sales persons and sales agents; secretaries; sign erectors; sign painters; social workers; solicitors; statisticians; stenographers; teachers; telephone, radio-telephone, telegraph and call-out operators; tellers; ticket agents; tracers; typists; vehicle operators; x-ray technicians; their assistants and other related occupations listed as professional, semiprofessional, technical, clerical, mechanical, and kindred occupations.

**Use of the asterisk (\*) in the following list indicates Order 4, an occupational order, covers the named and related occupations *only* when they are not covered by an industry order. They type of business determines the industry order.**

*Accountants
Accounting firms
Advertising agencies
*Agents
*Agronomist
Animal care services, no overnight shelter or feeding provided (see Order 5, when overnight shelter or feeding are provided)
*Appraisers
Architectural offices
*Artists
Associations, business (Chamber of Commerce, retailers' associations, etc.)
Athletic agents
*Attendants
Attorney offices
*Audio-visual technicians
Banks
*Billposters
Boats, office and support personnel
*Bookkeeper
*Bundlers
Business Associations (Chamber of Commerce, retailers' associations, etc.)
Business services
Cable TV service and installation
*Call-out operators
*Canvassers
*Carriers
*Cashiers

15

Cemeteries
Charitable agencies (non-profit)
*Checkers
Checkrooms
Churches
*Cleaners and porters
*Clerks
Collection agencies
*Collectors
Colleges, private, no board or lodging
Commercial fishing boats, office and support personnel
Commercial photography (except in motion picture industry, see Order 12)
Communications firms
*Communications technicians
*Compilers
*Computer operators, programmers
Construction, office and support personnel
Contractors, office and support personnel
*Copyholders
*Copyreaders
*Copywriters
Credit agencies
Credit unions
Crop dusting, office and support personnel
Dance schools, studios
Day care centers, no board or lodging provided
*Demonstrators
Dental offices
*Dental technicians and technologists
Detective agencies, protective and investigative
Direct mail advertising and service
*Display representatives
*Dispatchers
Doctors' offices
*Drafters
*Drivers (vehicle)
Dumps/landfills
*Editors
*Elevator operators
Employment agencies
Engineering firms
*Estimators
Farm clerical and technical personnel when not covered by Order 14 or industry order
Farm labor contractors
Finance companies
Fishing boats (commercial) office and support personnel
Geophysical exploration
*Graphic arts technicians
*Guards
*Guides
Hazardous materials cleanup and handling when contractor's license not required (when contractor's license
          required, see Order 16)
*Horticulturist
*Hosts, hostesses
*Inspectors
*Installers when contractor's license not required (when contractor's license
          required, see Order 16)
*Instructors
Insurance companies
Internet service providers
*Interviewers
*Investigators
Investment houses

16

Laboratories (independent research, testing, etc.)
*Laboratory workers
Labor contractors (office and support personnel)
Labor unions
Landfills/dumps
Legal firms
*Librarians
Libraries
Loan offices
Logging, office and support personnel
*Machine operator
*Mailers
*Mechanics
Medical clinics (apart from hospitals)
*Medical technicians and technologists
Mining, office and support personnel
*Models
Nonprofit organizations (charitable, social agencies)
*Nurses
Oculist offices
*Packagers
Painting contractors, office and support personnel
*Photographers
Photography, commercial
*Porters and cleaners
Portrait studios
*Printers
Private schools, universities, colleges, no board or lodging provided (when board or lodging are provided, see Order 5)
*Process servers
Professional offices (architects, attorneys, doctors, dentists, engineers)
*Programmers, computer
*Proofreaders
Protective agencies
Public/private utilities, water, natural gas, telephone (for electrical utilities, see Order 1)
Public works, office and support personnel
*Radiotelephone operators
Real estate offices (brokerage only; see also Order 5)
Recycling centers, non-processing
Repossession agencies
Research and development
*Sales agents
*Salespersons
Savings and loan
Schools, private, no board or lodging provided (when board or lodging are provided, see Order 5)
*Secretaries
*Security guards
Security guard service
Shopping services
*Sign erectors
*Sign painters
Social agencies
*Social workers
*Solicitors
*Sound technicians
*Statisticians
*Stenographers
Stock brokerage firms
Talent agents
Tax Consultants
*Teachers
*Telegraph operators
Telephone/Telegraph companies (includes cell/wireless phone service)
Telephone answering service

17

\*Telephone operators
\*Tellers
Temporary employment agencies
\*Ticket agents
\*Tracers
Travel agencies
\*Truck drivers
\*Typists
Universities, private, no board or lodging provided (when board or lodging are provided, see Order 5)
\*Vehicle operators
Veterinary service, no overnight shelter or feeding provided (when overnight shelter or feeding are provided, see Order 5)
Water and oil well drilling and servicing firms, office and support personnel
\*X-ray technicians

**Use of the asterisk (\*) in the following list indicates Order 4, an occupational order, covers the named and related occupations *only* when they are not covered by an industry order. They type of business determines the industry order.**


## Order 5 – PUBLIC HOUSEKEEPING INDUSTRY

Definition, Section 2(P)

"Public Housekeeping Industry" means any industry, business, or establishment, which provides meals, housing, or maintenance, services whether operated as a primary business or when incidental to other operations in an establishment not covered by an industry order of the Commission, and includes, but is not limited to the following:

(1) Restaurants, nightclubs, taverns, bars, cocktail lounges, lunch counters, cafeterias, boarding houses, clubs, and all similar establishments where food in either solid or liquid form is prepared and served to be consumed on the premises;

(2) Catering, banquet, box lunch service, and similar establishments, which prepare food for consumption on or off the premises;

(3) Hotel, motels, apartment houses, rooming houses, camps, clubs, trailer parks, office or loft buildings, and similar establishments offering rental of living, business or commercial quarters;

(4) Hospitals, sanitariums, rest homes, child nurseries, child care institutions, homes for the aged, and similar establishments offering board or lodging in additional to medical, surgical, nursing, convalescent, aged or child care.

(5) Private schools, colleges, or universities, and similar establishments which provide board or lodging in addition to educational facilities;

(6) Establishments contracting for development, maintenance or cleaning of grounds; maintenance or cleaning of facilities and/or quarters of commercial units and living units; and

(7) Establishments providing veterinary or other animal care services.

Animal care services with overnight shelter or feeding (when no overnight shelter or feeding are provided, see Order 4)

18

Animal sanctuaries/shelters with overnight shelter or feeding (when no overnight shelter or
      Feeding are provided, see Order 4)
Apartment houses
Bakeries, with tables for patrons' use
Banquet service
Bars
Boarding and care homes for the aged
Boarding houses
Box lunch services
Cafeterias
Camps, day
Camps, organized
Catering service
Childcare institutions
Child nurseries
Cleaning of facilities, grounds, commercial units, living units
Cocktail lounges
Colleges, private with board or lodging
Commissaries
Convalescent hospitals
Cookhouses in lumber camps
Day camps
Day care centers that provide board or lodging
Development of grounds
Donut shops, with tables for patrons' use (if no tables are provided for patrons' use, see Order 7)
Drinking places
Dude ranch
Eating-places
Farm labor camps with board or lodging
Fraternity houses
Homes for the aged
Hospitals, including convalescent
Hotels
Ice cream store, with tables for patrons' use
Janitorial service
Landscaping (except initial earth moving and cement work, see Order 16)
Loft or office buildings
Logging camps with board or lodging
Lunch counters
Lunch wagons
Maintenance of grounds, facilities, quarters of commercial units and living units
Mini-storage not connected with transportation firm (if connected with a transportation firm, see Order 9)
Motels
Nightclubs, if food or drink is served incidental to main business of offering entertainment (if
      main business is serving food or drink, See Order 10)
Nurseries, child
Office and loft buildings
Organized camps
Pest control
Pre-schools
Property management
Real estate offices, if business includes property management
Restaurants
Rest homes
Sanitariums
School, private, with board or lodging
Sewer/septic cleaning

19

Sorority houses
Stables, with board and care
Storage, mini, not connected with transportation firm (if connected with a transportation firm, see Order 9)
Taverns
Termite control
Trailer parks
Tree service firms
Universities, private, with board or lodging
Veterinary service that provides overnight shelter or feeding

Note: Order 5 covers all classifications of employees in an Order 5 business, such as a hospital, whether they assist patients, clean rooms, do laundry, drive, keep books, etc.  This is also true of other industry orders.


## Order 6 – LAUNDRY, LINEN SUPPLY, DRY CLEANING AND DYEING INDUSTRY

Definition, Section 2(H)

> "Laundry, Linen Supply, Dry Cleaning and Dyeing Industry" means any industry, business or establishment operated for the purpose of washing, ironing, cleaning, refreshing, restoring, pressing, dyeing, storing, fumigating, mothproofing, or other processes incidental thereto, on articles of fabrics of any kind, including but not limited to clothing, hats, drapery, rugs, curtains, linens, household furnishings, textiles, furs, or leather goods; and includes self-service laundries, self-service dry cleaning establishments, and the collection, distribution, storage, sale or resale at retail or wholesale of the foregoing services.

Carpet cleaning service, including in-home
Diaper service, if laundering included (if laundered elsewhere, see Order 7)
Drapery cleaning service, including in-home
Dry cleaning, including self-service
Dyeing plants
Laundries, including self-service
Laundromats
Linen supply, if laundering included
Rental of uniforms, if laundering/cleaning included (if laundering/cleaning not included, see Order 7)
Self-service laundries/dry cleaners
Uniform rentals, if laundering/cleaning included (if laundering/cleaning not included, see Order 7)

20

Order 7 – MERCANTILE INDUSTRY

Definition, Section 2(H)

"Mercantile Industry" means any industry, business, or establishment operated for the purpose of purchasing, selling or distributing goods or commodities at wholesale or retail; or for the purpose of renting goods or commodities.

Antique Stores, retail/wholesale
Auction houses
Bakeries, retail, if no tables for patrons' use (if bakery has tables for patrons' use, see Order 5)
Building materials, retail/wholesale
Commodity agents and brokers
Commodity rentals
Costume rental
Diaper service, if laundered elsewhere (if laundering included, see Order 6)
Donut shops, if no tables for patrons' use (if shop has tables for patrons' use, see Order 5)
Equipment rentals (except vehicles, see Order 9)
Flea markets
Florists, retail/wholesale
Gas stations (with or without car washes or garages)
Hardware stores, retail/wholesale
Ice cream stores, if no tables are provided for patrons' use
Import-export, retail/wholesale
Irrigation systems (sales)
Linen supply, if laundering not included (if laundering included, see Order 6)
Mail order houses, retail/wholesale
Nurseries, horticultural (main purpose selling)
Optician (except manufacturer, see Order 1)
Rental of commodities and goods
Rental of equipment (except vehicles, see Order 9)
Rental of uniforms, if laundering/cleaning not included (if laundering included, see Order 6)
Retail stores
Rummage sales
Solar equipment (sales)
Telephone soliciting
Thrift shops
Uniform rentals, if laundering/cleaning not included (if laundering included, see Order 6)
Wholesale houses

Note:  A retail store operating incidentally as part of another business; such as a gift shop operated by a hotel or hospital, is covered by the industry order applicable to the main business, i.e., the hotel or hospital (Order 5).  A retail store operating on the premises of another business where the retail store is neither owned nor operated by the other business is covered y the industry order applicable to its type of business, which in this example, a retail store, is Order 7.  A separate establishment under a distinctly separate organization, such as a telephone equipment store under the sales division of a telephone company, would be under Order 7,  and not under Order 4, the order applicable to the telephone company.  Each such situation must be analyzed on a case-by-case basis, as it depends upon the particular facts of the situation.

21

## Order 8 – INDUSTRIES HANDLING PRODUCTS AFTER HARVEST

Definition, Section 2(H)

> "Industries Handling Products After Harvest" means any industry, business or establishment operated for the purpose of grading, sorting, cleaning, drying, cooling, icing, dehydrating, cracking, shelling, candling, separating, slaughtering, picking, plucking, shucking, pasteurizing, fermenting, ripening, molding, or otherwise preparing any agricultural, horticultural, egg, poultry, meat, seafood, rabbit, or dairy product for distribution, and includes all the operations incidental thereto.

Beet sugar mills
Citrus and deciduous fruit packing
Cooperatives (farmers') for warehousing, grading, packing, cooling, etc.
Cotton gins
Dairies (which process milk commercially)
Deciduous and citrus fruit packing
Dried fruit processing
Drying vegetables and fruit
Egg candling and packing
Egg processing (washing, grading and bulk packing any eggs other than farmer's own)
Feed mills (commercial)
Fresh vegetable and fruit packing
Fruit drying
Fruit (fresh) packing
Ice cream (made from whole milk as first processing)
Meat slaughtering (commercial packing house)
Moving packing plant (operator brings rig into field, works on farmer's crop on same basis as a commercial packing house)
Nut hulling, cracking, shelling, sorting and hauling
Olive oil
Packing fresh vegetables and fruit
Packing plant, moving (operator brings rig into field, works on farmer's crop on same basis as a commercial packing house)
Potato grading, sorting and bagging
Poultry processing, commercial packing house
Rice drying (commercial)
Sausage making (at point of first processing)
Slaughtering meat (commercial packing house)
Sugar (beet) mills
Sugar or syrup directly from sugar cane
Vegetable drying
Vegetables (fresh) packing

Note:  A grower who processes the product of any other employer is engaged in a "commercial" operation.  Most of the operations listed here if done by the grower on his or her own crop would be under Order 13, but the grinding and mixing of feed exclusively for the employer's own use would be part of the care of farm animals under Order 14, even if done mechanically in a separate building (the grower's own "feed mill").  All beet sugar mill operations are under Order 8, but cane sugar refining from purchased raw sugar or syrup (typical of the industry in California) is under Order 1.  The production of sugar or syrup directly from sugar cane would be under Order 8.  A firm in the business of making sausage or cold cuts from purchased cuts of meat would be manufacturing under Order 1.

22

## Order 9 – TRANSPORTATION INDUSTRY

Definition, Section 2(N)

> "Transportation Industry" means any industry, business or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air or water, and all operations and services in connection therewith; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or cleaning of vehicles.

Airlines
Ambulance service
Armored car service
Boat rentals
Boats, cruise, ferry
Bus lines
Buses, tour
Car loading
Car rentals
Car washes, when not in retail business
Courier service
Cruise boats
Express and parcel delivery companies
Ferryboats
Garages, repair (except when operated by vehicle dealer or gas station, see Order 7)
Garages, storage
Garbage collectors
Limousine service
Logging trucks, commercial (for on-site logging, see Order 16)
Maintenance of vehicles, e.g., garages, car washes, etc., if not connected with gas station or vehicle dealer (if connected with gas station or vehicle dealer, See Order 7)
Mini-storage connected with a transportation firm (if not connected with a transportation firm, see Order 5)
Moving and storage warehousing (of commodities moved)
Parcel delivery service
Parking lots
Railways
Rental of vehicles (cars, trucks, boats, ships, airplanes)
Repairs to vehicles (except when operated by vehicle dealer or gas station, see Order 7)
Ship rental
Ship repair
Stevedoring
Storage and moving warehouse (of commodities moved)
Storage garages
Taxi service, including water taxis
Tire aligning and balancing companies
Tour buses, companies
Tow companies
Transportation companies
Trucking, including commercial trucking of farm products
Truck rental
Vehicle rental, including boats and ships
Vehicle repairs (except when operated by vehicle dealer or gas station, see Order 7)
Warehousing and storage (of commodities moved)
Water taxi service

23

Note:  Many kinds of industries employ people to operate and maintain vehicles and warehouses; transportation companies under Order 9 have that as their main purpose.  A hotel employee who drives a van is under Order 5; a mechanic employed by a retail chain is under Order 7; a mini-storage facility not connected with a transportation firm is under Order 5; the building of vehicles, including ships, is under Order 1; a farm employee who delivers farm products to the first point of distribution is under Order 14, but a trucking company which is in the business of trucking mostly farm products is under Order 9; employees who balance and align tires are under Order 9, if their employer is in the business of providing that service but under Order 7 if their employer is basically in the business of selling tires.

## Order 10 – AMUSEMENT AND RECREATION INDUSTRY

Definition, Section 2(A)

> "Amusement and Recreation Industry" means any industry, business or establishment operated for the purpose of furnishing entertainment or recreation to the public, including but not limited to theaters, dance halls, bowling alleys, billiard parlors, skating rinks, riding academies, race tracks, amusement parks, athletic fields, swimming pools, gymnasiums, gold courses, tennis courts, carnivals, and wired music studios.

Academies, riding
Amusement parks
Arena/auditoriums (multipurpose)
Aquariums
Athletic fields
Ballooning
Billiard parlors
Bingo parlors, games
Boating, golf, tennis, etc., clubs
Boats, charter fishing
Botanical Gardens
Bowling alleys
Card rooms
Carnivals
Casinos
Charter fishing boats
Clubs; golf, tennis, boating, etc. (also see Order 5)
Dance halls
Fishing: charter boats, party boats, recreational fishing lakes
Game rooms
Golf courses
Golf, tennis, boating, etc., clubs
Gymnasiums, spectator or participatory sports
Ice skating rinks
Music festival, opera and symphony organizations
Music groups and orchestras
Nightclubs, entertainment is primary purpose (if food or drink is served other than incidentally, see Order 5)
Opera, symphony and music festival organizations
Orchestras and other music groups
Penny arcades
Racetracks
Racing stables
Riding academies, stables
Rodeos
Roller skating rinks

24

Ski facilities
Ski lifts
Stables, riding academies (primarily recreational), racing
Swimming pools
Symphony, music festival and opera organizations
Tennis courts
Theaters
Theatrical companies
Wired music studios
Zoos

Note:  The gymnasiums under Order 10 are those used primarily for spectator or participatory sports and are different from the establishments offering bodybuilding or weight control facilities under Order 2.  Musicians may be employed directly by restaurants or hotels under Order 5; by symphony or opera organizations under Order 10; or, in a group which shares receipts, by a leader who can hire or fire them and command more than an equal share of the fees paid for the group's services under Order 10.  Food service may be provided incidentally by a firm whose main business is offering entertainment, as in a theater, bowling alley, nightclub or golf club without affecting the classification under Order 10.  But a golf club with a public dining room not operated by the golf club (separate ownership or leased from the golf club) is operating a restaurant, and the restaurant employees are covered under the provisions of Order 5.

## Order 11 – BROADCASTING INDUSTRY

Definition, Section 2(B)

> "Broadcasting Industry" means any industry, business or establishment operated for the purpose of broadcasting or taping and broadcasting programs through the medium of radio or television.

Broadcasting and taping (sound or video)
Radio broadcasting
TV broadcasting

Note:  The production of motion pictures on videotapes for a purpose other than broadcasting usually falls under Order 12 (see note following Order 12).  If the company both tapes and broadcasts, as in a TV news show, the taping is under Order 11, but if the broadcaster contracts with another firm for the production of a video tape, the taping is an Order 12 operation.  Most cable TV companies are in the business primarily for the purpose of selling and providing a communications service and are under Order 4.

25

## Order 12 – MOTION PICTURE INDUSTRY

Definition, Section 2(K)

> "Motion Picture Industry" mean any industry, business or establishment operated for the purpose of motion picture or television film production, or primarily allied with theatrical or television, motion picture productions, including but not limited to motion pictures for entertainment, commercial, religious or educational purposes, whether made by film, tape, or otherwise.

Advertising films, production of
Casting bureaus, motion picture industry
Commercial motion picture production
Distribution of motion pictures to theaters or television
Educational motion pictures, production and distribution
Film, developing and printing, motion picture production
Film libraries, motion picture production
Film production, television
Films, advertising, production of
Libraries, film, motion picture production
Motion picture production, casting bureaus
Motion picture production, theatrical and non-theatrical (commercial, education, religious, etc.)
Motion picture, distribution to theaters and television
Non-theatrical motion picture production (commercial, education, religious, etc.)
Property or wardrobe rental, motion picture production
Religious motion picture production
Rental of property, wardrobe, motion picture production
Television advertising films (production)
Television film production
Theatrical motion picture production
TV advertising films (production)
TV film production
Video production companies producing tapes for industrial, training, or other purposes (but if reproducing the tapes,
        see Order 1)
Wardrobe or property rental, motion picture industry


Note:  A firm producing motion picture programs on videotape for corporate customers would be under Order 12, even if it made and distributed copies; but a firm whose main business is to reproduce tapes (i.e., manufacture them) for wholesale and retail trade would be under Order 1.  If video production is incidental to the employer's main business (i.e., a function of the promotional office of an industrial or financial corporation) the order covering the main business would apply.

26

## Order 13 –     INDUSTRIES PREPARING AGRICULTURAL PRODUCTS FOR MARKET, ON THE FARM

Definition, Section 2(H)

"Industries Preparing Agricultural Products for Market, on the Farm" means any operation performed in a permanently fixed structure or establishment on the farm or on a moving packing plant on the farm for the purpose of preparing agricultural, horticultural, egg, poultry, meat, seafood, rabbit, or dairy products for market when such operations are done on the premises owned or operated by the same employer who produced the products referred to herein and includes all operations incidental thereto.

Agricultural commodities, packing and processing, on grower's own land and crops
Dairies (which process own products on farm)
Egg processing and packing for distribution (if it includes candling)
Meat slaughtering (when done on grower's own product)
Moving packing plant, processing grower's own crop on grower's own land
Nut hulling, cracking, shelling, sorting and hauling
Packing and processing agricultural commodities on grower's own land and crops
Packing plant (moving) processing grower's own crop on grower's own land
Packing shed (permanent) processing grower's own crop on grower's own land
Poultry processing, when done on grower's own product
Slaughtering meat (when done on grower's own land and product)

Note:  If the grower's packing or processing operation handles the product of any other employer, even "a little for a neighbor", it is a commercial operation under Order 8.  Conversely, almost everything done under Order 8 is an Order 13 operation when performed only on the farm employer's own crop or animal product, but there are rare exceptions; rice drying, for example, is Order 14 or Order 8.  If an employee is working under Order 13 and 14, the applicable order for overtime purposes would relate to the activity in which the person was engaged at the time of the overtime was worked.

**Order 14 – AGRICULTURAL OCCUPATIONS**

Definition, Section 2(D)

"Employed in an agricultural occupation", means any of the following described occupations:

(1) The preparation, care, and treatment of farm land, pipeline, or ditches, including leveling for agricultural purposes, plowing, disking, and fertilizing the soil;

(2) The sowing and planting of any agricultural or horticultural commodity;

(3) The care of any agricultural or horticultural commodity, as used in this subdivision, "care" includes, but is not limited to, cultivation, irrigation, weed control, thinning, heating, pruning, or tying, fumigating, spraying, and dusting;

(4) The harvesting of any agricultural or horticultural commodity, including but not limited to, picking, threshing, mowing, knocking off, field chopping, bunching, baling, balling, field packing, and placing in field containers or in the vehicle in which the commodity will be hauled, and transportation on the farm or to a place of first processing or distribution;

(5) The assembly and storage of any agricultural or horticultural commodity, including but not limited to, loading, road siding, banking, stacking, binding, and piling;

(6) The raising, feeding and management of livestock, fur bearing animals, poultry, fish, mollusks, and insects, including but not limited to herding, housing, hatching, milking, shearing, handling eggs, and extracting honey;

(7) The harvesting of fish, as defined by Section 45 of the Fish and Game Code, for commercial sale;

(8) The conservation, improvement or maintenance of such farm and its tools and equipment;

Agricultural workers
Agronomist
Apiary
Bee hives
Chemical application (on-site agriculture)
Chicken debeaking
Cowboy/Cowgirl
Crop dusting (on-site activities)
Dairies (no processing except cooling)
Egg handling (if no candling is done)
Farm laborers
Fish hatcheries
Harvesting machines, tomato and grain

28

Hatcheries, commercial
Hatcheries, fish
Hives, bee
Irrigation districts
Irrigators
Milk tester (employed by agricultural employer)
Nurseries, horticultural (primarily a growing operation)
Oyster farms
Ranch hands
Shepherds
Tomato and grain harvesting machines
Tree farms (growing but not logging)
Trout farms, hatcheries
Wranglers

Note: Order 14 occupations generally include all growing occupations up through harvesting, including field packing, loading on trucks, and delivery by farm employees to the point of first processing or distribution (if a farmer has a packing plant, employees who transport products to any point off the farm are under Order 13). Employees directly engaged in the on-farm application of chemicals by a commercial agricultural service are under Order 14, but other employees of a company which is also in the business of selling chemicals are under Order 7; if the firm only contracts to apply the grower's materials or facilitates obtaining chemicals only incidentally, its non-farm employees are under the applicable occupation or industry order.

If during a workday/workweek an employee is working under both Order 13 *and* 14, the applicable order for overtime purposes would relate to the activity in which the person was engaged at the time the overtime was worked.

If the nature of the farm is the growing of timber, including Christmas trees, for commercial purposes and the harvesting requires a timber operator's license pursuant to California Public Resources Code §§4571, 4586, the logging is covered under Order 16.

29

## Order 15 – HOUSEHOLD OCCUPATIONS

Definition, Section 2(I)

"Household Occupations" means all services related to the care of persons or maintenance of a private household or its premises by an employee of a private householder. Said occupations shall include, but not be limited to, the following: butlers, chauffeurs, companions, cooks, day workers, gardeners, graduate nurses, grooms, house cleaners, housekeepers, maids, practical nurses, tutors, valets, and other similar occupations.

Persons employed in such occupations by any employer other than the private householder are covered by some other order.

Note: Personal attendants are only covered by Sections 1, 2, 4, 10 and 15 or Order 15. A personal attendant includes babysitters and means "any person employed by a private householder or by any third party employer recognized in the health care industry to work in a private household, to supervise, feed, or dress a child or person who by reason of advanced age, physical disability or mental deficiency needs supervision. The status of "personal attendant" shall not apply when no significant amount of work other than the foregoing is required. The phrase "no significant amount of work other than the foregoing" in the definition means not more than twenty percent (20%) of the work time. Usually, such "other work" involves housekeeping duties such as making beds, preparing meals, washing clothes, and other similar services. It should be noted that practical nurses and companions are explicitly covered by Order 15 and may not be exempted as personal attendants even though many of their duties are the same. Any worker who regularly gives medication or takes temperatures or pulse or respiratory rate, regardless of the amount of time such duties take, falls within some classification of nurse, licensed or unlicensed.

## Order 16 –    OCCUPATIONS IN THE CONSTRUCTION, DRILLING, LOGGING AND MINING INDUSTRIES

Definition, Section 2(C)

"Construction occupations" mean all job classifications associated with construction, including, but not limited to, work involving alteration, demolition, building, excavation, renovation, remodeling, maintenance, improvement and repair work by the California Business and Professions Code, Division 3, Chapter 9, §§7025 *et seq*., and any other similar, or related occupations or trades.

Bricklayers/tenders
Carpenters
Carpet installers
Cement masons
Drywall installer/finisher
Electricians
Flag person
Framers
Glaziers
Hazardous material cleanup and handling (when contractor's license required)
Hod carriers
Iron workers
Laborers, construction

30

Landscape installers
Marble/granite/slate installer/finisher (natural or synthetic)
Mechanics (equipment)
Operating engineers
Painters
Plasterers
Plumbers
Roofers
Sheet metal workers
Slurry seal workers
Steel erectors
Stonemason and tenders
Surveyors
Teamsters (when working on-site)
Telecommunication workers
Tile setters and finishers
Welders

Order 16 covers the preceding listed crafts when the worker is participating in on-site construction activities.  However, there may be situations where a worker is covered under another industry order if he or she is involved in fabrication (manufacturing industry).

Definition, Section 2(E)

> "Drilling occupations" mean all job classifications associated with the exploration or extraction of oil, gas, or water resources work, including but not limited to, the installation, establishment, reworking, maintenance or repair of wells and pumps by boring, drilling, excavating, casting, cementing and cleaning for the extraction or conveyance of fluids such as water, steam, gases, or petroleum.

Derrickman (Derrick person)
Driller
Electrician
Field mechanic
Floor hand – motorman
Floor hand (roughneck)
Lubeman (Lube person)
Mechanic
Operator
Pipe racker
Reservoir engineer
Reliability specialist
Rig operator (sometimes referred to as "head well puller")
Rig supervisor
Roughneck (Floor hand)
Tool-pusher
Welder
Well puller

Definition, Section 2(K)

> "Logging occupations" mean any work for which a timber operator's license is required pursuant to California Public Resources Code §§4571, 4586, including the cutting or

31

removal, or both, of timber or other solid wood forest products, including Christmas trees from timerlands for commercial purposes, together with all the work that is incidental thereto, including but not limited to, construction and maintenance of roads, fuel breaks, firebreaks, stream crossings, landings, skid trails, beds for the falling of trees, and fire hazard abatement.

Choker setters
Equipment operators
Fallers
Forester
Skidders
Water truck drivers

Definition, Section 2(L)

"Mining occupations" mean miners, and other associated and related occupations (not covered by Labor Code Section          *et seq*.) required to engage in excavation or operations above or below ground including work in mines, quarries, or open pits used for the purposes of exploration or extraction of non-metallic minerals and ores, coal, and building materials, such as stone, gravel and rock, or other materials intended for manufacture or sale, whether paid on a time, piece rate, commission, or other basis.

Batch plant laborer
Blaster
Bull gang mucker
Cable tender
Change houseman
Chemical grout operator
Cherry picker operator
Chuck tender
Coal worker
Dredge operator
Driller
Dump person
Flume maker
Grout gun operator
Grout mix operator
Grout pump operator
Jackleg miner
Jumbo person
Kemper
Miner
Nozzle person
Nipper
Pneumatic vibrator operator
Pot tender
Powderman
Primer person
Raiser/Setter
Rodders (concrete crew)
Sandblaster
Shotcrete operator
Spiral runner

32

Spreaders (concrete crew)
Stone grinder
Swamper (Brakeman and Switchman on tunnel work)
Timber person
Tool person
Track person
Tunnel concrete finisher
Tunnel materials handler


## Order 17 – MISCELLANEOUS EMPLOYEES

Applicability of Order.

Section 1(A)  Any industry or occupation not previously covered by, and all employees not specifically exempted in, the Commission's Wage Orders in effect in 1997, or otherwise exempted by law, are covered by this order.

Currently the Division of Labor Standards Enforcement has not identified any occupations that meet the definition of "miscellaneous employees" in Industrial Welfare Commission Order 17-2001.

33

## ¹INDEX OF BUSINESSES AND OCCUPATIONS

| | -A- | IWC Order |
|---|---|---|
| | Academies, Riding | 10 |
| * | Accountants | |
| † | Accountants (CPAs) – exempt from Sections 3-12, Orders 1-13, 15 and 16 | |
| | Accounting firms | 4 |
| † | Actors, professional – *ONLY* Sections 1, 2, 4, 10 and 20 of Orders 11 and 12 are applicable; exempt from all other provisions of Orders 11 and 12) | - |
| | Advertising agencies | 4 |
| | Advertising films, production of | 12 |
| * | Agents | 4 |
| †† | Agricultural commodities, packing and processing | 8 or 13 |
| | Aircraft and aircraft parts, manufacturing | 1 |
| | Airlines | 9 |
| | Ambulance service | 9 |
| | Amusement parks | 10 |
| | Animal care services (no overnight shelter or feeding) | 4 |
| | Animal care services (with overnight shelter or feeding) | 5 |
| | Apartment houses | 5 |
| †† | Apiary | 8 or 13 |
| | Apparel products, manufacturing | 1 |
| | Applying chemicals (on-site agriculture) | 14 |
| * | Appraisers | 4 |
| † | Architects – exempt from Sections 3-12, Orders 1-13, 15 and 16 | - |
| | Architectural offices | 4 |
| | Armored car services | 9 |
| * | Artists | 4 |
| | Assembly (any manufacturing) | 1 |
| | Associations, business (homeowners, retailers associations, Chamber of Commerce, etc. | 4 |
| | Athletic agents | 4 |
| | Athletic fields | 10 |
| * | Attendants | 4 |
| † | Attendants, personal – Exempt from Order 15 | - |
| | Attorney offices | 4 |
| † | Attorneys – exempt from Sections 3-12, Orders 1-13, 15 and 16 | - |
| | Auctioneers | 7 |
| * | Audio-visual technicians | 4 |
| | Automobile manufacturing | 1 |
| | Auto wrecking (non-retail) | 1 |
| | | |
| | -B- | |
| | Baby formulas (except canned fruit, etc., see Order 3) | 1 |
| † | Baby sitters (under 18 years, sitting for child of employer in employer's home) except from Order 15 | - |
| | Bakeries (non-retail) | 1 |
| | Bakeries, retail (no tables for customers) | 7 |
| | Bakeries, with tables for patrons' use | 5 |
| | Ballooning | 10 |
| | Banks | 4 |
| | Banquet service | 5 |
| | Barber shops | 2 |
| | Bars | 5 |
| | Batch Plant Laborer (mining) | 16 |
| | Bath parlors | 2 |
| | Beauty shops | 2 |
| | Bee hives | 14 |
| | Beet sugar mills | 8 |
| | Billiard parlors | 10 |
| * | Billposters | 4 |

34

| | | |
|---|---|---|
| | Bingo parlors, games | 10 |
| | Blaster (mining | 16 |
| | Blueprinting | 1 |
| | Boarding and care homes for the aged or infirm | 5 |
| | Boarding houses | 5 |
| | Boating, golf, tennis, etc. clubs (see also Order 5) | 10 |
| | Boat rental | 9 |
| | Boats, charter fishing | 10 |
| | Boats, commercial fishing, office and support personnel | 4 |
| | Boats, commercial fishing, on-site activities | 10 and 14 |
| | Boats, commercial passenger fishing (crew member) | 10 |
| | Boats, cruise, ferry | 9 |
| | Body building gymnasium, facility | 2 |
| | Book and magazine publishers | 1 |
| * | Bookkeepers | 4 |
| | Bottling soft drinks | 1 |
| | Bowling alleys | 10 |
| | Box lunch service | 5 |
| | Breweries | 1 |
| | Bricklayer/tender (construction) | 16 |
| | Broadcasting and taping (sound or video) | 11 |
| | Broadcasting, radio or TV | 11 |
| | Building materials, retail or wholesale | 7 |
| | Bull gang mucker (mining) | 16 |
| * | Bundlers | 4 |
| | Bureaus, casting, motion picture industry | 12 |
| | Business associations (homeowners, retailers associations, Chamber of Commerce, etc.) | 4 |
| | Business services | 4 |
| | Bus lines | 9 |
| | Buses, tour | 9 |
| | | |
| | **-C-** | |
| | Cabletender (mining) | 16 |
| | Cable TV service and installation | 4 |
| | Cafeterias | 5 |
| | Call offices (for laundry/dry cleaning pickup) | 6 |
| * | Call out operators | 4 |
| | Camps, day | 5 |
| | Camps, organized | 5 |
| | Candy, (food processing) | 1 |
| | Cane sugar refining (of purchased raw sugar or syrup) | 1 |
| | Canned pet food | 3 |
| | Canned soup, stews, hash, etc. | 3 |
| | Canned fish, fruit, meat, poultry, rabbit, vegetables | 3 |
| * | Canvassers | 4 |
| | Card rooms | 10 |
| | Car loading | 9 |
| | Carnivals | 10 |
| † | Carnival (traveling) operators (full-time) *ONLY* Sections 1, 2, 4, 10 and 20 of Order 10 are applicable; exempt from all other provisions of Order 10 | 10 |
| | Carpenter (construction) | 16 |
| | Carpet cleaning service, including in-home | 6 |
| | Carpet installers (construction) | 16 |
| | Car rentals | 9 |
| * | Carriers | 4 |
| | Car washes (when not in retail business) | 9 |
| * | Cashiers | 4 |
| | Casinos | 10 |
| | Casting bureaus (motion picture industry) | 12 |
| | Catering service | 5 |

35

| | | |
|---|---|---|
| | Cement (ready mix) | 1 |
| | Cement masons (construction) | 16 |
| | Cemeteries | 5 |
| | Ceramics | 1 |
| † | Certified public accountants – exempt from Sections 3-12, Orders 1-13, 15 and 16 | - |
| | Changehouseman (mining) | 16 |
| | Charitable agencies (non-profit) | 4 |
| | Charter fishing boats | 10 |
| * | Checkers | 4 |
| | Checkrooms | 4 |
| | Chemical applications (on-site agriculture) | 14 |
| | Chemical grout operator (mining) | 16 |
| | Cherry picker operator | 16 |
| | Chicken debeaking | 14 |
| | Child care institutions | 5 |
| | Child nurseries | 5 |
| | Choker setters (logging) | 16 |
| | Chuck tender (mining) | 16 |
| | Churches | 4 |
| †† | Citrus and deciduous fruit packing | 8 or 13 |
| | Citrus by-products (food processing) | 1 |
| * | Cleaners and porters | 4 |
| | Cleaning of facilities, grounds, commercial units, living units | 5 |
| * | Clerks | 4 |
| | Clubs (golf, etc.) operating public eating facilities | 5 |
| | Clubs: golf, tennis, boating, etc. (also see Order 5) | 10 |
| | Clubs offering rental of living, business or commercial quarters | 5 |
| | Clubs preparing and serving food, solid or liquid, consumed on premises | 5 |
| | Coal worker (mining) | 16 |
| | Coating lumber products | 1 |
| | Cocktail lounges | 5 |
| | Collection agencies | 4 |
| * | Collectors | 4 |
| | Colleges, private, no boarding or lodging | 4 |
| | Colleges, private, with boarding or lodging | 5 |
| | Commercial fishing boats, office and support personnel | 4 |
| | Commercial fishing boats, on-site activities | 10 and 14 |
| | Commercial passenger fishing boats (crew member) | 10 |
| | Commercial motion picture production | 12 |
| | Commercial photography (except in motion picture industry, see Order 12) | 4 |
| | Commodity agents and brokers | 7 |
| | Commodity rentals | 7 |
| | Communication equipment manufacturing | 1 |
| | Communication firms | 4 |
| * | Communication technicians | 4 |
| * | Compilers | 4 |
| * | Computer operators, programmers | 4 |
| | Concrete (ready-mix) | 1 |
| | Construction, office and support personnel | 4 |
| | Construction, on-site activities | 16 |
| | Contractors, office and support personnel | 4 |
| | Contractors, on-site activities | 16 |
| | Convalescent hospitals | 5 |
| | Cook houses in lumber camps (if part of lumber company operation) | 16 |
| | Cook houses in lumber camps (if separate employer) | 5 |
| | Cook traveling with farm workers | 5 |
| | Cooperatives (farmers') for warehousing, grading, packing, etc. | 8 |
| * | Copy holders | 4 |
| | Copy making service | 1 |
| * | Copy readers | 4 |

36

| | | |
|---|---|---|
| * | Copy writers | 4 |
| †† | Cotton gins | 8 or 13 |
| | Cotton seed oil (food processing) | 1 |
| | Courier service | 9 |
| | Credit agencies | 4 |
| | Credit unions | 4 |
| | Crop dusting, office and support personnel | 4 |
| | Crop dusting, on-site activities | 14 |
| | Cruise boats | 9 |
| | | |
| | -D- | |
| | Dairies (no processing except cooling) | 14 |
| | Dairies (which process milk commercially) | 8 |
| | Dairies (which process own products on the farm) | 13 |
| | Dance halls | 10 |
| | Dance schools, studios | 4 |
| | Day camps | 5 |
| | Day care centers (no board or lodging) | 4 |
| | Day care centers (with board or lodging) | 5 |
| †† | Deciduous and citrus fruit packing | 8 or 13 |
| | Dehydrated soups and mixes (food processing) | 1 |
| * | Demonstrators | 4 |
| | Dental laboratories | 1 |
| | Dental offices | 4 |
| * | Dental technicians and technologists | 4 |
| † | Dentists – exempt from Sections 3-12, Orders 1-13, 15 and 16 | - |
| | Derrickman (Derrick person) (drilling) | 16 |
| | Detective agencies, protective and investigative | 4 |
| | Developing, printing or editing of film (except motion picture industry, see Order 12) | 1 |
| | Development of grounds | 5 |
| | Diaper service (if laundered elsewhere) | 7 |
| | Diaper service (if laundering included) | 6 |
| | Direct mail advertising and service | 4 |
| * | Display representatives | 4 |
| * | Dispatchers | 4 |
| | Distribution of motion pictures to theaters or television | 12 |
| † | Doctors/medical offices – exempt from Section 3-12, Orders 1-13, 15 and 16 | - |
| | Doctors offices | 4 |
| | Donut shops (no tables for patrons' use) | 7 |
| | Donut shops (with tables for patrons' use) | 5 |
| * | Drafters | 4 |
| | Drapery cleaning service, including in-home | 6 |
| | Dredge operator (mining) | 16 |
| †† | Dried fruit processing | 8 or 13 |
| | Driller (drilling and mining) | 16 |
| | Drinking places | 5 |
| * | Drivers (vehicle) | 4 |
| | Drug stores | 7 |
| | Dry cleaning (including self-serve) | 6 |
| †† | Drying fruits or vegetables | 8 or 13 |
| | Drywall installer/finisher (construction) | 16 |
| | Dude or guest ranch | 10 |
| | Dump person (mining) | 16 |
| | Dumps/landfill | 4 |
| | Dyeing plants | 6 |
| | | |
| | -E- | |
| | Eating places | 5 |
| * | Editors | 4 |
| | Education motion pictures, production and distribution | 12 |

| †† | Eggs | 8, 13, or 14 |
|---|---|---|
| | Electrician (construction) | 16 |
| | Electronic productions, manufacturing | 1 |
| * | Elevator operators | 4 |
| | Employment agencies | 4 |
| | Engineering firms | 4 |
| † | Engineers – exempt from Section 3-12, Orders 1-13, 15 and 16 | - |
| | Equipment operators (construction and logging) | 16 |
| | Equipment rentals (except vehicles, see Order 9) | 7 |
| * | Estimators | 4 |
| | Express and parcel delivery | 9 |
| | | |
| | **-F-** | |
| | Fallers (logging) | 16 |
| | Farm labor camps (with board or lodging) | 5 |
| | Farm labor contractor (if employer of farm workers) | 14 |
| | Farm labor contractor, office and support personnel | 4 |
| | Feed mills, commercial | 8 |
| | Ferry boats | 9 |
| | Field mechanic (construction and drilling) | 16 |
| | Film, developing and printing, motion picture industry | 12 |
| | Film, libraries, motion picture industry | 12 |
| | Film processing (except motion picture industry) | 1 |
| | Film production television and motion pictures | 12 |
| | Films, advertising, production of | 12 |
| | Finance companies | 4 |
| | Fish: freezing, canning | 3 |
| | Fish hatcheries | 14 |
| | Fishing boats (charter) | 10 |
| | Fishing boats (commercial), office and support personnel | 4 |
| | Fishing boats (commercial), on-site activities | 10 and 14 |
| | Fishing boats (charter, commercial passenger, party, recreational fishing lakes) | 10 |
| | Flag person (traffic control – construction) | 16 |
| | Flea markets | 7 |
| | Floor hand – motorman (drilling) | 16 |
| | Floor hand (roughneck – drilling) | 16 |
| | Florists, retail/wholesale | 7 |
| | Flume maker (mining) | 16 |
| | Food manufacturing (secondary processing) | 1 |
| | Food processing | 1 |
| |     Baby formulas (except canned fruits etc., see Order 3) | |
| |     Bakeries (non-retail) | |
| |     Bottling (soft drink) | |
| |     Breweries | |
| |     Candy | |
| |     Cane sugar refining (of purchased raw sugar or syrup) | |
| |     Citrus by-products | |
| |     Cotton seed oil | |
| |     Dehydrated soups and mixes | |
| |     Ice cream (beyond first processing) | |
| |     Margarine | |
| |     Meat | |
| |     Pet foods, dry | |
| |     Pizza manufacturing | |
| |     Potato and corn chip manufacturing | |
| |     Preparing fruit and vegetables for restaurants, bakeries, etc. | |
| |     Salad oil | |
| |     Soft drinks, bottling | |
| |     Tortilla manufacturing | |
| |     Yeast | |

38

| | | |
|---|---|---|
| | Food Products, manufacturing | 1 |
| | Forester (logging) | 16 |
| | Framer (construction) | 16 |
| | Fraternity houses | 5 |
| | Fresh vegetables and fruit packing | 8 or 13 |
| | Freezing: fish, fruit, meat, poultry, rabbit, vegetables | 3 |
| | Fruit and vegetables, preparing for restaurant, bakeries, etc. | 1 |
| † | Fruit drying | 8 or 13 |
| †† | Fruit (fresh) packing | 8 or 13 |
| | Fruit: freezing, canning | 3 |
| | Fruit jellies and preserves | 3 |
| | Funeral parlors | 2 |
| | | |
| | **-G-** | |
| | Galvanizing | 1 |
| | Game rooms | 10 |
| | Garages, repair (except when operated by vehicle dealer or gas stations (Order 7) | 9 |
| | Garages, storage | 9 |
| | Garbage collectors | 9 |
| | Garment manufacturing | 1 |
| | Gas Stations (with or without car washes or garages) | 7 |
| | Geophysical exploration | 4 |
| | Glazier (construction) | 16 |
| | Golf courses | 10 |
| | Golf, tennis, boating, etc., clubs (also see Order 5) | 10 |
| | Grain and tomato harvesting machines | 14 |
| * | Graphic art technicians | 4 |
| | Grout gun operator (mining) | 16 |
| | Grout mix operator (mining) | 16 |
| | Grout pump operator (mining) | 16 |
| * | Guards | 4 |
| | Guest or dude ranch | 10 |
| * | Guides | 4 |
| | Gymnasium, body building | 2 |
| | Gymnasium, spectator or participatory sports | 10 |
| | | |
| | **-H-** | |
| | Harvesting machines, tomato and grain | 14 |
| | Hash, canned | 3 |
| | Hatcheries, commercial | 14 |
| | Hatcheries, fish | 14 |
| | Hazardous material "HAZMAT" cleanup and handling (if no contractor's license required), or Order 16 if on construction site (contractor's license required) | 4 or 16 |
| | Health clubs | 2 |
| | Hives, bee | 14 |
| | Hod carrier (construction) | 16 |
| | Homes for the aged or infirm | 5 |
| †† | Honey | 8 or 13 |
| | Hospitals, including convalescent | 5 |
| * | Hosts, hostesses | 4 |
| | Hotels | 5 |
| | | |
| | **-I-** | |
| | Ice cream (beyond first processing) | 1 |
| †† | Ice cream (made from whole milk as first processing) | 8 or 13 |
| | Ice cream stores (no tables for patrons' use) | 7 |
| | Ice cream stores (with tables for patrons' use) | 5 |
| | Ice skating rinks | 10 |
| | Import/export, retail/wholesale | 7 |
| † | Inside salespersons – except from Subsections 3(A), 3(B) and 3(C), or Orders 4 and 7 if | 4 or 7 |

39

| | | |
|---|---|---|
| | wages equal more than 1 ½ times the minimum wage and if more the ½ of employee's compensation represents commissions | |
| * | Inspectors | 4 |
| * | Installers, if no license required (if license required, see Order 16) | 4 |
| * | Instructors | 4 |
| | Insurance companies | 4 |
| | Internet service provider (ISP) | 4 |
| * | Interviewers | 4 |
| * | Investigators | 4 |
| | Investment houses | 4 |
| | Iron worker | 16 |
| | Irrigation districts | 14 |
| | Irrigation systems (sales) | 7 |
| | Irrigators – except from Subsection 3(A) if more than ½ of week spent as irrigator | 14 |
| | | |
| | **-J-** | |
| | Jackleg Miner (mining) | 16 |
| | Janitorial service | 5 |
| | Juice concentrates | 3 |
| | Jumbo person (mining) | 16 |
| | | |
| | **-K-** | |
| | Kemper (mining) | 16 |
| | | |
| | **-L-** | |
| | Laboratories, dental and optical | 1 |
| | Laboratories (independent research, development and testing, etc. | 4 |
| * | Laboratories workers | 4 |
| | Labor contractors (for farm labor, see Order 14, for construction, see Order 16) | 4 |
| | Labor unions | 4 |
| | Laborer (construction) | 16 |
| | Landscape installer (initial and construction sites) | 16 |
| | Landscaping (except initial earth moving and cement work, see Order 16) | 5 |
| | Landfill/dumps | 4 |
| | Laundries, including self-service | 6 |
| | Laundromats | 6 |
| † | Lawyers – exempt from Section 3-12, Orders 1-13, 15 and 16 | - |
| | Legal firms | 4 |
| * | Librarians | 4 |
| | Libraries | 4 |
| | Libraries, film, motion picture industry | 12 |
| | Limousine service | 9 |
| | Linen supply (if laundering included) | 6 |
| | Linen supply (no laundering included) | 7 |
| | Loan offices | 4 |
| | Locker clubs | 6 |
| | Loft or office buildings | 5 |
| | Logging camps (with board or lodging) | 16 |
| | Logging, office and support personnel | 4 |
| | Logging, on-site activities | 16 |
| | Logging trucks (not associated with actual logging operations) | 9 |
| | Logging truck drivers (associated with on-site logging operations) | 16 |
| | Lube man (Lube person) | 16 |
| | Lumber products, manufacturing | 1 |
| | Lumber trucks (not on-site logging trucks) | 9 |
| | Lunch counters | 5 |
| | | |
| | | |
| | | |
| | | |

40

| | -M- | |
|---|---|---|
| * | Machine operator (for construction, logging, mining or drilling machinery see Order 16) | 4 |
| | Machinery, metal products | 1 |
| | Magazine and book publishers | 1 |
| * | Mailers | 4 |
| | Mail order houses, retail/wholesale | 7 |
| | Maintenance, repair, improvement of building (contractor's license required) | 16 |
| | Maintenance of grounds, facilities, quarters of commercial units and living units (no contractor's license required) | 5 |
| | Maintenance of vehicles (garages, car washes, etc.)(if connected with gas station or vehicle dealer see Order 7) | 9 |
| | Marble/granite/slate installer/finisher (natural or synthetic) (construction) | 16 |
| | Margarine (food processing) | 1 |
| | Massage parlors | 2 |
| | Meat: freezing, canning | 3 |
| | Meat processing | 1 |
| † | Meat slaughtering | 8 or 13 |
| * | Mechanics | 4 |
| | Mechanic, equipment (on-site construction and logging) | 16 |
| | Medical clinics (apart from hospitals) | 4 |
| * | Medical technicians and technologists | 4 |
| | Metal products, machinery | 1 |
| | Microfilm service | 1 |
| | Milk testing | 14 |
| | Miner | 16 |
| | Mining, office and support personnel | 4 |
| | Mining, on-site activity | 16 |
| | Mini-storage (if connected with transportation firm, see Order 9) | 5 |
| † | Minor baby sitter (under age 18) sitting for a minor child of the employer in the employer's home, exempt from Order 15 | - |
| * | Models | 4 |
| | Mortuaries | 2 |
| | Motels | 5 |
| | Motion picture production, casting bureaus | 12 |
| | Motion picture production, theatrical and non-theatrical (commercial, educational, religious, etc.) | 12 |
| | Motion pictures, distribution to theaters and television | 12 |
| | Motorman (floor hand) (drilling) | 16 |
| | Moving and storage warehousing (of commodities moved) | 9 |
| †† | Moving packing plant | 8 or 13 |
| | Music festival, opera and symphony organizations | 10 |
| | Music groups and orchestras | 10 |
| | | |
| | -N- | |
| | National service organizations (CCC, Americorps, etc.); exempt from all Orders (Labor Code Section 1171) | - |
| | Needle trades | 1 |
| | Newspaper publishers | 1 |
| | Night clubs (food and drink are served) | 5 |
| | Night clubs (entertainment is primary purpose) | 10 |
| | Nipper (mining) | 16 |
| | Non-profit organizations (charitable, churches, social agencies) | 4 |
| | Non-theatrical motion picture production (commercial, educational, religious, etc.) | 12 |
| | Nozzle person (mining) | 16 |
| | Nurseries, child | 5 |
| | Nurseries, Horticultural (main purpose selling) | 7 |
| | Nurseries, Horticultural (primarily a growing operation) | 14 |
| * | Nurses | 4 |
| † | Nurse, student; exempt from Order 5 if student of bona fide nursing school | - |
| †† | Nut cracking, shelling, sorting and hauling | 8 or 13 |

41

| | | |
|---|---|---|
| | **-O-** | |
| | Oculist offices | 4 |
| † | Oculists – exempt from Sections 3-12, Orders 1-13, 15 and 16 | - |
| | Office and loft buildings | 5 |
| | Oil refining | 1 |
| | Oil and water well drilling and servicing firms, office and support personnel | 4 |
| | Oil and water well drilling and servicing firms, on-site activities | 16 |
| †† | Olive oil | 8 or 13 |
| | Opera, symphony and music festival organization | 10 |
| | Operating engineer (construction) | 16 |
| | Operator (drilling and mining occupations) | 16 |
| * | Operators, computer | 4 |
| † | Operators, full-time, employed by traveling carnivals; *ONLY* Sections 1, 2, 4, 10 and 20 of Order 10 are applicable; exempt from all other provisions of Order 10 | 10 |
| | Optical laboratories | 1 |
| | Optician (except manufacturer, see Order 1) | 7 |
| | Optometrist office | 4 |
| † | Optometrists – exempt from Sections 3-12, Orders 1-13, 15 and 16 | - |
| | Orchestras and other music groups | 10 |
| | Organized camps | 5 |
| † | Outside salespersons; exempt from all orders (Labor Code Section 1171) | - |
| | Oyster farms | 14 |
| | | |
| | **-P-** | |
| * | Packers | 4 |
| †† | Packing and processing agricultural commodities | 8 or 13 |
| †† | Packing fresh vegetables and fruit | 8 or 13 |
| †† | Packing plant or shed, moving or permanent | 8 or 13 |
| | Painter (construction) | 16 |
| | Painting contractors, office and support personnel | 4 |
| | Painting contractors, on-site activities | 16 |
| | Paper products | 1 |
| | Parcel delivery service | 9 |
| | Parking lots | 9 |
| | Penny arcades | 10 |
| † | Personal attendants covered by Order 15 are employed by a private householder or by any third party employer recognized in the health care industry to work in a private household, and *ONLY* Sections 1, 2, 4, 10 and 15 or Order 15 apply | 15 |
| | Personal attendants covered by Order 5 are employed by a nonprofit organization, and are exempt from Section 3 of Order 5 | 5 |
| | Pest control | 5 |
| | Pet foods, canned | 3 |
| | Pet foods, dry (food processing) | 1 |
| | Pharmacies | 7 |
| †* | Pharmacists | 4 |
| | Photocopy services | 1 |
| | Photographers | 4 |
| | Photography, commercial | 4 |
| | Photostatting services | 1 |
| | Physical conditioning centers | 2 |
| | Pipe racker (drilling) | 16 |
| | Pizza manufacturing | 1 |
| | Pizza parlors (with tables for patrons' use) | 5 |
| | Pizza parlors (pick-up and delivery only; no tables for patrons' use) | 7 |
| | Plasterer (construction) | 16 |
| | Plastic products | 1 |
| | Plumber (construction) | 16 |
| | Plumbing, installation | 16 |
| | Plumbing, maintenance | 16 |

42

| | | |
|---|---|---|
| | Pneumatic vibrator operator (mining) | 16 |
| * | Porters and cleaners | 4 |
| | Portrait studios | 4 |
| | Pot tender (mining) | 16 |
| | Potato and corm chip manufacturing | 1 |
| †† | Potato grading, sorting and bagging | 8 or 13 |
| | Poultry: freezing and canning | 3 |
| †† | Poultry processing | 8 or 13 |
| | Powderman (mining) | 16 |
| | Primer person (mining) | 16 |
| * | Printers | 4 |
| * | Process servers | 4 |
| | Production of motion pictures, theatrical and non-theatrical (commercial, educational, religious, etc.) | 12 |
| | Production of TV advertising films | 12 |
| † | Professional actors; Only Sections 1, 2, 4, 10 and 20 of Orders 11 and 12 are applicable; exempt from all other provisions of Orders 11 and 12 | 11 or 12 |
| | Professional offices (architects, attorneys, doctors, dentists, engineers, etc.) | 4 |
| * | Programmers, computer | 4 |
| * | Proof readers | 4 |
| | Property management | 5 |
| | Property or wardrobe rental, motion picture production | 12 |
| | Protective agencies | 4 |
| | Public utilities, electrical (for telephone, natural gas and water utilities, see Order 4) | 1 |
| | Public works, office and support personnel | 4 |
| | Public works, on-site activity | 16 |
| | Publishers, books, magazines and newspapers | 1 |
| | | |
| | **-R-** | |
| | Rabbit: freezing, canning | 3 |
| | Race tracks | 10 |
| | Racing stables | 10 |
| | Radio broadcasting | 11 |
| * | Radio telephone operators | 4 |
| | Railways | 9 |
| | Raiser/Setter (mining) | 16 |
| | Real estate offices (brokerage only; also see Order 5) | 4 |
| | Real estate offices, if business includes property management | 5 |
| | Records and tapes (reproduction; retail/wholesale) | 7 |
| | Recycling center (processing plants altering/transforming material) | 1 |
| | Recycling center, nonprocessing | 4 |
| | Reliability Specialist (drilling occupations) | 16 |
| | Refineries, oil | 1 |
| | Refineries, sugar | 1 |
| | Religious motion picture production | 12 |
| | Rentals [See Below] | 6, 7, 9 or 12 |
| | Rental of commodities and goods | 7 |
| | Rental of equipment | 7 |
| | Rental of property or wardrobe, motion picture industry | 12 |
| | Rental of uniforms (no laundering/cleaning) | 7 |
| | Rental of uniforms (with laundering/cleaning) | 6 |
| | Rental of vehicles (cars, trucks, boats, ships, airplanes) | 9 |
| | Repacking bulk products | 1 |
| | Repairs to vehicles (if operated by vehicle dealer or gas station, see Order 7) | 9 |
| * | Research and development | 4 |
| | Resorts that provide meals or lodging (if resort does not provide meals or lodging, see Order 10) | 5 |
| | Reservoir engineer (drilling occupations) | 16 |
| | Restaurants | 5 |
| | Rest homes | 5 |

43

| | Retail stores | 7 |
|---|---|---|
| | Retirement homes | 5 |
| | Reweaving (if done by laundries/dry cleaners, see Order 6) | 1 |
| †† | Rice drying (commercial) | 8 or 13 |
| | Riding academies, stables | 10 |
| | Rig operator (sometimes referred to as "head well puller") (drilling) | 16 |
| | Rig supervisor (drilling) | 16 |
| | Rinks, ice and roller skating | 10 |
| | Rodders (concrete crew – mining) | 16 |
| | Roller skating rinks | 10 |
| | Roofer (construction) | 16 |
| | Rooming houses | 5 |
| | Roughneck (floor hand; drilling) | 16 |
| | Rubber manufacturing | 1 |
| | Rummage sales | 7 |
| | | |
| | **-S-** | |
| | Salad oil manufacturing | 1 |
| * | Sales agents | 4 |
| * | Salespersons | 4 |
| † | Salespersons, outside (exempt from all orders (Labor Code Section 1171)) | - |
| † | Salespersons, inside – exempt from Sections 3(A), 3(B) and 3(C) of Orders 4 and 7 if wages equal more than 1 ½ times the minimum wage and if more than ½ of employees compensation represents commissions | 4 or 7 |
| | Sandblaster (mining) | 16 |
| | Sanitariums | 5 |
| †† | Sausage making (at point of first processing) | 8 or 13 |
| | Savings and loan | 4 |
| | Sawmills | 1 |
| | Schools, private (not boarding) | 4 |
| | Schools, private (with board or lodging) | 5 |
| * | Secretaries | 4 |
| * | Security guards | 4 |
| | Security guard service | 4 |
| | Self-service laundries/dry cleaners | 6 |
| | Sewer cleaning | 5 |
| † | Sheepherders; exempt from Sections 3, 4 (A)-(D), 5, 6, 9, 11-13 of Order 14. Entire Order is applicable to any workweek during which a sheepherder employee is engaged in any non-shepherding work. | 14 |
| | Sheet metal shops | 1 |
| | Sheet metal, on-site installation (construction) | 16 |
| | Sheet metal worker (construction) | 16 |
| | Shipbuilding (except repair, see Order 9) | 1 |
| | Ship rental | 9 |
| | Ship repair | 9 |
| | Shoe manufacturing and repair | 1 |
| | Shopping services | 4 |
| | Shotcrete operator (mining) | 16 |
| | Skating rinks | 10 |
| | Ski facilities that do not provide meals or lodging (if facility provides meals or lodging, see Order 5) | 10 |
| | Ski lifts | 10 |
| | Skidders (logging) | 16 |
| * | Sign erectors | 4 |
| * | Sign painters | 4 |
| †† | Slaughtering meat | 8 or 13 |
| | Slurry seal worker (construction) | 16 |
| | Social agencies | 4 |
| * | Social workers | 4 |
| | Soft drinks, bottling | 1 |

| | | |
|---|---|---|
| | Solar equipment (sales) | 7 |
| | Soliciting, telephone | 7 |
| * | Solicitors | 4 |
| | Sorority houses | 5 |
| * | Sound technician | 4 |
| | Soups, canned | 3 |
| | Spiral runner (mining) | 16 |
| | Spreaders (concrete crew; mining) | 16 |
| | Stables, racing | 10 |
| | Stables, riding academies (primarily recreational) | 10 |
| | Stables, with boarding and care | 5 |
| * | Statisticians | 4 |
| | Steel worker (erector) (construction) | 16 |
| * | Stenographers | 4 |
| | Stevedoring | 9 |
| | Stews, canned | 3 |
| | Stock brokerage firms | 4 |
| | Stone grinder (mining) | 16 |
| | Stone mason/tender (natural and synthetic) (construction) | 16 |
| | Storage and moving warehouse (of commodities moved) | 9 |
| | Storage garages | 9 |
| | Storage, mini (not connected to transportation firm [Order 9]) | 5 |
| † | Student nurses; exempt from Order 5 if student of bona fide nursing school | - |
| †† | Sugar (beet) mills | 8 or 13 |
| †† | Sugar or syrup directly from sugar cane | 8 or 13 |
| | Sugar refineries | 2 |
| | Sun tanning parlors | 2 |
| | Surveyors (construction) | 16 |
| | Swamper (Brakeman and Switchman on tunnel work; mining) | 16 |
| | Swimming pool, construction | 16 |
| | Swimming pools | 10 |
| | Symphony, music festival and opera organizations | 10 |
| | | |
| | **-T-** | |
| | Talent agents | 4 |
| | Tanning (sun) parlors | 2 |
| | Taping and broadcasting (sound or video) | 11 |
| | Taverns | 5 |
| | Tax consultants | 4 |
| | Taxidermy | 1 |
| * | Teachers | 4 |
| † | Teachers – exempt from Sections 3-12, Orders 1-13, 15 and 16 | - |
| | Teamster (construction) | 16 |
| | Telecommunication installation worker | 16 |
| | Telegraph and telephone companies | 4 |
| * | Telegraph operators | 4 |
| | Telephone and telegraph companies | 4 |
| | Telephone answering service | 4 |
| * | Telephone operators | 4 |
| | Telephone soliciting | 7 |
| | Television advertising firms (production) | 12 |
| | Television broadcasting | 11 |
| | Television film production | 12 |
| * | Tellers | 4 |
| | Tennis courts | 10 |
| | Termite control | 5 |
| | Textile products, manufacturing | 1 |
| | Theaters | 10 |
| | Theatrical companies | 10 |
| | Theatrical motion picture production | 12 |

45

| | Thrift shops | 7 |
|---|---|---|
| * | Ticket agents | 4 |
| | Tile setter/finisher (construction) | 16 |
| | Timber person (mining) | 16 |
| | Tire alignment and balancing companies (when not part of a tire sales company [Order 7]) | 9 |
| | Tomato and grain harvesting machines | 14 |
| | Tool person (mining) | 16 |
| | Tool-pusher (drilling) | 16 |
| | Tortilla manufacturing | 1 |
| | Tour buses | 9 |
| | Tour companies | 9 |
| * | Tracers | 4 |
| | Track person (mining) | 16 |
| | Trailer parks | 5 |
| | Transfer stations (garbage, sorting out hazardous materials and recyclable items) | 4 |
| | Transportation companies | 9 |
| | Travel agencies | 4 |
| | Tree farms (growing; not logging) | 14 |
| | Tree service firms | 5 |
| | Trout farms, hatcheries | 14 |
| * | Truck drivers, transportation (excluding log truck drivers associated with on-site logging operations, see Order 16) | 9 |
| * | Truck drivers engaged in on-site logging operations | 16 |
| | Trucking (including commercial trucking of farm products) | 9 |
| | Truck rentals | 9 |
| | Tunnel concrete finisher (mining) | 16 |
| | Tunnel materials handler (mining) | 16 |
| | TV advertising films (production) | 12 |
| | TV broadcasting | 11 |
| | TV film production | 12 |
| * | Typists | 4 |
| | | |
| | **-U-** | |
| | Uniform rentals (if laundered/cleaned elsewhere) | 7 |
| | Uniform rental (if laundered/cleaned included) | 6 |
| | Universities, private (no board or lodging) | 4 |
| | Universities, private (with board or lodging) | 5 |
| | Utilities, public, telephone, natural gas and water (for electrical utilities, see Order 1) | 4 |
| | | |
| | **-V-** | |
| †† | Vegetable drying | 8 or 13 |
| | Vegetables and fruit, preparing for restaurants, bakeries, etc. | 1 |
| | Vegetables: freezing, canning | 3 |
| †† | Vegetables (fresh) packing | 8 or 13 |
| * | Vehicle operators (if involved in the construction, logging, mining or drilling industries, see Order 16) | 4 |
| | Vehicle rental, including boats, aircraft and ships | 9 |
| | Repairs to vehicles (except when operated by vehicle dealer or gas station, see Order 7) | 9 |
| | Veterinary service (no overnight shelter or feeding) | 4 |
| | Veterinary service (with overnight shelter or feeding) | 5 |
| | Video production companies producing (but not reproducing) tapes for industrial, training or other purposes. If reproducing, see Order 1 | 12 |
| | | |
| | **-W-X-Y-Z-** | |
| | Wardrobe or property rental, motion picture industry | 12 |
| | Warehousing and storage (of commodities moved) | 9 |
| | Waste water treatment facilities | 1 |
| | Water and oil well drilling and servicing firms, office and support personnel | 4 |
| | Water and oil well drilling and servicing firms, on-site activities | 16 |
| | Water taxi service | 9 |

| | | |
|---|---|---|
| | Water truck driver (construction) | 16 |
| * | Weather forecaster | 4 |
| | Weight control salons | 2 |
| | Welder (iron or steel worker in construction occupations) | 16 |
| | Welder (drilling occupations) | 16 |
| | Well puller (drilling occupations) | 16 |
| | Wholesale houses | 7 |
| | Wired music studios | 10 |
| | Winery (mixed grapes) | 8 |
| | Winery (on the farm) | 13 |
| * | X-ray technicians | 4 |
| | Yeast (food processing) | 1 |

---

\*      Named and related occupations are covered by occupational order only when they are not covered by an industry order.
        They type of business determines the industry code.

†      Exempt occupations must meet the criteria stated in Section 1, Applicability and/or Section 2, Definitions, of the applicable
        IWC Order

††     Also see Notes following Order 8 (page 22), Order 13 (page 27) and Order 14 (page 28)

47

# EXHIBIT 69

CONFIDENTIAL



| Image | Link | Notes |
|-------|------|-------|



https://modernicaprops.com/collections/furniture-seating-sofas/products/white-leather-cloud-loveseat



https://modernicaprops.com/collections/furniture-seating-sofas/products/pink-suede-cloud-loveseat



https://modernicaprops.com/collections/furniture-seating-sofas/products/ligne-roset-orange-togo-loveseat



https://modernicaprops.com/collections/furniture-seating-sofas/products/curved-split-rail-love-seat



EXHIBIT

7

CONFINDENTIAL

000065

https://modernicaprops.com/collections/furniture-seating-sofas/products/pink-velvet-sectional

https://modernicaprops.com/collections/furniture-seating-sofas/products/white-tufted-boucle-loveseat

https://modernicaprops.com/collections/furniture-seating-sofas/products/black-velvet-love-seat

https://modernicaprops.com/collections/furniture-seating-sofas/products/black-velvet-asymmetrical-deco-loveseat

https://modernicaprops.com/collections/furniture-seating-sofas/products/barcelona-love-seat-black



CONFINDENTIAL

https://modernicaprops.com/collections/furniture-seating-daybeds-chaises/products/copine-peacock-velvet-curved-chaise



https://modernicaprops.com/collections/furniture-seating-sofas/products/case-study-metal-v-leg-day-bed

Modernica Props

Case Study Metal V Leg Day Bed

Details: Case Study Bentwood Day Bed with laminated maple hardwood. Sofa come with solid steel metal V legs or walnut wooden legs. Dimensions: 27'' H x 77'' W x 33'' D *Available in Natural, Class, and Walnut Hood, with Bentwood Legs (Pictured) or Metal V - Legs *Fabric Color Options : Grey, Red, Black, Wheat

4.20



https://modernicaprops.com/collections/furniture-seating-sofas/products/cream-modern-daybed

Modernica Props

Cream Modern Daybed

Details: Contemporary modern cream colored daybed Dimensions: 33'' H x 88'' W x 37'' D Quantity: 1

4.23

4.24



https://modernicaprops.com/collections/furniture-seating-sofas/products/beige-sofa

Modernica Props

Tan Midcentury Low Back Settee

Details: Tan leather settee/sofa with tapered wooden legs. Available as part of the beige seating ensemble Dimensions: 27'' H x 39'' W x 67'' D Quantity: 1

4.24

000066

CONFINDENTIAL

*https://modernicaprops.com/collections/furniture-seating-sofas/products/white-serpentine-cloud-sofa*

Modernica Props

*X-Large Ecru Beige Cloud Couch*

*Details: Vladimir Kagan white fabric cloud sofa Dimensions: 30" H x 112" W x 34" D Quantity: 1*

*https://modernicaprops.com/collections/furniture-seating-reception-area-seating/products/white-leather-contemporary-lobby-seat*

Modernica Props

*White Leather Contemporary Lobby Seat*

*Details: Angular white leather lobby lounge seating Dimensions: 32" H x 183" W x 55.5" D Quantity: 1*

**Bolsters are removable**

4/29

*https://modernicaprops.com/collections/furniture-seating-sofas/products/case-study-bentwood-day-bed*

Modernica Props

*Case Study Bentwood Day Bed*

*Details: Case Study Bentwood Day Bed with laminated maple hardwood frame. Sofa come with solid steel legs and upholstered mattress. Available in Natural, Clare, and Walnut Wood, with Bentwood Legs (Pictured) or Metal V - Legs *Fabric Color Options - Grey, Red, Black, Wheat Dimensions : 27" H x 77" L x 33" D*

http://www.omegacinemaprops.com/detail/F1-23177keyword=sofa&per_page=30&categories%5B0%5D=01_Seating&subcategories%5B0%5D=5of0%20and%20Couch

http://www.omegacinemaprops.com/detail/F1-71012-page=3&keyword=sofa&per_page=30&categories%5B0%5D=01_Seating&subcategories%5B0%5D=5of0%20and%20Couch





000067

CONFIDENTIAL



I beleive the bolsters are removable

Pillow is removable

http://www.omegaacnemaprops.com/detail/F1-2535?keyword=daybed&per_page=30

http://www.omegaacnemaprops.com/detail/F1-2095C?keyword=daybed&per_page=30

https://modernacprops.com/products/walnut-rail-daybed

https://modernacprops.com/products/black-tufted-leather-chaise

http://www.omegaacnemaprops.com/detail/F1-2441?page=2&keyword=chaise&per_page=30

000068

CONFINDENTIAL

To purchase - could use again at PH - $1150    Won't arrive on time :(

https://www.cb2.com/lubi-silver-grey-sleeper-daybed/s476085

At penthosue

https://modernicaprops.com/collections/furniture-seating-sofas/products/blue-velvet-daybed

https://modernicaprops.com/collections/furniture-seating-sofas/products/red-playpen

https://modernicaprops.com/collections/furniture-seating-sofas/products/organic-cast-resin-loveseat

000069

CONFINDENTIAL

https://modernamericanpops.com/collections/furniture-seating-sofas/products/flips-loveseat

000070



# EXHIBIT 70

CONFIDENTIAL



**mike** 6:06 PM

Please make sure Kenzie is using Blacked Raw branding on her social assets

https://twitter.com/misskenzieanne


**twitter.com**

**Kenzie Anne💖 (@misskenzieanne) | Twitter**

The latest Tweets from Kenzie Anne💖 (@misskenzieanne). ✨ CEO of @KENZIELAND_ 👠 ✨Penthouse Pet 🔑 ✨Playmate X2 🐰 ✨click the link✨@misskenzieanne2 booking: ryan@motleymodels.com. Your dreams



**Anthony** 6:08 PM

👍

018059

# EXHIBIT 71

**From:** Fred ██████████
**Subject:** 2021 Project Overview - ACTIONS AGREED
**Date:** July 15, 2021 at 12:04 PM
**To:** Steve ████████████, Alexandra ████████████████, Basia ████████████ Matt ██████t ███████████ Mike Miller ████████

Hey guys,

Great meeting, thanks for setting it up Alex.

Just a quick email to keep a log on a unanimous decision we made:

1. NO special projects to be schedule in 2021
2. If Kenzie Anne sign her deal with us, her special scenes would be push in 2022
3. August-Dec 2021 will be dedicated to shoot REGULAR run of the mill content + HIRE and TRAIN new resources
4. Joanna Angel can be a max 1 scene project and with a VERY light script that can translate into a shoot that ideally Kayden can handle all by herself OR worst case with a minimal crew/help from us.
5. On the next 4-8 months horizon (2022) more love needs to be invest in other brands, notably Blacked.
6. Alex and Fred will work together to make sure we stick to the above
7. Mike will support all of us into keeping Kayden to stick to this plan

Thanks,

----
Fred G.
Vice-President
Operation & Business Development

# EXHIBIT 72

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, Mackenzie Thoma                                               (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in
compliance with the United States federal law and any false statement or misrepresentation is a
crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required.
<u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by
the artist.

(1) First form of identification:    USA PP: 536536600

(2) Second form of identification:    CA DL: E3231780

**Birthdate:** ____03091993____/_____/_____ **(Month/Day/Year) Age:** 27_____ **SSN:** 624663372_____

C. **Stage Name for the Shoot:**    Miss Kenzie Anne

I have also used the following names, stage names, aliases, nicknames and married and/or
maiden names: 1. _____    2. _____
             3. _____    4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, Mackenzie Thoma                                          pursuant to 28 U.S.C §1746 and the
penalties of perjury, under the laws of the United States, swear that the above is true and
correct and that the ID which I have provided, a copy of which is attached and signed by me,
was lawfully obtained by me and has not been forged or altered.

**Today's date:** 2/27/2021_____/_____/_____

Signature: _____
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury
under the laws of the United States, I swear that I have personally examined the Model's ID
containing the date of birth set forth above, that I have personally questioned the Model
regarding the answers given in this document, and that I have observed the Model execute this
document and sign the attached copy of the ID. In addition, I swear that the date set forth below
is the date on which production involving this model occurred.

Date of Production: 02/27/2021_____/_____/_____

Taylor Brock
_____    _____
Print name of Producer                    Signature of Producer

Model's initials 

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, _____Mackenzie Thoma_____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. <u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: _____536536600_____

(2) Second form of identification: _____E3231780_____

**Birthdate:** ___03/09/1993___/_____/_____**(Month/Day/Year) Age:** __29___ **SSN:** ___624663372___

C. **Stage Name for the Shoot**: _____Kenzie Anne_____

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____   2. _____
3. _____   4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, _____Mackenzie Thoma_____ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** ___03-28-2022___/_____/_____

**Signature:** _____
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: ___03-28-2022___/_____/_____

__Iuliia Zorkina_____     _____
Print name of Producer                    Signature of Producer

Model's initials: 

## 18 U.S.C. § 2257 Records Keeping for Models

A. I, <u>Mackenzie Thoma</u> (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. <u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: ___US Passport 536536600___

(2) Second form of identification: ___CA DL E3231780___

**Birthdate:** ___03/09/1991___/_____/_____ **(Month/Day/Year) Age:** ___29___ **SSN:** ___624663372___

C. **Stage Name for the Shoot:** ___Kenzie Anne___

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____ 2. _____
3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, ___Mackenzie Thoma___ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** ___4/3/2022___/_____

Signature: ___[DocuSigned by: signature]___
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: ___04/03/2022___/_____/_____

___Taylor Brock___
Print name of Producer

_DocuSigned by: Taylor Brock_
Signature of Producer

Model's initials 

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, Mackenzie Thoma _____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. Describe each, including number. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: PP: 536536600 _____

(2) Second form of identification: DL CA: E3231780 _____

**Birthdate:** 03/09/1993 / _____ / _____ **(Month/Day/Year) Age:** 29 _____ **SSN:** 624663372 _____

C. **Stage Name for the Shoot:** Kenzie anne _____

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____ 2. _____
                         3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, Mackenzie Thoma _____ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** 7/15/2022 / _____ / _____

Signature: _____
DocuSigned by:
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: 07/15/2022 / _____ / _____

Taylor Brock
_____
Print name of Producer

DocuSigned by:
*Taylor Brock*
_____
**Signature of Producer**

Model's initials 

## 18 U.S.C. § 2257 Records Keeping for Models

A. I, Mackenzie Thoma _____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in
compliance with the United States federal law and any false statement or misrepresentation is a
crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required.
<u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by
the artist.

(1) First form of identification: _____ US PP 536536600 _____

(2) Second form of identification: _____ CA DL E3231780 _____

**Birthdate:** ___03091993___/_____/_____ **(Month/Day/Year) Age:** __28____ **SSN:** __624663372_____

C. **Stage Name for the Shoot:** _____ Kenzie Anne _____

I have also used the following names, stage names, aliases, nicknames and married and/or
maiden names: 1. _____   2. _____
              3. _____   4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, ___ Mackenzie Thoma _____ pursuant to 28 U.S.C §1746 and the
penalties of perjury, under the laws of the United States, swear that the above is true and
correct and that the ID which I have provided, a copy of which is attached and signed by me,
was lawfully obtained by me and has not been forged or altered.

**Today's date:** __7/29/2021__/_____/_____

Signature: _____
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury
under the laws of the United States, I swear that I have personally examined the Model's ID
containing the date of birth set forth above, that I have personally questioned the Model
regarding the answers given in this document, and that I have observed the Model execute this
document and sign the attached copy of the ID. In addition, I swear that the date set forth below
is the date on which production involving this model occurred.

Date of Production: ___07/29/2021___/_____/_____

_____Taylor Brock_____
Print name of Producer

_____Taylor Brock_____
Signature of Producer

Model's initials 

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, Mackenzie Thoma _____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. <u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: USA PP: 536536600 _____

(2) Second form of identification: CA DL: E3231780 _____

**Birthdate:** 03/09/1993 ____/____/____ **(Month/Day/Year) Age:** 28 ____ **SSN:** 624 66 3372 _____

C. **Stage Name for the Shoot:** Kenzie Anne _____

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____  2. _____
    3. _____  4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: **(PRINT FULL LEGAL NAME)**

I, Mackenzie Thoma _____ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** 12/11/2021 ____/____/____

Signature: _____
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: 12/11/21 ____/____/____

Taylor Brock
_____        _____
Print name of Producer                              Signature of Producer



Model's initials

## 18 U.S.C. § 2257 Records Keeping for Models

A. I, Mackenzie Thoma _____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. Describe each, including number. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: USA PP: 536536600 _____

(2) Second form of identification: CA DL: E3231780 _____

**Birthdate:** 03091993 __/__/__ **(Month/Day/Year) Age:** 28 ___ **SSN:** 624663372 _____

C. **Stage Name for the Shoot:** Kenzie Anne _____

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____ 2. _____
3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, Mackenzie Thoma _____ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** 1/25/2022 __/__/__

Signature: _____
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: 1/25/2022 __/__/__

Michael Mosny
_____     _____
Print name of Producer                Signature of Producer

Model's initials 

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, _Mackenzie Thoma_ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in
compliance with the United States federal law and any false statement or misrepresentation is a
crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required.
<u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by
the artist.

(1) First form of identification: _PP : 536536600_

(2) Second form of identification: _DL CA : E3231780_

**Birthdate:** _03/09/1993_ / ___ / ___ **(Month/Day/Year) Age:** _29_ **SSN:** _624663372_

C. **Stage Name for the Shoot**: _Kenzie anne_

I have also used the following names, stage names, aliases, nicknames and married and/or
maiden names: 1. _____ 2. _____
3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, _Mackenzie Thoma_ pursuant to 28 U.S.C §1746 and the
penalties of perjury, under the laws of the United States, swear that the above is true and
correct and that the ID which I have provided, a copy of which is attached and signed by me,
was lawfully obtained by me and has not been forged or altered.

**Today's date:** _4/22/2022_ / ___

Signature: _[signature]_
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury
under the laws of the United States, I swear that I have personally examined the Model's ID
containing the date of birth set forth above, that I have personally questioned the Model
regarding the answers given in this document, and that I have observed the Model execute this
document and sign the attached copy of the ID. In addition, I swear that the date set forth below
is the date on which production involving this model occurred.

Date of Production: _04/22/2022_ / ___ / ___

_Jeff Roe_ _____
Print name of Producer    Signature of Producer

Model's initials _[initials]_

## 18 U.S.C. § 2257 Records Keeping for Models

A. I, <u>Mackenzie Thoma</u> **(Print full legal name)**
("Model"), understand that all the information required by this agreement is required in
compliance with the United States federal law and any false statement or misrepresentation is a
crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required.
<u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by
the artist.

(1) First form of identification: <u>PP: 536536600</u>

(2) Second form of identification: <u>CA DL: E3231780</u>

**Birthdate:** <u>03091993</u>/<u>    </u>/<u>    </u> **(Month/Day/Year) Age:** <u>28</u> **SSN:** <u>624663372</u>

C. **Stage Name for the Shoot:** <u>Kenzie Anne</u>

I have also used the following names, stage names, aliases, nicknames and married and/or
maiden names: 1. _____ 2. _____
3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: **(PRINT FULL LEGAL NAME)**

I, <u>Mackenzie Thoma</u> pursuant to 28 U.S.C §1746 and the
penalties of perjury, under the laws of the United States, swear that the above is true and
correct and that the ID which I have provided, a copy of which is attached and signed by me,
was lawfully obtained by me and has not been forged or altered.

**Today's date:** <u>8/28/2021</u>/<u>    </u>/<u>    </u>

Signature: _____
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury
under the laws of the United States, I swear that I have personally examined the Model's ID
containing the date of birth set forth above, that I have personally questioned the Model
regarding the answers given in this document, and that I have observed the Model execute this
document and sign the attached copy of the ID. In addition, I swear that the date set forth below
is the date on which production involving this model occurred.

Date of Production: <u>8/28/21</u>/<u>    </u>/<u>    </u>

Michael Mozny
_____          _Michael Mozny_____
Print name of Producer                      Signature of Producer



Model's initials

DocuSign Envelope ID: 9D6467A5-D3F8-4G1F-A030-A61905583E2F

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, Mackenzie Thoma _____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. Describe each, including number. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: ___PP # 536536600_____

(2) Second form of identification: ___CA DL # E3231780_____

**Birthdate:** ___03091993___/_____/_____ **(Month/Day/Year) Age:** __28___ **SSN:** __624663372_____

C. **Stage Name for the Shoot:** ___Kenzie Anne_____

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____ 2. _____
3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, Mackenzie Thoma _____ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** __4/1/2021___/_____/_____

Signature: _____
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: ___04/01/2021___/_____/_____

Taylor Brock
_____         _Taylor Brock_____
Print name of Producer                    Signature of Producer

Model's initials 

CONFIDENTIAL

VXN0122

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, Mackenzie Thoma _____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. Describe each, including number. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: ___ US Passport 536536600 _____

(2) Second form of identification: ___ CA DL E3231780 _____

**Birthdate:** ___ 03/09/199 ___/_____/_____ **(Month/Day/Year) Age:** ___29_____ **SSN:** ___624663372_____

C. **Stage Name for the Shoot:** ___ Kenzie anne _____

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____ 2. _____
          3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, ___ Mackenzie Thoma _____ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** ___5/23/2022___/_____/_____

Signature: _____
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: ___05/23/2022___/_____/_____

Taylor Brock
_____     _____
Print name of Producer                        Signature of Producer

Model's initials 

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, _Mackenzie Thomas_ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. <u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: _PP: 536536600_

(2) Second form of identification: _CA DL: E3231780_

**Birthdate:** _03091993_ / _____ / _____ (Month/Day/Year) Age: _28_ SSN: _624663372_

C. **Stage Name for the Shoot:** _Kenzie Anne_

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____ 2. _____
3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, _Mackenzie Thomas_ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** _6/29/2021_ / _____ / _____

Signature: _[DocuSigned by: signature]_
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: _6/29/2021_ / _____ / _____

_Taylor Brock_ _____    _DocuSigned by: Taylor Brock_
Print name of Producer    Signature of Producer

Model's initials _[signature]_

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, __Mackenzie Thoma_____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. <u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: __PP # 536536600_____

(2) Second form of identification: __CA DL # E3231780_____

**Birthdate:** __03081993__/_____/_____ **(Month/Day/Year) Age:** __28___ **SSN:** __624663372_____

C. **Stage Name for the Shoot:** __Kenzie Anne_____

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____  2. _____
                              3. _____  4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, __Mackenzie Thoma_____ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** __7/28/2021__/_____/_____

Signature: _____
              **Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: __07/28/2021__/_____/_____

__Taylor Brock_____    _Taylor Brock_____
Print name of Producer                Signature of Producer


Model's initials

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, _____Mackenzie Thoma_____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. Describe each, including number. Clear photocopies of each must be attached and signed by the artist.

(1) First form of identification: _____536536600_____

(2) Second form of identification: _____E3231780_____

**Birthdate:** ___03/09/1993___/_____ (**Month/Day/Year) Age:** _29___ **SSN:** ___624663372____

C. **Stage Name for the Shoot**: _____Kenzie Anne_____

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____  2. _____
3. _____  4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, _____Mackenzie Thoma_____ pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

**Today's date:** ___03-29-2022___/_____

**Signature:** _____

**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

Date of Production: ___03-29-2022___/_____

_____Iuliia Zorkina_____   _____
Print name of Producer                      Signature of Producer

Model's initials: 

## 18 U.S.C. § 2257 Records Keeping for Models

A. I, **Mackenzie Thoma** _____ (**Print full legal name**)
("Model"), understand that all the information required by this agreement is required in
compliance with the United States federal law and any false statement or misrepresentation is a
crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required.
<u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by
the artist.

(1) First form of identification: _____ USA PP: 536536600 _____

(2) Second form of identification: _____ CA DL: E3231780 _____

**Birthdate:** _03/09/1993_ / _____ / _____ **(Month/Day/Year) Age:** _28_ **SSN:** _624663372_

C. **Stage Name for the Shoot:** _____ Kenzie Anne _____

I have also used the following names, stage names, aliases, nicknames and married and/or
maiden names: 1. _____ 2. _____
                     3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: (PRINT FULL LEGAL NAME)

I, **Mackenzie Thoma** _____ pursuant to 28 U.S.C §1746 and the
penalties of perjury, under the laws of the United States, swear that the above is true and
correct and that the ID which I have provided, a copy of which is attached and signed by me,
was lawfully obtained by me and has not been forged or altered.

**Today's date:** _10/30/2021_ / _____

Signature: _____
           **Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury
under the laws of the United States, I swear that I have personally examined the Model's ID
containing the date of birth set forth above, that I have personally questioned the Model
regarding the answers given in this document, and that I have observed the Model execute this
document and sign the attached copy of the ID. In addition, I swear that the date set forth below
is the date on which production involving this model occurred.

Date of Production: _10/30/21_ / _____

Taylor Brock                                    _Taylor Brock_
_____          _____
Print name of Producer                    Signature of Producer


Model's initials

# 18 U.S.C. § 2257 Records Keeping for Models

A. I, <u>Mackenzie Thoma</u> **(Print full legal name)**
("Model"), understand that all the information required by this agreement is required in compliance with the United States federal law and any false statement or misrepresentation is a crime under United States law.

B. Two forms of identification, including at least one government issued photo ID, are required. <u>Describe each, including number</u>. Clear photocopies of each must be attached and signed by the artist.

CA DL# E3231780
(1) First form of identification: _____

US PASSPORT: 536536600
(2) Second form of identification: _____

03091993                              27        624663372
**Birthdate:** _____/_____/_____ **(Month/Day/Year) Age:** _____ **SSN:** _____

Kenzie Anne
C. **Stage Name for the Shoot**: _____

I have also used the following names, stage names, aliases, nicknames and married and/or maiden names: 1. _____ 2. _____
3. _____ 4. _____

If more than 4 please attach a spate sheet, signed by the model inducing the additional names.

MODEL'S SWORN STATEMENT: **(PRINT FULL LEGAL NAME)**

I, <u>Mackenzie Thoma</u> pursuant to 28 U.S.C §1746 and the penalties of perjury, under the laws of the United States, swear that the above is true and correct and that the ID which I have provided, a copy of which is attached and signed by me, was lawfully obtained by me and has not been forged or altered.

12/9/2020
**Today's date:** _____/_____/_____

**Signature:** _____
**Model's signature (using full legal name)**

PRODUCER'S SWORN STATEMENT: Pursuant to 28 U.S.C §1746 and the penalties of perjury under the laws of the United States, I swear that I have personally examined the Model's ID containing the date of birth set forth above, that I have personally questioned the Model regarding the answers given in this document, and that I have observed the Model execute this document and sign the attached copy of the ID. In addition, I swear that the date set forth below is the date on which production involving this model occurred.

12 / 09
Date of Production: _____/_____/ 2020

Taylor Brock
_____    _____
Print name of Producer                      Signature of Producer

**Model's initials:** _____

# EXHIBIT 73

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma ("Model", "my" or "I") and VXN Group, LLC ("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence of any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion.  Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: $15,000.00 (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: 02/27/2021 ____/_____/_____

Taylor Brock

Print Name of Producer's Representative

X Taylor Brock

Signature of Producer's Representative

MODEL: Date: 2/27/2021 ____/_____

Mackenzie Thoma

Print Name of Model

X _____

Signature of Model

Model's initials: 

DocuSign Envelope ID: 8A6A3692-9329-4468-AABA-7AC515483CFD

## <u>MODEL RELEASE AND GRANT OF RIGHTS</u>

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma _____ ("Model", "my" or "I") and VXN
Group, LLC ("Producer"), hereby agree as follows:

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol; 4. I do not have any health conditions nor recent exposure to COVID-19, nor any symptoms of COVID-19 that could put myself or others at risk to exposure of negative health conditions from my participation on this production.

2. **SERVICES**. Model hereby grants Producer the right to film Model for the purpose of performing in a motion picture film or scene including any applicable auditions, interviews, background shots, behind the scenes footage, or other images captured during the filming of Producer's motion pictures, social media, or in other fixed audio visual performances such as behind the scenes footage or promotions on Producer's websites, DVDs, or otherwise affiliated with Producer's brands and affiliate brands. Model understands these performances may be used in connection with sexually explicit content and material.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion. Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion,



Model's Initials

alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity, claims invasion of privacy claims, defamation claims, sexual harassment claims, injuries (Both physical and emotional), any and all claims related to COVID-19, negligence, and all other such claims, whether or not listed above. Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

5. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that she will not disparage Producer or any of its officers, directors, or employees. For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement. Any violation of this Section shall be deemed a material breach of this Agreement.

6. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum. In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

7. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

8. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: 02/27/2021 ___/___/2020                MODEL: Date: 3/1/2021 ___/___/2020

Taylor Brock

Print Name of Producer's Representative               Print Name of Model

X _Taylor Brock_                                      X _____
Signature of Producer's Representative               Signature of Model

                                                     Model's Initials _____

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) _____ Mackenzie Thoma _____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion.  Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: _____ 5,000usd _____ (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials: [signature]

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: ___03-28-2022___

MODEL: Date: ___03-28-2022___

Iuliia Zorkina

Mackenzie Thoma

Print Name of Producer's Representative

Print Name of Model

X _____

Signature of Producer's Representative

X _____

Signature of Model
1183CF222482413...

Model's initials: 

DocuSign Envelope ID: 5E3A93C2-95AF-4D42-9F9A-434B77911BF3

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma _____ ("Model", "my" or "I") and VXN Group, LLC ("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion. Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose. Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: $5,000 USD _____ (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6.  **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: 04/03/2022 /_____/_____          MODEL: Date: 4/3/2022 /_____/_____

Taylor Brock                                      Mackenzie Thoma

Print Name of Producer's Representative            Print Name of Model

X Taylor Brock                                    X _____

Signature of Producer's Representative             Signature of Model

Model's initials: 

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma _____ ("Model", "my" or "I") and VXN Group, LLC ("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion. Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose. Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: $5,000 USD _____ (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof. voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date:  07/15/2022  /_____/_____

Taylor Brock
Print Name of Producer's Representative

X  Taylor Brock
Signature of Producer's Representative

MODEL: Date:  7/15/2022  /_____

Mackenzie Thoma
Print Name of Model

X  [signature]
Signature of Model

Model's initials: 

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma                                        ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion.  Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: $3,000                                        (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

CONFIDENTIAL
VXN0073

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6.  **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7.  **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8.  **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9.  **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10.  **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11.  **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: 07/29/2021 /       /

Taylor Brock
Print Name of Producer's Representative

X Taylor Brock
Signature of Producer's Representative

MODEL: Date: 7/29/2021 /       /

Mackenzie Thoma
Print Name of Model

X
Signature of Model

Model's initials: 

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) ___Mackenzie Thoma_____ ("Model", "my" or "I") and VXN Group, LLC ("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion.  Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: __$5,000_____(Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this fully and fully intent to be legally bound.

PRODUCER: Date: _____12/11/21_____/_____/_____          MODEL: Date: ___12/11/2021___/_____

Taylor Brock                                           Mackenzie Thoma

Print Name of Producer's Representative                Print Name of Model

X_ Taylor Brock _____                        X_____

Signature of Producer's Representative                 Signature of Model

Model's initials: 

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) _Mackenzie Thoma_____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence of any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion. Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose. Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: _$5,000_____(Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

**CONFIDENTIAL**                    **VXN0085**

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: _____1/25/2022_____/_____/_____

Michael Mosny

Print Name of Producer's Representative

X Michael Mosny

Signature of Producer's Representative

MODEL: Date: _____1/25/2022____/_____

Mackenzie Thoma

Print Name of Model

X _____

Signature of Model

Model's initials:

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma _____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion. Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose. Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: $5,000.00 USD _____ (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials [signature]

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: ___04/22/2022__/_____

Jeff Roe

Print Name of Producer's Representative

X _____
Signature of Producer's Representative

MODEL: Date: __4/22/2022__/_____

Mackenzie Thoma

Print Name of Model

X _____
Signature of Model

Model's initials: _____

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees. For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement. Any violation of this Section shall be deemed a material breach of this Agreement. Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum. In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: 05 / 06 / 2021

Michael Mosay
Print Name of Producer's Representative

X
Signature of Producer's Representative

MODEL: Date: 05 / 06 / 21

Mackenze Thona
Print Name of Model

X
Signature of Model

Model's initials: ____

**CONFIDENTIAL** **VXN0101**

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion.  Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: $3,000 (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: 8/28/21 ___/_____/_____        MODEL: Date: 8/28/2021 ___/_____/_____

Michael Mozny
_____
Print Name of Producer's Representative

Mackenzie Thoma
_____
Print Name of Model

X Michael Mozny
_____
Signature of Producer's Representative

X _____
Signature of Model

Model's initials: _____

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) _Mackenzie Thoma_____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion.  Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: _$3,000.00_____(Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

CONFIDENTIAL                                                    VXN0118

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6.  **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7.  **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8.  **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9.  **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10.  **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11.  **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: 04/01/2021 ____/_____/_____          MODEL: Date: 4/1/2021 ____/_____/_____

Taylor Brock                                           Mackenzie Thoma
Print Name of Producer's Representative                Print Name of Model

X Taylor Brock                                         X _____
Signature of Producer's Representative                 Signature of Model

Model's initials: _____

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma _____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion. Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose. Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: $1,500 USD _____ (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials [signature]

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: ___05/23/2022___ / _____

Taylor Brock
_____
Print Name of Producer's Representative

X _Taylor Brock_____
Signature of Producer's Representative

MODEL: Date: __5/23/2022__ / _____

Mackenzie Thoma
_____
Print Name of Model

X _____
Signature of Model

Model's initials: _____

# MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) _Mackenzie Thomas_____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion. Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
   Rate: _$1,500.00_____(Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

defamation claims, sexual harassment claims, injuries (both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: ___6/29/2021___/_____/_____

Taylor Brock

Print Name of Producer's Representative

X_ _Taylor Brock_____

Signature of Producer's Representative

MODEL: Date:___6/29/2021___/_____/_____

Mackenzie Thomas

Print Name of Model

X_ _____

Signature of Model

Model's initials: _____

**CONFIDENTIAL**

VXN0134

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) _Mackenzie Thoma_____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion.  Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: _$1,500.00_____(Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials: _____

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: 07/28/2021 / _____

Taylor Brock

Print Name of Producer's Representative

X Taylor Brock

Signature of Producer's Representative

MODEL: Date: 7/28/2021 / _____

Mackenzie Thoma

Print Name of Model

X _____

Signature of Model

Model's initials: _____

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) _____ Mackenzie Thoma _____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion.  Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: _____ 5,000 usd _____ (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials: _____

defamation claims, sexual harassment claims, injuries (both physical and emotional), negligence, and any claims relating to disease or illness (including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: ___03-29-2022___/_____/_____

Iuliia Zorkina

Print Name of Producer's Representative

X_____

Signature of Producer's Representative

MODEL: Date: ___03-29-2022___

Mackenzie Thoma

Print Name of Model

X_____

Signature of Model      1183CF222482413...

Model's initials: 

CONFIDENTIAL

VXN0153

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma _____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion.  Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: $5,000 _____(Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees. For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement. Any violation of this Section shall be deemed a material breach of this Agreement. Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum. In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof. voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: ____10/30/21____/_____/_____          MODEL: Date: ___10/30/2021___/_____

Taylor Brock                                             Mackenzie Thoma
Print Name of Producer's Representative                  Print Name of Model

X_ Taylor Brock _____                         X_ [signature] _____
Signature of Producer's Representative                   Signature of Model

Model's initials: [initials]

# MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma _____ ("Model", "my" or "I") and VXN Group, LLC
("Producer"), hereby agree as follows ("Agreement"):

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. My performance of sexual activities is completely voluntary; 4. I do not have any health conditions, exposure to COVID-19, or sexually transmitted diseases that would expose others to negative health conditions from engaging in sexual activities with me; and 5. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol.

2. **SERVICES**. Model will render services as an actor/performer for one or more films or performances at the direction of and for Producer, at such times, dates and places as Producer shall set forth. Model agrees to render such services on an exclusive basis for those dates, times and places. Model further agrees to render such services including, but not limited to, pre-production services, and services at other times designated by the Producer until the film(s) and/or performance(s) are complete.

3. **GRANT OF RIGHTS.** a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion. Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose. Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **COMPENSATION**. In complete consideration for the services rendered and to be rendered under this Agreement, Producer agrees to pay Model the following rate.
Rate: $10,000.00 USD _____ (Please fill in amount and currency).

5. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion, alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his or her employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity claims, intellectual property claims, invasion of privacy claims,

Model's initials: 

defamation claims, sexual harassment claims, injuries (Both physical and emotional), negligence, and any claims relating to disease or illness (Including STD's and COVID-19), pregnancy, and all other such claims, whether or not listed above. f Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

6. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that he or she will not disparage Producer or any of its officers, directors, or employees.  For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement.  Any violation of this Section shall be deemed a material breach of this Agreement.  Model further agrees that he or she will not post any unofficial photographs or videos from the production on any social media or in any public forum and that Producer may take any and all remedies available to it at law to remove the unofficial content from public view.

7. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum.  In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

8. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

9. **OTHER DOCUMENTS AND ACTS.** Each party hereto agrees to execute (with acknowledgement where necessary) and deliver all documents and instruments and to perform such further acts as may be necessary to carry out the agreement set forth herein including but not limited to Records Keeping Compliance forms mandated by 18 U.S.C § 2257, and/or 29 C.F.R. Sec. 75.1, et seq.

10. **SEVERABILITY.** If a tribunal finds any term of this Agreement or the application of them to any person or circumstance unenforceable, the remainder remains fully enforceable.

11. **MISCELLANEOUS.** Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: ___12__ / _09__ /2020

Taylor Brock

Print Name of Producer's Representative

X _____
DocuSigned by:
Signature of Producer's Representative
EDFB47CEAC04AE...

MODEL: Date: ___12/9/2020_____/2020

Mackenzie Thoma

Print Name of Model

X _____
DocuSigned by:
Signature of Model
1183CF222482413...

Model's initials: _____

**CONFIDENTIAL**

**VXN0173**

DocuSign Envelope ID: 82F45326-1AC4-4F3B-9DD6-E18A1AD30CA5

## MODEL RELEASE AND GRANT OF RIGHTS

As of the date written below, for the consideration set forth herein,
(Full legal name) Mackenzie Thoma _____ ("Model", "my" or "I") and VXN
Group, LLC ("Producer"), hereby agree as follows:

1. **WARRANTS**. Model warrants and represents that: 1. The information and government issued photo identification produced and attached to this Agreement is correct and valid; 2. I am at least eighteen (18) years of age or older, and I have the capacity to enter into this Agreement; 3. I am signing this contract and performing my duties hereunder on my own volition and not under the influence or any drugs, legal or not, or alcohol; 4. I do not have any health conditions nor recent exposure to COVID-19, nor any symptoms of COVID-19 that could put myself or others at risk to exposure of negative health conditions from my participation on this production.

2. **SERVICES**. Model hereby grants Producer the right to film Model for the purpose of performing in a motion picture film or scene including any applicable auditions, interviews, background shots, behind the scenes footage, or other images captured during the filming of Producer's motion pictures, social media, or in other fixed audio visual performances such as behind the scenes footage or promotions on Producer's websites, DVDs, or otherwise affiliated with Producer's brands and affiliate brands. Model understands these performances may be used in connection with sexually explicit content and material.

3. **GRANT OF RIGHTS**. a. The Producer is hiring Model for the purposes of creating motion pictures, photographs and other audiovisual work ("Work" or "Works"). Model specifically understands and acknowledges that Model shall comply to the best of Model's ability with Producer's reasonable directions, rules, instructions and regulations. Producer shall be the sole and exclusive owner and copyright proprietor of all rights and title in and to the results and proceeds of Model's services in whatever stage of completion. Model hereby irrevocably transfers and assigns to Producer all right, title and interest therein, including all copyrights, as well as the renewals and extensions thereto including the following specific perpetual and exclusive rights in connection with any and all results, products and proceeds of the performance; 1. To reproduce all or any part of the Model's performances, acts, poses, sounds, gestures and appearances of every kind made or done by Model in connection with Model's performance of duties under this agreement (the "Performance"); 2. To reproduce Model's voice and all musical instrumental or other sounds created by Model, if any, in connection with the Performance (the "Audio"), and reproduce, issue, sell and transmit the same, either separately or in conjunction with the Performance, or any part thereof; 3. To exhibit, sell, assign, license, transmit and reproduce any and all works, films or audio resulting from the Performance in whatever form and format as Producer may chose, in Producer's sole discretion, whether now known or unknown; 4. To use the Performance and/or the Audio in connection with any and all advertising; 5. To use the Performance and/or the Audio or any part thereof, as a portion of a motion picture, website, or other work, and for the advertising thereof, and in connection with the sale of any by-products or merchandise relating thereto, and to reproduce and/or transmit the same by and in any media; 6. Edit and revise the Performance and Audio in any manner as Producer may, in Producer's sole and absolute discretion, chose.  Additionally, Model grants Producer the perpetual nonexclusive right to use Model's name, any and all stage names and aliases, and biography and reproductions of Model's likeness and/or voice in connection with advertising and exploitation of any work embodying the Performance and/or Audio; and to exploit any of the rights herein granted for commercial advertising or publicity (including endorsement) in connection with any product, commodity or service manufactured, distributed or offered by Producer.

4. **WAIVER**. Model acknowledges and agrees that; a. The Performance and / or Audio may be utilized in conjunction with sexually graphic or explicit materials; b. Producer shall have no obligation to release, complete or in any way utilize the Performance and/or the Audio; c. Model shall have no right to inspect or approve any product in connection with the performance; d. Producer reserves the right to use any distortion,

Model's Initials _____

CONFIDENTIAL    VXN0180

DocuSign Envelope ID: 82F45326-1AC4-4F3B-9DD6-E18A1AD30CA5

alterations retouching, optical illusion, special effect and his employer, employees, agents, attorney and assigns from any liability for and by virtue of blurring, distortion, alteration, retouching, optical illusion or use of the performance and/or audio portion which may hold model in false or unfavorable light, whether such action is intentional or otherwise. e. Model releases producer and his employer, employees, agents, attorneys and assigns from any and all claims arising out of this agreement or the use of the performance and/or audio including, without limitation, right of publicity, claims invasion of privacy claims, defamation claims, sexual harassment claims, injuries (Both physical and emotional), any and all claims related to COVID-19, negligence, and all other such claims, whether or not listed above. Model hereby specifically acknowledges that certain records containing personal identification information may be transmitted to subsequent purchasers and licensees or assigns of the producer with respect to the performance, including but not limited to any records compiled for this contract. Model hereby releases and agrees to hold harmless the producer and producer's assigns and/or licensees with regards to the sharing of any and all personal information.

5. **CONFIDENTIALITY AND NON-DISPARAGEMENT**. The terms and conditions of this Agreement are absolutely confidential between the parties and shall not be disclosed to anyone else, except as shall be necessary to effectuate its terms. Model agrees that she will not disparage Producer or any of its officers, directors, or employees. For the purposes of this Section, "disparage" shall mean any negative statement, whether written or oral, about VXN Group, LLC or any of its affiliated companies, or any of the crew members or people on set, film and location shoot, product, motion pictures, or photographs, or from any events that occurred while performing under this Agreement. Any violation of this Section shall be deemed a material breach of this Agreement.

6. **NO UNOFFICIAL SOCIAL MEDIA POSTS.** Model agrees that he or she will not take and post any unofficial photographs or videos or other behind the scenes content ("Unofficial Content") from the production or any events arising out of this Agreement on any social media or in any public forum. In the event Model does post or share Unofficial Content, it will constitute a material breach of this Agreement and Producer may direct Model to take down the Unofficial Content immediately. Further, Producer may take any and all remedies available to it at law to remove the Unofficial Content.

7. **ASSIGNMENT**. Model acknowledges and agrees that producer may assign this agreement, in whole or in part, including all rights and waiver contained herein, to the benefit to whomever Producer may choose, without consulting or informing Model.

8. **MISCELLANEOUS**. Model's performance is for adult oriented entertainment and will be used to create and market adult oriented content and products. Model certifies that he or she has entered this agreement on his or her own free will, and not the under the influence of any drugs (whether prescription or illegal), alcohol, or other mind-altering substance. Model reads, writes and understands the language of this agreement. Model does not suffer from any mental or physical impairment that would prevent model from understanding the nature of this agreement or the terms thereof. Model executes to the term thereof voluntary, free of any duress or coercion, and is not under the inducement of any promise not set forth in this document. Model represents and warrants that he or she is over the age of 18, and has read the foregoing and fully understands the meaning and effect thereof, and is fully authorized to execute this and fully intent to be legally bound.

PRODUCER: Date: <u>5/5/2021</u>    /_____

Michael Mosny
_____
Print Name of Producer's Representative

X *Michael Mosny*
_____
Signature of Producer's Representative

MODEL: Date: <u>5/5/2021</u>    /_____

_____
Print Name of Model

X _____
_____
Signature of Model

Model's Initials _____

**CONFIDENTIAL**                    **VXN0181**

# EXHIBIT 74

**BIBIYAN LAW GROUP, P.C.**
David D. Bibiyan (Cal. Bar No. 287811)
*david@tomorrowlaw.com*
Sarah H. Cohen (Cal. Bar No. 330700)
*sarah@tomorrowlaw.com*
Rafael Yedoyan (Cal. Bar. No. 351499)
*Rafael@tomorrowlaw.com*
1460 Westwood Boulevard,
Los Angeles, California 90024
Telephone: (310) 438-5555
Facsimile: (310) 300-1705

Attorneys for Plaintiff, MACKENZIE ANNE THOMA and
on behalf of herself and all others similarly situated

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MACKENZIE ANNE THOMA, an individual and on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VXN GROUP, LLC., a Delaware limited liability company; STRIKE 3 HOLDINGS, LLC., a Delaware limited liability company; GENERAL MEDIA SYSTEMS, LLC., a Delaware limited liability company; MIKE MILLER, an individual; and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE NO.: 2:23-cv-04901-WLH-AGRx<br><br>[*Assigned for all purposes to the Hon. Wesley L. Hsu*]<br><br>**DECLARATION OF MACKENZIE ANNE THOMA** |

DECLARATION OF MACKENZIE ANNE THOMA

## <u>DECLARATION OF MACKENZIE ANNE THOMA</u>

I, Mackenzie Anne Thoma, declare the following:

1.     I am 18 years of age or older and reside in Los Angeles, California. I am fully competent to make this declaration. I have personal knowledge of the facts set forth in this document, except those stated in information and belief, and as to which I am informed and believe to be true. If I were asked to testify, I could and would testify as set forth in this document.

2.     I have received no formal acting training prior to my time working for Defendants

3.     I had not performed any acting in a professional setting prior to or during my time working with Defendants.

4.     I received no formal acting training by Defendants.

5.     There was always a director on set that would instruct me on how to perform my scenes while filming.

6.     I informed Defendants that I would be unable to attend the June 2022 showcase shoot because I had contracted Monkeypox.

7.     I was given no reason for the termination of my agreement with Defendants aside from my unavailability to attend the June 2022 and August 2022 shoots, and the alleged modifications I made to my body.

8.     I modeled merchandise for Defendants that would eventually be sold online.

9.     I was not able to negotiate the terms of the Performance Agreements aside from the amount that I would get paid. I was not able to alter the terms of the agreement, draft my own contract, or request sections be removed.

10.     Defendants initially paid me directly, but soon let me know this was unacceptable and if I wanted to continue working for Defendants, I would need to be paid through a "loan-out" company. Defendants would then *only* pay me through my loan out companies and would never pay me directly otherwise. This was extremely common place in the adult entertainment industry, as adult entertainment companies refused to pay adult performers directly.

2

DECLARATION OF MACKENZIE ANNE THOMA

11.     I was *required* to sign and submit a W-9 to Defendants as a condition to work with them. I was not given the option to sign or submit a W-2.This was common place in the adult entertainment industry, as adult entertainment companies refused to pay employees with a W-2, which is wrong.

12.     I was unable to modify my appearance without fear of having my contract with Defendants terminated.

13.     I operated an online adult entertainment brand called "Kenzieland." While Kenzieland did release some films, I did not release films during the term of my first Agreement with Defendants.

Executed on January 3, 2025 at _Los Angeles_____, California

_Mackenzie Anne Thoma (Jan 4, 2025 11:16 PST)_____

MACKENZIE ANNE THOMA

---

3

DECLARATION OF MACKENZIE ANNE THOMA

# Exhibit 74

Final Audit Report                                                      2025-01-04

| | |
|---|---|
| Created: | 2025-01-04 |
| By: | BLG Admin (admin@tomorrowlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA6q8RoZzNJ4fpU1eZde_xOT16htoyXNGm |

## "Exhibit 74" History

Document created by BLG Admin (admin@tomorrowlaw.com)
2025-01-04 - 1:02:25 AM GMT

Document emailed to Mackenzie Anne Thoma (misskenzieanne@gmail.com) for signature
2025-01-04 - 1:02:28 AM GMT

Email viewed by Mackenzie Anne Thoma (misskenzieanne@gmail.com)
2025-01-04 - 7:13:50 PM GMT

Document e-signed by Mackenzie Anne Thoma (misskenzieanne@gmail.com)
Signature Date: 2025-01-04 - 7:16:02 PM GMT - Time Source: server

Agreement completed.
2025-01-04 - 7:16:02 PM GMT

Adobe Acrobat Sign

# EXHIBIT 75

**From:** Matt ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Script notes
**Date:** November 29, 2020 at 5:29 PM
**To:** Matt ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

<u>**Script notes**</u>

Change int master closet to master bathroom (that's where the mirror is that Chris wants to use)

Int Entrance at night elevator
- need to expand on that and add a note for 2-3 minute music video promo sequence that Chris wants to work into this and also use that portion as SFW promo for the campaign.

I think this part will make most sense here, it will jump into this really epic sequence of the girls lavishly partying together in the living room area that we want to rent a chandelier for as well

I'm also working on a deal with Diddys team to
license "mo money mo problems" or a similar track in exchange for some product placement of his Tequila brand Delèon in the intro section.

-Remove spaghetti line

-need to layout areas we are shooting in a bit better

-Master bathroom & closet should be utilized for intro, girls getting clothes on and doing make up together
-need to work in the fetish setups more thoroughly

Ie living room is where that plays out with wood in background


— —



— —

The style of this very high-end luxury art porn fuses a sophisticated, elevated look with Kenzie's insatiable desire for pleasure, very explicit sex, and making bodies look like the slickest, shiniest car commercial trapped inside a music video. While this is the Fantasy, the Vixen brand always has a grace to set everything up. I think Kenzie's real-life story is great - simultaneously a fashion model and secret cam girl - until she decided one day to say fuck it and just shoot porn. I imagine a set up where (hypothetically) Gianna and Naomi are getting ready for an elegant event (award show), wearing evening gowns. Chic. Yves Saint Laurent vibes. Red lips. Glossy red nails. Naomi's friend Kenzie is going to pick them up in her Uber Black so they can all go to the event together. Since Gianna hasn't met Kenzie yet, she asks Naomi to tell her a little more about her. Naomi takes out her phone and shows her Kenzie's Instagram, explaining that she wants to get into porn and it will be fun for two pro's to give her advice. As the doorbell rings, Gianna asks (not in a bitchy way) if she's got what it takes to really make it. After all, it's not all about good looks...

Kenzie enters and the three look gorgeous together. "So this is the fashion model that wants to do porn?" Gianna asks. Let's just say that they leave the Uber in the driveway for the next hour as Gianna and Naomi initiate Kenzie to see if she's got what it takes. This is a set up to have Kenzie need to "prove" herself to both Gianna and Naomi. I want to infuse an element of the Spectacular so this is the Superbowl of G/G films. What I'm talking about are a lot of interesting, super fetish-y set-ups to constantly excite viewers. I imagine the sex to have a tinge of Andrew Blake...high heels and pearl necklaces stay on the whole time. One of the girls may simply hike up her dress but leaves it on. Kenzie ravages Gianna and Naomi in impressive fashion but the initiation isn't complete. The girls need to see how far this fashion model will take it. Gianna and Naomi brandish dildos, Kenzie shows them her impressive skills at blow jobs, and the two treat Kenzie to a dildo double-penetration in a final, memorable scene. In a perfect world this would be done with Kenzie standing, her hands steadying her while she holds onto a chandelier. We can work on this more if this isn't a possibility, but whatever the art direction, it should be clear to everyone by the end of this scene that Kenzie is certainly ready for the big stage...

I put together a mood board for both Vixen and Blacked with the Look & Feel + some key shot ideas. A couple of these things can be revised/massaged based on logistics, costs, etc. Please consider the following as suggestions, a springboard to work from...



CONFIDENTIAL





VIXEN x EATS KENZIE DEBUT

The style of this very high-end luxury art porn fuses a sophisticated, elevated look with Kenzie's insatiable desire for pleasure, very explicit sex, and making bodies look like the slickest, shiniest car commercial inside a music video. While this is the Fantasy, the Vixen brand always has a story to set everything up. I think Kenzie's real-life story is great - simultaneously a fashion model and secret cam girl - until she decided one day to say fuck it and just shoot porn. I imagine a set up where (hypothetically) Gianna and Naomi are getting ready for an elegant event (award show), wearing evening gowns. Chic. Yves Saint Laurent vibes. Red lips. Glossy red nails. Naomi's friend Kenzie is going to pick them up in her Uber Black so they can all go to the event together. Since Gianna hasn't met Kenzie yet, she asks Naomi to tell her a little more about her. Naomi takes out her phone and shows her Kenzie's Instagram, explaining that she wants to get into porn and it will be fun for two pro's to give her advice. As the doorbell rings, Gianna asks (not in a bitchy way) if she's got what it takes to really make it. After all, it's not all about good looks...

Kenzie enters and the three look gorgeous together. "So this is the fashion model that wants to do porn?" Gianna asks. Let's just say that they leave the Uber in the driveway for the next hour as Gianna and Naomi initiate Kenzie to see if she's got what it takes. This is a set up to have Kenzie need to "prove" herself to both Gianna and Naomi. I want to infuse an element of the Spectacular so this is the Superbowl of G/G films. What I'm talking about are a lot of interesting, super fetish-y set-ups to constantly excite viewers. I imagine the sex to have a tinge of Andrew Blake...high heels and pearl necklaces stay on the whole time. One of the girls may simply hike up her dress but leaves it on. Kenzie ravages Gianna and Naomi in impressive fashion but the initiation isn't complete. The girls need to see how far this fashion model will take it. Gianna and Naomi brandish dildos, Kenzie shows them her impressive skills at blow jobs, and the two treat Kenzie to a dildo double-penetration in a final, memorable scene. In a perfect world this would be done with Kenzie standing, her hands steadying her while she holds onto a chandelier. We can work on this more if this isn't a possibility, but whatever the art direction, it should be clear to everyone by the end of this scene that Kenzie is certainly ready for the big stage...

*Eats*





VIXEN MOOD BOARD

I put together a mood board for both Vixen and Blacked with the Look & Feel + some key shot ideas. A couple of these things can be revised/massaged based on logistics, costs, etc. Please consider the following as suggestions, a springboard to work from...

*Eats*

017300

CONFIDENTIAL







CONFIDENTIAL





CONFIDENTIAL

# EXHIBIT 76

1          A.     Yes, ma'am.

2          Q.     So what exactly would you need to do to make

3     sure that they could -- they got to the set, the

4     location?

5               MR. BROWN:  Objection.  Vague.

6               THE WITNESS:  Could you please be more

7     specific with the question?

8     BY MS. COHEN:

9          Q.     Okay.  Yeah.  Would this involve putting

10    together, like, a schedule for them?

11         A.     It's more of making arrangements.

12    Arrangements for them to and from, arrangements for

13    medical.  It's a lot of arrangements that we typically

14    make for them.

15         Q.     Okay.  So you would say it's more like a

16    logistics type of thing?

17         A.     Yes, ma'am.  A lot of logistics.

18         Q.     Okay.  Does this involve arranging

19    transportation?

20         A.     Yes, ma'am.

21         Q.     Okay.  And who would set the time that the

22    transportation would occur, the pickup and drop-off

23    times?  Who would set that?

24         A.     That would come -- there would be a call time,

25    is what we refer to it as, when someone's supposed to

18

Michael Mosny                                                    September 16, 2024

1    show up.  And then we have to figure out where the

2    person's coming from and where it's at.  And try to

3    figure logistically what the length of time to get that

4    person to be there would be.  And that's how we start.

5        Q.    Okay.  And who sets the call time?

6        A.    The call time is set through the production

7    team.

8        Q.    Production team.

9              And this is the production team of Defendant

10   Vixen?

11       A.    Yes, ma'am.

12       Q.    Okay.  All right.  Before we move forward, I'm

13   going to introduce the first exhibit which is going to

14   be the second amended notice of deposition.  I have some

15   copies here.

16             (Plaintiff's Exhibit No. 1 was marked

17             for identification.)

18             THE WITNESS:  Thank you.

19   BY MS. COHEN:

20       Q.    I'm going to mark this exhibit as Exhibit 1.

21   Mr. Moz, do you recognize this document?  You can take

22   your time to look through it.

23       A.    I'm honestly -- I'm not familiar with this.

24       Q.    Okay.  Do you --

25       A.    "Second amended notice of deposition of agents

                                                              19

```
 1     to go in that.  Like, no, I never discussed with Mike
 2     Miller what the people are doing in the movies.
 3             MS. COHEN:  Okay.  All right.  Trey, are you
 4     okay with taking a quick break?  We've been going for
 5     about -- I'd say about an hour.
 6             MR. BROWN:  Sure.
 7             MS. COHEN:  All right.  We're just going to
 8     take a five- or six-minute break.  Off the record.
 9             (Break.)
10     BY MS. COHEN:
11        Q.    All right.  So, Mr. Moz, do you understand
12     that you are still under oath?
13        A.    Yes, ma'am.
14        Q.    Even though we just took a break?
15        A.    Yes, ma'am.
16        Q.    Okay.  Perfect.  Can you describe for me what
17     your understanding is of the -- of Vixen's type of
18     business?
19             How would you describe Vixen's business?
20        A.    We are -- it's online entertainment.
21        Q.    Online entertainment?
22             And are you familiar with the first time that
23     Plaintiff met with any representative of Defendant?
24        A.    Am I aware of the first time?
25        Q.    Right.  That's correct.
```

44

1   "nonexclusive basis" means?

2        A.   Can you please rephrase the question?  I'll

3   try my best to answer.

4        Q.   Yeah.  So 7.1, I will read it out.

5   "Nonexclusivity of Services.  During the term of this

6   agreement, Performer will provide services to Producer

7   on a nonexclusive basis."

8        A.   Okay.

9        Q.   I'm just asking if you know what that means.

10        A.   Yes.  Throughout the length of this agreement,

11   we know, moving forward, that Kenzie should be available

12   when we're planning projects.  So we need to start with

13   her in mind in the projects, and then go forward because

14   we know that she's not going to sign with another

15   company or not be available to us due to, again, a

16   collaboration that -- maybe another agreement or

17   something that she signed.

18        Q.   Okay.  So the concern is with Plaintiff's

19   availability?

20        A.   No.

21             MR. BROWN:  Objection.  Vague.

22             THE WITNESS:  It's -- for us, it's -- we know

23   that within -- or hopefully within the amount of time,

24   the length of the nonexclusive agreement, that that

25   person, in some way, will be available throughout.  Not

                                                        119